1 KEKER, VAN NEST & PETERS LLP
ROBERT A. VAN NEST - # 84065
2 rvannest@keker.com
CHRISTA M. ANDERSON - # 184325
3 canderson@keker.com
MATTHEW M. WERDEGAR - # 200470
4 mwerdegar@keker.com
EUGENE M. PAIGE - # 202849
5 epaige@keker.com
MATTHIAS A. KAMBER - # 232147
6 mkamber@keker.com
THOMAS E. GORMAN - # 279409
7 tgorman@keker.com
LEAH PRANSKY - # 302246
8 lpransky@keker.com
633 Battery Street
9 San Francisco, CA 94111-1809
Telephone:    415 391 5400
10 Facsimile:    415 397 7188

11 Attorneys for Defendants
ALPHABET INC. and GOOGLE INC.

12                    UNITED STATES DISTRICT COURT

13                    NORTHERN DISTRICT OF CALIFORNIA

14                           SAN JOSE DIVISION

15

16 | SPACE DATA CORPORATION, | Case No. 5:16-cv-03260-BLF |

17 | Plaintiff, | **DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT** |

18 | v. | |

19 | ALPHABET INC., and GOOGLE INC., | Date:        July 6, 2017 |
| | Time:        9:00 a.m. |

20 | Defendants. | Dept.:       Courtroom 3, 5th Floor |
| | Judge:       Hon. Beth Labson Freeman |

21 | | Date Filed:  June 13, 2016 |

22 | | Trial Date:  June 3, 2019 |

23

24              **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

25

26

27

28

1164608

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on July 6, 2017, at 9:00 a.m., defendants Alphabet Inc. and Google Inc. (collectively "Google") will, and hereby do, move the Court, located at 280 South 1st Street, San Jose, California, for an order dismissing plaintiff Space Data Corporation's ("Space Data") claims for misappropriation of trade secrets pursuant to 18 U.S.C. § 1836(b) (Count II), misappropriation of trade secrets pursuant to California Civil Code § 3426, *et seq.* (Count III), and breach of written contract (Count IV) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on grounds that Space Data's Second Amended Complaint fails to state a claim upon which relief can be granted.

This motion is based on the following Memorandum of Points and Authorities, the Declaration of Matthew M. Werdegar, on all other pleadings and papers on file or to be filed in the above-entitled action, the arguments of counsel, and any other matters that may properly come before the Court for its consideration.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Although Space Data's allegations have now ballooned to 265 paragraphs spanning 80 pages, its Second Amended Complaint ("SAC") still suffers from the same fundamental failings as Space Data's prior complaint.

*First*, Space Data's SAC, like its prior complaint, fails to set forth facts concerning Google's alleged misappropriation of any trade secrets.  Space Data's allegations of improper use—made on "information and belief"—are purely conclusory and are no better than those the Court found to be deficient in its February 16, 2017 order.  While Space Data hypothesizes that "a skilled engineer" conceivably could reverse engineer various aspects of Space Data's technology from the information allegedly disclosed to Google, Space Data does not allege that Google actually engaged in such reverse engineering or offer any facts to support such an allegation.  Likewise, the SAC still fails to allege facts that would allow the Court plausibly to infer that Google breached the limited confidentiality obligations imposed by the parties' Mutual

Confidentiality and Non-Disclosure Agreement ("NDA").

*Second*, even if Space Data had succeeded in alleging some misuse of its confidential information prior to May 11, 2016, Space Data still fails to allege any act of misappropriation post-dating the enactment of the Defend Trade Secrets Act ("DTSA"). Indeed, Space Data does not allege any specific acts by Google, lawful or otherwise, post-dating May 11, 2016. Rather, despite this Court's clear guidance that more is needed to plead a valid DTSA claim,[1] all that Space Data offers is a single conclusory allegation of ongoing misappropriation based on the mere fact that Google's Project Loon continues to exist.

*Third*, Space Data's SAC still fails to identify Space Data's alleged trade secrets with the requisite particularity. For example, it is unclear what wind data and wind data "epiphanies" Space Data is claiming as its trade secrets—especially given that Space Data seems to have publicly disclosed its supposed epiphanies in its SAC. Similarly, it is unclear what Space Data is claiming as its "thermal management" trade secrets; Space Data identifies two techniques, but then suggests that it disclosed other, unidentified "thermal management techniques, and solutions generally" to Google, leaving Google to guess at what Space Data is asserting.

The SAC also fails to describe any of Space Data's claimed trade secrets with sufficient particularity to distinguish them from information that has been publicly disclosed in Space Data's patents and patent applications, pre-NDA disclosures to Google, and press interviews. While Space Data admits that it engaged in multiple technical and business meetings with Google in 2007 prior to any non-disclosure agreement being put in place, Space Data does not allege facts distinguishing its claimed trade secrets from the information that it provided to Google in those meetings. Also, while Space Data's SAC reproduces and relies on information from a publicly available Wall Street Journal news video about Space Data, it does not distinguish its claimed trade secrets from the detailed information about Space Data's business and technology disclosed in that video.

For these reasons, as explained in detail below, the Court should grant Google's motion to dismiss Counts II, III and IV of Space Data's Second Amended Complaint. Furthermore, because

---

[1] *See* Dkt. No. 59 (Feb. 16, 2017 Order) at 3 n.2; Feb. 16, 2017 Hr'g Tr. at 16:21-17:14.

Space Data already has had the opportunity to amend its complaint in response to specific guidance from the Court, the Court should dismiss Counts II, III and IV with prejudice.

## II.   STATEMENT OF ISSUES TO BE DECIDED

Whether Space Data's trade secret misappropriation claim pursuant to 18 U.S.C. § 1836(b) (Count II), trade secret misappropriation claim pursuant to California Civil Code § 3426, *et seq.* (California Uniform Trade Secrets Act, hereinafter "CUTSA") (Count III), and breach of written contract claim (Count IV) should be dismissed with prejudice for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## III.   FACTUAL AND PROCEDURAL BACKGROUND

Space Data claims to have developed a communications system based on an array of free floating balloons capable of providing wireless communications services to locations not served by traditional terrestrial communications infrastructure.  *See* SAC ¶¶ 5, 38.  Space Data further claims that its system utilizes peaceful, "structured" wind patterns in the stratosphere to control the direction of travel of the balloons that make up its communications system.  *See id.* ¶¶ 42-43. "From 1999 forward," Space Data claims to have "filed and prosecuted fundamental balloon constellation patents[,]" and "[i]t now has six issued patents, several more applications with Notice of Allowance on file and the patents about to issue, and additional applications pending." *Id.* ¶ 59.  Space Data also claims to have been operating its balloon communications system commercially since 2004, and it claims still to be an active operating business.  *Id.* ¶¶ 60, 62.

