SPENCER HOSIE (CA Bar No. 101777)
shosie@hosielaw.com
DIANE S. RICE (CA Bar No. 118303)
drice@hosielaw.com
LYNDSEY C. HEATON (CA Bar No. 262883)
lheaton@hosielaw.com
DARRELL R. ATKINSON (CA Bar No. 280564)
datkinson@hosielaw.com
HOSIE RICE LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, CA 94111
(415) 247-6000 Tel.
(415) 247-6001 Fax

*Attorneys for Plaintiff,*
*Space Data Corporation*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| SPACE DATA CORPORATION, | Case No.: 5:16-cv-03260-BLF |
| Plaintiff, | **SECOND AMENDED COMPLAINT FOR:** |
| v. | 1. PATENT INFRINGEMENT UNDER 35 U.S.C. § 1 *et seq.* ('941 Patent); |
| X, ALPHABET INC., and GOOGLE INC., | 2. MISAPPROPRIATION OF TRADE SECRETS UNDER 18 U.S.C. § 1836 & 1837; |
| Defendants. | 3. MISAPPROPRIATION OF TRADE SECRETS UNDER CALIFORNIA CIVIL CODE § 3426, *et seq.*; and |
| | 4. BREACH OF WRITTEN CONTRACT. |
| | **JURY TRIAL DEMANDED** |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

Plaintiff, SPACE DATA CORPORATION ("Space Data"), by way of its Second Amended Complaint against Defendants, alleges as follows:

## I.   <u>INTRODUCTION AND SUMMARY</u>.

1.   The internet has changed how we live.  In urban areas, we are online all the time: constantly checking where to eat, meet, buy gas, the new political news, the President's latest tweet, and so on.  Life without internet access would be unworkable, unthinkable.  The web has become the water we swim in, as ubiquitous and critical as oxygen.  *Cf.* David Foster Wallace "<u>This is Water</u>" Address (*see* https://web.ics.purdue.edu/~drkelly/DFWKenyonAddress2005.pdf).

2.   All are not so fortunate, however.  People who live in remote or undeveloped areas rarely have online access.  Terrestrial infrastructure is **expensive**, especially when spread across a thin population base.  A cell tower costs what it costs, regardless of whether it serves a hundred people in Wyoming or a hundred thousand people in Manhattan.

3.   As we write, two out of every three human beings lack internet access.  There are great swaths of this and other countries with no wireless access.  This creates a very real digital divide.

4.   As an important aspect of its ongoing business strategy, Google has made universal internet access a corporate priority.  Google's goal is not entirely altruistic, as Google's value as a business depends in large part on Google's ubiquity.  But bringing all the information to all of the people is impossible if most lack internet access.

5.   And so we come to balloons.  In 1997 and 1998, Space Data was developed by two MIT engineers to build a constellation of floating balloons, each linked to the other, communicating from the stratosphere to earth-based mobile devices.  Instead of a laborious and expensive terrestrial buildout, Space Data envisioned an array of inexpensive floating balloons, quickly and cheaply creating a stratospheric communications platform, thereby bringing internet to all.  These balloons would essentially "sail" in the stratosphere, riding micro-wind currents meticulously mapped through hundreds of thousands of hours of test and data collection flights.  Contrary to all conventional wisdom, there exists a "peaceful band" in the stratosphere, that is, a region where the winds are calm, relatively predictable, and sufficiently **structured** to enable an

operator to fly an unpowered balloon by adjusting its altitude to catch different, segregated wind currents. These wind patterns make it possible to choreograph a balloon array to keep the balloons in tight concert, and so enable the balloons to work as a coherent uniquitous network.

6.      Over years of development, and $75 million of private investment, Space Data perfected its technology. It filed for its first patent in 1999, and now owns many foundational patents, including one captured from Google in an interference proceeding, as set forth below. Space Data's technology has been purchased by the U.S. military and deployed in Iraq and other war theaters. Space Data also has numerous private sector commercial customers, *e.g.* oil service companies needing network coverage in remote areas to monitor oil wells and pipelines. *See* below, ¶ 57.

7.      Beginning in the fall of 2007, Google began a detailed technical due diligence of the Space Data business, finances, and technology. Under NDA, Space Data disclosed proprietary information to Google, all to aid Google in its technical evaluation and pre-acquisition Space Data due diligence. Google cofounders Larry Page and Sergey Brin were involved in the Space Data due diligence in a very hands-on way (literally; *see* below).

8.      The Google due diligence culminated with the Google team, including the two Google cofounders visiting Space Data's Chandler, Arizona facility on February 15, 2008. When Google arrived, Space Data was flying a commercial constellation of balloons over Louisiana and West Texas, providing internet access to remote oil rigs. As the constellation flew, computer monitors in the Space Date Network Operations Control Center ("NOC") reflected the status of each balloon, including proprietary wind data, "hover" algorithms, and similar sensitive information, as set forth below. *See* below, ¶¶ 104-129. These pictures were themselves captured in pictures taken by the Space Data employees, as a visit from the two Google co-founders is far from an everyday occurrence.

9.      Despite its earlier professed eagerness to acquire Space Data, Google abruptly went dark weeks after this meeting.

10.     And that brings us to Space Data II, now known as Project Loon.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

11.     Google publicly launched Project Loon in mid-2013.  Project Loon consists of an array of balloons floating in the stratosphere, each communicating with the other, and communicating with the ground to create a stratospheric internet platform.  Google does this exactly as did Space Data, down to the smallest technical details, *e.g.*, micro-mapping stratospheric winds in order to sail the balloons to maintain the integrity of the constellation over time and space.

12.     In interviews after it launched Loon, several Google engineers explained that Google's great Loon epiphany was that one can choreograph a balloon array in the stratosphere once one understands the micro-wind patterns in the quiet, peaceful band.  This, said Google, made it possible to "sail" the balloons and so control the array, all to make the airborne constellation work as a wireless communications mesh.  Indeed, Google filed a patent claiming this micro-wind mapping constellation sailing as a Google invention in January 2012, along with a request not to publish the application, as set forth below.  This initial filing was soon followed by many dozens more, all claiming as original Google inventions ideas patented by Space Data and disclosed by Space Data to Google under a non-disclosure agreement years before.

13.     The Project Loon balloons have means of ascent and descent, as do the Space Data balloons; they have wireless transceivers attached, as do the Space Data balloons; they have GPS capabilities; as do the Space Data balloons; they have twin redundant termination mechanisms; as do the Space Data balloons; they fly the stratospheric micro-currents, as do the Space Data balloons, they have cut-down mechanisms, as do the Space Data balloons, and so it goes, detail by technical detail.

14.     On information and belief, Google is spending over $1 million a day on the Google Loon Project.  It has successfully deployed balloons over the world, including in California and elsewhere in the United States.

15.     Google, itself, announced that Google Loon would make substantial profits.  As of March 2015, Google controlled 88 percent of the search world worldwide.  Google estimated that if 250 million people (approximately 5 percent of the total people worldwide without internet access) paid $5 per month for the service, Google could bring in tens of billions of dollars per year.  As Google's Mike Cassidy said: "Think about it, with 4.5 billion people without internet access,

take 5 percent; you're talking 250 million people. If those people pay just a small portion of their monthly income, say $5 a piece, you're going to be in a billion dollars a month in revenue, tens of billions a year in revenue, so it's a good business, too." This, said Google, was the future of Loon.

16.     As set forth in detail below, Project Loon improperly uses Space Data's confidential information and trade secrets which Space Data disclosed under a 2007 Mutual Confidentiality and Non-Disclosure Agreement ("NDA"), attached hereto as Exhibit A and incorporated herein by reference. Google's use of this confidential information is also a breach of that same NDA. Project Loon also infringes Space Data's patents, including claims that Google itself filed in January 2012, but Space Data clawed back in an administrative interference proceeding in late 2016 and early 2017.

17.     Accordingly, Space Data files this Second Amended Complaint for: (1) infringement of United States Patent No. 6,628,941 titled "Airborne constellation of communications platforms and method" by Knoblach et al., ("the '941 Patent") arising out of the patent laws of the United States, 35 U.S.C. § 1 *et seq.*; (2) misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836; (3) misappropriation of trade secrets under California Uniform Trade Secrets Act, Civil Code § 3426, *et seq.*; and (4) breach of written contract under California law. Counts I through IV are against Defendants Alphabet and Google Inc. ("Google"). Alphabet and Google are referred to collectively as "Defendants" hereinafter.

### THE PARTIES

18.     Space Data is an Arizona corporation, with its principal place of business at 2535 W. Fairview Street, Suite 101, Chandler, Arizona 85224-4707.

19.     Space Data was co-founded by Jerry Knoblach and Eric Frische**.** Mr. Knoblach began concept development, research, planning, and organizational work for Space Data in December 1996. Mr. Knoblach earned a Master's of Business Administration (MBA) Degree from Harvard University in 1992, a Master's Degree in electrical engineering from the University of Minnesota in 1990, and a Bachelor's Degree in mechanical engineering from the Massachusetts Institute of Technology (MIT) in 1985. Mr. Knoblach has been awarded two patents outside of the business of Space Data.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1        20.      From 1996 to 1998, Mr. Knoblach was a program manager at CrossLink, Inc., a

2   wireless communications equipment company.  At CrossLink, he led an effort to develop a

3   commercial communications system for the space shuttle, using a satellite system that provides

4   connections to the Internet, voice and fax capabilities and the use of commercial hardware to

5   enable rapid development.  The system first flew in June 1998.  From 1992 to 1997, Mr. Knoblach

6   was a manager of business development and a program manager for Orbital Sciences Corporation

7   ("Orbital").  From 1995 to 1997, he was responsible for marketing radiosondes (a device attached

8   to a balloon that tracks weather and wind data as the balloon ascends) and satellite ground stations.

9   In 1996, he played a key role in winning a contract with the U.S. Air Force to develop and produce

10  the next generation radiosondes using GPS technology (given the expense, the GPS enabled

11  radiosondes were slow to deploy).  From 1994 to 1995, Mr. Knoblach served as a program

12  manager at Orbital's subsidiary, Magellan Systems Corporation ("Magellan"), where he led the

13  effort to develop the first handheld, personal communicator for use with the Orbcomm satellite

14  network.  Mr. Knoblach managed a marketing effort that won a contract to develop a GPS guided

15  missile during 1992 and 1994.  Prior to Orbital, Mr. Knoblach spent five years at FMC Corporation

16  in Minneapolis, Minnesota, designing missile launchers for the U.S. Navy and Air Force.

17        21.      Eric Frische co-founded Space Data and served as its Chief Technical Officer and as

18  a Director.  Mr. Frische earned a Bachelor's Degree in electrical engineering from MIT in 1985.

19  He is a licensed patent agent and has been awarded multiple patents outside of the company.  From

20  1989 to 1998, Mr. Frische owned and operated Applied Solutions, which was a prototyping

21  company in Dallas, Texas.  Mr. Frische was responsible for all aspects of business at Applied

22  Solutions, from marketing to engineering and production.  During his tenure, Mr. Frische

23  developed a wide variety of prototypes in areas ranging from communications devices to toys to

24  aides for the handicapped.  Prior to Applied Solutions, Mr. Frische was a captain in the U.S. Air

25  Force.  Mr. Frische worked at the National Security Agency ("NSA") where he developed a

26  microwave lab and research program that investigated reception of faint RF signals.  Both Mr.

27  Knoblach and Mr. Frische have served on the American Institute of Aeronautics and Astronautics

28  (AIAA) Scientific Balloon Systems and Technology Committee.

22.     Alphabet is a Delaware corporation, with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043-1351.  Alphabet is the successor issuer to, and parent holding company of, Google. Alphabet owns all of the equity interests in Google. The reorganization of Google into Alphabet was completed on October 2, 2015.

23.     Google is a Delaware corporation, with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043-1351.

### JURISDICTION AND VENUE

24.     Space Data brings its action for patent infringement under the patent laws of the United States, 35 U.S.C. § 271 *et seq.*  This Court has federal question subject matter jurisdiction over Space Data's patent infringement claims under 28 U.S.C. §§ 1331 and 1338(a).

25.     This Court also has federal question subject matter jurisdiction under the DTSA, 18 U.S.C. § 1836.  This Court has original jurisdiction over this controversy for misappropriation of trade secrets claims pursuant to 18 U.S.C. § 1836(c) and 35 U.S.C. § 1331.  This Court has supplemental jurisdiction over the controversy for all other claims asserted herein pursuant to 28 U.S.C. § 1367.

26.     Venue is proper in this District under 28 U.S.C. §§ 1391(c)-(d) and 1400(b) because (i) Defendants maintain their principal places of business in this District, and (ii) this is a District in which Defendants are subject to the Court's personal jurisdiction with respect to this action, and/or the District in this State where Defendants have the most significant contacts.

### INTRADISTRICT ASSIGNMENT

27.     Pursuant to Civil Local Rule 3-2(c), this intellectual property action would be properly assigned to any division within this district.  The parties, however, agreed to adjudicate any dispute arising out of the NDA, which forms a basis for the trade secret allegations, in the state or federal court of Santa Clara County, California.  *See* Exhibit A, hereto, § 17.  Assignment to the San Jose Division would therefore be proper.

## II.     STATEMENT OF THE FACTS.

### A.     Airborne Communications Platforms.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

28.     Until recently, there were two basic ways to provision a large-scale wireless network: a terrestrial tower-based infrastructure, or a satellite array orbiting the earth.

29.     Terrestrial networks are expensive to build and are economic only when the cost can be spread over many people.  It is economic to build a cell tower in Manhattan; it is not in rural Wyoming.  As a pragmatic matter, a terrestrial tower system will never bring the internet to all.