In late 2007, Google and Space Data began a short-lived discussion about Google's potential investment in or acquisition of Space Data for the purpose of "using Space Data's balloon technology to accelerate the buildout of any 700 MHz spectrum Google might acquire." *See* SAC ¶¶ 7-9, 75.  By Space Data's own admission, those discussions included multiple technical and business meetings, teleconferences, and email communications made without any confidentiality agreement in place between the parties.  *See, e.g., id.* ¶¶ 74-75, 77-82.  The parties only entered into an NDA effective December 1, 2007.  *See id.* ¶ 137; *see also id.* Ex. A (NDA). In that NDA, Space Data agreed that the nondisclosure obligations shall not apply to any

information that was already known to Google, publicly available, received from others or independently developed.  *Id.* Ex. A ¶ 5.  With respect to "Confidential Information" protected by the NDA, Space Data expressly "recognize[d]" that Google may in the future "develop products or services related to or similar to the subject matter of the Confidential Information disclosed under th[e] Agreement."  *Id.* Ex. A ¶ 8.  Space Data also agreed that Google could use any confidential Space Data information ***"retained in the unaided memories of Google employees or Representatives*** who had access to Confidential Information" under the NDA *"**for any purpose**, including without limitation, use in the acquisition, development, manufacture, promotion, sale, or maintenance of products and services[.]"  *Id.* (emphasis added).

On February 15, 2008, in connection with the parties' discussions, a group from Google visited Space Data's facilities in Arizona.  SAC ¶ 97.  Space Data alleges that during this visit, the Google group received a tour of Space Data's production line and network operation center ("NOC"), launched two balloons from Space Data's parking lot, ate lunch in a conference room, and then observed on monitors in the NOC the balloons that had been launched before lunch.  *See id.* ¶¶ 99-100, 106-107.  All told, Google's visit lasted approximately four hours, lunch included.  *See id.* ¶¶ 97, 99, 107.

Space Data claims that both before and during the visit, "Space Data provided proprietary, confidential and trade secret information to Google under the NDA."  *Id.* ¶ 110.  According to Space Data, before the visit it sent Google "financial models and projections, as well as presentations describing just how a worldwide, ubiquitous, balloon-based communications network would work," and during the visit it provided Google with access to "restricted areas and proprietary information which Space Data keeps closely guarded."  *Id.*  Space Data alleges that after the visit, on February 19, 2008, it sent Google an email pursuant to paragraph 3 of the NDA itemizing the confidential information that Space Data had disclosed during the visit.[2]  *Id.*

---

[2] Space Data does not include this email with its SAC.  However, a redacted version of the email was attached as Exhibit E to Space Data's FAC, and Google submitted the unredacted email to the Court in connection with its prior motion to dismiss.  *See* Dkt. No. 28-5; Dkt. No. 53-8 (Reply Werdegar Decl. In Supp. of Mot. to Dismiss FAC, Ex. 2).  Paragraph 3 of the NDA specifies that "[i]nformation communicated orally only shall be considered Confidential Information if such information is designated as being confidential at the time of disclosure (or promptly thereafter) and is reduced to writing and confirmed to the Recipient as being Confidential Information within fifteen (15) days after the initial disclosure."  SAC Ex. A ¶ 3.

1    Notably, that email makes no mention of a "hover algorithm," "thermal management techniques,"

2    or an "altitude control and monitoring system"—three of the five categories of trade secrets that

3    Space Data is now asserting.  *See* Dkt. No. 53-8 (Space Data email).

4         Shortly after Google's visit, on February 24, 2008, Google informed Space Data that it

5    was not interested in engaging in further discussions, primarily because of Google's discovery

6    that Space Data had leaked Google's interest in the company to the Wall Street Journal in

7    violation of the NDA.  SAC ¶ 9; *see also* Dkt. No. 28 (FAC) ¶ 31; *see* SAC Ex. A ¶ 4 (requiring

8    parties to keep confidential "the fact that discussions or negotiations between the Parties to this

9    Agreement are taking or have taken place").  Also, as Space Data acknowledges, Google's

10   principal reason for engaging with Space Data—as a potential way to satisfy the FCC's network

11   build-out requirements should Google unexpectedly win the 700 MHz spectrum auction that it

12   was engaged in—no longer existed, as it was apparent that Verizon had outbid Google.  *Id.* ¶ 70;

13   *see also id.* ¶¶ 63-69.

14        In mid-2011, over three years after the termination of Google's discussions with Space

15   Data, Google's "X" research and development group began to assess the viability of providing

16   wireless internet service to underserved areas of the world via balloons in the stratosphere.

17   Richard DeVaul, who came to Google from Apple in 2011, was the initial engineer to work on

18   the project.  *See* SAC ¶¶ 148, 153.  The project eventually became "Project Loon."  Project Loon

19   launched its first test balloon in August 2011.  *See id.* ¶ 158.  Since then, Google has invested

20   millions of dollars in developing and refining its balloon systems and technology, has launched

21   and landed nearly a thousand experimental Loon balloons, and has accumulated thousands of

22   hours of flight time and flight data.  *See id.* ¶¶ 165, 174.  Project Loon made its first publicly

23   announced balloon launch in June 2013 in New Zealand.  *See id.* ¶ 166.

24        On June 13, 2016, years after the public disclosure of Project Loon, Space Data

25   commenced this action, accusing Google of misappropriation of trade secrets, breach of contract

26   and infringement of two Space Data patents.  *See* Dkt. No. 1 (original complaint).  Thereafter, on

27   September 30, 2016, Space Data filed its FAC, which dropped its claims of infringement as to

28   one of its two asserted patents—U.S. Patent No. 7,801,522.  Dkt. No. 28.  On December 2, 2016,

Google timely moved to dismiss Space Data's trade secret misappropriation and breach of contract claims. *See* Dkt. No. 46. The Court granted Google's motion with leave to amend on February 16, 2017. Dkt. No. 59. After requesting and receiving an extension of time to accommodate its new counsel in this matter, Space Data filed the SAC on April 20, 2017. The parties met and conferred concerning the defects identified by Google in the SAC between April 27 and May 11, 2017, but were unable to reach agreement obviating the need for this motion to dismiss. *See* Werdegar Decl.[3] ¶¶ 4-10, Exs. 1-6.