30.     Satellites, too, are very expensive.  A satellite can cost well in excess of $10 million to build, and an additional $100 plus million to launch.  According to the Union of Concerned Scientists, there are 600 non-military, communications satellites operating today versus the over five million cell sites which service the third of the world's population with a wireless broadband device.  Even if the number of communication satellites increased ten-fold, those satellites would need nearly a thousand times the capacity of a typical cell phone tower to have enough capacity to serve the uncovered population.  More, since satellites orbit at great distance from the earth, latency (delay), poor signal strength, and limited spectrum limit an average satellite to lower capacity than the average cell phone tower.  Again, as a pragmatic matter, a satellite network will never bring the internet to all.

31.     Satellites in geostationary orbit, *i.e.* placed in orbit to stay in a fixed spot relative to a terrestrial location, are placed at roughly 23,200 miles above the earth.  Given this great distance, custom equipment is needed to receive and use signals form the distant satellites, *e.g.*, special receiving dishes.  This equipment is expensive, and this expense presents a further barrier to broad-based satellite provisioned internet.

32.     Satellites in low earth orbit (*e.g.*, Iridium communications satellites at a height of approximately 485 miles) are not geosynchronous, and they move across the sky (at about 17,000 miles per hour) relative to a fixed terrestrial location.  To receive signals from these satellites, each receiver needs to track the satellite to receive the signal.  This requires additional ground-based infrastructure.  And this is expensive.  For example, Motorola founded Iridium to create a new low earth orbit satellite network.  The system cost billions to build, but the required "sat" phone cost and cost of phone time proved prohibitive and the network failed.  Iridium emerged out of

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

1    bankruptcy and is a niche player today, serving limited industrial, government, and aviation

2    markets.

3         33.    Given these inadequacies, and the ever-increasing need for additional bandwidth

4    and greater geographic coverage, there is a need for a better approach, a third way to create an

5    airborne communications network.

6         **B.    Balloons and Airships.**

7         34.    Communication engineers have considered using the airborne equivalent of cell

8    towers for years.  Historically, there have been two basic approaches: (1) motorized lighter than air

9    craft (Goodyear blimp), or unmanned, unmotorized balloons (*e.g.*, weather balloons).

10        35.    Airships (dirigibles) did and do not work.  To keep a dirigible in place in the

11   troposphere or stratosphere requires significant amounts of energy, as the dirigible will battle the

12   wind ceaselessly.  It is simply not possible to station a dirigible in a fixed location for any length of

13   time; the energy requirements are prohibitive.  For example, Lockheed-Martin launched (with great

14   fanfare) a giant airship to create an airborne cell tower in 2011, the High Altitude Airship –

15   (HALE-D).  It was designed to fly at 60,000 feet, made it to 32,000 feet, malfunctioned, and had

16   what Lockheed euphemistically called a sudden "controlled descent," *e.g.*, a slow motion crash.

17        36.    The other approach involved tethered balloons.  While attaching a very lengthy

18   tether would fix the balloon in place, there were two other unsurmountable obstacles: the tether

19   itself is very heavy, requiring ever larger balloons, until the system collapses of its own weight;

20   and, (2) even assuming some solution to this tether-weight conundrum, hundreds if not thousands

21   of balloons tethered to the earth would create obvious hazards to other aircraft.

22        **C.    Space Data: a Sailing Constellation.**

23        37.    Jerry Knoblach, as discussed above, had a background in communications and

24   satellite technology.  He appreciated the problems in using the satellite network to supply

25   additional network bandwidth coverage for terrestrial users, just as he appreciated that powered

26   dirigibles or tethered balloons would not work.

27        38.    In late 1996, after significant research and development, Knoblach realized that it

28   would be possible to develop a constellation of "near-space" balloons to create a floating network

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

1    that could connect to terrestrial communications networks to provide coverage in areas cell towers

2    do not reach.  "Near space" is the area of the atmosphere above the range that jet airliners fly

3    (30,000 to 52,000 feet) and far below the low altitude orbiting satellites (485 miles).  This, thought

4    Knoblach, was the new frontier for airborne communications networks.  In 1997 and 1998,

5    Knoblach and Frische developed this idea into the Space Data '941 Patent, attached hereto as

6    Exhibit B and incorporated herein by reference.

7            39.     This epiphany turned on a number of subparts, each important:

8    ***The Balloon-Based Network***

9            40.     By treaty, numerous countries release weather balloons twice a day.  These weather

10   balloons ascend rapidly, burst, and the payload parachutes to earth.

11           41.     Given the rapid ascent, and the fact that these weather balloons were not equipped

12   with sensitive GPS functionality until relatively recently, historical wind data in the stratosphere

13   has been sparse and profoundly inaccurate.  Weather balloons were not designed to provide micro-

14   mapping of wind currents in the stratosphere, but rather provide metadata for basic weather

15   modeling of the atmospheric layers where airliners fly and below.  Until recently, these balloons

16   were tracked with radio-theodolites, an instrument used to measure location and height.  Such

17   radio-theodolites provide very basic and error prone data on wind patterns, particularly at high

18   altitudes (a function of how the radio-theodolites estimate wind, *i.e.*, by using azimuth as a critical

19   measurement, and azimuth provides an increasingly distorted reading the higher the balloons

20   ascend as a simple function of geometry).

21           42.     Knoblach and Frische understood that it would then be possible to "sail" a

22   constellation of balloons in a loose array by exploiting the wind patterns in the 60,000 to 140,000

23   foot altitudes and attach to those balloons a communications signal transceiver, so making feasible

24   a balloon-borne communications network.  Knoblach and Frische realized it would be possible to

25   control a balloon's micro-**horizontal** location by adjusting its altitude, *i.e.*, moving the balloon up

26   or down a modest amount to take advantage of the wind patterns to move the balloon to its desired

27   horizontal location.  The pair understood that it would then be possible to "sail" a constellation of

28   balloons in a loose array by exploiting the wind patterns, so making feasible a balloon-borne

communications network. If a balloon drifted out of place, one could raise it or lower it to catch a discrete wind stream to bring it back into position. Knoblach and Frische also realized that flying a network of balloons for communications would also generate high resolution stratospheric wind data of a quality beyond that publicly available, which would provide Space Data with valuable information.

43.     Once test flights began in 2000, Space Data captured this high-resolution wind data and developed its proprietary knowledge of the micro-wind structure of the 60,000 to 140,000 foot range. The analysis of this proprietary data showed Space Data that there is a horizontal band in the stratosphere above 60,000 feet where the winds are particularly calm (15 to 20 mph), and, importantly, **structured**, *i.e.*, not blowing randomly (the "peaceful band") which sits (approximately) between 60,000 to 80,000 feet. This "peaceful band" analysis was derived from hundreds of thousands of hours of proprietary flight data.

### *Use Moore's Law*

44.     Knoblach and Frische further realized that electronic circuitry was shrinking every year, and that it would be possible to build a radio transceiver that was less than 12 pounds, with two separate frangible components which would separate at impact, with each component weighing less than six pounds. This matters, as aircraft jet engines are built to withstand bird strikes of up to eight pounds. A balloon payload of less than 12 pounds that broke into two components of less than six pounds each (frangible) is, accordingly, exempt from regulatory hurdles as the payload would not pose a hazard to aircraft.

45.     Aviation regulations permit balloons with payloads greater than 12 pounds, but these heavier payloads cannot be launched on cloudy days. For example, in July 2013, under the sponsorship of the Federal Communications Commission and in conjunction with the National Institute of Standards and Technology, Space Data flew a 4G LTE (wireless protocol) payload that

weighed 50 pounds to service public safety needs after Katrina-like disasters.  Currently, Space

Data is flying 4G LTE payloads that weigh less than six pounds.

### *Cheap and Scalable*

46.     Another key Knoblach-Frische realization was that such a choreographed

stratosphere-based balloon constellation could provide needed network coverage at an extremely

low cost, relative to the alternatives (millions of additional terrestrial towers, or many more

satellites than could feasibly be orbited).  Building a new tower-based network is **very** capital

intensive, literally trillions of dollars to cover the uncovered areas of the world, and has to be built

to provision the anticipated future traffic.  Less than a third of the world's landmass had broadband

wireless coverage as of 2013.  Half the world's population lived within this coverage area, yet only

about a third of the population used the Internet.  These users were served by about five million

cell phone towers.  Since these existing towers cover only a third of the landmass, complete

coverage would require on the order of ten million additional cell phone towers.  Rural cell phone

towers are more expensive than urban towers as they are farther from the electricity/data

connectivity and they cover fewer potential customers, who generally earn a lower per-capita

income.  The average rural tower in Asia/Africa costs $385,000 to build.  The math is daunting: the

additional ten million towers needed to provide coverage to all, at $385,000 per tower, would

consume nearly four trillion dollars.  No one is willing to write this check.  Absent coordinated

government activity, tower-based Internet for all will never happen.

47.     In contrast, a near-space balloon constellation can start small and scale as demand

increases.  This new approach is **not** capital intensive, and can be scaled to match growing demand,

a significant advantage.  This also means that, unlike traditional networks, a balloon network's

operating costs will increase only as traffic and revenue increase.  This means that a balloon

network will be profoundly more self-funding than a terrestrial or satellite network.  While

satellites (with coverage areas hundreds or thousands of miles in diameter) have too **little** capacity

and towers (with coverage areas a few miles in diameter) cost too much given the sparse

population density, balloons with coverage areas hundreds of miles in diameter make sense.

Further, as traffic in an area with balloon coverage increases to the point where a tower becomes economic, towers can be built to offload the capacity of the balloon network, much as Wi-Fi hotspots offload tower capacity today. This balloon approach was, in short, smarter, faster, cheaper, and **realistic**.

### *Interoperate With Terrestrial Systems With No New User Hardware*

48.     Once Space Data began collecting and analyzing its proprietary wind data, Knoblach and Frische were able to conclude that the winds in the approximately 60,000 to 80,000 foot altitude were the calmest winds, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ If a balloon constellation can provide coverage to a phone in common use, it is much more valuable than a balloon constellation that requires users to purchase a new, particular device to connect. Unlike satellite transmissions, users did not need to buy new dishes or bulky handsets and one balloon constellation could serve all users. Once the LTE protocol became the standard for all broadband smartphones, this meant the balloon constellation could fly with one signal protocol and provide Internet to everyone with a 4G phone. This is one very important advantage to the Space Data balloon network: it works seamlessly and without any additional cost to the users with legacy terrestrial cell-based devices.

**D.     Space Data, the Company.**

49.     Jerry Knoblach began working on the balloon-constellation communication system idea in late 1996 after years of working in the aerospace communications field.

50.     In early 1997, he connected with his colleague from MIT, Eric Frische and, together, they began developing the idea that became Space Data. Frische was an engineer and registered patent agent, as set forth above.

51.     In 1997 and 1998, Knoblach and Frische worked to develop the balloon-

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

constellation idea by analyzing wind data and communications protocol to prove that this lighter-than-air network would work.

52.     Space Data was formally incorporated in 1997.

53.     In June of 1999, Space Data filed for its first patent related to this technology.

54.     By early 2000, Space Data was funded, had opened an office, and hired six employees.

55.     In 2001, Jim Wiesenberg joined the company as a Chief Strategy Officer ("CSO"). Wiesenberg was a Harvard Business School graduate, as was Knoblach, with deep experience in spectrum acquisition and management.

56.     The Federal Communications Commission ("FCC") held a spectrum auction in September 2001, in days after the 9/11 attacks.  Space Data bought a significant amount of spectrum at this auction in the 900 MHz band, and owns much of that spectrum today.  The spectrum is now worth in excess of $200 million.

57.     In 2004, Space Data deployed a number of balloons covering four states, serving oil companies and oil field service companies.  Oil wells are often in remote areas, with no landline or cellphone access.  But wells and pumps need to be monitored continuously (leaks; malfunctions). Space Data's balloon constellation provided inexpensive, comprehensive network coverage for these remote wells and pipelines.  In the years to come, Space Data entered into numerous commercial contracts with such oil and oil field service companies.

58.     By 2007, Space Data had nearly 100 employees, a working balloon constellation covering vast swaths of the Southwest, and was building hundreds of proprietary payloads for the U.S. Air Force on a classified project.

59.     From 1999 forward, Space Data filed and prosecuted fundamental balloon constellation patents.  It now has six issued patents, several more applications with Notice of Allowance on file and the patents about to issue, and additional applications pending.

60.     Space Data operates balloons that practice its patents.  Space Data has commercially exploited the '941 Patent, the patent-in-suit, by making, marketing, selling, and using products covered by the '941 Patent, including for example its popular SkySat™ repeater platform, currently

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

being used operationally by the US Marine Corps and US Army, as well as its SkySite™ network that has provided wireless services from a constellation of balloons in the stratosphere on a commercial basis since 2004.

61.     Throughout its corporate history, Space Data has worked zealously to maintain the secrecy of its proprietary information.  Employees all sign secrecy agreements, the Space Data facilities are security card keyed, all visitors sign in on a mandatory visitor log, and no third party prospective partner was shown proprietary information absent signing an NDA.  Space Data maintains a file of these NDA's in its electronic and hard copy records.

62.     Space Data is an active operating business today.

**E.     Google's Space Data Due Diligence.**

***Google's Android Platform and Wireless Neutrality***

63.     Apple released the first iPhone in November 2007.  Long prior to the iPhone launch, Google understood that search would likely move to mobile devices, migrating away from PC's and other tethered computers.  This was a seismic technological shift, and one that posed an existential threat to Google.

64.     As an early part of a multiyear, sophisticated response, Google bought Android in 2005.  Android designed and sold a mobile software platform.