## IV.    ARGUMENT

To satisfy the pleading requirements of Rule 8 of the Federal Rules of Civil Procedure, Space Data must "give [Google] fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (internal quotations omitted). Satisfying this obligation "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Id.* at 555 n.3. Space Data must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. Consequently, to survive a motion to dismiss under Rule 12(b)(6), Space Data's complaint must plead enough factual matter that, when taken as true, "state[s] a claim to relief that is plausible on its face." *Id.* at 570. "The plausibility standard . . . asks for more than a sheer possibility that a defendant acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although non-speculative factual allegations are to be accepted as true, the Court is not required to accept as true legal conclusions couched as factual allegations. *Id.*; *see also id.* at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

### A.    Space Data fails to adequately allege misappropriation of its purported trade secrets.

To maintain a claim for misappropriation, a plaintiff may not allege "[m]ere possession of trade secrets." *S. Cal. Inst. of Law v. TCS Educ. Sys.*, No. CV 10-8026 PSG (AJWx), 2011 WL 1296602, at *7 (C.D. Cal. Apr. 5, 2011) (quoting *FLIR Sys., Inc. v. Parrish*, 174 Cal. App. 4th

---

[3] "Werdegar Decl." refers to the Declaration of Matthew M. Werdegar in Support of Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint.

1164608

1270, 1279 (2009)).  Rather, a plaintiff must plead facts from which the court can plausibly infer that the defendant **misused** that information.  *See id.*; *see also Pellerin v. Honeywell Int'l, Inc.* 877 F. Supp. 2d 983, 989 (S.D. Cal. 2012) (plaintiff must allege facts to support legal conclusion that defendant misused plaintiff's trade secrets).  In cases such as this one where a defendant received the alleged trade secrets under an agreement with the plaintiff, this means that the plaintiff must plead facts showing that that defendant had a duty ***not*** to use the information in the way alleged.  *S. Cal. Inst. of Law*, 2011 WL 1296602, at *8; *Farhang v. Indian Inst. of Tech., Kharagpur*, No. C-08-02658 RMW, 2010 WL 2228936, at *6-7, 14-15 (N.D. Cal. June 1, 2010).  As the Court explained to Space Data at the February 16, 2017 hearing:  Space Data must "allege facts that hone to the contract and show exactly what you allege Google did that was outside the scope of the NDA."  Feb. 16, 2017 Hr'g Tr. at 15:14-17.

Space Data has not followed the Court's instructions.  In the section of the SAC headed "Google Uses Space Data's Trade Secrets as Well as its Patents," Space Data merely offers a series of conclusions.  *See* SAC ¶¶ 220-224.  Space Data alleges that it "is informed and believes" that Google flies its balloons at roughly the same altitude as Space Data, and spaces its balloons a similar distance apart from each other, "for the reasons Space Data identified in 2008 and based on the information received from Space Data."  *Id.* ¶ 221.  Next, Space Data claims, again on information and belief, that "Google's Project Loon was developed based on the proprietary, trade secret information obtained from Space Data during the February 2008 visit … [and] obtained from Space Data's financial data and modelling …."  *Id.* ¶¶ 222-223.  And finally, Space Data alleges that Project Loon is based on Space Data's allegedly proprietary and confidential "vision" slides.  *Id.* ¶ 224.

Space Data does not offer any facts to back up these conclusory assertions—much less facts that "show exactly what [Space Data] allege[s] Google did that was outside the scope of the NDA"—either in the "use" section of the SAC or elsewhere.[4]  Feb. 16, 2017 Hr'g Tr. at 15:14-

---

[4] Space Data's misappropriation charging allegations simply point back to paragraphs 220-224, and the equally conclusory paragraph 143, and conclude:  "Defendants used Space Data trade secrets, without express or implied consent, by using Space Data Trade secrets in connection with its assessment of whether to pursue its Project Loon business and in its Project Loon business thereafter, as further described above."  *See* SAC ¶¶ 245, 253.  Space Data's charging allegations also repeat the elements of misappropriation by acquisition and disclosure.  *See id.*  But there are

7

17.   Space Data does not offer any facts to support its claim that Google actually spaces its Project Loon balloons ████████████████.   Nor does Space Data offer any facts to support its claim that the supposed idea and technical ability to closely space balloons was gleaned from Space Data.   Likewise, Space Data offers no facts to support its claim that Google got the idea or business model for a balloon-based communications platform from Space Data's "vision slides" or any other Space Data information subject to the parties' NDA.[5]   *See Rita Med. Sys., Inc. v. Resect Med.*, Inc., No. C 05-03291 WHA, 2007 WL 161049, at *8 (N.D. Cal. Jan. 17, 2007) ("Plaintiff has the burden of establishing that defendants did not independently derive trade-secret information." (citing *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1669 (2003)). And while Space Data hypothesizes that a "skilled engineer" exposed to the information that Space Data allegedly provided to Google could "reverse engineer" Space Data's alleged "hover algorithm," "thermal management," and "NOC altitude control and monitoring system" trade secrets, Space Data never alleges that any Google engineer actually performed such acts of reverse engineering or that Project Loon actually uses any of the same techniques.   *See* SAC ¶¶ 122, 126, 129.

In a section of the SAC entitled "Google Copies Space Data," Space Data offers up examples of purportedly "eerie similarit[ies]" between Google's Project Loon and Space Data. *See* SAC ¶¶ 175-188.   But the alleged similarities that are mentioned in this section either are unrelated to Space Data's claimed trade secrets and/or involve admittedly public information on balloon technology.[6]   For instance, Space Data claims, without explanation, that "many aspects of

---

no allegations in the SAC—conclusory or otherwise—supporting these alternate theories of misappropriation.  And in opposing Google's prior motion to dismiss, Space Data conceded that its misappropriation claims were based on alleged misuse.  *See* Dkt. No. 50 (Opp. to Mot. to Dismiss FAC) at 8.