65.     With Android, Google needed a way to ensure network access for Android-enabled phones friendly to Google and Google apps.  But cell (wireless) networks were proprietary; AT&T owns the AT&T network, just as Verizon owns the Verizon network, and so forth.  Google planned to release an open platform Google based phone, but was not terribly interested in paying to build its own new cell network.  Google essentially wanted the equivalent of net neutrality for devices on the cellular airwaves.

66.     In 2007, the FCC announced that it would auction a very valuable spectrum band, the 700 MHz band, in early 2008.  This band is particularly well-suited for wireless cell phone communication.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

67.     In auctioning spectrum, the FCC has two contradictory goals; (1) the agency wishes to generate as much revenue as possible, but, (2) sees value in having broad and open access to public airwaves.

68.     Appreciating this tension, Google lobbied the FCC to include an "open access" provision for the key portion of the auctioned 700 MHz spectrum to be auctioned.  That is, the FCC agreed that if a certain minimum bid were submitted, the 700 MHz spectrum would become open to all.  The FCC ultimately set that "open access" bid trigger at $6.45 billion.

69.     With the auction rules set, Google heavily publicized its intention to bid, hired game theory economists to structure its bid strategy, and participated actively in the bidding process.  As largely admitted by Google, and as widely speculated by the other bidders, Google did not in fact intend to acquire the spectrum itself.  Instead, Google wanted to ensure that an existing carrier, likely Verizon, would hit the minimum bid, thereby providing Google devices with open network access at no cost to Google.

70.     This is precisely what happened.  By early March 2008, it was apparent that Verizon had submitted a bid in excess of the minimum, and Verizon subsequently was awarded the 700 MHz spectrum.  Google friendly mobile devices are now ubiquitous, and Android-based phones are the most popular phones in the world, outselling iPhones by close to 9 to 1.  And, as search moved to mobile, Google's search revenue has increased hugely.

### *And So Space Data*

71.     This FCC auction and Google's game-theory strategy was important to the early relationship between Google and Space Data.  Under the FCC rules, a winning bidder had the obligation to build out coverage to 40% of the population within four years of being awarded the spectrum.  For an existing wireless carrier with tens of thousands of towers, this was simply a matter of installing new radios on the towers.  For a new entrant like Google, however, losing the spectrum due to missing the construction deadline was a very real risk.  If Google's strategy failed, and if Google actually submitted a winning bid, Google had to honor the buildout requirement.  Google understood that it could use the Space Data balloon constellation approach to satisfy its buildout obligation quickly and inexpensively.

72.     Nor was this point lost on Space Data.  Space Data understood exactly how its technology could aid Google should Google win the spectrum auction.

73.     In late August 2007, a Space Data consultant learned of the Google open phone initiative, and emailed Google suggesting that Google should talk to Space Data about incorporating the Space Data balloon technology in Google's open platform strategy, including its planned FCC 700 MHz spectrum bid.

74.     On August 10, 2007, Google's Christopher ("Chris") Sacca, then involved in Google's open phone and spectrum initiative, emailed the Space Data consultant, saying "I am curious to hear more about your proposal," and setting a meeting.  Contemporaneously, Sacca sent an internal email to several Google engineers, noting the upcoming Space Data meeting, and saying that "Larry Page was interested in us following up."

75.     The Space Data and Google executives met on the Google campus (Googleplex) late in the morning on Tuesday, September 18.  Chris Sacca and Minnie Ingersoll (see ¶ 98 below describing the Google executives in detail) attended for Google; Jerry Knoblach and Space Data Chief Strategy Officer Jim Wiesenberg, attended for Space Data.  The Google co-founders, Brin and Page, attended the presentation portion of the meeting.  The meeting lasted two and a half hours, and concluded with Google saying that Google was interested in using Space Data's balloon technology to accelerate the buildout of any 700 MHz spectrum Google might acquire.

76.     At this meeting, Space Data provided basic and public information on the Space Data platform.

77.     Google's Chris Sacca followed up on Tuesday, October 16, 2007.  In an email sent to Wiesenberg and Knoblach, Sacca said "we are back on focused with you guys.  Stay tuned for a proposal for a next step.  Should hear something today."

78.     Google Business Development executive Minnie Ingersoll followed up the next day, Wednesday, October 17, 2007.  In an email to Knoblach and Wiesenberg, Ingersoll said that Google "remain[ed] interested in Space Data."  She asked to schedule another meeting to enable Google to do further "technical due diligence," and introduce Space Data to "a few more people on our [Google] team."

79.     On Wednesday, October 24, Knoblach and Wiesenberg met with Washington-based Google lobbyist Rick Whitt to discuss Google's open phone platform, upcoming spectrum bid, and a potential business relationship with Space Data.

80.     The parties then set a follow-up meeting at the Googleplex for Thursday, November 1.  Google's group included Ingersoll, Sacca, and two engineers, Larry Alder and Phil Gossett. Larry Page and Sergey Brin also attended this second meeting.  Wiesenberg, Knoblach, and Space Data co-founder and patent co-inventor Eric Frische attended for Space Data.  The group discussed Space Data's technology at a fairly general and high level, and likewise discussed how Google might work with Space Data to build out any 700 MHz spectrum acquired.

81.     The parties continued to exchange emails following the November 1, 2007 meeting.

82.     On November 28, 2007, Google's Ingersoll introduced the Space Data team to Google's Mike Pearson.  Pearson was on Google's "Corporate Development Team," and Ingersoll told Space Data that Google was bringing Pearson in as "the right person to help us take this discussion into more formal deal terms."

83.     Pearson then scheduled a December 4, 2007 call with the Space Data executives. After that call, Pearson said that Google was interested in going forward, and forwarded a copy of Google's standard Mutual Non-Disclosure Agreement ("NDA").  Google drafted this NDA in full.

84.     In the December 4, 2007 call, Pearson asked that Space Data begin to supply confidential and proprietary information to Google to assist Google in its technical and financial due diligence.  Pearson first requested detailed Space Data financial information, including the latest "capitalization table, income statement and balance sheet."  On the larger business opportunity, Pearson described Google's interest as follows:

> The most critical piece of information however will be getting some sense from you and the team about what you would envision as being the potential uses for the balloon technology here at Google.  If you remove the constraint of having to find near term monetization opportunities, what are the areas that you and the team would like to focus on at Google?  **I think the easiest way to flesh it out is to look at opportunities that do and do not involve Google owning a large block of spectrum in the near term and what are the goals you would like to accomplish in either scenario.**

(Emphasis added). In this way, Google moved beyond the spectrum buildout relationship to a general acquisition; Pearson's job at Google was to evaluate early stage companies as potential Google acquisitions.

85.     On Friday, December 14, Space Data provided to Google detailed Space Data financial information. Specifically, Space Data provided its five-year going-forward projections (more than 2,000 pages). In a separate email on the same day, Space Data provided its audited actual financials for the prior three years and, in aggregated form, financial for the prior years since inception of Space Data in 1997. These financial reports set for the exact economic picture of the company over time, including capital expense, operating expense, reserves, debt, investment, and the like. These confidential reports and models provided the big picture and intimate detail, scope and scale, revealed valuable successes and costly expenditures, forward looking goals and interim milestones to Google. Historical numbers provided proof and projections provided strategy and expectations. Details in the pro-forma embodied and summarized a great deal of the wisdom accumulated through careful, multi-year planning, effort and expense by Space Data and its investors. The cover email explicitly stated that all of the financial information, past, present and future, was proprietary, confidential, and fully subject to the NDA. A subset of the proprietary financial information sent to Google under the NDA is attached hereto as Exhibit D and incorporated herein by reference.

86.     In mid-December, Google's Chris Sacca left Google, and went on to significant notoriety as an angel investor (Instagram; Twitter).

87.     Ingersoll reviewed the information provided, and responded by email to Space Data on Thursday, December 20, 2007:

> **We are making a lot of positive progress getting our head around the financials of Space Data, but I'd like to schedule some time for a followup with our technical team to do more due diligence about the Space Data constellation. Can we schedule time with you to review the balloon technology in more detail when we get back to work in Jan?**

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

88.     The parties so scheduled a technical conference call for January 3, 2008.  At this point, the Google evaluation team had grown to seven people, including multiple engineers.  The call was attended not only by this team, but also by the founders of Google.

89.     On January 2, 2008, Space Data sent Google proprietary and confidential "vision" slides which detailed the concept of a worldwide network of balloons providing Internet coverage, and a plan for how to do it.

90.     By late January 2008, Google and Space Data were discussing a range of valuations for a Space Data-Google acquisition.  As part of this process, Space Data forwarded on January 25, 2008, a 2007 year-end Space Data (pre-audit) P&L.  This document was marked as confidential pursuant to the NDA.

91.     By the end of January, Google had evaluated Space Data's technical and financial information and wanted to schedule a full day technical inspection and due diligence visit at the Space Data headquarters in Chandler, Arizona (a Phoenix suburb).  This meeting was subsequently set for February 15, 2008.

92.     On January 28, 2008, Space Data forwarded a 600 page WiMax (network) financial model to Google.

93.     On February 5, 2008, Space Data executives had another conference call with Google's Mike Pearson.

94.     On Monday, February 11, Space Data's C.E.O. Jerry Knoblach forwarded a detailed analysis on how Google could use Space Data's spectrum paired with other spectrum available for lease in the Air to Ground band "to provide service to GSM equipment operating on the standard 900 MHz band used for GSM elsewhere in the world."  The proposal provided a quick and inexpensive way of providing capacity for GSM mobile phone handsets, and GSM was the most prevalent cellphone handset in the world at the time.

95.     On February 12, 2008, Knoblach forwarded to Pearson a PowerPoint presentation summarizing Space Data's forecast and revenue projection for Space Data.  The document set out the details of Space Data Government contracts, including details of the United States Air Force's use of Space Data balloons in Central Iraq.  The document also set forth the economics and Space

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

1  Data margins on this contract. The document further set forth Space Data's prospective military

2  opportunities. The cover email notes that the attachment was "confidential under the terms of our

3  NDA," as does every page of the underlying document itself.

4       96.     Just days prior to the in-person meeting in Chandler, Arizona, Google's Daniel

5  Conrad forwarded a series of detailed questions concerning Space Data's valuation, particularly

6  given events that occurred in recent spectrum auctions.

7  ***The Google Team Comes to Space Data***

8       97.     On February 15, 2008, twelve Google executives and engineers, including the two

9  cofounders, flew to Arizona and then traveled in several SUV's to the Space Data Chandler

10 facility. The group spent the better part of a day at the facility.

11      98.     The following executives and engineers attended for Google:

12  • **Sergey Brin**: Mr. Brin is a Google cofounder, and a C.S. engineer by training.

13  • **Larry Page**: Larry Page is the other Google cofounder, and also a C.S. engineer by

14      training.

15  • **Larry Alder**: Larry Alder is an engineer with advanced degrees in aeronautics and

16      astronautics. He joined Google in 2005. For approximately 12 years, he lead Google's

17      "Business Operations Access Group," which houses Google initiatives "promoting open

18      internet access." He has worked closely with Minnie Ingersoll, described below, since

19      he joined Google in 2005.

20  • **Minnie Ingersoll**: Ms. Ingersoll has an MBA and B.S. in Computer Science. She

21      joined Google in 2002. From 2002 to 2011, Ms. Ingersoll worked as a Google products

22      manager, leading efforts to broaden internet access for all, including Google's work

23      with Space Data, Google's work on Google fiber, and like projects. She co-founded the

24      Access team; a cross-functional product, policy and engineering team. She was a

25      Principal at Google from 2011-2014.

26  • **Daniel Conrad**: Daniel Conrad is an engineer, and served as an early member of the

27      Android and "Access" teams at Google. He was a Google Project Manager from 2006

28      to 2010. The Google Access team is dedicated to providing internet access to all.

SPACE DATA CORP.'S SECOND AMENDED COMPLAINT                    CASE NO.: 5:16-cv-3260 BLF
FOR, *INTER ALIA*, PATENT INFRINGEMENT        - 20 -

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

- **Daniel McCloskey**: Mr. McCloskey is an engineer, and an inventor on numerous patents, often with Phillip Gossett (*see* below) as a co-inventor. He joined Google in 2007. Mr. McCloskey's expertise appears to lie in network communications. For several years, Mr. McCloskey served as Head of Design for Google's Advanced Technologies and Projects Group.

- **Phillip Gossett**: Mr. Gossett is an engineer and co-holder of patents with McCloskey. Mr. Gossett has been a Senior Staff Software Engineer at Google from 2005 to the present.

- **Richard Walker**: Mr. Walker worked as a Google engineer from 2007 to 2010.

- **Sunil Daluvoy**: Mr. Daluvoy has a Bachelor's in Science and a law degree. From 2006 to 2013, he worked on New Business Development at Google. Mr. Daluvoy is currently Head of Business Development at Uber Technologies. While at Google, he worked with Business Development and "Access," the group charged with improving internet access for all. He was also involved in the Google spectrum auction. From 2006 to 2011, he was a senior executive in Google's New Business Development Group.

- **Mike Pearson**: Mr. Pearson joined Google in 2005. Mike Pearson was a general partner at Google Capital, Google's in-house venture entity. He also worked as a Director, Corporate Development, on Android projects at Google. As a partner at Google Capital, Pearson focused on early stage acquisition opportunities for Google.

- **Joseph S. Faber**: Mr. Faber is a lawyer, and joined Google just prior to the 2008 spectrum auction. He has deep FCC regulatory experience, including working with AT&T. He currently serves as a senior Google in-house lawyer.