[5] Space Data's '941 patent, among other sources, discloses the concept of a free-floating balloon-based communications network, as well as the business model of using balloons to fill in gaps in the terrestrial communications infrastructure.  SAC, Ex. B at 3:59-4:44, 6:58-7:43, 8:18-10:21. And the '941 patent includes a figure showing how such a balloon-based network could provide coverage over the entirety of the United States.  *Id.* Ex. B at Fig. 8; *see also id.* at 10:53-60.

[6] Under the parties' NDA, Google was free to use any and all "publicly available" information and was permitted "develop products or services related to or similar to the subject matter of [Space Data's] Confidential Information."  SAC, Ex. A ¶¶ 5, 8.  Thus, the mere fact that Google decided to develop its own balloon-based stratospheric communications platform does not support any inference of wrongdoing.

the Loon balloons overlap with the Space Data progenitor," but states in the same paragraph that "this is **not** a case about how one constructs a balloon[.]" *Id.* ¶ 183 (emphasis added). Space Data also claims that Google has adopted Space Data's approach of making its balloon system compatible with legacy terrestrial infrastructure. *See id.* ¶ 180. But Space Data's '941 patent publicly disclosed this approach years before Google ever met with Space Data:

> Existing user equipment designed for terrestrial wireless communications can work with the [balloon] system of the present invention.… Compatibility with existing wireless communications systems is a significant advantage because when deploying new communications systems, the user equipment investment is always the largest total investment required."

SAC Ex. B at 4:5-7, 4:21-24. Likely for these reasons, Space Data does **not** actually rely on any of these allegations of copying in claiming misappropriation. *See* SAC ¶¶ 245, 253.

In sum, Space Data's SAC lacks any factual allegations establishing any use of Space Data's information in connection with Project Loon, much less any use that was not in compliance with the parties' NDA. Space Data therefore fails to sufficiently allege trade secret misappropriation under either CUTSA or the DTSA. *See S. Cal. Inst. of Law*, 2011 WL 1296602, at *8; *Farhang*, 2010 WL 2228936, at *14-15. Furthermore, because Space Data already has had notice and an opportunity to cure this critical defect in its pleadings, but has failed to do so, its misappropriation claims should be dismissed with prejudice. *See, e.g., Eminence Capital LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (court may deny leave to amend due to "failure to cure deficiencies by amendments previously allowed"); *NetApp, Inc. v. Nimble Storage, Inc.*, 13-cv-05058-LHK (HRL), 2015 WL 400251 at *9-10 (N.D. Cal. Jan. 29, 2015) (dismissing claims with prejudice where court had previously granted leave to amend "and identified the grounds on which [plaintiff] had to cure its pleading[,]" but plaintiff "failed to heed this Court's instructions").

## B.    Space Data fails to state a claim under the DTSA because it fails to allege any act of misappropriation occurring on or after May 11, 2016.

As the Court recognized in its February 16, 2017 order, the Defend Trade Secrets Act only applies to "'misappropriation of a trade secret … for which any act occurs on or after' May 11, 2016, the date the law was enacted." Dkt. No. 59 at 3 n.2 (quoting Pub. L. No. 114-153, 130 Stat

376).   Therefore, to plead a claim under the DTSA, a plaintiff must allege specific acts of misappropriation post-dating May 11, 2016.  In cases such as this one where the misappropriation allegedly began before May 11, 2016, merely alleging continued misuse of the same information is not enough.  *See Avago Techs. U.S. Inc. v. Nanoprecision Prods., Inc.*, No. 16-cv-03737-JCS, 2017 WL 412524 at *9 (N.D. Cal. Jan. 31, 2017) (the DTSA does not allow "a misappropriation claim to be asserted based on the continued use of information that was disclosed prior to the effective date of the statute"); *Hydrogen Master Rights, Ltd. v. Weston*, No. 16-474-RGA, 2017 WL 78582, at *10 (D. Del. Jan. 9, 2017) (dismissing DTSA claim because "[t]he complaint does not allege any acts on or after May 11, 2016, other than a conclusory allegation of continuing use and disclosure").  As Judge Illston explained recently in *Cave Consulting Grp., Inc. v. Truven Health Analytics, Inc.*  "[W]ithout facts about when post-enactment use occurred and whether the information disclosed was new or somehow different from the prior misappropriation, plaintiff has failed to state a claim under the DTSA."  No. 15-cv-02177-SI, 2017 WL 1436044, at *5 (N.D. Cal. Apr. 24, 2017).

Space Data has not satisfied these pleading requirements, despite clear notice from the Court that it needed to do so.  *See* Dkt. No. 59 at 3 n.2; Feb. 16, 2017 Hr'g Tr. at 16:21-17:14.  The SAC does not allege any "facts about when post-enactment use occurred and whether the information disclosed was new or somehow different from the prior misappropriation." *Cave Consulting Grp.*, 2017 WL 1436044, at *5.  Indeed, the SAC is silent on Google's alleged post-May 11, 2016 conduct, other than to generally assert that "Defendants' use of Space Data's trade secrets, without express or implied consent, in connection with Defendants' Project Loon business is ongoing." SAC ¶ 249.  This lone, conclusory allegation is insufficient to state a claim under the DTSA—particularly when coupled with Space Data's failure to plead any facts concerning *pre*-May 11, 2016 misuse.  *See id.* 2017 WL 1436044 at *5 (DTSA claim dismissed where "plaintiff makes no specific allegations that defendant used the alleged trade secrets after the DTSA's May 11, 2016 enactment"); *Hydrogen Master Rights*, 2017 WL 78582, at *10 (dismissing DTSA claim because "[t]he complaint does not allege any acts on or after May 11, 2016 other than a conclusory allegation of continuing use and disclosure").