99.     The Google team arrived at approximately 10:45 a.m. They were first given a tour of Space Data's balloon manufacturing facility, where Space Data walked the group through the precise mechanics of the Space Data balloon construction process.

1    100.   The group then went to the Space Data Network Operations Control ("NOC")

2    Center.  The NOC is essentially Space Data's Mission Control, the group monitoring all Space

3    Data balloons and balloon arrays.

4    101.   The Space Data NOC had, at that time, two large projected screens on the wall, one

5    ████████████████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████████████████████

7    ██████████████████████████████████████████

8    102.   Here is how the Space Data NOC looked (at a distance with data obscured) in

9    February 2008:



22   103.   In addition, the Space Data NOC contains multiple computer monitors (in white

23   above) on desks arranged in a U shape with a dozen monitors, each tracking various aspects of a

24   balloon flight, as described in detail below.

25   104.   When the Google due diligence team arrived at the Space Data NOC, ███████████

26   ████████████████████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████████████████████████

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

SPACE DATA CORP.'S SECOND AMENDED COMPLAINT
FOR, *INTER ALIA*, PATENT INFRINGEMENT          - 22 -

CASE NO.: 5:16-cv-3260 BLF

[REDACTED] This was a real balloon array, providing real-time data and network coverage, all for real customers.

105. The Google team took photographs of various Space Data gear, including screenshots of the Space Data data on the NOC monitors, as set forth below. The Google team spent over an hour in the NOC asking questions, asking how balloon trajectories are controlled, asking to see the various screens NOC operators controlled, and asking how wind alone is used to maintain the spacing of the array of balloons. [REDACTED]

106. From the NOC, the Google team walked 50 feet outside to launch a balloon. [REDACTED]

107. After the launches, lunch was served in the main conference room. Metadata on photos record that by approximately 1:53 p.m. lunch was over and the tour was in the production area examining the detailed construction of the internal components of the company's balloon payloads and watching monitors displaying real-time data of the two balloons launched before lunch. [REDACTED] Thus, Google was able to observe and photograph the company's proprietary flight control software in operation for over an hour in the NOC and over an additional half hour in the production area.

108. Space Data knows this to be true, as it has pictures of the Google founders and Google photographers, including a picture of a visibly entertained Sergey Brin personally releasing a Space Data balloon, as set forth below:

***The Founders at Space Data***



***The Brin Release***



***Google (Daluvoy Here) Photographs the Space Data Screens***

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111



*__The Type of Camera Used: a High Resolution Nikon(s)__*



*__Google Visit to Space Data With Private Property Posting__*

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111



*__Google Reviews the Payload Details__*



## The Cameras



Holding Camera

109. Space Data has dozens of images documenting the various aspects of Google's Space Data tour and technical due diligence.

### F. Trade Secrets Disclosed to Google.

110. Both before the February 15, 2008 tour of Space Data, and during that tour, Space Data provided proprietary, confidential, trade secret information to Google under the NDA. Before the meeting, Space Data sent Google detailed financial models and projections as well as presentations describing just how a worldwide, ubiquitous, balloon-based communications network would work. During the visit, Space Data gave Google access to restricted areas and proprietary information which Space Data keeps closely guarded. Following the meeting, on February 19, 2008, Space Data sent Google an email summarizing the confidential information that had been disclosed during the visit and designating it as confidential. As described below (in section G), under the NDA, Google could not use the information disclosed for any purpose other than to "enable the Parties to evaluate the feasibility of a business relationship" of a proposed acquisition of shares or assets of Space Data. *See* Ex. A, NDA, § 2.

**_Confidential Information Disclosed During the February 15, 2008 Visit_**

111. The following paragraphs recount what Google saw during its visit to Space Data and why that proprietary information mattered. ████████████████████

████████████████████████████████████████████████████████████

**_Structured Wind Data in the Peaceful Band_**

112. As one example, reproduced below is the wind data screenshot for Space Data

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

*See* Exhibit C, a compilation of screen shots of the flight data on display on February 15, 2008, which is attached hereto and incorporated herein by reference.

113. ███████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

114. ███████████████████████████████████████████████

████████████████████████████████████████████ These data prove the existence of discrete and structured wind patterns in the stratosphere, a key predicate to making an airborne balloon constellation work. With structured wind patterns, one can fly a balloon array; without, one cannot.

115. The wind data that Google saw in its tour represented proprietary and trade secret Space Data information. Space Data had laboriously assembled such wind data over literally hundreds of thousands of hours of flight time. The Space Data information contradicted the information then in the public record and was not disclosed in the '941 Patent. █████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████ Space Data explained this point in detail to Google at the Space Data facility, and showed Google many examples on the screens, with the screenshots proving Space Data's point correct.

116. This wind data epiphany matters in flying a balloon constellation intending to provide broadband wireless coverage to standard smartphones. ███████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

[BLACK REDACTION BLOCK]

the highly structured (stratified) winds in the peaceful band. These epiphanies, and the data supporting their legitimacy, are all Space Data trade secrets, were not in the public domain, and were disclosed pursuant to NDA to Google on February 15, 2008.

117. This data also showed Google that Space Data's idea was not a hypothetical "beam me up Scotty" assertion, but a proof of principle based on real data recording a real flight, as captured in screenshots from the NOC. Over the course of its visit, Google saw similar data for every one of the balloons in the constellation then flying. All-in, Google saw and could photograph hundreds of similar screenshots covering every balloon in the array for a period exceeding an hour and a half. *See* Ex. C. This was a robust set of data indeed and available nowhere else on earth other than in the company's NOC and secure air-gapped servers.

*The "Hover" Algorithm*

118. Contrary to conventional wisdom, [BLACK REDACTION BLOCK]

119. Space Data proved this conventional wisdom wrong. Before Space Data's hover algorithm, all balloons flown in the stratosphere were zero pressure balloons, which means the neck is open and as a balloon rises above its float altitude excess lift gas simply spills out of the neck or very rigid balloons that did not expand much as they ascended.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

120. For each balloon flight on February 15, 2008, Space Data implemented its hover algorithm, and reflected the input data and resulting balloon behavior on the "hover" screenshot.

121. The hover screenshot is reproduced below:



*See* Ex. C.

122. From this screenshot, an engineer experienced in predictive feedback systems and controls would know what Space Data did in its hover algorithm,

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

[REDACTED]

123. This was not another abstract, "beam me up Scotty" assertion, but rather real data reflecting real behavior of balloons in a real constellation in commercial service real-time.

*__Thermal Management__*

124. The ambient temperature in the peaceful band is approximates negative 40° Fahrenheit. Counter-intuitively, one of the principal challenges to making a stratospheric balloon constellation work is thermal (heat) management. At 60,000 plus feet, the air is very thin, and extremely ineffective at conducting heat away from the balloon payload. As is true for all electronics, the electronics in a balloon (particularly the power amplifier ("PA")), generate heat. More, while the PA is hot, and reducing heat is an issue, the GPS instrumentation, which sits higher in the payload, tends to be very cold.

125. After significant experimentation, Space Data learned how to manage thermal heat regulation in the stratosphere. [REDACTED]

126. During the Space Data tour, Space Data explained its thermal management techniques, and solutions generally, to Google at great length. These, too, were trade secrets. A skilled engineer with photos of the inside of Space Data's payload as well as data from the NOC screens (relating to power consumed and temperature) could reverse engineer Space Data's thermal management designs.

*__Space Data's Proprietary NOC Altitude Control and Monitoring System__*

127. As another of the many screenshots monitored for each balloon monitored in flight, [REDACTED]

128. [REDACTED]

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111



*See* Ex. C.

129.    In viewing these screens, Google was able to see (and capture with its camera) the specific types of data Space Data captures, monitors, and analyzes for each flight from its NOC.  A knowledgeable engineer would be able to use this information to reconstruct Space Data's proprietary altitude control and monitoring systems, as Google has done in its own "Mission Control" described below.

130.    Google's current Loon Mission Control bears a striking similarity to Space Data's NOC:

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

*__The Economics: This Was Not a "Moonshot," But a Real and Viable Commercial Enterprise__*

131.    In addition to the flight information Space Data shared with Google (under the NDA), Space Data gave Google over 2,000 pages reflecting Space Data historical financial performance and future projections, as described above in paragraph 85. *See also*, Ex. D.

132.    From this financial data, Google could see all the economic aspects of the Space Data business.  Google would have known, for example, what it costs to set up and run the Space Data balloon constellation. ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████ The trillions of dollars required to construct towers (as discussed above) to cover the rest of the world's population was over ten times Google's entire market capitalization in 2013.

133.    Space Data's economic data was also valuable in that it showed detail on the main cost drivers in the logistics cycle of providing service from balloons including: ██████████

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

[REDACTED] Not only were the actual costs for each step of this process shared with Google, the models contain the mathematical relationships to vary assumptions for each step of the process to run sensitivity analysis to understand the operational costs and how they can be modified. These basic mathematical relationships, costs and improvements with experience are very useful for modeling all types of balloon-based wireless services businesses. Space Data's network may be a regional network, but by changing some parameters in the model, it can be scaled to model a broadband network covering an entire nation, an entire continent, or the entire world. And Space Data explained all of this to Google.

134. This economic data were of very real value to Google. Although Google's pockets are deep, Google has emphasized publicly that it will not green-light Google X "moonshot" projects unless *it has the conviction that the projects would likely be economic and commercially viable*. As Google put it recently:

> **Thinking about X as a portfolio**
>
> Being a "corporate lab" is a difficult balancing act: place big bets on the future, but don't spook the people giving you the money. As an Other Bet (one of the Alphabet divisions that's not Google), we want to be good stewards of the resources invested here and deliver a good return so that we're trusted to keep the factory open for years to come.
>
> We look for opportunities to balance X's overall portfolio sensibly, and aim for diversity: a mix of hardware and software, a mix of industries and problems, a mix of ideas that will take more (closer to 10 years) or less (closer to 5 years) time to have an impact. We have clear budgets and limitations; we can aspire to creating significant growth for Alphabet without significantly growing ourselves.

https://blog.x.company/a-peek-inside-the-moonshot-factory-operating-manual-f5c33c9ab4d7

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

1    135.    The Space Data technical information, coupled with the detailed Space Data

2 economic information, would have proven that the Loon project was commercial, feasible, and

3 worth Google's investment.

4 ***Space Data's Worldwide Balloon Communications Network "Vision" Slides***

5    136.    Not only did Space Data provide Google financial models before the February 15th

6 visit, but Space Data also provided Google "vision" slides, marked as proprietary and confidential,

7 which laid out how Google could develop a worldwide constellation of balloons to provide

8 ubiquitous Internet coverage, and how to make this work (*i.e.* the idea Google later called "Project

9 Loon").



Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111



### G. The NDA.

137.     As described above, the parties entered into an NDA, effective as of December 1, 2007, for the purpose of engaging in "discussions and negotiations concerning a proposed acquisition of shares or assets" of Space Data. This was the only permissible use of the Space Data information.

138.     The NDA expressly stated that "it is anticipated that the Parties will disclose or deliver to the other Party certain trade secrets or confidential or proprietary information and Google and [Space Data] are entering into this Agreement in order to ensure the confidentiality of such trade secrets and confidential or proprietary information…." *See* Ex. A.

139.     The NDA required that confidential information be clearly marked or identified as confidential by the party disclosing the information, a requirement Space Data met with every trade secret category described above in section F.

140.     After the NDA was signed, Space Data provided Google with access to Space Data's confidential and trade secret information, all of which Google was required to "hold in confidence." *See* Ex. A § 4. The NDA also prohibited Google from using any confidential

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

information disclosed by Space Data except for the purpose of "enabling the Parties to evaluate the feasibility of a business relationship" or the acquisition of Space Data by Google. *See* Ex. A. § 4.

141.    The terms of the NDA expressly provide that this agreement would remain in effect until terminated by either party with thirty days prior written notice, and that the agreement shall "survive with respect to Confidential Information that is disclosed before the effective date of termination." See Ex. A § 6.  As of today, Defendants have never provided any such notice of termination.

142.    Despite Google's express agreement to the terms of the NDA, Space Data is informed and believes that Defendants have developed Google Loon based on Space Data's confidential and trade secret information, in breach of the NDA, as set forth below in sections H and I.

143.    As Google was only permitted to use Space Data's trade secrets and other confidential information in order to evaluate Space Data as an acquisition target (or business partner), Google's evident use of Space Data's proprietary financial modeling confidential business plan for a worldwide balloon constellation network, and information derived from access to Space Data's proprietary wind data, hover algorithm, thermal management system, altitude control system, and network operations center to develop Project Loon, constitutes a breach of the NDA.

144.    Google's disclosure of certain of Space Data's trade secrets and confidential information in Google's patent applications and asserted "ownership" of Space Data's intellectual property is also a breach of the NDA as it violates section 8, which states that "[n]o Party acquires any intellectual property rights under this Agreement[.]" *See*, Ex. A, § 8.

145.    Google's continued use of these trade secrets contrary to the NDA, Google's assertion of ownership over Space Data's trade secrets, and Google's disclosure of certain trade secrets constitutes misappropriation of Space Data's trade secrets under the California Uniform Trade Secrets Act and the Defend Trade Secrets Act.

146.    As described more fully below, Google's Project Loon echoes not only Space Data's patent, but also the confidential, trade secret information provided to Google under the parties' NDA.

**H.**     **Google's Project Loon.**

147.     According to Google's public statements, Project Loon came into existence as follows:

148.     In mid-2011, Google hired Richard DeVaul, an engineer previously working at Apple Computer.

149.     DeVaul joined Google's experimental research group, known as X (formerly known as and/or referred to as "Google X" or "Google X Lab" or "Google[x]").  At X, DeVaul worked with X's Rapid Evaluation Team, a group responsible for quickly ascertaining the viability of proposed research projects.