1164608

During the parties' meet and confer discussions concerning the SAC, Google pointed out to Space Data that its SAC lacked any factual allegations concerning post-May 11, 2016 acts of misappropriation.  *See* Werdegar Decl. Ex. 1 (Apr. 28, 2017 Werdegar email).  In response, Space Data did not point to any overlooked factual allegations or suggest that it could add more facts to its complaint.  Instead, it argued that generally alleging that Google's use of Space Data's trade secrets is "ongoing" is sufficient as a matter of law.  Werdegar Decl. Ex. 4 (May 5, 2017 Hosie ltr.); *see also id.*, Ex. 2 (May 1, 2017 Hosie ltr.) ("On Google's continuing use/misappropriation, has Google now discontinued Loon?  I do not see how Google can be befuddled about Space Data's continuing use/misappropriation allegations.").  But Space Data made—and the Court rejected—the very same argument in connection with Google's first motion to dismiss.  *See* Dkt. No. 50 at 9-10; Feb. 16, 2017 Hr'g Tr. at 16:21-17:14; Dkt. No. 59 at 3 n.2.  And for good reason, as Space Data's argument, if accepted, "eviscerates the nonretroactivity of the Defend Trade Secrets Act."  Feb. 16, 2017 Hr'g Tr. at 17:7-9.

"Because [Space Data] has failed to allege any *facts* showing that acts of misappropriation occurred after DTSA came into effect, its DTSA claim fails on the pleadings." *Avago Techs.*, 2017 WL 412524 at * 9 (emphasis added).  And because Space Data already has had notice and an opportunity to cure this defect, but has failed to do so, the Court should dismiss Space Data's DTSA claim with prejudice.  *See, e.g., Eminence Capital*, 316 F.3d at 1052 (9th Cir. 2003); *NetApp*, 2015 WL 400251 at *9-10.

**C.**   **Space Data fails to state a claim for misappropriation because it does not identify its trade secrets with sufficient particularity.**

**1.**   **Space Data's allegations identifying its trade secrets are impermissibly vague and ambiguous.**

To adequately allege a misappropriation of trade secrets claim, Space Data must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Pellerin*, 877 F. Supp. 2d at 988 (quoting *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 253 (1968)); *accord Imax Corp. v. Cinema Techs., Inc.,* 152 F.3d 1161, 1164–65 (9th Cir. 1998);

11

Dkt. No. 59 at 2.  Despite adding hundreds of paragraphs of new allegations to its complaint, Space Data still does not satisfy this basic pleading requirement.[7]

Space Data's SAC now asserts five general categories of trade secrets: (1) "structured wind data in the peaceful band" secrets; (2) "hover algorithm" related secrets; (3) "thermal management" secrets; (4) "NOC altitude control and monitoring system secrets"; and (5) business model and vision secrets.  *See* SAC ¶¶ 110-136.  None of these categories are adequately identified.

For example, it is unclear what Space Data is claiming as its "structured wind data in the peaceful band" trade secrets.  *See* SAC ¶¶ 112-117.  Space Data alleges that "[t]he wind data that Google ***saw in its tour*** represented proprietary and trade secret information."  SAC ¶ 115 (emphasis added).  But it is impossible to tell from the SAC whether that data is limited to the data reflected in the reconstructed computer screen shots attached as Exhibit C to the SAC, which allegedly matches the data displayed during Google's visit, or some additional, unspecified wind data examples.  *Id.* ¶ 115; *see also id.* ¶ 112 (explaining Exhibit C).  Additionally, the SAC does not clearly identify the secret "epiphanies" that Space Data claims to have derived from its wind data.  In paragraph 116, the SAC claims "***[t]hese epiphanies*** … are all Space Data trade secrets[,]" but does not specify whether "these epiphanies" are just what is described earlier in paragraph ██████████████████████████████████████████████████████████ ████████████████████████████████—or also encompass other alleged insights described (or not described) elsewhere.  *Id.* ¶ 116 (emphasis added)

Adding to the confusion is the fact that Space Data's SAC publicly discloses many of the alleged wind data "epiphanies" described in the trade secrets section of the complaint.  *See Loop AI Labs Inc. v. Gatti*, 195 F. Supp. 3d 1107, 1112 (N.D. Cal. 2016) ("the fact that Plaintiff publicly filed its trade secret disclosure belies the proposition that it contains information specific

---

[7] In the trade secret misappropriation counts in the SAC, Space Data identifies its alleged trade secrets by referring back to a series of narrative paragraphs in the body of the complaint that supposedly describe the secrets.  Those references are identified as examples ("*see, e.g.*,"), and not necessarily as the complete list of asserted trade secrets.  SAC ¶¶ 243, 251.  But during the parties' meet and confer discussions, Space Data represented that the referenced paragraphs were exhaustive and not merely exemplary.  *See* Werdegar Decl. Ex. 5 (May 8, 2017 Hosie ltr.).

enough to be considered "confidential" trade secrets"); *Forcier v. v. Microsoft Corp.*, 123 F. Supp. 2de 520, 528 (N.D. Cal. 2000) ("it is clear that an unprotected disclosure of the holder's secret terminates the existence of the trade secret").  Specifically, in █████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ ████████ ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████.

In light of these public disclosures, Google can only guess what exactly Space Data believes is valuable and confidential and "distinct from matters of general knowledge in the trade or of special knowledge to those persons who are skilled in the trade." *Pellerin*, 877 F. Supp. 2d at 988; ██████████████████████████████

Likewise, with respect to the alleged "thermal management" trade secrets, Space Data does not say whether it is just claiming the two items specifically referenced in paragraph 125, or also other, unidentified "thermal management techniques, and solutions generally[.]"  *Id.* ¶ 126; *see also id.* ¶ 125.  And even as to the two referenced items, it is unclear whether Space Data is claiming any and all uses of ████████████████████████████████ or some specific design or configuration of those components.[8]  *See Social Apps, LLC v. Zynga, Inc.*, No. 14-cv-04910 YGR, 2012 WL 2203063, at *4 (N.D. Cal. June 14, 2012) ("A description of the category, or even the subcategories of information within a category, does not comply with the requirement to identify the actual matter that is claimed to be a trade secret."); *Gabriel Techs. Corp. v. Qualcomm, Inc.*, No. 08CV1992 AJB (MDD), 2011 WL 6152240, at *5 (S.D. Cal. Dec.

---

[8] Space Data also fails to allege facts to support its claim that its thermal management techniques qualify as trade secrets.  In particular, it does not allege that Google was informed of the confidentiality of such techniques as required by paragraph 3 of the parties' NDA.  *See* SAC Ex. A at ¶ 3.  Notably, ████████████████████████████████████████████████████████████
████████████████████████████████████████████████

DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 5:16-cv-03260-BLF

1164608

12, 2011) (a "procedural approach or framework can constitute a trade secret" only if it is described in sufficient detail that "the description could [be] handed to a group of engineers and programmers who would … know what to build"); *see also Imax,* 152 F.3d at 1167 ("CTI could not be expected to prepare its rebuttal to Imax's trade secrets claim without some concrete identification of exactly which 'dimensions and tolerances' Imax alleged were incorporated into CTI's own projector system.").