150.     According to Google, the Rapid Evaluation Team's job is to kill as many ideas as quickly as possible.  Prove to us, says Google, that these bizarre, "moonshot" ideas will **not** work.

151.     And Google X was not just a research lab for moonshot ideas.  As Google's Mike Cassidy explained "[v]ery early on in the [Google Loon] project analysis it had to be a viable business model . . . . And they are tough on the business model."

152.     Eric "Astro"[1] Teller ran Google X when DeVaul joined the organization. DeVaul reported to Teller, and Teller reported to Page.  Both Brin and Page had offices at X.

153.     As one of DeVaul's first assignments, Teller asked DeVaul to assess the viability of a balloon borne internet constellation.  According to Google, this directive came directly from the cofounder and then C.E.O. Larry Page, whom Google reports had been fascinated with the idea of a balloon internet constellation for several years.

154.     DeVaul began working on the project, and Google reports that DeVaul soon had his first epiphany: rather than huge powered and stationary balloons, why not a gaggle of smaller balloons, all inexpensive and quickly landed and replaced?

---

[1]  The name evidently refers to his haircut in high school, which looked like Astroturf, not a background in astrophysics.

155. The problem, said Google, was that there was no way to steer or control an array of such unpowered balloons. Even if launched in proximity, Google believed that they would soon drift apart, destroying the constellation and unraveling the airborne internet.

156. DeVaul's second epiphany, according to Google, lay in mapping the micro-wind currents in a calm band in the stratosphere. DeVaul realized that Google could essentially "sail" balloons in an array once these micro-wind patterns were understood.

157. DeVaul further realized, again according to Google, that Google could control the **horizontal** placement of the balloon by adjusting its **altitude**, up or down, to catch a different wind stream to move the balloon to the desired horizontal location (later a claim Google repeatedly patented as a novel and innovative Google invention!). *See* below, § I.

158. Google launched its first test balloon in August 2011. The balloon consisted of a simple latex balloon envelope, and a basic Wi-Fi transceiver payload. Google called this first generation balloon the Pterodactyl, and it is depicted below:



159. And another shot:

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111



160.    These early Loon balloons are strikingly similar to the Space Data progenitors as shown below with the National Guard launching one of Space Data's balloons.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111



161.    DeVaul tethered a small Wi-Fi transceiver to the balloon.  This transceiver could communicate with receivers on the ground.

162.    The Pterodactyl test worked, proving in principle that airborne balloons could create a working internet link.

163.    Over the remaining months of 2011, Google continued to launch new balloons.  By the end of 2011, Google had discovered (it says) that the balloon constellation worked, with one balloon receiving feeds from other balloons, and then transmitting the feed to the ground-based receiver.  Google thereafter patented this idea too.

164.    In these early tests, Google's Loon payload tended to land in an uncontrolled fashion.  To aid retrieval and assuage anxiety, Google attached a label to each Loon payload, saying "**Harmless science experiment: call Paul [at the number below] for a reward.**"  Google later applied for and received a patent on this novel "retrieval mechanism," *i.e.*, having an "if found, please call" label, something Space Data had been doing for years and was on the payloads Google took photos of while touring Space Data.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

165.    From 2011 through June 2016, Google launched and landed nearly a thousand Loon balloons. It accumulated hundreds of thousands of hours of flight time, collecting wind data, and further refined its balloon constellation and electronic configurations.

166.    In June 2013, Google had its first public balloon launch in New Zealand, a country selected given friendly airspace coupled with confidentiality and vast tracks of thinly populated land. To wide press coverage, the launch worked, providing internet access to several sheep farmers in the New Zealand hinterlands.

167.    In January 2012, Google filed the first of what would become approximately 102 Project Loon patents and applications. These early applications claim basic aspects of a balloon borne network constellation as organic Google inventions, even though these ideas had long prior been either disclosed to Google by Space Data or previously patented by Space Data itself. *See* below § I.

168.    Over the years following, Google has refined its balloon constellation and payload design and circuitry. Google now buys its balloons from Raven Aerospace, a Texas company with its principal place of business in Sulfur Springs, Texas. Space Data signed an NDA with Raven on August 19, 1999, and presented the patented constellation of balloons for communications to the C.E.O. of Raven shortly thereafter. Raven is contributorily infringing.

169.    Google's current Loon design "uses super-pressure balloons equipped with limited altitude control systems." Specifically, air is used as ballasts, and pumped into or out of an enclosure within the balloon, known as a Ballonet. This approach allows "the balloon to modify its weight for ascent or descent." Google characterizes the advantages of this altitude control as follows; "These altitude changes allow the balloon to take advantage of different wind patterns at different altitudes for navigation…. Modeling how a balloon will fly at different altitudes is a significant technical achievement for the project, and Loon is constantly improving our predictive abilities."

170.    The current Google balloon is made of polyethylene, weighs 55 kilograms, is 60 feet high and 15 feet wide, and is equipped with at least two independent redundant flight termination systems (described below) and a parachute tethered to the payload. While Space Data

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

1    has not employed polyethylene balloons due to their environmental impact, Space Data's patent

2    claims are general enough to cover a wide range of balloon types.

3         171.     The Loon balloons carry communications and safety equipment, including a flight

4    computer, batteries, solar panels, environmental sensors, transponder, a GPS receiver, and iridium

5    satellite communications link, and a parachute. Some of the Google Project Loon balloons also

6    "carry communication equipment to conduct operations with local telecommunications

7    companies…."

8         172.     Google currently launches balloons principally from the United States (adjacent to

9    the Winnemucca Nevada Municipal Airport and the José Aponte de la Torre Airport in Puerto

10    Rico) and a small number of additional sites.

11         173.     Google has recently reported that it is in commercial discussions with several large

12    telephone carriers to provide Loon internet coverage.

13         174.     On information and belief, Google is spending approximately $1 million a day on

14    Project Loon.

15    ***Google Copies Space Data***

16         175.     In describing Loon and the underlying technology, Google's engineers made plain

17    the eerie similarity between Loon and Space Data. To quote Google:

18    ***On Sailing With the Micro-Currents***

19

20

21

22

23

24

25

26

27

28



Project Loon balloons travel around 20 km above the Earth's surface in the stratosphere. Winds in the stratosphere are generally steady and slow-moving at between 5 and 20 mph, and each layer of wind varies in direction and magnitude. Project Loon uses software algorithms to determine where its balloons need to go, then moves each one into a layer of wind blowing in the right direction. By moving with the wind, the balloons can be arranged to form one large communications network.

www.google.com/loon/how/

This is Space Data sailing in the peaceful band exactly.

### *On Controlling the Array*

176. "Since the balloons drift with the wind, Google engineers devised a system to raise or lower them in order to catch the air currents needed to keep them floating just the right distance from each other – and aligned so if one floats out of range from Internet users in a particular region, another will come along and take its place."

**Source:** http://www.mercurynews.com/2013/07/26/google-thinks-balloons-may-solve-problem-of-internet-access-in-third-world/

### *On Loon to Earth Communications*

177. Here is a Google depiction of how its own constellation communicates:

Each balloon can provide connectivity to a ground area about 40 km in diameter at speeds comparable to 3G. For balloon-to-balloon and balloon-to-ground communications, the balloons use antennas equipped with specialized radio frequency technology. Project Loon currently uses ISM bands (specifically 2.4 and 5.8 GHz bands) that are available for anyone to use.

**Source:** www.google.com/loon/how/

### *On the Choreography: the Loon "Dances"*

178. "Loon is a network of free floating stratospheric balloons. Now if the balloons just floated entirely free, they would eventually drift to either pole and that wouldn't be terribly useful." - Rich DeVaul, Google Innovator." **Source:** https://www.youtube.com/watch?v=F8QeQLf53Cw

179. "You have these two free floating platforms that are kind of swaying and bobbing freely, a dance, if you will between the two balloons...." – Baris Erkmen, Technical Lead, Project Loon." **Source:** https://www.youtube.com/watch?v=BEC0G2HbuiE

### *On Working With the Legacy Infrastructure*

180. One of Google's most important Loon epiphanies was that its network could communicate seamlessly with the legacy terrestrial infrastructure, a huge advantage:

> We've established gigabit per second connectivity between the balloons up in the stratosphere, hundreds of kilometers apart getting the signal down to the user. We're using LTE, so you can just use the same mobile device you used today to get service whenever there's a loon balloon floating by. All of this technology coming together will allow someone

who could be thousands of kilometers away from the nearest ground infrastructure to have access to the Internet. – Baris Erkmen, Technical Lead, Project Loon

**Source:** https://plus.google.com/+ProjectLoon/posts/LAc5SVq9wyj.  This concept, too, Space Data discussed with Google.

### ***On the Hand-Off, Balloon to Balloon***

181.    "The idea is to have enough balloons so as one balloon floats out of you area, there's another balloon ready to float into place, handing off the internet connection." – Astro Teller, Captain of Moonshots, Google X.  **Source:**

https://www.ted.com/talks/astro_teller_the_unexpected_benefit_of_celebrating_failure/transcript?language=en

182.    "[S]o another balloon is coming just at the right time to take the place of the one that left." – Mike Cassidy, Project Lead, Project Loon.  **Source:**

https://www.youtube.com/watch?v=HOndhtfIXSY

### ***On the Loon Balloons***

183.    While the current "Night Hawk" Loon balloon differs in construction, this is not a case about how one constructs a balloon; it is, instead, a case about how one makes a **balloon network** work.  But many aspects of the Loon balloons overlap with the Space Data progenitor, as set forth below:

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111



**Source:** www.google.com/loon/how

***On the Inner Air Bladder***

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111



***On Google's Current and Commercial "Night Hawk" Balloon***

***Page Takes Credit for Google***

184.     Google's co-founder Page, who visited the Space Data facility and **saw** the stratified

wind data, described this exact point as something Google had discovered:

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1   **[B]ut it turns out, we did some weather simulations which probably hadn't really been done before**, and if you control the altitude of the
2   balloons, which you can do by pumping air into them and other ways, you can actually control roughly where they go, and so I think we can build a
3   worldwide mesh of these balloons that can kind of cover the whole planet.

4   www.ted.com/talks/larry_page_where_s_google_going_next/transcript?language=en.com

5          185.   Page was at the early Space Data meetings, he saw the data, he learned this from

6   Space Data, he worked at X, and yet he said this was all Google's idea.

7          186.   And Google's own statements during its New Zealand launch of Loon likewise

8   describes the information.  Google again claims information learned from Space Data as something

9   Google discovered:

10         This is a secret project that we've been working on for two years, and this is a project that our team is so excited to be launching here in New
11         Zealand.  This is what the balloons really look like.  It's an experimental technology.  The balloons fly twice as high as commercial airplanes.  20
12         kilometers up in the sky.  This is what's gonna help us bring internet access to some of the 5 billion people around the world who don't have it.
13         It truly fits our definition at Google X of moonshot.  **It's a huge problem, the solution is radical, and it took significant technology**
14         **breakthroughs to get there.**

15         **One of the technology breakthroughs is the way we control the position of the balloons**.  In the past, others have thought about ways of
16         providing communication from a high altitude platform.  And they thought of maybe tethering the balloon to the ground, which has obvious issues of
17         aircraft collisions.  Or they thought of a platform that was continuously fighting against the wind to stay in one place above the ground.  **But**
18         **instead we thought, what if you don't have to stay in one place.  What if you have one balloon sail with the wind and another balloon come**
19         **and take its place**.

20         We thought, is it better to be friends with mother nature instead of fighting against mother nature? ***
21
22         By changing how we thought about the problem, by deciding that instead of maybe a small number of large, expensive things staying in one place,
23         providing the internet to one area, maybe we could have a large number of free-floating, **inexpensive, high altitude balloons, that would drift with**
         **the winds**, not fight them, and provide the internet all around the world.
24
25         **And it was this breakthrough thinking that gave us hope that maybe we really had a solution**.  So, I want you to imagine a setup.  I want you
26         to imagine a bunch of stratospheric internet balloons drifting with the winds.  Now, that's a beautiful image, but these balloons will last a long
27         time and will draft a long way, so maybe many times around the world. We want these balloons to go not just where the winds take them, we want
28         these balloons to go where we want to provide the internet on the ground.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

> **So, it turns out that the stratosphere is actually very stratified. Who would have thought, given the name? And what that means is the winds on different levels go different directions and different speeds. And so, if it were possible to go up and down in the stratosphere, you could catch a wind that would take you generally in the direction you wanted to go.**

www.youtube.com/watch?v=8tJWECskB9s

187.   This was exactly what Google learned from Space Data years earlier.

188.   Finally, Astro Teller has recently confirmed in his personal online blog that Google Loon "hovers" and works just like Space Data:

> **Improving balloon navigation**
>
> Project Loon's algorithms can now send small teams of balloons to form a cluster over a specific region where people need internet access. This is a shift from our original model for Loon in which we planned to create rings of balloons sailing around the globe, and balloons would take turns moving through a region to provide service.



> With our original navigational models, rings of balloons sailed around the globe. As one balloon drifted out of range of a specific region, another would move in to take its place.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

Machine-learning-powered algorithms now enable us to send small teams of balloons to a specific region. The balloons dance on the winds in small loops to remain where needed.