Space Data's identification of its alleged "hover algorithm"-related trade secrets is also vague and deficient. Specifically, it is unclear whether Space Data is claiming each of the components described in paragraphs 120 through 123 from which an experienced engineer allegedly could "reverse engineer" the purported "hover algorithm"—███████████████ ███████████████████████████████████████—as trade secrets individually, or whether Space Data is claiming the specific combination of these components as a trade secret, or something else.[9] *See* SAC ¶¶ 118-123; *Perlan Therapeutics, Inc. v. Sup. Ct.,* 178 Cal. App. 4th 1333, 1352 n.14 (2009) ("If Plaintiff contends that a trade secret consists of a specific combination of items, it shall so state and concisely describe the combination." (internal quotations omitted)).

Similar problems exist with Space Data's allegations concerning the allegedly confidential business and financial documents it provided to Google. *See* SAC ¶¶ 85, 90, 92, 94-95, Ex. D. Taken together, these documents amount to thousands of pages of information. *See, e.g., id.* ¶ 85 ("Space Data provided its five-year going forward projections (more than 2,000 pages)."); *id.* ¶ 92 ("Space Data forwarded a 600 page WiMax (network) financial model to Google."). Yet Space Data fails to identify what portions of these documents it is claiming are valuable and secret, thereby thwarting Google's ability to investigate Space Data's claims and develop its

---

[9] Space Data does not appear to be alleging that it disclosed the actual alleged hover algorithm to Google, just various pieces of information from which one allegedly could derive the algorithm, although even that is not entirely clear given the caption of this section of the complaint. If Space Data is in fact claiming that ████████████████████████████ are trade secrets, Space Data does not explain how they are not disclosed each time it publicly launches one of its balloons or one of its balloons crashes back to earth. Also, as with Space Data's claimed "thermal management" trade secrets, ████████████████████████████████████ ██████████████████████████████████████████████████

DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 5:16-cv-03260-BLF

1164608

defenses.  *See, e.g., Loop AI Labs*, 195 F. Supp. 3d at 1116 ("[i]dentifying documents alone [is] not be an adequate substitute for detailed identification of the trade secrets therein, since review of the documents may not inform Defendants as to what precisely Plaintiff is asserting is a trade secret"); *Myrio Corp. v. Minerva Network, Inc*., No. C 00–20996 RMW (PVT), 2001 U.S. Dist. LEXIS 10461, at *3 (N.D. Cal. Apr. 10, 2001) ("If Plaintiff references a document as setting forth one or more trade secrets, it shall specify precisely which portions of the document describes the trade secret[s].").

In short, Space Data's SAC does not adequately identify Space Data's alleged trade secrets.

### 2.     Space Data fails to adequately distinguish Space Data's asserted trade secrets from public information.

Space Data's SAC also still fails to adequately distinguish Space Data's asserted trade secrets from information that was and is public.  *See* Dkt. No. 59 at 3.  Accurately distinguishing what is allegedly secret from what is public information is particularly critical in this case because Space Data's own allegations make clear that it has publicly disclosed substantial quantities of information concerning the very same topics as its alleged trade secrets.  Space Data asserts that it has been filing and prosecuting "fundamental balloon constellation patents" since 1999—eight years before its first contacts with Google—including the '941 patent in suit.  SAC ¶ 59.  And these patents publicly disclose information concerning Space Data's stratospheric balloon communication system and the business model underlying that system.  *See, e.g.*, SAC Ex. B at 3:41-10:21 ("Objects and Advantages of the Invention" and "Summary of the Invention"); *see also Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp*., 587 F.3d 1339, 1355 (Fed. Cir. 2009) ("[I]t is well established that disclosure of a trade secret in a patent places the information comprising the secret into the public domain.  Once the information is in the public domain and the element of secrecy is gone, the trade secret is extinguished ….").

Space Data also acknowledges that representatives of Space Data and Google had hours of meetings long ***before*** the parties entered into any non-disclosure agreement, during which Space Data "provided … information on the Space Data platform," and "discussed Space Data's

technology … and likewise discussed how Google might work with Space Data data to build out any 700 MHz spectrum acquired."  SAC ¶¶ 76, 80.  While Space Data asserts that the information it provided during these pre-NDA business and technical meetings was "basic," "public" and "fairly general and high level," it does not allege facts to support these assertions or to put Google and the Court on notice of "where the boundary between [its trade] secrets" and "fairly general and high level" information lies.  *Id.; cf. Bladeroom Grp. Ltd. v. Facebook, Inc.*, No. 15-cv-01370-EJD, 2015 WL 8028294, at *4 (N.D. Cal. Dec. 7, 2015) (trade secrets inadequately described if it is unclear from "which aspects are publicly known and which are not").

Furthermore, Space Data's SAC includes and relies on a portion of a publicly available Wall Street Journal WSJ.com news video from 2008 to show what its NOC looked like at the time of Google's visit.  *See* SAC ¶ 102 (picture of Space Data's NOC with WSJ.com logo); Werdegar Decl. ¶¶ 11-13.[10]  That a reporter from the Wall Street Journal was permitted to access and video record Space Data's allegedly confidential facilities begs the question of what exactly Space Data claims is secret about its facilities and what is not.  Moreover, a review of the entire video from which Space Data extracted the image at paragraph 102 reveals that Space Data gave the Wall Street Journal wide-ranging access to Space Data's supposedly confidential and secure balloon manufacturing facilities and NOC, and provided the Wall Street Journal with substantial information concerning the very same topics that Space Data now claims are secret, including compatibility with terrestrial wireless communication systems, station-keeping by adjusting balloon altitude, and close-up screenshots of its altitude control and monitoring system:[11]

---

[10]  As explained in the Werdegar Declaration, the WSJ.com video is publicly available at: http://www.wsj.com/video/bringing-wireless-to-hinterlands/DF067123-A7C8-4284-B50F-60A0B1EAC923.html.  Werdegar Decl. ¶ 12.