*\*\**

**Back in 2011, we had a hunch that balloons flying freely on the winds could be controlled just enough to act like floating cell phone towers in the sky.** We'd pump air out of or into the balloon to make it lighter or heavier, and then move up or down to catch winds traveling in the direction we wanted to travel. When we ran our first sizable test of Project Loon in 2013, launching dozens of balloons from New Zealand to see if they'd circumnavigate the globe, we knew we had a lot to learn. We thought the balloons would act like leaves in a stream, flowing where the air currents went, and we figured our main task was to manage the balloons' paths just enough to keep them at a roughly equal distance from each other.

*\*\**

By early 2016, the team was seeing a few balloons behave in a slightly weird way: lingering in an area rather than sailing away. In the weirdness, they saw opportunity. They asked themselves the once-impossible question: could our algorithms help the balloons stay much closer to the location they were already in? In mid 2016, we started sending balloons from our launch site in Puerto Rico to hang out in Peruvian airspace—and they did, some for as long as three months. We repeated the experiments, and saw the same results: **we had figured out how to cluster balloons in teams, dancing in small loops on the stratospheric winds, over a particular region**.

*See* https://blog.x.company/how-project-loons-smart-software-learned-to-sail-the-winds-ec904e6d08c (emphasis added).

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

189.     Google in no way used a clean room to develop Loon.  Many of the Google engineers who had full access to Space Data information continued to work in the Google "Access" group, the very same small group the Google Loon "inventors" joined thereafter, as depicted below:



**I.     Google Zealously Patents Every Aspect of Project Loon.**

190.     Beginning with a bevy of applications filed on January 9, 2012, Google assiduously patented every aspect of a constellation balloon network.  Time and again, Google claimed as new and original Google inventions ideas disclosed to Google by Space Data or patented by Space Data **years** earlier.

191.     For example, Google filed applications covering, and now claims, the following:

*A Balloon Constellation, Sailed in the Stratosphere*

192.     Google claimed an airborne balloon constellation providing a communication mesh (internet coverage), where the horizontal placement of the balloons is a function of adjusting the balloon's altitude, up or down, to capture favorable wind patterns. *See* U.S. Patent 8,820,678 (DeVaul et al.).  Google explains its ability to maintain a constellation array in the specification as follows:

> [I]n a high altitude balloon network, balloons [that] may generally be configured to operate at altitudes between 18 kilometers and 25 kilometers [59,000 ft and 82,000 ft]….  This altitude range may be

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1    advantageous for several reasons. **In particular, this layer of the
2    stratosphere generally has relatively low wind speeds (e.g.,
     winds between 5 and 20 mph) and relatively little turbulence.
     Further, while the winds between 18 kilometers and 25
3    kilometers** [59,000 ft and 82,000 ft] **may vary with latitude and
     by season, the variations can be modeled in a reasonably
4    accurate manner.**

5    *Id.* at 4:43-53 (emphasis added). This was not Google's epiphany.

6          193.    Google further described its ability to "sail" the balloons as follows:

7                   [A] desired horizontal movement of the target balloon may be
                    achieved by adjusting the altitude of the target balloon…. To the
8                   extent that the target balloon is moving as a result of ambient
                    winds, the motion of the target balloon can be adjusted by either
9                   increasing or decreasing its altitude. For example, altitude control
                    may be used to achieve a desired horizontal movement of the
10                  target balloon by determining that the desired horizontal movement
                    of the target balloon can be achieved by exposing the target
11                  balloon to ambient winds of particular velocity, determining that
                    ambient winds of the particular velocity are likely to be available
12                  at a particular altitude… and adjusting the altitude of the target
                    balloon to attain the particular attitude.
13
     *Id.* at 20:47-66.
14
          194.    Google claimed these ideas generally in the '678 patent (thereafter captured by
15
     Space Data in interference proceeding, as set forth below in section J). **Google has now claimed**
16
     **various aspects of an airborne balloon constellation literally dozens of times over hundreds of**
17
     **claims.**
18
     ***Using an Inner Bladder With Ventable Air as Ballast***
19
          195.    As another example, Google claimed the idea of putting a bladder within a balloon,
20
     and using air in the bladder to serve as ballast. Since the balloon gas (hydrogen or helium) is
21
     lighter than air, air itself serves as ballast. To descend, one pumps more air into the inner bladder;
22
     to ascend, one evacuates air from the inner bladder. (This was disclosed to Google by Space Data
23
     at the February 15, 2008 meeting when discussing alternative ways to control altitude of balloons
24
     and Space Data discussed ballonets. When Ms. Ingersoll asked what a ballonet was, Space Data
25
     showed a book from 1927 with a chapter on ballonets as shown below. In fact, this is Dependent
26
     Claim 22 of Space Data's first patent, the '941 patent).
27

28



[Ch. 3]

| | Fabric s. per . yd. | Wt. Seam lbs. per linear yd. |
|---|---|---|
| Ballonet Seam | 8.5 | .073 |
| Ballonet Shoe | 8.5 | .074 |
| Envelope Seam, Gas-tight, Circumferential | 13.4 | .0808 |
| Envelope Seam, Air-tight, Circumferential | 11.4 | .05214 |
| Envelope Seam, Gas-tight, Longitudinal | 13.4 | .120 |
| Envelope Seam, Air-tight, Longitudinal | 11.4 | .078 |

The width of the strips has been standardized to a maximum of 3 in.

The theoretical determination of the deformation of the envelope from which it is possible to determine the proper amount and location for tailoring, will not be dealt with here; it is set forth fully in Report No. 16 of the National Advisory Committee for Aeronautics (1917) by Haas and Dietzius as translated from the German by Professor Karl K. Darrow.

For the comparatively small nonrigid airships so far produced in this country, the proper amount of tailoring has been determined by one or more of the following methods: by observations on the form of the first airship of any new series upon which corrections may be based; by comparison of the bending moment curves of similar types of airships; or by water model tests showing the amount of deformation to be overcome.

**Ballonet**

**Historical.** The ballonets of the first practical airship to be constructed in America, the Goodyear *F*, 77,000 cu. ft., sister ship of the Navy *B*, 84,000 cu. ft. airship, were ovoidal in form and were suspended from the top of the envelope by means of patches and ropes, one being located in the —

[Ch. 3]          AIRSHIP HULL          35

nose and the other one-fourth of the envelope length from the tail of the airship.

This type of bailonet proved impracticable for the following and the upper side by a diaphragm duplicating reasons: Excessive fabric weight; internal rigging which was difficult to install and inaccessible to inspection adjustment, and maintenance; inflation difficulties caused by gas pressure on folded fabric which produced excessive strains on the suspension, at times causing it to break away.

**Form.** The ovoidal form was superseded by the diaphragm. In this type the underside is formed by the envelope and the upper side by a diaphragm duplicating the portion of the envelope enclosed. The diaphragm is attached to the inside of the envelope along the "ballonet intersection line." The problem is to design the diaphragm so that on deflation of the ballonet, the diaphragm fabric will lie evenly upon the envelope beneath.

With the ballonet located in the *nose* of the envelope, the diaphragm is designed as a duplication of the envelope patterns beneath (see Figure 8).

Figure 8. Ballonet Diaphragms and Attachment Details

## *On Balloon to Balloon Communications*

196.    As another example, Google claimed using the predicted movements of balloons to keep the constellation together, so each balloon could communicate with the others (also disclosed by Space Data to Google).  *See* U.S. Patent 9,306,668.

## *On the "Call Home" Recovery Station*

197.    As a further example, Google claimed as a novel and innovative Google invention an "incentivized recovery" system.  In plain English, Google would attach a label to the payload saying "reward: call" to ensure the recovery of the payload (also disclosed by Space Data to Google and on the side of many payloads Google photographed at Space Data's facility).

## *On Communicating Balloon to Balloon to Maintain Position*

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

198.    As another example, Google claimed as a novel and original Google invention the idea of the balloons in a constellation mesh communicating with one another to maintain position. *See* U.S. Patent 9,285,450 (an idea also disclosed by Space Data to Google).

### *On Flight Termination*

199.    As another example, Google claimed as a novel and innovative Google invention the idea of using an Exacto blade on a rail to cut a hole in the top of a balloon, to vent gas, to cause the balloon to descend.  *See* U.S. Patent 9,168,994 (also disclosed in concept by Space Data to Google).

200.    As another example, Google claimed as a novel and original Google invention the idea of using a blade to cut the balloon in half, so the top half of the balloon would serve as a parachute.  *See* 9,139,278.  This is an old concept from the following illustrations, as shown below, from a coffee table book in Space Data's lobby the day of Google's tour and passed around to the visitors when discussing various lighter than air technologies.






### *On Controlling the Rate of Descent*

201.    As another example, Google claimed as an original and novel Google invention the idea of using a drag plate (that is, a piece of flat material) below the payload to slow the descent of a balloon, should the balloon fail.  *See* U.S. Patent 9,096,301.

### *On a Cut Down Mechanism*

202.     As another example, Google claimed as a novel and original Google invention the idea of using a "cut down" mechanism, to sever the payload from the balloon proper (also disclosed by Space Data to Google and used by Space Data in thousands of flights).  *See* U.S. Patent 9,016,634.

### *On Using a Fuel Cell for Energy*

203.     As another example, Google claimed as a novel and original Google invention the idea of using a hydrogen fuel cell to generate electricity to run a heater to heat the balloon during nighttime hours (also disclosed by Space Data to Google).  *See* U.S. Patent 9,290,258 (also disclosed by Space Data to Google).

### *On Venting Gas through Straws*

204.     As another example, Google claimed as an original and novel Google invention the idea of using "straws," (*i.e.* tubes) perforating the exterior of a balloon, where one end of the "straw" could be opened to vent gas to cause the balloon to descend (a concept also discussed between Space Data to Google).  *See* U.S. Patent 9,211,942.  Similar to an early Space Data payload on display during Google's tour of Space Data.





_**Why This Matters**_

205.    From January 9, 2012 forward, Google has filed at least 102 published Google Loon applications, many of which are now patents.  Given that Google often files non-publication requests with its applications, as it did with every Loon application filed in January 2012 (the first filings), there may well be additional non-public Google Loon applications pending.  Putting aside its systematic effort to capture as Google inventions ideas disclosed to Google by others, **in all of these applications, Google claimed as novel, innovative and patentable the Space Data ideas that Google now insists were fully in the public record long before Google filed its patents.  If these ideas were public, as Google now claims in this litigation, Google could not have filed patents on these ideas.  Google's own sworn declarations to the PTO contradict its advocacy position in this litigation.**

J.      **The Interference: Google's Copycat Claims Now Belong to Space Data.**

206.    The PTO has now recognized that Space Data is the senior rights holder on these foundational balloon constellation networking patents.

207.    One of Google's first (January 9, 2012) patent filings related to "Relative Positioning of Balloons With Altitude Control and Wind Data."  Google filed this application on January 9, 2012, along with several related applications.  With each, Google filed a non-publication

1   request, which kept the filings dark, even though significantly limiting Google's foreign rights.

2   That is, Google lost something as its price for keeping these applications secret.

3       208.    This application matured into U.S. Patent No. 8,820,678, which issued on

4   September 2, 2014.

5       209.    The specification begins by noting the increasing demand for "network

6   infrastructure" given proliferating connected devices.  This paragraph is common to most of

7   Google's approximately 102 Loon patents and applications.

8       210.    The specification then describes a constellation of balloons working together to

9   create a "mesh" to provide a "data network…."  The specification further describes **how** Google

10  would pilot the balloon constellation:

11       Example of embodiments help to provide a data network that includes a
         plurality of balloons; for example, a mesh network formed by high-
12       altitude balloons deployed in the stratosphere.  **Since winds in the**
         **stratosphere my affect the locations of the balloons in a differential**
13       **manner, each balloon in an example network may be configured to**
         **change its horizontal position by adjusting its vertical position (i.e.**
14       **altitude).**  For example, by adjusting its altitude, a balloon may be able to
         find winds that will carry it horizontally (e.g., latitudinally and/or
15       longitudinally) to a designed horizontal location.

16  U.S. Patent No. 8,820,678 at 2:63-3:6 (emphasis added).

17      211.    The specification further describes an exemplary balloon, which consists of an outer

18  envelope, an inner "bladder" which would use air as a ballast, a cut-down mechanism (to separate

19  the payload form the balloon), several adjustable antennas, an electronics package, a battery and

20  solar power source, and communications ability.

21      212.    The '678 Google patent broadly claims using the winds to fly a balloon

22  constellation to provide a balloon mesh network to provide a data communications system.

23      213.    With this application, Google claimed as an original Google invention the

24  preexisting Space Data balloon network, including the Space Data method of mapping winds in the

25  stratosphere and flying the balloons accordingly.

26      214.    On June 1, 2016, Space Data filed an interference with the Patent Trial and Appeal

27  Board ("PTAB").  Space Data asserted that it was the senior rights holder, as Google had simply

28  copied preexisting Space Data technology.

215. On June 26, 2016, Google's counsel conceded the interference, and told the Administrative Law judge that Google would not contest the interference. ("Google did not intend to contest priority in this case.").

216. On August 31, 2016, the Administrative Panel, Judge Moore presiding, ruled for Space Data. On December 22, 2016, the final Judgment was issued, and on February 22, 2017, after the statutory 63 day appeal period per 37 CFR 90.3 with no appeals filed, the judgment became final and nonappealable. The Google application and Google claims went back to the PTO to be assigned to Space Data.

217. On April 12, the PTO published a Notice of Allowance awarding the prior Google claims to Space Data. That patent will issue to Space Data in weeks.

218. **This prior Google '678 patent is fundamental to Google's Project Loon promiscuous patent filing strategy.** As Space Data has been adjudicated to be the senior rights owner on this parent application, it perforce is the senior rights holder on all children of the '678 patent and the many related patents.