[11]  Because Space Data relies on a portion of the Wall Street Journal video in pleading its claims, the court may consider the entirety of the video in assessing the sufficiency of Space Data's SAC. *See, e.g., In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (9th Cir.1996) (appropriate for court to consider in connection with a motion to dismiss other portions of a document referenced by plaintiff in complaint); *Hapin v. Arrow Fin. Servs.*, 428 F. Supp. 2d 1057, 1060 (N.D. Cal. 2006) ("[T]he district court may consider the full texts of documents that the complaint only quotes in part.").

DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 5:16-cv-03260-BLF

1164608



*Id.* ¶¶ 14-15.

In light of all of Space Data's admitted and evident public disclosures of information closely related to—if not overlapping completely with—the subject matter of Space Data's asserted trade secrets, Space Data's SAC fails to adequately identify what it believes are its trade secrets and what are not.  *See* Dkt. No. 59 at 3; *Bladeroom*, 2015 WL 8028294, at *4; *Farhang*, 2010 WL 2228936, at *14 (dismissing claim where complaint was too "vague" to put defendant on notice as to what was a trade secret and what was covered by plaintiff's copyright or other public documents).

### 3.   Space Data's amended Section 2019.210 trade secret list does not cure its pleading defects.

On May 5, 2017, two weeks after filing its SAC, Space Data served on Google an amended California Code of Civil Procedure § 2019.210 trade secret disclosure ("Amended 2019.210 List").  *See* Werdegar Decl. ¶ 16, Ex. 7.  This new disclosure does not cure Space Data's failure to adequately ***plead*** its trade secrets with sufficient particularity.  Dkt. No. 59 at 2-3; *see also Top Agent Network, Inc. v. Zillow, Inc.*, No. 14-cv-04769-RS, 2015 WL 7709655, at *4 (N.D. Cal. Apr. 13, 2015) ("***To pass muster under Rule 8***, plaintiffs raising claims under CUTSA must itemize the information claimed as a trade secret with reasonable particularity (emphasis added)); *Synopsys, Inc. v. ATopTech, Inc.*, No. 13-cv-02965 SC, 2013 WL 5770542, at *5 n.1 (N.D. Cal. Oct. 24, 2013) (rejecting argument that "sufficient particularity" pleading

standard is not applicable given separate identification requirements of Cal. Code Civ. Pro. § 2019.210).

Furthermore, even if a Section 2019.210 trade secret disclosure that is not incorporated or referenced in the complaint could satisfy the requirements of Rule 8, Space Data's new Amended 2019.210 List does little more than rehash Space Data's pleadings and thus does ***not*** fix any of the problems with Space Data's description of its alleged secrets.  For example, the Amended 2019.210 List is equally vague as to what wind data and wind data epiphanies Space Data is asserting are its trade secrets.  *Compare* SAC ¶¶ 112-117 *with* Werdegar Decl. Ex. 7 at 3-6.  The Amended 2019.210 List also fails to flesh out Space Data's purported "hover algorithm" and "thermal management" trade secrets.  *Compare* SAC ¶¶ 118-126 *with* Werdegar Decl. Ex. 7 at 8-10.  And while the Amended 2019.210 List provides a bit more detail about Space Data's alleged "altitude control and monitoring systems" trade secrets in the form of a new flowchart, Space Data does not claim that the disclosed flowchart was actually shown to Google, rather than created in the course of this litigation for use in the Amended 2019.210 List.  *See id*. Ex. 7 at 11-12.

Space Data's Amended 2019.210 List also fails to clarify how its claimed trade secrets differ from all of the information that it has publicly disclosed—in its patents and applications, to Google pre-NDA, and to the Wall Street Journal and other media outlets.  Space Data simply asserts, without elaboration, that its various alleged trade secrets are treated as such by Space Data and "are not generally known to the public."  Werdegar Decl. Ex. 7 at 9; *see also id.* at 8, 12. Space Data's continued "failure to distinguish the allegedly shared trade secrets from non-trade secret information renders [its misappropriation] claim defective."  *Top Agent Network*, 2015 WL 7706955, at *5. And given that Space Data has now had multiple opportunities to adequately identify its trade secrets, but is unable or unwilling to do so, the Court should dismiss its misappropriation claims with prejudice.

### D.    Space Data fails to state a claim for breach of contract.

To state a claim for breach of written contract, a plaintiff must plead facts that establish "(1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance;

1164608

(3) defendant's breach; and (4) damages to plaintiff as a result of the breach." *CDF Firefighters v. Maldonado*, 158 Cal. App. 4th 1226, 1239 (2008).  "[B]oilerplate allegations of breach are insufficient."  *Pellerin*, 877 F. Supp. 2d at 990; *accord Sensible Foods, LLC v. World Gourmet, Inc.*, No. 11-2819 SC, 2011 WL 5244716, at *5-6 (N.D. Cal. Nov. 3, 2011).  Rather, to adequately plead a breach of contract claim, the complaint must set forth *facts* showing that the defendant's conduct was inconsistent with the contract's terms.  In *Sensible Foods*, for example, the plaintiff alleged that the defendant had breached a confidentiality agreement by "disclosing all or a portion of Plaintiff's Confidential Information without the express or implied consent of Plaintiff," but the Court held that this allegation was inadequate because the plaintiff did not plead any facts regarding "what information was allegedly disclosed or how it was disclosed."  2011 WL 5244716 at *5

Here, Space Data's breach of contract claim is based on the same allegations of misuse of its alleged trade secrets as Space Data's misappropriation claims.  *See* SAC ¶ 261.  Consequently, its breach of contract claim is deficient for the same reasons.  Just as Space Data does not adequately plead misappropriation, Space Data does not offer any factual allegations about what information Google used, how Google used that information, or how that purported use violated the NDA's confidentiality provisions.  Absent any such facts, Space Data's allegations "do not permit the court to infer more than the mere possibility" of Google's misconduct.  *Iqbal*, 556 U.S. at 679.  The Court therefore should dismiss Space Data's claim for breach of contract.  *See Pellerin*, 877 F. Supp. 2d at 990-91 (explaining that "Honeywell has not pled facts to establish a breach of the Employment Agreement or NDA, because it has not pled facts to establish misappropriation"); *Sensible Foods*, 2011 WL 524476 at *5-6; *Farhang*, 2010 WL 2228936, at *6-7 (dismissing claim for breach of NDA because complaint "does not contain facts suggesting that [defendant's] development of applications was outside the scope of what it was permitted to do under the joint venture agreement.").  Furthermore, because Space Data already has repeatedly tried and failed to plead a valid breach of contract claim, the Court should dismiss with prejudice.