K. <u>Google Uses Space Data's Trade Secrets as Well as its Patented Inventions</u>.

219. As described above, Space Data made important refinements to the idea embodied in its '941 invention after that patent was issued.

220. After flying tens of thousands of flights, Space Data accumulated valuable, proprietary wind data that allowed Space Data to come to the conclusion that the optimum altitude for flying its constellation of balloons was in the approximately 60,000 to 80,000 foot "peaceful band." ███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████ was not known to the public in 2008 (as Space Data made this realization from its own proprietary wind data) and Space Data had not disclosed this finding in any of its patent applications or public statements.

221. This information about the "peaceful band," ████████████████████
████████████ and the wind data underlying this conclusion were all disclosed to Google under

the NDA and Space Data is informed and believes Google flies its constellation in this band and spaces its Project Loon constellations this distance apart, precisely for the reasons Space Data identified in 2008 and based on the information received from Space Data.

222.    Space Data also developed proprietary systems for monitoring its balloon constellation, controlling altitude with its hover algorithm, managing thermal heat regulation, and operating its system form the NOC, all of which were disclosed to Google in its visit in February 2008.  With the team of executives and engineers and the aid of the camera Google brought to its visit, Google was able to capitalize on all of the trade secret information Space Data disclosed to it during this visit.  Space Data is informed and believes that Google's Project Loon was developed based on the proprietary, trade secret information obtained from Space Data during the February 2008 visit and that such information proved to Google that a worldwide constellation of balloons providing network connectivity was feasible.

223.    In addition to the technical information provided to Google, Space Data shared with Google detailed proprietary financial models which allowed Google to piece together the cost model and logistical processes involved in developing its own Project Loon.  All of which is separate from any idea disclosed in any of Space Data's patents.  Space Data is informed and believes that Google's Project Loon was developed based on the proprietary, trade secret information obtained from Space Data's financial data and modelling that showed a pathway to making a balloon-constellation communication system economically feasible.

224.    Lastly, Space Data provided Google with confidential and proprietary "vision" slides in early 2008 which described, for the first time, the concept of a worldwide balloon-based network and gave Google detail on how to use a worldwide network, how to implement such a network and the advantages of such a network.  This worldwide concept and the details on how to implement are not contained in any of Space Data's patents and were disclosed to Google only under the NDA for purposes of evaluating Space Data as an acquisition target.  Then, suddenly, years later, this Space Data concept becomes "Google Loon."

## COUNT I

**(Infringement of United States Patent No. 6,628,941 Against all Defendants)**

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

225.    Space Data repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1 to 224 above.

226.    On September 30, 2003, United States Patent No. 6,628,941, entitled "Airborne Constellation of Communications Platforms and Method," (the "'941 Patent") was duly and legally issued.  A true and correct copy of the '941 Patent is attached hereto as Exhibit B and incorporated herein by reference.

227.    Gerald M. Knoblach and Eric A. Frische are the inventors of the '941 Patent.  Space Data is the assignee and owner of all right, title, and interest in and to the '941 Patent.

228.    The systems and methods practiced by Google's Project Loon infringes the '941 Patent.  The following describes, at least in part, Project Loon, which "uses software algorithms to determine where its balloons need to go, then moves each one into a layer of wind blowing in the right direction. By moving with the wind, the balloons can be arranged to form one large communications network" (http://www.google.com/loon/how/).

229.    The following describes, at least in part, Project Loon: "Each balloon can provide connectivity to a ground area about 80 km in diameter using a wireless communications technology called LTE. To use LTE, Project Loon partners with telecommunications companies to share cellular spectrum so that people will be able to access the Internet everywhere directly from their phones and other LTE-enabled devices. Balloons relay wireless traffic from cell phones and other devices back to the global Internet using high-speed links" (http://www.google.com/loon/how/).

///
///
///
///
///
///
///
///
///

230.     The Project Loon website describes a free-floating constellation communications system comprising a plurality of lighter-than-air platforms comprising at least a first platform and a second platform, as shown in the following images captured from the Project Loon website (http://www.google.com/loon/how/):



Project Loon balloons float in the stratosphere, twice as high as airplanes and the weather. They are carried around the Earth by winds and they can be steered by rising or descending to an altitude with winds moving in the desired direction. People connect to the balloon network using a special Internet antenna attached to their building. The signal bounces from balloon to balloon, then to the global Internet back on Earth.

A small box containing the balloon's electronic equipment hangs underneath the inflated envelope, like the basket that is carried by a hot air balloon. This box contains circuit boards that control the system, radio antennas to communicate with other balloons and with Internet antennas on the ground, and batteries to store solar power so the balloons can operate during the night.



Project Loon balloons travel around 20 km above the Earth's surface in the stratosphere. Winds in the stratosphere are generally steady and slow-moving at between 5 and 20 mph, and each layer of wind varies in direction and magnitude. Project Loon uses software algorithms to determine where its balloons need to go, then moves each one into a layer of wind blowing in the right direction. By moving with the wind, the balloons can be arranged to form one large communications network.

231. The Project Loon website describes a first and second platforms comprising a communications signal transceiver, as shown in the following images captured from the Project Loon web site (http://www.google.com/loon/how/):



A small box containing the balloon's electronic equipment hangs underneath the inflated envelope, like the basket that is carried by a hot air balloon. This box contains circuit boards that control the system, radio antennas to communicate with other balloons and with Internet antennas on the ground, and batteries to store solar power so the balloons can operate during the night.

[Remainder of page intentionally blank]

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

232.    The Project Loon website describes a free floating platform without any longitudinal and latitudinal position control, as shown in the following images captured from the Project Loon website (http://www.google.com/loon/how/):





[Remainder of page intentionally blank]

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

233. The Project Loon website describes a plurality of communications devices within a contiguous geographic area, at least one of said communications devices having communications capability with communications signal transceivers, as shown in the following images captured from the Project Loon website (http://www.google.com/loon/how/):





234. The Project Loon website shows communications devices capable of handing off communication with one platform to another platform as the first platform moves out of a communication range of said at least one of the communications devices, as shown in the following images and video narratives captured from the Google Project Loon website (http://www.google.com/loon/how/ and https://www.youtube.com/watch?v=HOndhtfIXSY ):



"… so another balloon is coming just at the right time to take the place of one that left."

Project Lead, Mike Cassidy, https://www.youtube.com/watch?v=HOndhtfIXSY.



[Remainder of page intentionally blank]

Hosic Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

235. The Project Loon website shows a free floating constellation communications system that provides a line-of-sight coverage of wireless data to a population on a contiguous landmass, as shown in the following information captured from the Project Loon website (http://www.google.com/loon/how/):



Each balloon can provide connectivity to a ground area about 40 km in diameter at speeds comparable to 3G. For balloon-to-balloon and balloon-to-ground communications, the balloons use antennas equipped with specialized radio frequency technology. Project Loon currently uses ISM bands (specifically 2.4 and 5.8 GHz bands) that are available for anyone to use.

[Remainder of page intentionally blank]

236.    The Project Loon website shows a plurality of lighter-than-air platforms operating in a range of 60,000 to 140,000 feet, as shown in the following information captured from the Project Loon website (http://www.google.com/loon/how/):



**Q: WHAT ARE PROJECT LOON BALLOONS?**

A: Project Loon is a global network of high altitude balloons. The balloons ascend like weather balloons until they reach the stratosphere, where they drift above 18 km (60,000 ft), safely above the altitudes used for aviation. Unlike weather balloons, Loon balloons are superpressure, which enable them to stay aloft for 100+ days at a time. This is far longer than typical weather balloons, which last for a matter of hours. Loon balloons are also unique in that they are steerable and entirely solar powered.

Project Loon balloons travel around 20 km above the Earth's surface in the stratosphere. Winds in the stratosphere are generally steady and slow-moving at between 5 and 20 mph, and each layer of wind varies in direction and magnitude. Project Loon uses software algorithms to determine where its balloons need to go, then moves each one into a layer of wind blowing in the right direction. By moving with the wind, the balloons can be arranged to form one large communications network.

**Q: HOW HIGH DO THE BALLOONS FLY?**

A: We are flying in the stratosphere well above commercial air traffic and weather events, at around 18-27 km or 60,000 - 90,000 feet.

[Remainder of page intentionally blank]

237. The Project Loon website describes that there is substantially a relative distance between the launched plurality of lighter-than-air platforms, as shown in the following images captured from the Project Loon website (http://www.google.com/loon/how/):



Project Loon balloons travel around 20 km above the Earth's surface in the stratosphere. Winds in the stratosphere are generally steady and slow-moving at between 5 and 20 mph, and each layer of wind varies in direction and magnitude. Project Loon uses software algorithms to determine where its balloons need to go, then moves each one into a layer of wind blowing in the right direction. By moving with the wind, the balloons can be arranged to form one large communications network.

238. Defendants infringe claims of the '941 Patent. Defendants, without authority, make, use, offer to sell, and/or sell instrumentalities that practice systems and methods covered by claims of the '941 Patent. Google's Loon instrumentalities meet all of the elements of claims of the '941 Patent, including, as further detailed in paragraphs 230 to 237 above, all the elements of the '941 Patent, Claim 1. Defendants have been, and are currently, directly infringing at least claim 1 of the '941 Patent in violation of 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by its Google Loon instrumentalities, that practice the system disclosed in the '941 Patent.

239. While Defendants have been on notice of the '941 Patent since at least September 2007, Defendants started to, and continue to, make, use, offer to sell, and/or sell instrumentalities that infringe the '941 Patent despite knowledge that their actions constitute infringement of a valid patent. In September 2007, Space Data sent Defendants information about Space Data and its technology which noted Space Data's ownership of patents. On February 15, 2008, executives of Defendants visited Space Data and launched a component of a Space Data system that practices the '941 Patent and which bore the '941 Patent marking. That same day, Defendants were exposed to

further components of, and information on, a Space Data system that practices the '941 Patent. More, Defendants disclosed the '941 Patent in an information disclosure statement they filed in February 2012, as part of the prosecution of its '678 Patent (many of the '678 Patent claims were assigned to Space Data as part of an interference proceeding). Defendants had knowledge of the '941 Patent and Space Data's technology that embodies it prior to when Defendants purport to have started work on their infringing instrumentalities (2011), and prior to Defendants' public launch of its instrumentalities (2013). Nevertheless, Defendants proceeded with their infringing instrumentalities despite their knowledge (and an objectively high likelihood) that their acts would infringe the '941 Patent. Defendants' infringement of the '941 Patent is willful, intentional and done in subjective bad faith.

240.    As a result of Defendants' direct infringement, Space Data has been and continues to be damaged and irreparably injured, including without limitation, the loss of sales and profits it would have earned but for Defendants' actions, and damage to Space Data's reputation among potential and existing customers, business partners, investors, and in the industry in general.

241.    Defendants will continue to irreparably harm Space Data unless enjoined. Space Data faces real, substantial and irreparable damage and injury of a continuing nature from infringement for which Space Data has no adequate remedy at law.

## COUNT II

**(Misappropriation of Trade Secrets Pursuant to 18 U.S.C. §§ 1836(b) and 1837 Against All Defendants)**

242.    Space Data repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1 to 224 above.

243.    Space Data's proprietary confidential technical and financial information disclosed to Defendants, as further described above, *see, e.g.*, ¶¶85, 90, 92, 94-95, 110-129, 131-133 & 136, constitutes trade secrets under 18 U.S.C. § 1839(3). These trade secrets were disclosed under the NDA between Space Data and Defendants. These trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from their disclosure or use. Throughout its

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

1  corporate history, Space Data has undertaken reasonable measures to keep secret its proprietary

2  confidential information. Employees all sign secrecy agreements, the Space Data facilities are

3  security card keyed, all visitors sign in on a mandatory visitor log, and no third party prospective

4  partner was shown proprietary confidential information absent signing a non-disclosure agreement.

5      244. Space Data's asserted trade secrets are not disclosed by Space Data's asserted

6  patent. For example, and as further detailed in paragraphs 43, 112-117, and 220 above, Space

7  Data's proprietary confidential analysis of the micro-wind structure of the 60,000 to 140,000 foot

8  range that shows a "peaceful band" at approximately 60,000 to 80,000 feet, ███████████

9  ████████████████████████████████████████████████████

10  ████████████████████ was not disclosed in the '941 Patent. As a further example, the

11  '941 Patent clearly makes no detailed financial disclosures with respect to the cost and logistical

12  process of operating a balloon constellation. Proprietary confidential financial information

13  disclosed by Space Data to Defendants under the NDA makes such detailed cost and logistical

14  process disclosures.

15      245. Defendants misappropriated Space Data's trade secrets. For example, Defendants

16  used Space Data trade secrets, without express or implied consent, by using Space Data trade

17  secrets in connection with its assessment of whether to pursue its Project Loon business and in its

18  Project Loon business thereafter, as further described above. *See, e.g.*, paragraphs 143 and 220-

19  224. Defendants knew or had reason to know that they could not use Space Data trade secrets in

20  this way, as this use vastly exceeds the use permitted under the NDA, which was limited to use in

21  connection with "discussions and negotiations concerning a proposed acquisition of the shares or

22  assets of [Space Data]." Defendants also disclosed Space Data trade secrets, without express or

23  implied consent. Defendants knew or had reason to know at the time of Defendants' disclosures

24  that Defendants had a duty to maintain the secrecy of Space Data's trade secrets, as Defendants'

25  disclosures exceed those permitted under the NDA, which obligated Defendants to hold Space

26  Data's trade secrets in "confidence" and not to disclose them to "any person outside its

27  organization." Defendants also knowingly acquired Space Data trade secrets by improper means,

28  including misrepresentation and breach of a duty to maintain secrecy. Defendants' use, disclosure

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

and acquisition of Space Data's trade secrets constitutes misappropriation under 18 U.S.C. § 1836(b), 1837 & 1839(5-6).