## V.   CONCLUSION

For the foregoing reasons, the Court should grant Google's motion to dismiss Counts II,

III, and IV of Space Data's First Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Dated:  May 11, 2017

Respectfully submitted,
KEKER, VAN NEST & PETERS LLP

By:   /s/ *Matthew M. Werdegar*
ROBERT A. VAN NEST
CHRISTA M. ANDERSON
MATTHEW M. WERDEGAR
EUGENE M. PAIGE
MATTHIAS A. KAMBER
THOMAS E. GORMAN
LEAH M. PRANSKY

Attorneys for Defendants
ALPHABET INC. and GOOGLE INC.

1164608

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................................1

II.     STATEMENT OF ISSUES TO BE DECIDED ................................................................3

III.    FACTUAL AND PROCEDURAL BACKGROUND.........................................................3

IV.     ARGUMENT .....................................................................................................................6

      A.      Space Data fails to adequately allege misappropriation of its purported trade secrets..............................................................................................................6

      B.      Space Data fails to state a claim under the DTSA because it fails to allege any act of misappropriation occurring on or after May 11, 2016. ..........................9

      C.      Space Data fails to state a claim for misappropriation because it does not identify its trade secrets with sufficient particularity..............................................11

            1.      Space Data's allegations identifying its trade secrets are impermissibly vague and ambiguous.........................................................11

            2.      Space Data fails to adequately distinguish Space Data's asserted trade secrets from public information. ........................................................15

            3.      Space Data's amended Section 2019.210 trade secret list does not cure its pleading defects................................................................................17

      D.      Space Data fails to state a claim for breach of contract. .......................................18

V.      CONCLUSION................................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) ......................................................................................... 6, 19

*Avago Techs. U.S. Inc. v. Nanoprecision Prods., Inc.*
No. 16-cv-03737-JCS, 2017 WL 412524 (N.D. Cal. Jan. 31, 2017) ................................... 10, 11

*Bell Atl. Corp. v. Twombly*
550 U.S. 544 (2007) .................................................................................................. 6

*Bladeroom Grp. Ltd. v. Facebook, Inc.*
No. 15-cv-01370-EJD, 2015 WL 8028294 (N.D. Cal. Dec. 7, 2015) .............................. 16, 17

*Cave Consulting Grp., Inc. v. Truven Health Analytics, Inc.*
No. 15-cv-02177-SI, 2017 WL 1436044 (N.D. Cal. Apr. 24, 2017) ...................................... 10

*Eminence Capital LLC v. Aspeon, Inc.*
316 F.3d 1048 (9th Cir. 2003) ...................................................................................... 9, 11

*Forcier v. v. Microsoft Corp.*
123 F. Supp. 2de 520, 528 (N.D. Cal. 2000) ...................................................................... 13

*Gabriel Techs. Corp. v. Qualcomm, Inc.*
No. 08CV1992 AJB (MDD), 2011 WL 6152240 (S.D. Cal. Dec. 12, 2011) ........................... 13

*Hapin v. Arrow Fin. Servs.*
428 F. Supp. 2d 1057 (N.D. Cal. 2006) .............................................................................. 16

*Hydrogen Master Rights, Ltd. v. Weston*
No. 16-474-RGA, 2017 WL 78582 (D. Del. Jan. 9, 2017) ...................................................... 10

*Imax Corp. v. Cinema Techs., Inc.*
152 F.3d 1161 (9th Cir. 1998) ...................................................................................... 11, 14

*In re Stac Elecs. Sec. Litig.*
89 F.3d 1399 (9th Cir.1996) ............................................................................................... 16

*Loop AI Labs Inc. v. Gatti*
195 F. Supp. 3d 1107 (N.D. Cal. 2016) ........................................................................ 12, 15

*Myrio Corp. v. Minerva Network, Inc.*
No. C 00–20996 RMW (PVT), 2001 U.S. Dist. LEXIS 10461 (N.D. Cal. Apr. 10, 2001) ...................................................................................................................... 15

*NetApp, Inc. v. Nimble Storage, Inc.*
13-cv-05058-LHK (HRL), 2015 WL 400251 (N.D. Cal. Jan 29, 2015) ............................ 9, 11

*Pellerin v. Honeywell Int'l, Inc.*
877 F. Supp. 2d 983 (S.D. Cal. 2012) ....................................................................... 7, 11, 13, 19

DEFENDANTS' MOTION TO DISMISS
Case No. 5:16-cv-03260-BLF

1164608

*Rita Med. Sys., Inc. v. Resect Med.*, Inc., No. C 05-03291 WHA, 2007 WL 161049 (N.D.
    Cal. Jan. 17, 2007) ............................................................................................................... 8, 9

*S. Cal. Inst. of Law v. TCS Educ. Sys.*
    No. CV 10-8026 PSG, 2011 WL 1296602 (C.D. Cal. Apr. 5, 2011) ................................. 6, 7, 9

*Sensible Foods, LLC v. World Gourmet, Inc.*
    No. 11-2819 SC, 2011 WL 5244716 (N.D. Cal. Nov. 3, 2011) ............................................ 19

*Social Apps, LLC v. Zynga, Inc.*
    No. 14-cv-04910 YGR, 2012 WL 2203063 (N.D. Cal. June 14, 2012) ................................. 13

*Synopsys, Inc. v. ATopTech, Inc.*
    No. 13-cv-02965 SC, 2013 WL 5770542 (N.D. Cal. Oct. 24, 2013) ...................................... 17

*Top Agent Network, Inc. v. Zillow, Inc.*
    No. 14-cv-04769-RS, 2015 WL 7709655 (N.D. Cal. Apr. 13, 2015)................................. 17, 18

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*
    587 F.3d 1339 (Fed. Cir. 2009)...................................................................................... 15, 16

### State Cases

*CDF Firefighters v. Maldonado*
    158 Cal. App. 4th 1226 (2008) .......................................................................................... 19

*Perlan Therapeutics, Inc. v. Sup. Ct.*
    178 Cal. App. 4th 1333 (2009) .......................................................................................... 14

1164608