246.     Space Data's trade secrets misappropriated by Defendants relate to products and/or services used in, or intended for use in, interstate or foreign commerce.  For example, Space Data trade secrets misappropriated by Defendants relate to Space Data's constellation of stratospheric floating balloons for communications.  Space Data uses its balloon constellation in interstate commerce.  By 2004 Space Data had deployed a number of balloons covering four states, and by 2007 Space Data had a working balloon constellation covering vast swaths of the Southwestern United States.  Space Data's technology has also been deployed abroad, including in Iraq.

247.     Space Data suffered damage as a direct and proximate result of Defendants' misappropriation of Space Data's trade secrets.  The damage suffered by Space Data includes, without limitation, the loss of sales and profits it would have earned but for Defendants' actions, and damages to Space Data's reputation among potential and existing customers, business partners, investors, and in the industry in general.  Defendants have also been unjustly enriched by their misappropriation of Space Data's trade secrets.

248.     Defendants' misappropriation and misconduct was willful and malicious.  Defendants intentionally breached the use and disclosure limitations imposed by the NDA, and deliberately exercised ownership over Space Data's trade secrets, in a conscious effort to harm Space Data's competitive position and to gain a competitive advantage over Space Data, in reckless disregard for Space Data's rights in its trade secrets.

249.     Defendants' use of Space Data trade secrets, without express or implied consent, in connection with Defendants' Project Loon business is ongoing.  Defendants' continuing misuse and/or disclosure of Space Data's trade secrets caused and continues to cause irreparable harm to Space Data for which Space Data has no adequate remedy at law.  An injunction prohibiting Defendants from further use and/or disclosure of Space Data's trade secrets is necessary to provide Space Data complete relief.

## COUNT III

**(Misappropriation of Trade Secret Pursuant to California Civil Code § 3426, *et seq.* Against**

250.   Space Data repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1 to 224 above.

251.   Space Data's proprietary confidential technical and financial information disclosed to Defendants, as further described above, *see, e.g.*, ¶¶85, 90, 92, 94-95, 110-129, 131-133 & 136, constitutes trade secrets under Cal. Civ. Code § 3426.1(d).  These trade secrets were disclosed under the NDA between Space Data and Defendants.  These trade secrets derive independent economic value from not being generally known to the public, or to others who can obtain economic value from their disclosure.  Throughout its corporate history, Space Data has undertaken reasonable efforts to maintain the secrecy of its proprietary confidential information. Employees all sign secrecy agreements, the Space Data facilities are security card keyed, all visitors sign in on a mandatory visitor log, and no third party prospective partner was shown proprietary confidential information absent signing a non-disclosure agreement.

252.   Space Data's asserted trade secrets are not disclosed by Space Data's asserted patent.  For example, and as further detailed in paragraphs 43, 112-117, and 220 above, Space Data's proprietary confidential analysis of the micro-wind structure of the 60,000 to 140,000 foot range that shows a "peaceful band" at approximately 60,000 to 80,000 feet, ███████████ ████████████████████████████████████████ was not disclosed in the '941 Patent.  As a further example, the '941 Patent clearly makes no detailed financial disclosures with respect to the cost and logistical process of operating a balloon constellation.  Proprietary confidential financial information disclosed by Space Data to Defendants under the NDA, makes such detailed cost and logistical process disclosures.

253.   Defendants misappropriated Space Data's trade secrets.  For example, Defendants used Space Data trade secrets, without express or implied consent, by using Space Data's trade secrets in connection with its assessment of whether to pursue its Project Loon business and in its Project Loon business thereafter, as further described above.  *See, e.g.*, paragraphs 143 and 220-224.  Defendants knew or had reason to know that they could not use Space Data's trade secrets in

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

this way, as this use vastly exceeds the use permitted under the NDA, which was limited to use in connection with "discussions and negotiations concerning a proposed acquisition of the shares or assets of [Space Data]." *See*, Ex. A. Defendants also disclosed Space Data trade secrets, without express or implied consent. Defendants knew or had reason to know at the time of Defendants' disclosures that Defendants had a duty to maintain the secrecy of Space Data's trade secrets, as Defendants' disclosures exceed those permitted under the NDA, which obligated Defendants to hold Space Data's trade secrets in "confidence" and not to disclose them to "any person outside its organization." Defendants also knowingly acquired Space Data trade secrets by improper means, including misrepresentation and breach of a duty to maintain secrecy. Defendants' use, disclosure and acquisition of Space Data's trade secrets constitutes misappropriation under Cal. Civ. Code § 3426.1(b).

254. Space Data suffered damage as a direct and proximate result of Defendants' misappropriation of Space Data's trade secrets. The damage suffered by Space Data includes, without limitation, the loss of sales and profits it would have earned but for Defendants' actions, and damages to Space Data's reputation among potential and existing customers, business partners, investors, and in the industry in general. Defendants have also been unjustly enriched by their misappropriation of Space Data's trade secrets.

255. Defendants' misappropriation and misconduct was willful and malicious. Defendants intentionally breached the use and disclosure limitations imposed by the NDA, and deliberately exercised ownership over Space Data's trade secrets, in a conscious effort to harm Space Data's competitive position and to gain a competitive advantage over Space Data, in reckless disregard for Space Data's rights in its trade secrets.

256. Defendants' continuing misuse and/or disclosure of Space Data's trade secrets caused and continues to cause irreparable harm to Space Data for which Space Data has no adequate remedy at law. An injunction prohibiting Defendants from further use and/or disclosure of Space Data's trade secrets is necessary to provide Space Data complete relief.

**COUNT IV**

257.    Space Data repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1 to 224 above.

258.    Defendants and Space Data entered into a "Mutual Confidentiality and Nondisclosure Agreement," effective December 1, 2007 (the "NDA").  The NDA is attached hereto as Exhibit A, and incorporated herein by reference.

259.    Space Data performed or substantially performed under the NDA and/or any non-performance by Space Data was excused.

260.    Under the NDA Space Data disclosed "Confidential Information" to Defendants, including Space Data technical and financial information, know-how and trade secrets.  The Space Data Confidential Information disclosed under the NDA to Defendants, includes, but is not limited to, information shared with Defendants during Defendants' February 2008 visit to Space Data's Chandler, Arizona facility.

261.    Defendants breached the NDA by, among other things: (1) using Space Data Confidential Information to assess whether the Defendants should undertake their Google Loon Project business; (2) using Space Data Confidential Information in implementations of their Google Loon Project technology; (3) disclosing Space Data Confidential Information; and (4) exercising ownership over Space Data Confidential Information.  Defendants' use, disclosure and exercise of ownership over Space Data Confidential Information violates at least Sections 4 and 8 of the NDA.  *See* Ex. A.  Examples of specific conduct of Defendants that violated the NDA are further described in paragraphs 143 and 220-224 above.

262.    Pursuant to the NDA, Defendants were obligated to "hold in confidence" and "not [to] disclose to any person outside its organization" any Space Data Confidential Information. Defendants and its personnel were permitted to use Space Data Confidential Information "only for the purposes" of "discussions and negotiations concerning a proposed acquisition of shares or assets of" Space Data.  Defendants' use of Space Data Confidential Information, including certain information identified herein as Space Data's trade secrets, in connection with Defendants' own constellation of stratospheric floating balloons for communication, opposed to solely in relation to

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

Defendants' assessment of whether to purchase Space Data, was a violation of Section 4 of the NDA.

263.    Pursuant to Section 8 of the NDA, "[n]o party acquire[d] any intellectual property rights under [the NDA] (including, but not limited to, patent, copyright, and trademark rights) except the limited rights necessary to carry out the purposes set forth in [the NDA]." *See* Ex. A. Defendants' use of Space Data Confidential Information in connection with Defendants' own constellation of stratospheric floating balloons for communication, is contrary to, and in violation of Section 8, as the NDA expressly states that Defendants shall not acquire any intellectual property rights in Space Data's Confidential Information.

264.    Space Data suffered damage as a direct and proximate result of Defendants' breaches of the NDA.  The damage suffered by Space Data includes, without limitation, the loss of sales and profits it would have earned but for Defendants' actions, and damages to Space Data's reputation among potential and existing customers, business partners, investors, and in the industry in general.  Defendants have also been unjustly enriched by their use of Space Data's Confidential Information in violation of the NDA.

265.    Defendants will continue to breach the NDA as described above unless enjoined from doing so by this Court.  Space Data faces real, substantial and irreparable injury of a continuing nature owing to Defendants' continuing breaches of the NDA for which Space Data has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Space Data prays for entry of judgment as follows:

A.    judgment in Space Data's favor and against Defendants on all causes of action alleged herein;

B.    that Defendants breached the NDA;

C.    for damages in an amount to be further proven at trial;

D.    that Defendants be ordered to disgorge, restore and/or make restitution to Space Data for all sums constituting unjust enrichment from their wrongful conduct, as allowed by law according to proof;

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

E.    that the patent-in-suit is valid and enforceable;

F.    that Defendants have infringed one or more claims of the patent-in-suit;

G.    that Defendants' infringement of the claims of the patent-in-suit was willful;

H.    that Defendants account for and pay to Space Data all damages caused by the infringement of the patent-in-suit, which by statute can be no less than a reasonable royalty;

I.    that the damages to Space Data with respect to the patent-in-suit be increased by three times the amount found or assessed pursuant to 35 U.S.C. § 284 and that the Defendants account for and pay to Space Data the increased amounts;

J.    that this be adjudicated an exceptional case and Space Data be awarded its attorneys' fees in this action pursuant to 35 U.S.C. § 285;

K.    that Defendants have wrongfully misappropriated Space Data's trade secrets;

L.    that Defendants account for and pay to Space Data all damages caused by the misappropriation of Space Data's trade secrets, which pursuant to Cal. Civ. Code § 3426.3, includes actual loss and any unjust enrichment not taken into account in computing actual loss, or a reasonable royalty if neither damages nor unjust enrichment is provable;

M.    that Defendants' misappropriation of Space Data's trade secrets was willful and malicious, and for exemplary damages pursuant to Cal. Civ. Code § 3426.3(c), and reasonable attorneys' fees and costs (including expert expenses) pursuant to Cal. Civ. Code § 3426.4;

N.    that Defendants account for and pay to Space Data all damages caused by the misappropriation of Space Data's trade secrets which, pursuant to 18 U.S.C. § 1836(b)(3)(B), includes actual loss and any unjust enrichment not addressed in computing damages for actual loss, or a reasonable royalty in lieu of damages measured by another method;

O.    that Defendants' misappropriation of Space Data's trade secrets was willful and malicious, and for exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C), and

1    reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D);

2    P.    that this Court issue preliminary and final injunctions enjoining the Defendants,

3          their officers, agents, servants, employees and attorneys, and any other person in

4          active concert or participation with them, from continuing the acts herein

5          complained of with respect to infringement of the patent-in-suit, and more

6          particularly, that Defendants and such other persons be permanently enjoined and

7          restrained form further infringing the patent-in-suit;

8    Q.    that this Court issue preliminary and final injunctions enjoining the Defendants,

9          their officers, agents, servants, employees and attorneys, and any other person in

10         active concert or participation with them, prohibiting them from: continuing to use

11         Space Data's trade secrets; continuing to use Space Data's Confidential

12         Information; continuing to disclose Space Data's trade secrets; continuing to

13         disclose Space Data's Confidential Information; continuing to breach the

14         proprietary, confidentiality and use limitation provisions of the NDA; continuing to

15         exercise ownership over Space Data's trade secrets; and continuing to exercise

16         ownership over Space Data's Confidential Information;

17   R.    that this Court require Defendants to file with this Court, within thirty (30) days

18         after entry of final judgment, a written statement under oath setting forth in detail

19         the manner in which Defendants have complied with the injunctions;

20   S.    that Space Data be granted pre-judgment and post-judgment interest on the damages

21         caused to them by reason of Defendants' conduct at the maximum legal rates

22         provided by statute or law;

23   T.    that this Court award Space Data its costs and disbursements in this civil action,

24         including reasonable attorneys' fees; and

25   U.    that Space Data be granted such other and further relief as the Court may deem just

26         and proper under the circumstances.

27                              Respectfully submitted,

28

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

Dated: April 20, 2017

By: */s/ Spencer Hosie*
SPENCER HOSIE (CA Bar No. 101777)
shosie@hosielaw.com
DIANE S. RICE (CA Bar No. 118303)
drice@hosielaw.com
LYNDSEY C. HEATON (CA Bar No. 262883)
lheaton@hosielaw.com
DARRELL R. ATKINSON (CA Bar No. 280564)
datkinson@hosielaw.com
HOSIE RICE LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, CA 94111
(415) 247-6000 Tel.
(415) 247-6001 Fax

*Attorneys for Plaintiff, Space Data Corporation*

# DEMAND FOR JURY TRIAL

Space Data demands a jury trial on all causes of action, claims or issues in this action that are triable as a matter of right to a jury issues so triable.

Respectfully submitted,

Dated: April 20, 2017

By: */s/ Spencer Hosie*
SPENCER HOSIE (CA Bar No. 101777)
shosie@hosielaw.com
DIANE S. RICE (CA Bar No. 118303)
drice@hosielaw.com
LYNDSEY C. HEATON (CA Bar No. 262883)
lheaton@hosielaw.com
DARRELL R. ATKINSON (CA Bar No. 280564)
datkinson@hosielaw.com
HOSIE RICE LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, CA 94111
(415) 247-6000 Tel.
(415) 247-6001 Fax