SPENCER HOSIE (CA Bar No. 101777)
shosie@hosielaw.com
DIANE S. RICE (CA Bar No. 118303)
drice@hosielaw.com
BRANDON C. MARTIN (CA Bar No. 269624)
bmartin@hosielaw.com
DARRELL R. ATKINSON (CA Bar No. 280564)
datkinson@hosielaw.com
HOSIE RICE LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, CA 94111
(415) 247-6000 Tel.
(415) 247-6001 Fax

*Attorneys for Plaintiff,*
*Space Data Corporation*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| SPACE DATA CORPORATION, | Case No.: 5:16-cv-03260-BLF (NC) |
|---|---|
| Plaintiff, | **FIFTH AMENDED COMPLAINT FOR:** |
| v. | |
| ALPHABET INC., GOOGLE LLC, and LOON LLC | 1. PATENT INFRINGEMENT UNDER 35 U.S.C. § 1 *et seq.* ('941 Patent); <br> 2. MISAPPROPRIATION OF TRADE SECRETS UNDER 18 U.S.C. § 1836 & 1837; <br> 3. MISAPPROPRIATION OF TRADE SECRETS UNDER CALIFORNIA CIVIL CODE § 3426, *et seq.*; <br> 4. BREACH OF WRITTEN CONTRACT; <br> 5. PATENT INFRINGEMENT UNDER 35 U.S.C. § 1 *et seq.* ('503 Patent); and <br> 6. PATENT INFRINGEMENT UNDER 35 U.S.C. § 1 *et seq.* ('706 Patent) <br> 7. PATENT INFRINGEMENT UNDER 35 U.S.C. § 1 *et seq.* ('193) |
| Defendants. | |
| | **JURY TRIAL DEMANDED** |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

Plaintiff, SPACE DATA CORPORATION ("Space Data"), by way of its Fifth Amended Complaint against Defendants, alleges as follows:

## I.   INTRODUCTION AND SUMMARY.

1.      The internet has changed how we live.  In urban areas, we are online all the time: constantly checking where to eat, meet, buy gas, the new political news, the President's latest tweet, and so on.  Life without internet access would be unworkable, unthinkable.  The web has become the water we swim in, as ubiquitous and critical as oxygen.  *Cf.* David Foster Wallace "This is Water" Address (*see* https://web.ics.purdue.edu/~drkelly/DFWKenyonAddress2005.pdf).

2.      All are not so fortunate, however.  People who live in remote or undeveloped areas rarely have online access.  Terrestrial infrastructure is **expensive**, especially when spread across a thin population base.  A cell tower costs what it costs, regardless of whether it serves a hundred people in Wyoming or a hundred thousand people in Manhattan.

3.      As we write, two out of every three human beings lack internet access.  There are great swaths of this and other countries with no wireless access.  This creates a very real digital divide.

4.       As an important aspect of its ongoing business strategy, Google has made universal internet access a corporate priority.  Google's goal is not entirely altruistic, as Google's value as a business depends in large part on Google's ubiquity.  But bringing all the information to all of the people is impossible if most lack internet access.

5.      And so we come to balloons.  In 1997 and 1998, Space Data was developed by two MIT engineers to build a constellation of floating balloons, each linked to the other, communicating from the stratosphere to earth-based mobile devices.  Instead of a laborious and expensive terrestrial buildout, Space Data envisioned an array of inexpensive floating balloons, quickly and cheaply creating a stratospheric communications platform, thereby bringing internet to all.  These balloons would essentially "sail" in the stratosphere, riding micro-wind currents meticulously mapped through hundreds of thousands of hours of test and data collection flights.  Contrary to all conventional wisdom, there exists a "peaceful band" in the stratosphere, that is, a region where the winds are calm, relatively predictable, and sufficiently **structured** to enable an

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

operator to fly an unpowered balloon by adjusting its altitude to catch different, segregated wind currents.  These wind patterns make it possible to choreograph a balloon array to keep the balloons in tight concert, and optimize the balloons' ability to work as a coherent, ubiquitous network.

6.      Over years of development, and $75 million of private investment, Space Data perfected its technology.  It filed for its first patent in 1999, and now owns many foundational patents, including one captured from Google in an interference proceeding, as set forth below. Space Data's technology has been purchased by the U.S. military and deployed in Iraq, Libya, and other war theaters.  Space Data also has numerous private sector commercial customers, *e.g.* oil service companies needing network coverage in remote areas to monitor oil wells and pipelines. *See* below, ¶ 58.

7.      Beginning in the fall of 2007, Google began a detailed, technical due diligence of the Space Data business, finances, and technology.  Under a non-disclosure agreement, Space Data disclosed proprietary information to Google, all to aid Google in its technical evaluation and pre-acquisition Space Data due diligence.  Google cofounders Larry Page and Sergey Brin were involved in the Space Data due diligence in a very hands-on way (literally; *see* below).

8.      The Google due diligence culminated with the Google team, including the two Google cofounders visiting Space Data's Chandler, Arizona facility on February 15, 2008.  When Google arrived, Space Data was flying a commercial constellation of balloons over the southcentral U.S., providing internet access to remote oil rigs, pipelines and service vehicles.  As the constellation flew, computer monitors in the Space Date Network Operations Control Center ("NOC") reflected the status of each balloon, including proprietary wind data, "hover" algorithms, and similar sensitive information, as set forth below.  *See* below, ¶¶ 104-139.  These pictures were themselves captured in pictures taken by the Space Data employees, as a visit from the two Google co-founders is far from an everyday occurrence.

9.      Despite its earlier, professed eagerness to acquire Space Data, Google abruptly went dark weeks after this meeting.

10.     And that brings us to Space Data II, now known as Project Loon.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1   11.     Google publicly launched Project Loon in mid-2013.  Project Loon consists of an

2   array of balloons floating in the stratosphere, each communicating with the other, and

3   communicating with the ground to create a stratospheric internet platform.  Google does this

4   exactly as did Space Data, down to the smallest technical details, *e.g.*, micro-mapping stratospheric

5   winds in order to sail the balloons to maintain the integrity of the constellation over time and space.

6   12.     In interviews after it launched Loon, several Google engineers explained that

7   Google's great Loon epiphany was that one can choreograph a balloon array in the stratosphere

8   once one understands the micro-wind patterns in the quiet, peaceful band.  This, said Google, made

9   it possible to "sail" the balloons and so control the array, all to make the airborne constellation

10  work as a wireless communications mesh.  Indeed, Google filed a patent claiming this micro-wind

11  mapping constellation sailing as a Google invention in January 2012, along with a request not to

12  publish the application, as set forth below.  This initial filing was soon followed by many dozens

13  more, all claiming as original Google inventions ideas patented by Space Data and disclosed by

14  Space Data to Google under the non-disclosure agreement years before.

15  13.     The Project Loon balloons have means of ascent and descent, as do the Space Data

16  balloons; they have wireless transceivers attached, as do the Space Data balloons; they have GPS

17  capabilities; as do the Space Data balloons; they have twin redundant termination mechanisms; as

18  do the Space Data balloons; they fly the stratospheric micro-currents, as do the Space Data

19  balloons, they have cut-down mechanisms, as do the Space Data balloons, and so it goes, detail by

20  technical detail.

21  14.     Google has successfully deployed balloons over the world, including in California

22  and elsewhere in the United States.

23  15.     Google, itself, announced that Google Loon would make substantial profits.  As of

24  March 2015, Google controlled 88 percent of the search world worldwide.  Google estimated that

25  if 250 million people (approximately 5 percent of the total people worldwide without internet

26  access) paid $5 per month for the service, Google could bring in tens of billions of dollars per year.

27  As Google's Mike Cassidy said: "Think about it, with 4.5 billion people without internet access,

28  take 5 percent; you're talking 250 million people.  If those people pay just a small portion of their

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

1  monthly income, say $5 a piece, you're going to be in a billion dollars a month in revenue, tens of

2  billions a year in revenue, so it's a good business, too."  This, said Google, was the future of Loon.

3       16.     As set forth in detail below, Project Loon improperly uses Space Data's confidential

4  information and trade secrets which Space Data disclosed under a 2007 Mutual Confidentiality and

5  Non-Disclosure Agreement ("NDA"), attached hereto as Exhibit A and incorporated herein by

6  reference.  Google's use of this confidential information is also a breach of that same NDA.

7  Project Loon also infringes Space Data's patents, including patent claims that Google itself filed

8  with the USPTO in January 2012, but Space Data clawed back in an administrative interference

9  proceeding in late 2016 and early 2017.

10       17.     Accordingly, Space Data files this Fifth Amended Complaint for: (1) infringement

11  of United States Patent No. 6,628,941 titled "Airborne constellation of communications platforms

12  and method" by Knoblach et al., ("the '941 Patent") arising out of the patent laws of the United

13  States, 35 U.S.C. § 1 *et seq.*; (2) misappropriation of trade secrets under the Defend Trade Secrets

14  Act ("DTSA"), 18 U.S.C. § 1836; (3) misappropriation of trade secrets under California Uniform

15  Trade Secrets Act, Cal. Civil Code § 3426, *et seq.*; (4) breach of written contract under California

16  law; (5) infringement of US. Patent No. 9,632,503 ("Systems and Applications of Lighter-Than-Air

17  (LTA) Platforms") ("the '503 Patent") arising out of the patent laws of the United States, 35 U.S.C.

18  § 1 *et seq.*; (6) infringement of US. Patent No. 9,643,706 ("Systems and Applications of Lighter-

19  Than-Air (LTA) Platforms") ("the '706 Patent") arising out of the patent laws of the United States,

20  35 U.S.C. § 1 *et seq.*, and (7) infringement of US. Patent No. 9,678,193 ("Systems and

21  Applications of Lighter-Than-Air (LTA) Platforms") ("the '193 Patent") arising out of the patent

22  laws of the United States, 35 U.S.C. § 1 *et seq.*  Counts I through VII are against Defendants

23  Alphabet, Google Inc. ("Google"), and Loon LLC.  Alphabet, Google, and Loon LLC are referred

24  to collectively as "Defendants" or "Google" hereinafter.

25  **THE PARTIES**

26       18.     Space Data is an Arizona corporation, with its principal place of business at 2535

27  W. Fairview Street, Suite 101, Chandler, Arizona 85224-4707.

28       19.     Space Data was co-founded by Jerry Knoblach and Eric Frische.  Mr. Knoblach

began concept development, research, planning, and organizational work for Space Data in December 1996. Mr. Knoblach earned a Master's of Business Administration (MBA) Degree from Harvard University in 1992, a Master's Degree in electrical engineering from the University of Minnesota in 1990, and a Bachelor's Degree in mechanical engineering from the Massachusetts Institute of Technology (MIT) in 1985. Mr. Knoblach has been awarded two patents outside of the business of Space Data.

20.     From 1996 to 1998, Mr. Knoblach was a program manager at CrossLink, Inc., a wireless communications equipment company. At CrossLink, he led an effort to develop a commercial communications system for the space shuttle, using a satellite system that provides connections to the Internet, voice and fax capabilities and the use of commercial hardware to enable rapid development. From 1992 to 1997, Mr. Knoblach was a manager of business development and a program manager for Orbital Sciences Corporation ("Orbital"). From 1995 to 1997, he was responsible for marketing radiosondes (a device attached to a balloon that tracks weather and wind data as the balloon ascends) and satellite ground stations. In 1996, he played a key role in winning a contract with the U.S. Air Force to develop and produce the next generation radiosondes using GPS technology (given the expense, the GPS enabled radiosondes were slow to deploy). From 1994 to 1995, Mr. Knoblach served as a program manager at Orbital's subsidiary, Magellan Systems Corporation ("Magellan"), where he led the effort to develop the first handheld, personal communicator for use with the Orbcomm satellite network. Mr. Knoblach managed a marketing effort that won a contract to develop a GPS guided missile during 1992 and 1994. Prior to Orbital, Mr. Knoblach spent five years at FMC Corporation in Minneapolis, Minnesota, designing missile launchers for the U.S. Navy and Air Force.

21.     Eric Frische co-founded Space Data and served as its Chief Technical Officer and as a Director. Mr. Frische earned a Bachelor's Degree in electrical engineering from MIT in 1985. He is a licensed patent agent and has been awarded multiple patents outside of the company. From 1989 to 1998, Mr. Frische owned and operated Applied Solutions, which was a prototyping company in Dallas, Texas. Mr. Frische was responsible for all aspects of business at Applied Solutions, from marketing to engineering and production. During his tenure, Mr. Frische

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1   developed a wide variety of prototypes in areas ranging from communications devices to toys to

2   aides for the handicapped.  Prior to Applied Solutions, Mr. Frische was a captain in the U.S. Air

3   Force.  Mr. Frische also worked at the National Security Agency ("NSA") where he developed a

4   microwave lab and research program that investigated reception of faint RF signals.  Both Mr.

5   Knoblach and Mr. Frische have served on the American Institute of Aeronautics and Astronautics

6   (AIAA) Scientific Balloon Systems and Technology Committee.

7   22.    Alphabet is a Delaware corporation, with its principal place of business at 1600

8   Amphitheatre Parkway, Mountain View, California 94043-1351.  Alphabet is the successor issuer

9   to, and parent holding company of, Google. Alphabet owns all of the equity interests in Google.

10   The reorganization of Google into Alphabet was completed on October 2, 2015.

11   23.    Google is a Delaware corporation, with its principal place of business at 1600

12   Amphitheatre Parkway, Mountain View, California 94043-1351.

13   24.    Loon LLC is a Delaware limited liability company, with its principal place of

14   business at 1600 Amphitheatre Parkway, Mountain View, California 94043-1351.  On or around

15   July 1, 2018 Project Loon was spun out of Google LLC (formerly named Google Inc., *see* ECF

16   169), as Loon LLC.  *See* ECF 340.  Loon LLC is a subsidiary of Alphabet.

17   **JURISDICTION AND VENUE**

18   25.    Space Data brings its action for patent infringement under the patent laws of the

19   United States, 35 U.S.C. § 271 *et seq.*  This Court has federal question subject matter jurisdiction

20   over Space Data's patent infringement claims under 28 U.S.C. §§ 1331 and 1338(a).

21   26.    This Court also has federal question subject matter jurisdiction under the DTSA, 18

22   U.S.C. § 1836.  This Court has original jurisdiction over this controversy for misappropriation of

23   trade secrets claims pursuant to 18 U.S.C. § 1836(c) and 35 U.S.C. § 1331.  This Court has

24   supplemental jurisdiction over the controversy for all other claims asserted herein pursuant to 28

25   U.S.C. § 1367.

26   27.    Venue is proper in this District under 28 U.S.C. §§ 1391(c)-(d) and 1400(b) because

27   (i) Defendants maintain their principal places of business in this District, and (ii) this is a District in

28   which Defendants are subject to the Court's personal jurisdiction with respect to this action, and/or

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1   the District in this State where Defendants have the most significant contacts.

2   **INTRADISTRICT ASSIGNMENT**

3   28.     Pursuant to Civil Local Rule 3-2(c), this intellectual property action would be

4   properly assigned to any division within this district.  The parties, however, agreed to adjudicate

5   any dispute arising out of the NDA, which forms a basis for the trade secret allegations, in the state

6   or federal courts of Santa Clara County, California.  *See* Ex. A § 17.  Assignment to the San Jose

7   Division would therefore be proper.

8   **II.     STATEMENT OF THE FACTS.**

9   **A.     Airborne Communications Platforms.**

10   29.     Until recently, there were two basic ways to provision a large-scale wireless

11   network: a terrestrial tower-based infrastructure, or a satellite array orbiting the earth.

12   30.     Terrestrial networks are expensive to build and are economic only when the cost can

13   be spread over many people.  It is economic to build a cell tower in Manhattan; it is not in rural

14   Wyoming.  As a pragmatic matter, a terrestrial tower system will never bring the internet to all.

15   31.     Satellites, too, are very expensive.  A satellite can cost well in excess of $10 million

16   to build, and an additional $100 million plus to launch.  According to the Union of Concerned

17   Scientists, there are 600 non-military, communications satellites operating today versus the over

18   five million cell sites which service a third of the world's population with a wireless broadband

19   device.  Even if the number of communication satellites increased ten-fold, those satellites would

20   need nearly a thousand times the capacity of a typical cell phone tower to have enough capacity to

21   serve the uncovered population.  More, since satellites orbit at great distance from the earth,

22   latency (delay), poor signal strength, and limited spectrum limit an average satellite to lower

23   capacity than the average cell phone tower.  Again, as a pragmatic matter, a satellite network will

24   never bring the internet to all.

25   32.     Satellites in geostationary orbit, *i.e.* placed in orbit to stay in a fixed spot relative to

26   a terrestrial location, are placed at roughly 23,200 miles above the earth.  Given this great distance,

27   custom equipment is needed to receive and use signals form the distant satellites, *e.g.*, special

28

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1   receiving dishes.  This equipment is expensive, and this expense presents a further barrier to broad-

2   based satellite provisioned internet.

3          33.    Satellites in low earth orbit (*e.g.*, Iridium communications satellites at a height of

4   approximately 485 miles) are not geosynchronous, and they move across the sky (at about 17,000

5   miles per hour) relative to a fixed terrestrial location.  To receive signals from these satellites, each

6   receiver needs to track the satellite to receive the signal.  This requires additional ground-based

7   infrastructure.  And this is expensive.  For example, Motorola founded Iridium to create a new low

8   earth orbit satellite network.  The system cost billions to build, but the required "sat" phone cost

9   and cost of phone time proved prohibitive and the network failed.  Iridium emerged out of

10  bankruptcy and is a niche player today, serving limited industrial, government, and aviation

11  markets.

12         34.    Given these inadequacies, and the ever-increasing need for additional bandwidth

13  and greater geographic coverage, there is a need for a better approach, a third way to create an

14  airborne communications network.

15         **B.     Balloons and Airships.**

16         35.    Historically, there have been two basic approaches to lighter than air technology: (1)

17  motorized lighter than air craft (Goodyear blimp), or unmanned, unmotorized balloons (*e.g.*,

18  weather balloons).

19         36.    Airships (dirigibles) did not and do not work for purposes of station-keeping.  To

20  keep a dirigible in place in the troposphere or stratosphere requires significant amounts of energy,

21  as the dirigible will battle the wind ceaselessly.  It is simply not possible to station a dirigible in a

22  fixed location for any length of time; the energy requirements are prohibitive.  For example,

23  Lockheed-Martin launched (with great fanfare) a giant airship to create an airborne cell tower in

24  2011, the High Altitude Airship – (HALE-D).  It was designed to fly at 60,000 feet, made it to

25  32,000 feet, malfunctioned, and had what Lockheed euphemistically called a sudden "controlled

26  descent," *e.g.*, a slow motion crash.

27         37.    The other approach involved tethered balloons.  While attaching a very lengthy

28  tether would fix the balloon in place, there were two other unsurmountable obstacles: the tether

SPACE DATA CORP.'S FIFTH AMENDED COMPLAINT                       CASE NO.: 5:16-cv-3260 BLF
FOR, *INTER ALIA*, PATENT INFRINGEMENT        - 8 -

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

1    itself is very heavy, requiring ever larger balloons, until the system collapses of its own weight;

2    and, (2) even assuming some solution to this tether-weight conundrum, hundreds if not thousands

3    of balloons tethered to the earth would create obvious hazards to other aircraft.

4         **C.      Space Data: a Sailing Constellation.**

5         38.      Jerry Knoblach, as discussed above, had a background in communications and

6    satellite technology.  He appreciated the problems in using the satellite network to supply

7    additional network bandwidth coverage for terrestrial users, just as he appreciated that powered

8    dirigibles or tethered balloons would not work for broad communications purposes.

9         39.      In late 1996, after significant research and development, Knoblach realized that it

10   would be possible to develop a constellation of "near-space" balloons to create a floating network

11   that could connect to terrestrial communications networks to provide coverage in areas cell towers

12   do not reach.  "Near space" is the area of the atmosphere above the range that jet airliners fly

13   (30,000 to 52,000 feet) and far below the low altitude orbiting satellites (485 miles).  This, thought

14   Knoblach, was the new frontier for airborne communications networks.  In 1997 and 1998,

15   Knoblach and Frische developed this idea into the Space Data '941 Patent, attached hereto as

16   Exhibit B and incorporated herein by reference.

17       40.      This epiphany turned on a number of subparts, each important:

18   ***The Balloon-Based Network***

19       41.      By treaty, numerous countries release weather balloons twice a day.  These weather

20   balloons ascend rapidly, burst, and their payloads parachute to earth.

21       42.      Given the rapid ascent, and the fact that these weather balloons were not equipped

22   with sensitive GPS functionality until relatively recently, historical wind data in the stratosphere

23   has been sparse and profoundly inaccurate.  Weather balloons were not designed to provide micro-

24   mapping of wind currents in the stratosphere, but rather provide metadata for basic weather

25   modeling of the atmospheric layers where airliners fly and below.  Until recently, these balloons

26   were tracked with radio-theodolites, an instrument used to measure location and height.  Such

27   radio-theodolites provide very basic and error-prone data on wind patterns, particularly at high

28   altitudes (a function of how the radio-theodolites estimate wind, *i.e.*, by using azimuth/elevation

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

1  angles as a critical measurement, and azimuth/elevation provides an increasingly distorted reading

2  the higher the balloons ascend and the further they are blown downwind as a simple function of

3  geometry).

4      43.    Knoblach and Frische understood that it would then be possible to "sail" a

5  constellation of balloons in a loose array by exploiting the wind patterns in the 60,000 to 140,000

6  foot altitudes and attach to those balloons a communications signal transceiver, so making feasible

7  a balloon-borne communications network.  Knoblach and Frische realized it would be possible to

8  control a balloon's micro-**horizontal** location by adjusting its altitude, *i.e.*, moving the balloon up

9  or down a modest amount to take advantage of the wind patterns to move the balloon to its desired

10 horizontal location.  The pair understood that it would, thus, be possible to "sail" a constellation of

11 balloons in a loose array by exploiting the wind patterns, so making feasible a balloon-borne

12 communications network.  If a balloon drifted out of place, one could raise it or lower it to catch a

13 discrete wind stream to bring it back into position.  Knoblach and Frische also realized that flying a

14 network of balloons for communications would also generate high resolution stratospheric wind

15 data of a quality beyond that publicly available, which would provide Space Data with valuable

16 information.

17     44.    Once test flights began in 2000, Space Data captured this high-resolution wind data

18 and developed its proprietary knowledge of the micro-wind structure of the 60,000 to 140,000 foot

19 range.  The analysis of this proprietary data showed Space Data that there is a horizontal band in

20 the stratosphere above approximately 60,000 feet where the winds are particularly calm (15 to 20

21 mph), and, importantly, **structured**, *i.e.*, not blowing randomly (the "peaceful band") which sits

22 (approximately) between 60,000 to 80,000 feet.  This "peaceful band" analysis was derived from

23 hundreds of thousands of hours of proprietary flight data.  ███████████████

24 ████████████████████████████████████████████████

25 ███████████████████████████████████████████████

26 ████████████████████████████████████████████████

27 ████████████████████████████████

28 <u>*Use Moore's Law*</u>

45.     Knoblach and Frische further realized that electronic circuitry was shrinking every year, and that it would be possible to build a radio transceiver that was less than 12 pounds, with two separate frangible components which would separate at impact, with each component weighing less than six pounds.  This matters, as aircraft are built to withstand bird strikes of up to eight pounds.  A balloon payload of less than 12 pounds that broke into two components of less than six pounds each (frangible) is, accordingly, exempt from regulatory hurdles as the payload would not pose a hazard to aircraft.

46.     Aviation regulations permit balloons with payloads greater than 12 pounds, but these heavier payloads cannot be launched on cloudy days.  For example, in July 2013, under the sponsorship of the Federal Communications Commission and in conjunction with the National Institute of Standards and Technology, Space Data flew a 4G LTE (wireless protocol) payload that weighed 50 pounds to service public safety needs after Katrina-like disasters.  Currently, Space Data is flying 4G LTE payloads that weigh less than six pounds.

### *Cheap and Scalable*

47.     Another key Knoblach-Frische realization was that such a choreographed stratosphere-based balloon constellation could provide needed network coverage at an extremely low cost, relative to the alternatives (millions of additional terrestrial towers, or many more satellites than could feasibly be orbited).  Building a new tower-based network is **very** capital intensive, literally trillions of dollars to cover the uncovered areas of the world, and has to be built to provision the anticipated future traffic.  Less than a third of the world's landmass had broadband wireless coverage as of 2013.  Half the world's population lived within this coverage area, yet only about a third of the population used the Internet.  These users were served by about five million cell phone towers.  Since these existing towers cover only a third of the landmass, complete coverage would require on the order of ten million additional cell phone towers.  Rural cell phone towers are more expensive than urban towers as they are farther from the electricity/data connectivity and they cover fewer potential customers, who generally earn a lower per-capita income.  The average rural tower in Asia/Africa costs $385,000 to build.  The math is daunting: the additional ten million towers needed to provide coverage to all, at $385,000 per tower, would

SPACE DATA CORP.'S FIFTH AMENDED COMPLAINT
FOR, *INTER ALIA*, PATENT INFRINGEMENT        - 11 -

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1    consume nearly four trillion dollars.  No one is willing to write this check.  Absent coordinated

2    government activity, tower-based Internet for all will never happen.

3        48.    In contrast, a near-space balloon constellation can start small and scale as demand

4    increases.  This new approach is **not** capital intensive, and can be scaled to match growing demand,

5    a significant advantage.  This also means that, unlike traditional networks, a balloon network's

6    operating costs will increase only as traffic and revenue increase.  This means that a balloon

7    network will be profoundly more self-funding than a terrestrial or satellite network.  While

8    satellites (with coverage areas hundreds or thousands of miles in diameter) have too **little** capacity

9    and towers (with coverage areas a few miles in diameter) cost too much given the sparse

10   population density, balloons with coverage areas dozens to hundreds of miles in diameter make

11   sense.  Further, as traffic in an area with balloon coverage increases to the point where a tower

12   becomes economic, towers can be built to offload the capacity of the balloon network, much as Wi-

13   Fi hotspots offload tower capacity today.  This balloon approach was, in short, smarter, faster,

14   cheaper, and **realistic**.

15   **_Interoperate With Terrestrial Systems With No New User Hardware_**

16       49.    Once Space Data began collecting and analyzing its proprietary wind data,

17   Knoblach and Frische were able to conclude that the winds in the approximately 60,000 to 80,000

18   foot altitude were the calmest winds.

22                                                                                         If a

23   balloon constellation can provide coverage to a phone in common use, it is more valuable than a

24   balloon constellation that requires users to purchase a new, particular device to connect.  Unlike

25   satellite transmissions, users did not need to buy new dishes or bulky handsets and one balloon

26   constellation could serve all users.  Once the LTE protocol became the standard for all broadband

27   smartphones, this meant the balloon constellation could fly with one signal protocol and provide

28

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

1  Internet to everyone with a 4G phone.  This is one very important advantage to the Space Data

2  balloon network: it works seamlessly and without any additional cost to the users with legacy,

3  terrestrial, cell-based devices.

4  **D.**   **Space Data, the Company.**

5  50.   Jerry Knoblach began working on the balloon-constellation communication system

6  idea in late 1996 after years of working in the aerospace communications field.

7  51.   In early 1997, he connected with his colleague from MIT, Eric Frische and,

8  together, they began developing the idea that became Space Data.  Frische was an engineer and

9  registered patent agent, as set forth above.

10  52.   In 1997 and 1998, Knoblach and Frische worked to develop the balloon-

11  constellation idea by analyzing wind data and communications protocol to prove that this lighter-

12  than-air network would work.

13  53.   Space Data was formally incorporated in 1997.

14  54.   In June of 1999, Space Data filed for its first patent related to this technology.

15  55.   By early 2000, Space Data was funded, had opened an office, and hired six

16  employees.

17  56.   In 2001, Jim Wiesenberg joined the company as a Chief Strategy Officer ("CSO").

18  Wiesenberg was a Harvard Business School graduate, as was Knoblach, with deep experience in

19  spectrum acquisition and management.

20  57.   The Federal Communications Commission ("FCC") held a spectrum auction in

21  September 2001, in days after the 9/11 attacks.  Space Data bought a significant amount of

22  spectrum at this auction in the 900 MHz band, and owns much of that spectrum today.  The

23  spectrum is now worth in excess of $200 million.

24  58.   In 2004, Space Data deployed a number of balloons covering four states, serving oil

25  companies and oil field service companies.  Oil wells are often in remote areas, with no landline or

26  cellphone access.  But wells and pumps need to be monitored continuously (leaks; malfunctions).

27  Space Data's balloon constellation provided inexpensive, comprehensive network coverage for

28  these remote wells and pipelines.  In the years to come, Space Data entered into numerous

1    commercial contracts with such oil and oil field service companies.

2         59.    By 2007, Space Data had nearly 100 employees, a working balloon constellation

3    covering vast swaths of the Southwest, and was building hundreds of proprietary payloads for the

4    U.S. Air Force on a classified project.

5         60.    From 1999 forward, Space Data filed and prosecuted fundamental balloon

6    constellation patents.  It now has eleven issued patents, two more applications with Notice of

7    Allowance on file and the patents likely to issue soon, and additional applications pending.

8         61.    Space Data operates balloons that practice its patents.  Space Data has commercially

9    exploited the '941 Patent, one of the patents-in-suit, by making, marketing, selling, and using

10   products covered by the '941 Patent, including for example its popular SkySat™ repeater platform,

11   currently being used operationally by the US Marine Corps and US Army, as well as its SkySite™

12   network that has provided wireless services from a constellation of balloons in the stratosphere on

13   a commercial basis since 2004.

14        62.    Throughout its corporate history, Space Data has worked zealously to maintain the

15   secrecy of its proprietary information.  Employees all sign secrecy agreements, the Space Data

16   facilities are security card keyed, all visitors sign in on a mandatory visitor log, and no third party

17   prospective partner was shown proprietary information absent signing an NDA.  Space Data

18   maintains a file of these NDA's in its electronic and hard copy records.

19        63.    Space Data is an active operating business today.

20        **E.    Google's Space Data Due Diligence.**

21   ***Google's Android Platform and Wireless Neutrality***

22        64.    Apple released the first iPhone in November 2007.  Long prior to the iPhone launch,

23   Google understood that search would likely move to mobile devices, migrating away from PC's

24   and other tethered computers.  This was a seismic technological shift, and one that posed an

25   existential threat to Google.

26        65.    As an early part of a multiyear, sophisticated response, Google bought Android in

27   2005.  Android designed and sold a mobile software platform.

28

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

66.     With Android, Google needed a way to ensure network access for Android-enabled phones friendly to Google and Google apps.  But cell (wireless) networks were proprietary; AT&T owns the AT&T network, just as Verizon owns the Verizon network, and so forth.  Google planned to release an open platform Google-based phone, but was not terribly interested in paying to build its own new cell network.  Google essentially wanted the equivalent of net neutrality for devices on the cellular airwaves.

67.     In 2007, the FCC announced that it would auction a very valuable spectrum band, the 700 MHz band, in early 2008.  This band is particularly well-suited for wireless cell phone communication.

68.     In auctioning spectrum, the FCC had two contradictory goals; (1) the agency wished to generate as much revenue as possible, but, (2) saw value in having broad and open access to public airwaves.

69.     Appreciating this tension, Google lobbied the FCC to include an "open access" provision for the key portion of the auctioned 700 MHz spectrum to be auctioned.  That is, the FCC agreed that if a certain minimum bid were submitted, the 700 MHz spectrum would become open to all.  The FCC ultimately set that "open access" bid trigger at $6.45 billion.

70.     With the auction rules set, Google heavily publicized its intention to bid, hired game theory economists to structure its bid strategy, and participated actively in the bidding process.  As largely admitted by Google, and as widely speculated by the other bidders, Google did not in fact intend to acquire the spectrum itself.  Instead, Google wanted to ensure that an existing carrier, likely Verizon, would hit the minimum bid, thereby providing Google devices with open network access at no cost to Google.

71.     That is precisely what happened.  By early March 2008, it was apparent that Verizon had submitted a bid in excess of the minimum, and Verizon was subsequently awarded the 700 MHz spectrum.  Google-friendly mobile devices are now ubiquitous, and Android-based phones are the most popular phones in the world, outselling iPhones by close to 9 to 1.  And, as search moved to mobile, Google's search revenue has increased hugely.

***And So Space Data***

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

72.     This FCC auction and Google's game-theory strategy was important to the early relationship between Google and Space Data.  Under the FCC rules, a winning bidder had the obligation to build out coverage to 40% of the population within four years of being awarded the spectrum.  For an existing wireless carrier with tens of thousands of towers, this was simply a matter of installing new radios on the towers.  For a new entrant like Google, however, losing the spectrum due to missing the construction deadline was a very real risk.  If Google's strategy failed, and if Google actually submitted a winning bid, Google had to honor the buildout requirement.  Google understood that it could use the Space Data balloon constellation approach to satisfy its buildout obligation quickly and inexpensively.

73.     Nor was this point lost on Space Data.  Space Data understood exactly how its technology could aid Google should Google win the spectrum auction.

74.     In late August 2007, a Space Data consultant learned of the Google open phone initiative, and emailed Google suggesting that Google should talk to Space Data about incorporating the Space Data balloon technology in Google's open platform strategy, including its planned FCC 700 MHz spectrum bid.

75.     On August 10, 2007, Google's Christopher ("Chris") Sacca, then involved in Google's open phone and spectrum initiative, emailed the Space Data consultant, saying "I am curious to hear more about your proposal," and setting a meeting.  Contemporaneously, Sacca sent an internal email to several Google engineers, noting the upcoming Space Data meeting, and saying that "Larry Page was interested in us following up."

76.     The Space Data and Google executives met on the Google campus (Googleplex) late in the morning on Tuesday, September 18.  Chris Sacca and Minnie Ingersoll (*see* ¶ 99 below describing the Google executives in detail) attended for Google; Jerry Knoblach and Space Data Chief Strategy Officer Jim Wiesenberg, attended for Space Data.  The Google co-founders, Brin and Page, attended the presentation portion of the meeting.  The meeting lasted two and a half hours, and concluded with Google saying that it was interested in using Space Data's balloon technology to accelerate the buildout of any 700 MHz spectrum Google might acquire.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

77.     At this meeting, Space Data provided basic and public information on the Space Data platform.

78.     Google's Chris Sacca followed up on Tuesday, October 16, 2007.  In an email sent to Wiesenberg and Knoblach, Sacca said "we are back on focused with you guys.  Stay tuned for a proposal for a next step.  Should hear something today."

79.     Google Business Development executive Minnie Ingersoll followed up the next day, Wednesday, October 17, 2007.  In an email to Knoblach and Wiesenberg, Ingersoll said that Google "remain[ed] interested in Space Data."  She asked to schedule another meeting to enable Google to do further "technical due diligence," and introduce Space Data to "a few more people on our [Google] team."

80.     On Wednesday, October 24, Knoblach and Wiesenberg met with Washington-based Google lobbyist Rick Whitt to discuss Google's open phone platform, upcoming spectrum bid, and a potential business relationship with Space Data.

81.     The parties then set a follow-up meeting at the Googleplex for Thursday, November 1.  Google's group included Ingersoll, Sacca, and two engineers, Larry Alder and Phil Gossett.  Larry Page and Sergey Brin also attended this second meeting.  Wiesenberg, Knoblach, and Space Data co-founder and patent co-inventor Eric Frische attended for Space Data.  The group discussed Space Data's technology at a fairly general and high level, and likewise discussed how Google might work with Space Data to build out any 700 MHz spectrum acquired.

82.     The parties continued to exchange emails following the November 1, 2007 meeting.

83.     On November 28, 2007, Google's Ingersoll introduced the Space Data team to Google's Mike Pearson.  Pearson was on Google's "Corporate Development Team," and Ingersoll told Space Data that Google was bringing Pearson in as "the right person to help us take this discussion into more formal deal terms."

84.     Pearson then scheduled a December 4, 2007 call with the Space Data executives.  After that call, Pearson said that Google was interested in going forward, and forwarded a copy of Google's standard Mutual Non-Disclosure Agreement ("NDA").  Google drafted this NDA in full.  The parties thereafter executed the NDA, which has an effective date of December 1, 2007.

85. In the December 4, 2007 call, Pearson asked that Space Data begin to supply confidential and proprietary information to Google to assist Google in its technical and financial due diligence. Pearson first requested detailed Space Data financial information, including the latest "capitalization table, income statement and balance sheet." On the larger business opportunity, Pearson described Google's interest as follows:

> The most critical piece of information however will be getting some sense from you and the team about what you would envision as being the potential uses for the balloon technology here at Google. If you remove the constraint of having to find near term monetization opportunities, what are the areas that you and the team would like to focus on at Google? **I think the easiest way to flesh it out is to look at opportunities that do and do not involve Google owning a large block of spectrum in the near term and what are the goals you would like to accomplish in either scenario.**

(Emphasis added). In this way, Google moved beyond the spectrum buildout relationship to a general acquisition; Pearson's job at Google was to evaluate early stage companies as potential Google acquisitions.

86. On Friday, December 14, under the NDA, Space Data provided to Google detailed Space Data financial information. Specifically, Space Data provided its five-year going-forward projections (more than 2,000 pages). In a separate email on the same day, Space Data provided its audited actual financials for the prior three years and, in aggregated form, financials for the years 2004 to 2007. These financial reports set forth the exact economic picture of the company over time, including capital expense, operating expense, reserves, debt, investment, and the like. These confidential reports and models provided the big picture and intimate detail, scope, and scale, and revealed valuable successes and costly expenditures, forward looking goals and interim milestones to Google. Historical numbers provided proof and projections provided strategy and expectations. Details in the pro-forma embodied and summarized a great deal of the wisdom accumulated through careful, multi-year planning, efforts and expense by Space Data and its investors. The cover email for the financials explicitly stated that all of the information, past, present and future, was proprietary, confidential, and fully subject to the NDA. A subset of the

proprietary financial information sent to Google under the NDA is attached hereto as Exhibit D and incorporated herein by reference.

87.     In mid-December, Google's Chris Sacca left Google, and went on to significant notoriety as an angel investor (Instagram; Twitter).

88.     Ingersoll reviewed the information provided, and responded by email to Space Data on Thursday, December 20, 2007:

> **We are making a lot of positive progress getting our head around the financials of Space Data, but I'd like to schedule some time for a followup with our technical team to do more due diligence about the Space Data constellation. Can we schedule time with you to review the balloon technology in more detail when we get back to work in Jan?**

89.     The parties so scheduled a technical conference call for January 3, 2008.  At this point, the Google evaluation team had grown to seven people, including multiple engineers.  The call was attended not only by this team, but also by the founders of Google.

90.     On January 2, 2008, Space Data sent Google proprietary and confidential "vision" slides which detailed the concept of a worldwide network of balloons providing Internet coverage, and a plan for how to do it.  These vision slides were marked and designated as confidential, as required by the NDA.

91.     By late January 2008, Google and Space Data were discussing a range of valuations for a Space Data-Google acquisition.  As part of this process, Space Data forwarded on January 25, 2008, a 2007 year-end Space Data (pre-audit) P&L.  This document was also marked as confidential pursuant to the NDA.

92.     By the end of January, Google had evaluated Space Data's technical and financial information and wanted to schedule a full day technical inspection and due diligence visit at the Space Data headquarters in Chandler, Arizona (a Phoenix suburb).  This meeting was subsequently set for February 15, 2008.

93.     On January 28, 2008, Space Data forwarded a 600 page WiMax (network) financial model to Google.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

94.     On February 5, 2008, Space Data executives had another conference call with Google's Mike Pearson.

95.     On Monday, February 11, Space Data's C.E.O. Jerry Knoblach forwarded a detailed analysis on how Google could use Space Data's spectrum paired with other spectrum available for lease in the Air to Ground band "to provide service to GSM equipment operating on the standard 900 MHz band used for GSM elsewhere in the world."  The proposal provided a quick and inexpensive way of providing capacity for GSM mobile phone handsets, and GSM was the most prevalent cellphone handset in the world at the time.

96.     On February 12, 2008, Knoblach forwarded to Pearson a PowerPoint presentation summarizing Space Data's forecast and revenue projection for Space Data.  The document set out the details of Space Data Government contracts, including details of the United States Air Force's use of Space Data balloons in Central Iraq.  The document also set forth the economics and Space Data margins on this contract.  The document further set forth Space Data's prospective military opportunities.  The cover email notes that the attachment was "confidential under the terms of our NDA," as does every page of the underlying document itself.

97.     Just days prior to the in-person meeting in Chandler, Arizona, Google's Daniel Conrad forwarded a series of detailed questions concerning Space Data's valuation, particularly given events that occurred in recent spectrum auctions.

### The Google Team Comes to Space Data

98.     On February 15, 2008, twelve Google executives and engineers, including the two cofounders, flew to Arizona and then traveled in several SUV's to the Space Data Chandler facility.  The group spent the better part of a day at the facility.

99.     The following executives and engineers attended for Google:

- **Sergey Brin**: Mr. Brin is a Google cofounder, and a C.S. engineer by training.

- **Larry Page**: Larry Page is the other Google cofounder, and also a C.S. engineer by training.

- **Larry Alder**: Larry Alder is an engineer with advanced degrees in aeronautics and astronautics.  He joined Google in 2005.  For approximately 12 years, he lead Google's

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

"Business Operations Access Group," which houses Google initiatives "promoting open internet access."  He has worked closely with Minnie Ingersoll, described below, since he joined Google in 2005.

- **Minnie Ingersoll**: Ms. Ingersoll has an MBA and B.S. in Computer Science.  She joined Google in 2002.  From 2002 to 2011, Ms. Ingersoll worked as a Google products manager, leading efforts to broaden internet access for all, including Google's work with Space Data, Google's work on Google fiber, and like projects.  She co-founded the Access team; a cross-functional product, policy and engineering team.  She was a Principal at Google from 2011-2014.

- **Daniel Conrad**: Daniel Conrad is an engineer, and served as an early member of the Android and "Access" teams at Google.  He was a Google Project Manager from 2006 to 2010.  The Google Access team is dedicated to providing internet access to all.

- **Daniel McCloskey**: Mr. McCloskey is an engineer, and an inventor on numerous patents, often with Phillip Gossett (*see* below) as a co-inventor.  He joined Google in 2007.  Mr. McCloskey's expertise appears to lie in network communications.  For several years, Mr. McCloskey served as Head of Design for Google's Advanced Technologies and Projects Group.

- **Phillip Gossett**: Mr. Gossett is an engineer and co-holder of patents with McCloskey.  Mr. Gossett has been a Senior Staff Software Engineer at Google from 2005 to the present.

- **Richard Walker**: Mr. Walker worked as a Google engineer from 2007 to 2010.

- **Sunil Daluvoy**: Mr. Daluvoy has a Bachelor's in Science and a law degree.  From 2006 to 2013, he worked on New Business Development at Google.  Until last year, Mr. Daluvoy was the Head of Business Development at Uber Technologies.  While at Google, he worked with Business Development and "Access," the group charged with improving internet access for all.  He was also involved in the Google spectrum auction. From 2006 to 2011, he was a senior executive in Google's New Business Development Group.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

- **Mike Pearson**: Mr. Pearson joined Google in 2005.  Mike Pearson was a general partner at Google Capital, Google's in-house venture entity.  He also worked as a Director, Corporate Development, on Android projects at Google.  As a partner at Google Capital, Pearson focused on early stage acquisition opportunities for Google.

- **Joseph S. Faber**: Mr. Faber is a lawyer, and joined Google just prior to the 2008 spectrum auction.  He has deep FCC regulatory experience, including working with AT&T.  He currently serves as a senior Google in-house lawyer.

100.    The Google team arrived at approximately 10:45 a.m.  They were first gathered in the conference room for introductions and a broad description of the agenda for the day, and explicitly admonished that what they were about to see and hear was confidential.  The Google team was then given a tour of Space Data's balloon manufacturing facility, where Space Data walked the group through the precise mechanics of the Space Data balloon construction process.

101.    The group then went to the Space Data Network Operations Control ("NOC") Center.  The NOC is essentially Space Data's Mission Control, the group monitoring all Space Data balloons and balloon arrays.

102.    The Space Data NOC had, at that time, two large projected screens on the wall, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

103.    Here is how the Space Data NOC looked (at a distance with data obscured) in February 2008:

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111



104.    In addition, the Space Data NOC contains multiple computer monitors (in white above) on desks arranged in a U shape with a dozen monitors, each tracking various aspects of a balloon flight, as described in detail below.

105.    When the Google due diligence team arrived at the Space Data NOC, ███████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████ This was a real balloon array, providing real-time data and network coverage, all for real customers.

106.    The Google team took photographs of various Space Data gear, including screenshots of the Space Data data on the NOC monitors, as set forth below.  The Google team spent over an hour in the NOC asking questions, asking how balloon trajectories are controlled, asking to see the various screens NOC operators controlled, and asking how wind alone is used to maintain the spacing of the array of balloons. ████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

1

2

3       107.    From the NOC, the Google team walked 50 feet outside to launch a balloon.

4

5

6

7

8       108.    After the launches, lunch was served in the main conference room.  Metadata on

9   photos record that by approximately 1:53 p.m. lunch was over and the tour was in the production

10  area examining the detailed construction of the internal components of the company's balloon

11  payloads and watching monitors displaying real-time data of the two balloons launched before

12  lunch.                                                                            Thus,

13  Google was able to observe and photograph the company's proprietary flight control software in

14  operation for over an hour in the NOC and over an additional half hour in the production area.

15

16      109.    Space Data knows this to be true, as it has pictures of the Google founders and

17  Google photographers, including a picture of a visibly entertained Sergey Brin personally releasing

18  a Space Data balloon, as set forth below:

19  ***The Founders at Space Data***

20

21

22

23

24

25

26

27

28

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111



***The Brin Release***



***Google (Daluvoy Here) Photographs the Space Data Screens***

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1
2
3
4
5
6
7
8



9  *__The Type of Camera Used: a High Resolution Nikon(s)__*

10
11
12
13
14
15
16
17
18
19



20  *__Google Visit to Space Data With Private Property Posting__*

21
22
23
24
25
26
27
28





*__Google Reviews the Payload Details__*



*The Cameras*



Holding Camera

110.    Space Data has dozens of images documenting the various aspects of Google's Space Data tour and technical due diligence.

**F.    Trade Secrets Disclosed to Google.**

111.    Both before the February 15, 2008 tour of Space Data, and during that tour, Space Data provided proprietary, confidential, trade secret information to Google under the NDA.  Before the meeting, Space Data sent Google detailed financial models and projections as well as presentations describing just how a worldwide, ubiquitous, balloon-based communications network would work and marked those documents as proprietary and confidential, as required under the NDA's terms as set out below.  During the visit, Space Data gave Google access to restricted areas which Space Data keeps closely guarded and showed Google proprietary information in visual form (on various screens within the NOC) as well as tangible form (including payloads, balloons, and components thereof).  Space Data told Google, both before, and during the facilities tour, that Space Data was showing Google confidential and proprietary Space Data information, as set forth in detail below.  Space Data also discussed with Google, during the tour, details regarding various proprietary, confidential concepts and methods.  Following the meeting, on February 19, 2008, Space Data sent Google an email summarizing the confidential information that had been disclosed

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

orally (as against showing in tangible form) during the visit and designating it as confidential.  The steps Space Data took to preserve its confidential information are described more fully below in Section H.   Under the NDA (as described below in Sections G and I), Google could not use the information disclosed for any purpose other than to "enable the Parties to evaluate the feasibility of a business relationship" of a proposed acquisition of shares or assets of Space Data. *See* Ex. A § 2.

### *Trade Secrets Disclosed to Google During the February 15, 2008 Visit*

112.    The following paragraphs recount the confidential, proprietary, trade secret information shared with Google during its February 15, 2008 visit to Space Data and why that information mattered.

#### *Structured Wind Data in the Peaceful Band*

113.    During the visit, Space Data shared with Google details of the proprietary wind data that it captures and analyzes for each of its flights, and discussed with Google the proprietary conclusions, concepts, and methods it has drawn from its analysis of this wind data.



114.

115.    As one example,

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111



*See* Exhibit C, a compilation of screen shots of the flight data on display on February 15, 2008, which is attached hereto and incorporated herein by reference.

117.   All-in, Google saw and could photograph hundreds of similar screenshots covering every balloon in the array for a period exceeding an hour and a half.  *See* Ex. C.  This was a robust set of data indeed and available nowhere else on earth other than in the company's NOC and secure

air-gapped servers.  Google, in fact, took photographs of data on these monitors, and Space Data

has photographs of Google taking these screenshot photographs, as set out above.

118.  ████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████  These data prove the existence of discrete and structured

wind patterns in the stratosphere, ████████████████████████████

119.  The wind data that Google saw in its tour represented proprietary and trade secret

Space Data information.  Space Data had laboriously assembled such wind data over literally

hundreds of thousands of hours of flight time.  The Space Data information contradicted the

information then in the public record and was not disclosed in the '941 Patent.  ████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████  Space Data explained this point in detail to Google at

the Space Data facility, and showed Google many examples on the screens, with the screenshots

proving Space Data's point correct.  Space Data executives, including its C.E.O., told Google that

the information displayed and presented was proprietary and confidential.

120.  This wind data epiphany matters in fine-tuning the flight of a balloon constellation

intending to provide broadband wireless coverage to standard smartphones.  ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████  These epiphanies, and the data

supporting their legitimacy, are all Space Data trade secrets, were not in the public domain, and

were disclosed pursuant to NDA to Google on February 15, 2008.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

121.    Space Data's wind data trade secrets are succinctly described as follows: ▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐   *See* Exhibit H, Space

Data's Second Amended 2019.210 Statement, attached hereto and incorporated herein by

reference.

### *The "Hover" Algorithm*

122.    Contrary to conventional wisdom, ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

123.    Space Data's proprietary work proved this conventional wisdom wrong.  Before

Space Data's hover algorithm, all balloons flown in the stratosphere were zero pressure balloons,

which means the neck is open and as a balloon rises above its float altitude excess lift gas simply

spills out of the neck or very rigid balloons that did not expand much as they ascended. ▐▐▐▐▐▐

1

2

3     124.     For each balloon flight on February 15, 2008, Space Data implemented its hover

4     algorithm, and reflected the input data and resulting balloon behavior on the "hover" screenshot on

5     computer monitors for Google to view.  Space Data also discussed the hover algorithm with

6     Google during the February 2008 visit.  During this presentation, Space Data executives told

7     Google that the information on the screens in the NOC was confidential.

8     125.     An example of the hover screenshot is reproduced below:

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    *See* Ex. C.

25    126.     Space Data maintains its hover algorithm and the data shown on the hover

26    monitoring screens as confidential trade secrets and they are not generally known to the public.

27    127.     From this screenshot, an engineer experienced in predictive feedback systems and

28    controls would know what Space Data did in its hover algorithm,

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111



10      As discussed below, upon information and belief, Google utilizes Space

11   Data's hover trade secrets in its deployment of Project Loon.

12          128.    This was not another abstract, "beam me up Scotty" assertion, but rather real data

13   reflecting real behavior of balloons in a real constellation in commercial service real-time.

14          129.    Space Data's hover trade secrets are specifically described as follows:

20      *See* Ex. H.

21   ***Thermal Management***

22          130.    The ambient temperature in the peaceful band is approximately negative 40°

23   Fahrenheit.  Counter-intuitively, one of the principal challenges to making a stratospheric balloon

24   constellation work is thermal (heat) management.  At 60,000 plus feet, the air is very thin, and

25   extremely ineffective at conducting heat away from the balloon payload.  As is true for all

26   electronics, the electronics in a balloon (particularly the power amplifier ("PA") and Digital Signal

27   Processor ("DSP")), generate heat.  More, while these components are hot, and reducing heat is an

28   issue, the GPS instrumentation, which sits higher in the payload, tends to be very cold, so keeping

1    that instrumentation sufficiently warm is also an issue.  Another key issue is keeping the batteries

2    warm as severe cold significantly degrades battery capacity.

3         131.   After significant experimentation through many balloon flights, Space Data learned

4    how to manage thermal heat regulation in the stratosphere. 

10        132.   Space Data's thermal management trade secrets are specifically described as

11   follows:

28                                *See* Ex. H.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

133.    During the Space Data tour, Space Data explained its thermal management techniques, and solutions generally, to Google at great length.  During this visit, Google was able to see (and photograph), for eleven different flights at eleven different altitudes, ████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████ Space Data also showed and allowed Google to photograph the thermal management techniques on display inside some of its payloads.  A skilled engineer with photos of the inside of Space Data's payload as well as data from the NOC ████████████████████████████ ████████ could reverse engineer Space Data's thermal management designs and design thermal components for systems operating in the quiet band without the expense of flying a multitude of balloon flights.  Upon information and belief, Google has utilized the thermal management trade secrets it learned from Space Data for Project Loon, as described below.

### *Space Data's Proprietary NOC Altitude Control and Monitoring System*

134.    During the February 2008 visit, Google was also able to see (and capture with its camera) the specific types of data Space Data captures, monitors, and analyzes for each flight from its Network Operations Center ("NOC").  ████████████████████████████ ████████████████████████████ 135.  ████████████████████████████

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111



*See* Ex. C.

136.   Space Data also had on display during Google's visit a block diagram showing how Space Data's NOC process operates.

137.   In viewing these screens, Google was able to see (and capture with its camera) the specific types of data Space Data captures, monitors, and analyzes for each flight from its NOC.  A knowledgeable engineer would be able to use this information to reconstruct Space Data's proprietary altitude control and monitoring systems, as Google has done in its own "Mission Control" described below.

138.   Space Data's NOC altitude control and monitoring system trade secrets are specifically described as follows: ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1   ████████████████████████████████████████████

2   ████████████████. *See* Ex. H.

3   ████████████████████████████████████████████
4
5
6
7
8
9
10
11
12
13
14
15

16      139.    Google's current Loon Mission Control bears a striking similarity to Space Data's

17   NOC:

18

19

20

21

22

23

24

25

26

27

28

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111



Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111



***Space Data Trade Secrets Disclosed to Google In Writing Before the February 2008 Visit***

***The Economics: This Was Not a "Moonshot," But a Real and Viable Commercial Enterprise***

140.    In addition to the flight information Space Data shared with Google (under the NDA), Space Data gave Google over 2,000 pages reflecting Space Data historical financial performance and future projections, as described above in Paragraph 86.  *See also*, Ex. D.

141.    By email dated December 14, 2007, Space Data provided Defendants with a Microsoft Excel workbook entitled "Model December 2007 v 1.1." ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████ Many of these worksheets have between 100 and 400 rows and columns for 60 months of projected financials.  Both the e-mail subject line and the cover page designate this model as Confidential.  By another e-mail dated December 14, 2007, Space Data provided Defendants with audited Financial Statements for the Years Ended December 31, 2006, 2005 and 2004, as well as unaudited quarterly financial statements for 2007, a spreadsheet

1   summarizing all equity rounds raised since inception for Space Data, and a list of shareholders of

2   Space Data.  The subject line of this e-mail designated all this information as Confidential.

3      142.   Together, these historic and projected financial data provide an in-depth insight into

4   the cost structure of running a wireless services business based on high altitude balloons.  At the

5   time, Space Data had the only network of balloon providing wireless services of any type.  The

6   specific cost drivers of running such a business were completely unknown in the public domain.

7   The model and historical financials showed details regarding the main cost drivers in the logistics

8   cycle of a balloon network, including: ████████████████████

9   ████████████████████████████████████████

10  ████████████████████████████████████████

11  ████████████████████████████ Not only were the

12  actual costs for each step of this process based on the experience of having launched over 15,000

13  balloons and flown over 200,000 flight hours, the financial model contains the mathematical

14  relationships to vary assumptions for each step of the process to run sensitivity analyses to

15  understand the operational costs and how they can be modified.  These basic mathematical

16  relationships, costs and improvements with experience are very useful for modeling all types of

17  balloon-based wireless services businesses.  Space Data's network may be a regional network, but

18  by changing some parameters in the model, it can be scaled to model a broadband network

19  covering an entire nation, an entire continent, or the entire world.  And Space Data explained all of

20  this to Google.

21     143.   Space Data also provided Google with financials dating to 2004 – the inception of

22  Space Data's network – which gave Google detailed information on Space Data's "learning curve"

23  on the costs to run the logistic cycle.  These mathematical relationships, costs, and improvements

24  with experience are very useful for modeling all types of balloon based wireless services business.

25     144.   Space Data's financial trade secrets are specifically described as follows: ████████

26  ████████████████████████████████████████

27  ████████████████████████████████████████

28  ████████████████████████████████████████

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1  ████████████████████████████████████████████████

2  ████████████████████████████████████████████████

3  ████████████████████████████████████████  *See* Ex. H.

4    145.   This economic data were of very real value to Google.  Although Google's pockets

5  are deep, Google has emphasized publicly that it will not green-light Google X "moonshot"

6  projects unless *it has the conviction that the projects would likely be economic and commercially*

7  *viable.*  As Google put it recently:

8         **Thinking about X as a portfolio**

9         Being a "corporate lab" is a difficult balancing act: place big bets on the
10        future, but don't spook the people giving you the money. As an Other Bet
          (one of the Alphabet divisions that's not Google), we want to be good
11        stewards of the resources invested here and deliver a good return so that
          we're trusted to keep the factory open for years to come.
12
13        We look for opportunities to balance X's overall portfolio sensibly, and
          aim for diversity: a mix of hardware and software, a mix of industries and
14        problems, a mix of ideas that will take more (closer to 10 years) or less
          (closer to 5 years) time to have an impact. We have clear budgets and
15        limitations; we can aspire to creating significant growth for Alphabet
          without significantly growing ourselves.
16
17   https://blog.x.company/a-peek-inside-the-moonshot-factory-operating-manual-
     f5c33c9ab4d7

18    146.   The Space Data technical information, coupled with the detailed Space Data

19  economic information, proved to Google that the Loon project was commercial, feasible, and worth

20  Google's investment.

21  ***Space Data's Worldwide Balloon Communications Network "Vision" Slides***

22    147.   Space Data also provided Google "vision" slides, marked as proprietary and

23  confidential, which laid out how Google could develop a worldwide constellation of balloons to

24  provide ubiquitous Internet coverage, and how to make this work (*i.e.* the idea Google later called

25  "Project Loon").

26    148.   By email dated January 2, 2008, Space Data provided the Defendants with a twelve

27  slide presentation entitled: "Google with Space Data," which was marked Proprietary /

28

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

SPACE DATA CORP.'S FIFTH AMENDED COMPLAINT                    CASE NO.: 5:16-cv-3260 BLF
FOR, *INTER ALIA*, PATENT INFRINGEMENT          - 42 -

1    Confidential. ████████████████████████████████████
2    ████████████████████████████████████████████████████
3    ██████████████████████

4        149.    These "vision" slides also laid out how Google could develop a worldwide

5    constellation of balloons to provide ubiquitous Internet coverage, and how to make this work (i.e.

6    the idea Google later called "Project Loon").



Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111



150. ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅ and all of it was clearly identified as proprietary and confidential Space Data material.

151. Space Data's vision slides trade secrets are specifically described as follows: ▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅ *See* Ex. H.

**G.    The NDA.**

152. As described above, the parties entered into an NDA, effective as of December 1, 2007, for the purpose of engaging in "discussions and negotiations concerning a proposed acquisition of shares or assets" of Space Data.  This was the only permissible use of the Space Data information.

153. The NDA expressly stated that "it is anticipated that the Parties will disclose or deliver to the other Party certain trade secrets or confidential or proprietary information and Google

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

and [Space Data] are entering into this Agreement in order to ensure the confidentiality of such trade secrets and confidential or proprietary information…." *See* Ex. A, Preamble.

154.    The NDA required that confidential information be clearly marked or identified as confidential by the party disclosing the information, a requirement Space Data met with every trade secret category described above in Section F.

155.    After the NDA was signed, Space Data provided Google with access to Space Data's confidential and trade secret information, all of which Google was required to "hold in confidence." *See* Ex. A § 4.  The NDA also prohibited Google from using any confidential information disclosed by Space Data except for the purpose of "enabling the Parties to evaluate the feasibility of a business relationship" or the acquisition of Space Data by Google.  *See* Ex. A. § 4.

156.    The terms of the NDA expressly provide that this agreement would remain in effect until terminated by either party with thirty days prior written notice, and that the agreement shall "survive with respect to Confidential Information that is disclosed before the effective date of termination." See Ex. A § 6.  As of today, Defendants have never provided any such notice of termination.

157.    Despite Google's express agreement to the terms of the NDA, Space Data is informed and believes that Defendants have developed Google Loon based on Space Data's confidential and trade secret information, in breach of the NDA, as set forth below in Sections I, J, and K.

158.    As Google was only permitted to use Space Data's trade secrets and other confidential information in order to evaluate Space Data as an acquisition target (or business partner), Google's evident use of Space Data's proprietary financial modeling confidential business plan for a worldwide balloon constellation network, and information derived from access to Space Data's proprietary wind data, hover algorithm, thermal management system, altitude control system, and network operations center to develop Project Loon, constitutes a breach of the NDA.

159.    Google's disclosure of certain of Space Data's trade secrets and confidential information in Google's patent applications and asserted "ownership" of Space Data's intellectual

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1   property is also a breach of the NDA as it violates Section 8, which states that "[n]o Party acquires

2   any intellectual property rights under this Agreement[.]" *See*, Ex. A § 8.

3       160.    Google's continued use of these trade secrets contrary to the NDA, Google's

4   assertion of ownership over Space Data's trade secrets, and Google's disclosure of certain trade

5   secrets constitutes misappropriation of Space Data's trade secrets under the California Uniform

6   Trade Secrets Act and the Defend Trade Secrets Act.

7       161.    As described more fully below, Google's Project Loon echoes not only Space

8   Data's patent, but also the confidential, trade secret information provided to Google under the

9   parties' NDA.

10  **H.    Space Data Preserved Its Trade Secrets As Per The Terms Of The Parties'
        NDA.**

11-12   162.    Paragraph 3 of the parties' December 1, 2007 NDA describes a disclosing party's
        obligations with respect to designating "Confidential Information."

13-14   163.    This paragraph sets forth three distinct classes of confidential information, as
        follows:

15-17       1.    Written information, *e.g.* presentation decks and documents "clearly and
                conspicuously marked as 'confidential' or with a similar designation." *See*
                Ex. A § 3(a).

18-27       2.    Tangible and visual information, including physical things (payloads;
                balloons; real-time streaming data), "identified as confidential and/or
                proprietary before, during, or promptly after presentation" to the receiving
                party. *See* Ex. A § 3(b).  Unlike documents under § 3(a), information
                presented or shown needs to be identified as confidential before or during or
                promptly after the presentation. *Id.*  To illustrate, if Space Data showed
                Google Space Data's physical payload package (as it did), including the
                internal electronics and thermal management techniques, and if Space Data
                told Google during the presentation that these payload materials were

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1    confidential and proprietary, then this material remained proprietary and

2    confidential under § 3(b) of the NDA.

3           3.     Information communicated orally alone, *i.e.* in a conversation, is be

4           considered confidential only "if such information is designated as being

5           confidential at the time of disclosure (or promptly thereafter) and is reduced

6           in writing and confirmed to the Recipient as being Confidential Information

7           within fifteen (15) days after the initial disclosure." *See* Ex. A § 3.

8         164.    These three different confidentiality designation subsections recognize the three

9 basic ways confidential information can be communicated: in written documents (stamped);

10 through visual information and tangible materials shown (*e.g.* payloads or streaming data,

11 described as confidential before or during the presentation); or conversations alone (described as

12 confidential during or after the discussion and confirmed in writing as confidential thereafter).

13 This different treatment reflects the different nature of the information and mode of

14 communication: documents and things shown are **tangible** and real – they exist in corporeal form –

15 while a conversation alone is evanescent and therefore needs to be confirmed in writing to ensure

16 clarity as to what was confidential and what not.  All of the trade secrets that Space Data disclosed

17 to Google were protected by one or more of the subsections of Paragraph 3 of the NDA, as set out

18 immediately below.

19 ***Wind Data Trade Secrets***

20       165.    As set forth above in ¶¶ 104-109, Space Data was flying a commercial array of

21 balloons when Google's engineers inspected its NOC.  Google saw the data on the screens, real-

22 time, and took numerous photographs of the screens to capture the data displayed.  Google took

23 these photographs for a reason; on information and belief, Google reviewed these photographs

24 following the inspection tour on February 8, 2008.

25       166.    During the presentation, and indeed before the presentation, Space Data executives,

26 including Jerry Knoblach, told Google engineers and executives repeatedly that the visual

27 information they were seeing on the NOC screens reflected and represented Space Data proprietary

28

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

trade secret information.  *Indeed, showing such proprietary and non-public data to Google was the very point of the visit.*

167.     During the NOC tour, Jerry Knoblach and other Space Data employees discussed Space Data's proprietary structured wind data and the methods Space Data had developed from its proprietary wind data with the Google engineers and executives.  These oral discussions came in addition to the actual wind data shown and photographed on the NOC monitors.

168.     Space Data, in a confirmatory email sent on February 19, 2008, identified as confidential "any and all data provided about the winds at our operational altitudes" and "the photographs your team took inside our facilities."

169.     Under Paragraph 3 of the NDA, the visual wind data shown on the various NOC screens, as viewed and indeed photographed by Google, retained its confidentiality status as Space Data identified the information as confidential at the time shown.  *See* Ex. C.  Further, the oral conversations about wind data were also preserved as confidential under the NDA by way of the confirmatory email sent following Google's visit.

### *Hover Trade Secrets*

170.     Just as it had with the wind data information displayed to Google during the visit, Space Data designated the visual hover information shown on the NOC screens to Google as confidential at the time the information was shown.

171.     Further, during the visit, Space Data showed Google its actual physical payload, as reflected in the photographs attached as Exhibit D to the Second Amended 2019.210 Statement (Exhibit H hereto).  During this presentation of the payload proper, Space Data executives, including Jerry Knoblach and Jim Weisnberg, told Google executives and engineers that the details of the payload Google saw represented proprietary and confidential Space Data trade secret information.  Again, the very purpose of this visit was to show Google the proprietary and non-public Space Data information and payload, all to persuade Google that it should invest in or acquire Space Data.  That is, the purpose of the visit was not to show Google what was already in the public domain, but conversely show Google what Space Data had developed as a proprietary technology.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

172.   The display of the payload ███████████████████████
███████████████████████████████████ Google was able to

photograph these portions of the payload as well as the NOC screens showing the detailed hover

algorithm at work.

173.   Under Paragraph 3 of the NDA, the visual hover data shown on the various NOC

screens and the tangible payload displayed retained their confidentiality status as Space Data

identified the information as confidential at the time shown.  Further, Space Data's confirmatory

email designating as confidential "the photographs your team took insides our facilities" and the

last paragraph stating "[i]t seems that we discussed quite a bit of information with you as to our

technologies and plans for the future and we would like to keep them confidential" further

provided confirmation that this visual and tangible information shown to Google during the visit

was protected under the NDA.

### Thermal Management Trade Secrets

174.   Space Data also displayed for Google during the visit the portions of Space Data's

payloads that comprise its proprietary thermal management system.   As described above, during

the payload presentation, Space Data's employees told Google that the details of the payload

represented proprietary and confidential Space Data trade secret information.  Google was able to

photograph the inner-workings of the payload as well as the NOC screens ██████████████
███████████████████████████ See Ex. H, (Sub-Exhibit E to Second

Amended 2019.210 Statement, photographs of thermal management techniques).

175.   Under Paragraph 3 of the NDA, ████████████████████████████
██████████████ and the tangible payload displayed retained their confidentiality status as

Space Data identified the information as confidential at the time shown.  Further, Space Data's

confirmatory email designating as confidential "the photographs your team took inside our

facilities" and the last paragraph "catch-all" language further provided confirmation that this visual

and tangible information shown to Google during the visit was protected under the NDA.

### NOC Altitude Control and Monitoring Secrets

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

176.     As described above, Space Data designated all the information shown on the NOC screens to Google (and then photographed by Google) as confidential at the time the information was shown.  Further, Space Data's NOC in general is security card keyed, locked, controlled at the front door, and under electronic monitoring.

177.     Under Paragraph 3 of the NDA, the visual data shown on the various NOC screens and the NOC flowchart retained their confidentiality status as Space Data identified the information as confidential at the time shown.  Further, Space Data's confirmatory email designating as confidential "any and all data provided about the winds at our operational altitudes," "the photographs your team took insides our facilities," and the final "catch-all" paragraph further provided confirmation that this visual and tangible information shown to Google during the visit was protected under the NDA.

### *Financial and Vision Slide Trade Secrets*

178.     As set forth above in ¶¶ 140-151, Space Data provided Google with written documents and presentation decks disclosing Space Data's financial and vision slide trade secrets. These documents were sent to Google after the effective date of the NDA and conspicuously marked as confidential and proprietary.  Thus, Space Data clearly and sufficiently maintained the secrecy of this written information under the NDA.

179.     Thus, each of Space Data's trade secrets outlined here were fully protected by Space Data as confidential under the parties' NDA.

**I.     Google Uses Space Data's Trade Secrets.**

180.     As described above, Space Data made important refinements to the idea embodied in its '941 invention after that patent was issued.

181.     After flying tens of thousands of flights, Space Data accumulated valuable, proprietary wind data that allowed Space Data to come to the conclusion that the optimum altitude for flying its constellation of balloons was in the approximately 60,000 to 80,000 foot "peaceful band." ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1   ████████████████████████, was not known to the

2   public in 2008 (as Space Data made this realization from its own proprietary wind data) and Space

3   Data had not disclosed this finding in any of its patent applications or public statements.

4        182.   This information about the "peaceful band," ████████████████

5   ████████████████████████ were all

6   disclosed to Google under the NDA and protected by designation under the NDA (as described

7   above in ¶¶ 165-169).  Space Data is informed and believes Google flies its constellation in this

8   band and spaces its Project Loon constellations this distance apart, precisely for the reasons Space

9   Data identified in 2008 and based on the information received from Space Data.

10       183.   Space Data also developed proprietary systems for monitoring its balloon

11  constellation, controlling altitude with its hover algorithm, managing thermal heat regulation, and

12  operating its system from the NOC, all of which were disclosed to Google in its visit in February

13  2008 and designated as confidential under the NDA.  *See* ¶¶ 170-177 above.  With the team of

14  executives and engineers and the aid of the camera Google brought to its visit, Google was able to

15  capitalize on all of the trade secret information Space Data disclosed to it during this visit.  Space

16  Data is informed and believes that Google's Project Loon was developed based on this proprietary,

17  trade secret information obtained from Space Data during the February 2008 visit and that such

18  information proved to Google that a worldwide constellation of balloons providing network

19  connectivity was feasible.

20       184.   In addition to the technical information provided to Google, Space Data shared with

21  Google detailed, proprietary, financial models and historical financial statements, which allowed

22  Google to piece together the cost model and logistical processes involved in developing its own

23  Project Loon.  This financial information was provided under the NDA and clearly designated as

24  confidential and proprietary by Space Data.  *See* ¶¶ 139-146, 178-179 above.  All of this financial

25  information is separate from any idea disclosed in any of Space Data's patents.  Space Data is

26  informed and believes that Google's Project Loon was developed based on the proprietary, trade

27  secret information obtained from Space Data's financial data and modelling that showed a pathway

28  to making a balloon-constellation communication system economically feasible.

Hosie Rice LLP
600 Montgomery Street, 34ᵗʰ Floor
San Francisco, CA  94111

1    185.    Lastly, Space Data provided Google with confidential and proprietary "vision"

2    slides in early 2008 which described, for the first time, the concept of a worldwide balloon-based

3    network and gave Google detail on how to use a worldwide network, how to implement such a

4    network and the advantages of such a network.  This worldwide concept and the details on how to

5    implement are not contained in any of Space Data's patents and were disclosed to Google only

6    under the NDA for purposes of evaluating Space Data as an acquisition target.  Space Data

7    protected these "vision" slides as confidential under the NDA, as described above in ¶¶ 147-151 and

8    178-179.  Then, suddenly, years later, this Space Data concept becomes "Google Loon."

9    186.    As discussed above, the NDA prohibited Google from using any of Space Data's

10   confidential information for any purpose other than to "enable the parties to evaluate the feasibility

11   of a business relationship or" "a proposed acquisition of shares or assets of" Space Data.  *See* Ex. A,

12   Preamble.  Google's use of the above-identified trade secrets of Space Data for its development and

13   execution of Project Loon is a clear violation of the allowed use under the NDA.

14   187.    Upon information and belief, Google has used and continues to use Space Data's

15   confidential, trade secret information in violation of the NDA, despite the NDA's "residuals" clause.

16   The residuals clause exempts from the NDA information "[r]etained in the unaided memories of

17   Google employees" and, importantly, states that "[a] person's memory is unaided if such person **has**

18   **not intentionally memorized** the Confidential Information for the purpose of retaining and

19   subsequently using or disclosing it."  *See*, Ex. A § 8.

20   188.    Space Data is informed and believes that Google is using the trade secrets disclosed

21   by Space Data under the NDA for its own use in Project Loon in a manner and to a degree that it

22   could not come from unintentional recollection from unaided memory.  Google's team of visitors

23   took extensive photographs of Space Data's facilities, payloads, balloons, NOC center, and its real-

24   time flight data reflected on the screens within the NOC.  Space Data also discussed, at length, with

25   Google, details regarding its technical trade secrets.  Space Data designated all such information as

26   confidential under the NDA.  (*See* Section H above.)  Google's Project Loon mirrors Space Data's

27   technology (and, specifically, the trade secrets disclosed) so closely that replication could not have

28

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1    occurred without reference to the photographs taken or contemporaneous, internal, Google notes or

2    communications about Space Data's technology.  Google took detailed photographs for a reason.

3         189.    Further, the specificity and volume of trade secrets provided to Google could not

4    have been misused by relying solely on "unaided" memory that was "unintentionally" retained.  For

5    example, the detail on the cost drivers alone is not the kind of information that could qualify as a

6    "residual," neither is the detail to be obtained from the photographs of the NOC screens.

7         **J.**    **Defendants Continue to Use Space Data's Trade Secrets.**

8         190.    Misappropriation is defined under DTSA to include disclosure **or use** of a trade

9    secret of another without express or implied consent.  A defendant who continues to misuse a trade

10   secret after the DTSA effective date (May 2016) is not immune from liability simply because it

11   initially misappropriated the trade secret prior to the DTSA effective date; such "continuing use" is

12   one of the three forms of misappropriation explicitly covered by the statute.

13        191.    Defendants continue to use Space Data's trade secrets post-May 11, 2016.

14   Defendants' post-May 11, 2016 activities, which include, but are not limited to, using Space Data's

15   wind data and hover trade secrets to navigate Project Loon balloons, are global in scale, spanning, for

16   example, St. Lucia (*see* below), Columbia (crash of a Loon balloon in March 2017), Australia (*see*

17   below), Peru (*see* below), and the United States (*see* below).[1]

18   **Loon off of St. Lucia:**

19        192.    The images below show an array of Project Loon balloons off of St. Lucia on March

20   28, 2017.  As the tracking images show, Google launched these balloons from Puerto Rico and

21   navigated the array to St. Lucia.  On information and belief, Google controlled this balloon array

22   using Space Data's trade secrets, including Space Data's wind data and hover algorithm trade

23   secrets.

24

25

26

27

28   _____

     [1]  DTSA explicitly provides for recovery where a misappropriated trade secret is used in, or
     intended for us in both interstate or foreign commerce.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111





**Loon in Australia:**

193.     The image below shows a group of Project Loon balloons over Northern Australia circa late May-early June, 2017.  On information and belief, Google launched these balloons from Puerto Rico, navigated the array to Peru, and then navigated the array to Northern Australia using Space Data's trade secrets, including Space Data's wind data and hover algorithm trade secrets. On information and belief, while over Australia, the balloons "were taking part in navigational testing, using software algorithms that allow them to rise and fall to take advantage of different wind speeds and wind directions within the stratosphere."

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111



**Loon in Peru:**

194.    On information and belief, post-DTSA enactment, Google has been flying balloon arrays over Peru.  As of mid-May 2017, Project Loon was providing internet connectivity to users in a flood ravaged region of Peru, with users having sent and received 160GB-worth of data, the equivalent of around 30 million instant messages, or two million emails.  With respect to these Peruvian arrays, Google made public statements in February 2017 about its new "discoveries" relating to balloon hover, which, on information and belief, constitute a misappropriation of Space Data's hover trade secrets.  As Google said:

> Project Loon's algorithms can now send small teams of balloons to
> form a cluster over a specific region where people need internet
> access. This is a shift from our original model for Loon in which
> we planned to create rings of balloons sailing around the globe,
> and balloons would take turns moving through a region to provide
> service. . . . In mid 2016, we started sending balloons from our
> launch site in Puerto Rico to hang out in Peruvian airspace—and
> they did, some for as long as three months. We repeated the
> experiments, and saw the same results: we had figured out how to

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

cluster balloons in teams, dancing in small loops on the
stratospheric winds, over a particular region.

**Loon in the U.S.:**

195.    On information and belief, Google is actively navigating balloons back into the U.S.

from Peru, using Space Data's trade secrets, including Space Data's wind data and hover algorithm

trade secrets:

> NEVADA City, Calif. July 6, 2017 – On Monday, reports of a
> shiny object in the skies over Nevada County prompted
> speculations about its origin.  A check of our flight tracker
> revealed it was HBAL187, a balloon used by Project Loon . . . A
> spokesperson for Project Loon shed some light on the balloon and
> its mission: "I can confirm this was a Project Loon balloon . . .
> This particular balloon had been providing service in Peru and
> after more than 100 days of flight was about to be recovered by a
> trained recovery team and brought back to our labs in California so
> that our engineers can learn more about its flight."

196.    Further, Google is actively flying arrays over the continental United States.  As

shown in the July 22, 2016 and August 3, 2016 images from FlightRadar24 below, Google

continues to fly arrays of Loon balloon's over the United States.  On information and belief,

Google is doing so using Space Data's trade secrets, including Space Data's wind data and hover

algorithm trade secrets.



Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111



197.    In September, 2016, a Google Loon balloon flew over Yellowstone National Park. On information and belief, Google's current U.S. activities include actively launching balloons from Winnemucca, Nevada, which then fly over the U.S., including Yellowstone National Park, using Space Data trade secrets.

198.    In the third quarter of 2016, post-DTSA, Google flew a ten-balloon array centered over Colorado, as depicted in the Google graphic below:

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111



199.    On information and belief, Google used Space Data's trade secrets to navigate, or "steer," this array.

200.    ████████████████████████████████████

████████████████████████

201.    ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

202.    On information and belief, all of the balloons discussed in ¶¶191-198 above were launched in the United States.  All of these balloons were made in the United States.  Each balloon and balloon array was "steered," to use Google's phrase, from Google's Mission Control in Mountain View, California, using Google hardware and software resident in Mountain View. Google assembled all of the electronics associated with the payload in the United States.  And

1   Google exported many of these balloons and arrays form the United States, and then imported them

2   back into the United States.

3        203.    On information and belief, the balloons identified in ¶¶191-198 above, are

4   controlled and monitored using systems that employ Space Data's NOC altitude control and

5   monitoring system trade secrets.

6        204.    On information and belief, the balloons identified in ¶¶191-198 above, use Space

7   Data's thermal management trade secrets.

8        205.    On information and belief, Defendants are still making decisions as to whether to

9   continue to fund Project Loon, such as the decision to fly the balloon arrays identified in ¶¶191-198

10   above, based on Space Data's financial and technical trade secrets

11       **K.**    **Google's Project Loon.**

12        206.    According to Google's public statements, Project Loon came into existence as

13   follows:

14        207.    In mid-2011, Google hired Richard DeVaul, an engineer previously working at

15   Apple, Inc.

16        208.    DeVaul joined Google's experimental research group, known as X (formerly known

17   as and/or referred to as "Google X" or "Google X Lab" or "Google[x]").  At X, DeVaul worked

18   with X's Rapid Evaluation Team, a group responsible for quickly ascertaining the viability of

19   proposed research projects.

20        209.    According to Google, the Rapid Evaluation Team's job is to kill as many ideas as

21   quickly as possible.  Prove to us, says Google, that these bizarre, "moonshot" ideas will **not** work.

22        210.    Google X was not just a research lab for moonshot ideas.  As Google's Mike

23   Cassidy explained "[v]ery early on in the [Google Loon] project analysis it had to be a viable

24   business model . . . . And they are tough on the business model."

25        211.    Eric "Astro"[2] Teller ran Google X when DeVaul joined the organization. DeVaul

26   reported to Teller, and Teller reported to Page.  Both Brin and Page had offices at X.

27

28   ---

[2]  The name evidently refers to his haircut in high school, which looked like Astroturf, not a
    background in astrophysics.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

212.   As one of DeVaul's first assignments, Teller asked DeVaul to assess the viability of a balloon borne internet constellation.  According to Google, this directive came directly from the cofounder and then C.E.O. Larry Page, whom Google reports had been fascinated with the idea of a balloon internet constellation for several years.

213.   DeVaul began working on the project, and Google reports that DeVaul soon had his first epiphany: rather than huge powered and stationary balloons, why not a gaggle of smaller balloons, all inexpensive and quickly landed and replaced?

214.   The problem, said Google, was that there was no way to steer or control an array of such unpowered balloons.  Even if launched in proximity, Google believed that they would soon drift apart, destroying the constellation and unraveling the airborne Internet.

215.   DeVaul's second epiphany, according to Google, lay in mapping the micro-wind currents in a calm band in the stratosphere.  DeVaul realized that Google could essentially "sail" balloons in an array once these micro-wind patterns were understood.

216.   DeVaul further realized, again according to Google, that Google could control the **horizontal** placement of the balloon by adjusting its **altitude**, up or down, to catch a different wind stream to move the balloon to the desired horizontal location (later a claim Google repeatedly patented as a novel and innovative Google invention!). *See* below, Section L.

217.   Google launched its first test balloon in August 2011.  The balloon consisted of a simple latex balloon envelope, and a basic Wi-Fi transceiver payload.  Google called this first generation balloon the Pterodactyl, and it is depicted below:

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111



218.   And another shot:



Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

219.    These early Loon balloons are strikingly similar to the Space Data progenitors as shown below with the National Guard launching one of Space Data's balloons.



220.    DeVaul tethered a small Wi-Fi transceiver to the balloon.  This transceiver could communicate with receivers on the ground.

221.    The Pterodactyl test worked, showing that airborne balloons could create a working internet link.

222.    Over the remaining months of 2011, Google continued to launch new balloons.  By the end of 2011, Google had discovered (it says) that the balloon constellation worked, with one balloon receiving feeds from other balloons, and then transmitting the feed to the ground-based receiver.  Google thereafter patented this idea too.

223.    In these early tests, Google's Loon payload tended to land in an uncontrolled fashion.  To aid retrieval and assuage anxiety, Google attached a label to each Loon payload, saying "**Harmless science experiment: call Paul [at the number below] for a reward.**"  Google

1  later applied for and received a patent on this novel "retrieval mechanism," *i.e.*, having an "if

2  found, please call" label, something Space Data had been doing for years and was on the payloads

3  Google took photos of while touring Space Data.

4       224.    From 2011 through June 2016, Google launched and landed nearly a thousand Loon

5  balloons.  It accumulated hundreds of thousands of hours of flight time, collecting wind data, and

6  further refined its balloon constellation and electronic configurations.

7       225.    In June 2013, Google had its first public balloon launch in New Zealand, a country

8  selected given friendly airspace coupled with confidentiality and vast tracks of thinly populated

9  land.  To wide press coverage, the launch worked, providing internet access to several sheep

10  farmers in the New Zealand hinterlands.

11       226.    In January 2012, Google filed the first of what would become approximately 102

12  Project Loon patents and applications.  These early applications claim basic aspects of a balloon

13  borne network constellation as organic Google inventions, even though these ideas had long prior

14  been either disclosed to Google by Space Data or previously patented by Space Data itself.  *See*

15  below Section L.

16       227.    Over the years following, Google has refined its balloon constellation and payload

17  design and circuitry.  Google now buys its balloons from Raven Aerospace, a Texas company with

18  its principal place of business in Sulfur Springs, Texas.  Space Data signed an NDA with Raven on

19  August 19, 1999, and presented the patented constellation of balloons for communications to the

20  C.E.O. of Raven shortly thereafter.  Raven is contributorily infringing.

21       228.    Google's current Loon design "uses super-pressure balloons equipped with limited

22  altitude control systems."  Specifically, air is used as ballasts, and pumped into or out of an

23  enclosure within the balloon, known as a Ballonet.  This approach allows "the balloon to modify its

24  weight for ascent or descent."  Google characterizes the advantages of this altitude control as

25  follows; "These altitude changes allow the balloon to take advantage of different wind patterns at

26  different altitudes for navigation….  Modeling how a balloon will fly at different altitudes is a

27  significant technical achievement for the project, and Loon is constantly improving our predictive

28  abilities."

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

229.     The current Google balloon is made of polyethylene, weighs 55 kilograms, is 60 feet high and 15 feet wide, and is equipped with at least two independent redundant flight termination systems (described below) and a parachute tethered to the payload.  While Space Data has not employed polyethylene balloons due to their environmental impact, Space Data's patent claims are general enough to cover a wide range of balloon types.

230.     The Loon balloons carry communications and safety equipment, including a flight computer, batteries, solar panels, environmental sensors, transponder, a GPS receiver, and iridium satellite communications link, and a parachute.  Some of the Google Project Loon balloons also "carry communication equipment to conduct operations with local telecommunications companies…."

231.     Google currently launches balloons principally from the United States (adjacent to the Winnemucca Nevada Municipal Airport and the José Aponte de la Torre Airport in Puerto Rico) and a small number of additional sites, including sites abroad.

232.     Upon information and belief, Google's balloons are made in the United States. Google controls its balloons and balloon arrays from Google's Mission Control in Mountain View, using Google hardware and software resident in Mountain View.  Google exported its balloons and balloon/array components from the United States, and then imported them back into the United States.

233.     Google has recently reported that it is in commercial discussions with several large telephone carriers to provide Loon internet coverage.

***Google Copies Space Data***

234.     In describing Loon and the underlying technology, Google's engineers made plain the eerie similarity between Loon and Space Data.  To quote Google:

***On Sailing With the Micro-Currents***

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111



Project Loon balloons travel around 20 km above the Earth's surface in the stratosphere. Winds in the stratosphere are generally steady and slow-moving at between 5 and 20 mph, and each layer of wind varies in direction and magnitude. Project Loon uses software algorithms to determine where its balloons need to go, then moves each one into a layer of wind blowing in the right direction. By moving with the wind, the balloons can be arranged to form one large communications network.

www.google.com/loon/how/. This is Space Data sailing in the peaceful band exactly as 20 km equates to 65,616 feet.

235. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████

### *On Controlling the Array*

236.    "Since the balloons drift with the wind, Google engineers devised a system to raise or lower them in order to catch the air currents needed to keep them floating just the right distance from each other – and aligned so if one floats out of range from Internet users in a particular region, another will come along and take its place."

**Source:** http://www.mercurynews.com/2013/07/26/google-thinks-balloons-may-solve-problem-of-internet-access-in-third-world/

### *On Loon to Earth Communications*

237.    Here is a Google depiction of how its own constellation communicates:

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

Each balloon can provide connectivity to a ground area about 40 km in diameter at speeds comparable to 3G. For balloon-to-balloon and balloon-to-ground communications, the balloons use antennas equipped with specialized radio frequency technology. Project Loon currently uses ISM bands (specifically 2.4 and 5.8 GHz bands) that are available for anyone to use.

**Source:** www.google.com/loon/how/

***On the Choreography: the Loon "Dances"***

238.   "Loon is a network of free floating stratospheric balloons. Now if the balloons just floated entirely free, they would eventually drift to either pole and that wouldn't be terribly useful." - Rich DeVaul, Google Innovator."  **Source:** https://www.youtube.com/watch?v=F8QeQLf53Cw

239.   "You have these two free floating platforms that are kind of swaying and bobbing freely, a dance, if you will between the two balloons…." – Baris Erkmen, Technical Lead, Project Loon."  **Source:** https://www.youtube.com/watch?v=BEC0G2HbuiE

***On Working With the Legacy Infrastructure***

240.   One of Google's most important Loon epiphanies was that its network could communicate seamlessly with the legacy terrestrial infrastructure, a huge advantage:

> We've established gigabit per second connectivity between the balloons up in the stratosphere, hundreds of kilometers apart getting the signal down to the user. We're using LTE, so you can just use the same mobile device you used today to get service whenever there's a loon balloon floating by. All of this technology coming together will allow someone who could be thousands of kilometers away from the nearest ground

infrastructure to have access to the Internet. – Baris Erkmen, Technical Lead, Project Loon

**Source:** https://plus.google.com/+ProjectLoon/posts/LAc5SVq9wyj.  This concept, too, Space Data discussed with Google.

### *On the Hand-Off, Balloon to Balloon*

241.    "The idea is to have enough balloons so as one balloon floats out of you area, there's another balloon ready to float into place, handing off the internet connection." – Astro Teller, Captain of Moonshots, Google X.  **Source:** https://www.ted.com/talks/astro_teller_the_unexpected_benefit_of_celebrating_failure/transcript?language=en

242.    "[S]o another balloon is coming just at the right time to take the place of the one that left." – Mike Cassidy, Project Lead, Project Loon.  **Source:** https://www.youtube.com/watch?v=HOndhtfIXSY

### *On the Loon Balloons*

243.    While the current "Night Hawk" Loon balloon differs in construction, this is not a case about how one constructs a balloon; it is, instead, a case about how one makes a **balloon network** work.  But many aspects of the Loon balloons overlap with the Space Data progenitor, as set forth below:

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111



**Source:** www.google.com/loon/how

***On the Inner Air Bladder***

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*__On Google's Current and Commercial "Night Hawk" Balloon__*

*__Page Takes Credit for Google__*

244.    Google's co-founder Page, who visited the Space Data facility and **saw** the stratified

wind data, described this exact point as something Google had discovered:

**[B]ut it turns out, we did some weather simulations which probably hadn't really been done before**, and if you control the altitude of the balloons, which you can do by pumping air into them and other ways, you can actually control roughly where they go, and so I think we can build a worldwide mesh of these balloons that can kind of cover the whole planet.

www.ted.com/talks/larry_page_where_s_google_going_next/transcript?language=en.com

245.    Page was at the early Space Data meetings, he saw the data, he learned this from Space Data, he worked at X, and yet he said this was all Google's idea.

246.    And Google's own statements during its New Zealand launch of Loon likewise describes the information. Google again claims information learned from Space Data as something Google discovered:

This is a secret project that we've been working on for two years, and this is a project that our team is so excited to be launching here in New Zealand. This is what the balloons really look like. It's an experimental technology. The balloons fly twice as high as commercial airplanes. 20 kilometers up in the sky. This is what's gonna help us bring internet access to some of the 5 billion people around the world who don't have it. It truly fits our definition at Google X of moonshot. **It's a huge problem, the solution is radical, and it took significant technology breakthroughs to get there.**

**One of the technology breakthroughs is the way we control the position of the balloons.** In the past, others have thought about ways of providing communication from a high altitude platform. And they thought of maybe tethering the balloon to the ground, which has obvious issues of aircraft collisions. Or they thought of a platform that was continuously fighting against the wind to stay in one place above the ground. **But instead we thought, what if you don't have to stay in one place. What if you have one balloon sail with the wind and another balloon come and take its place.**

We thought, is it better to be friends with mother nature instead of fighting against mother nature? ***

By changing how we thought about the problem, by deciding that instead of maybe a small number of large, expensive things staying in one place, providing the internet to one area, maybe we could have a large number of free-floating, **inexpensive, high altitude balloons, that would drift with the winds**, not fight them, and provide the internet all around the world.

**And it was this breakthrough thinking that gave us hope that maybe we really had a solution.** So, I want you to imagine a setup. I want you to imagine a bunch of stratospheric internet balloons drifting with the winds. Now, that's a beautiful image, but these balloons will last a long time and will draft a long way, so maybe many times around the world. We want these balloons to go not just where the winds take them, we want these balloons to go where we want to provide the internet on the ground.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

**So, it turns out that the stratosphere is actually very stratified.  Who would have thought, given the name?  And what that means is the winds on different levels go different directions and different speeds.  And so, if it were possible to go up and down in the stratosphere, you could catch a wind that would take you generally in the direction you wanted to go.**

www.youtube.com/watch?v=8tJWECskB9s

247.   This was exactly what Google learned from Space Data years earlier.

248.   Finally, Astro Teller has recently confirmed in his personal online blog that Google Loon "hovers" and works just like Space Data:

**Improving balloon navigation**

Project Loon's algorithms can now send small teams of balloons to form a cluster over a specific region where people need internet access. This is a shift from our original model for Loon in which we planned to create rings of balloons sailing around the globe, and balloons would take turns moving through a region to provide service.



With our original navigational models, rings of balloons sailed around the globe. As one balloon drifted out of range of a specific region, another would move in to take its place.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

Machine-learning-powered algorithms now enable us to send small teams of balloons to a specific region. The balloons dance on the winds in small loops to remain where needed.

\*\*\*

**Back in 2011, we had a hunch that balloons flying freely on the winds could be controlled just enough to act like floating cell phone towers in the sky.** We'd pump air out of or into the balloon to make it lighter or heavier, and then move up or down to catch winds traveling in the direction we wanted to travel. When we ran our first sizable test of Project Loon in 2013, launching dozens of balloons from New Zealand to see if they'd circumnavigate the globe, we knew we had a lot to learn. We thought the balloons would act like leaves in a stream, flowing where the air currents went, and we figured our main task was to manage the balloons' paths just enough to keep them at a roughly equal distance from each other.

\*\*\*

By early 2016, the team was seeing a few balloons behave in a slightly weird way: lingering in an area rather than sailing away. In the weirdness, they saw opportunity. They asked themselves the once-impossible question: could our algorithms help the balloons stay much closer to the location they were already in? In mid 2016, we started sending balloons from our launch site in Puerto Rico to hang out in Peruvian airspace—and they did, some for as long as three months. We repeated the experiments, and saw the same results: **we had figured out how to cluster balloons in teams, dancing in small loops on the stratospheric winds, over a particular region**.

*See* https://blog.x.company/how-project-loons-smart-software-learned-to-sail-the-winds-ec904e6d08c (emphasis added).

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

249.    Google in no way used a clean room to develop Loon.  Many of the Google engineers who had full access to Space Data information continued to work in the Google "Access" group, the very same small group the Google Loon "inventors" joined thereafter, as depicted below:



L.    **Google Zealously Patents Every Aspect of Project Loon.**

250.    Beginning with a bevy of applications filed on January 9, 2012, Google assiduously patented every aspect of a constellation balloon network.  Time and again, Google claimed as new and original Google inventions ideas disclosed to Google by Space Data or patented by Space Data **years** earlier.

251.    For example, Google filed applications covering, and now claims, the following:

*A Balloon Constellation, Sailed in the Stratosphere*

252.    Google claimed an airborne balloon constellation providing a communication mesh (internet coverage), where the horizontal placement of the balloons is a function of adjusting the balloon's altitude, up or down, to capture favorable wind patterns. *See* U.S. Patent 8,820,678 (DeVaul et al.).  Google explains its ability to maintain a constellation array in the specification as follows:

> [I]n a high altitude balloon network, balloons [that] may generally be configured to operate at altitudes between 18 kilometers and 25 kilometers [59,000 ft and 82,000 ft]….  This altitude range may be

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

advantageous for several reasons.  **In particular, this layer of the stratosphere generally has relatively low wind speeds (e.g., winds between 5 and 20 mph) and relatively little turbulence. Further, while the winds between 18 kilometers and 25 kilometers** [59,000 ft and 82,000 ft] **may vary with latitude and by season, the variations can be modeled in a reasonably accurate manner.**

*Id.* at 4:43-53 (emphasis added).  This was not Google's epiphany.

253.    Google further described its ability to "sail" the balloons as follows:

[A] desired horizontal movement of the target balloon may be achieved by adjusting the altitude of the target balloon…. To the extent that the target balloon is moving as a result of ambient winds, the motion of the target balloon can be adjusted by either increasing or decreasing its altitude.  For example, altitude control may be used to achieve a desired horizontal movement of the target balloon by determining that the desired horizontal movement of the target balloon can be achieved by exposing the target balloon to ambient winds of particular velocity, determining that ambient winds of the particular velocity are likely to be available at a particular altitude… and adjusting the altitude of the target balloon to attain the particular attitude.

*Id.* at 20:47-66.

254.    Google claimed these ideas generally in the '678 patent (thereafter captured by Space Data in interference proceeding, as set forth below in Section M).  **Google has now claimed various aspects of an airborne balloon constellation literally dozens of times over hundreds of claims.**

### *Using an Inner Bladder With Ventable Air as Ballast*

255.    As another example, Google claimed the idea of putting a bladder within a balloon, and using air in the bladder to serve as ballast.  Since the balloon gas (hydrogen or helium) is lighter than air, air itself serves as ballast.  To descend, one pumps more air into the inner bladder; to ascend, one evacuates air from the inner bladder.  (This was disclosed to Google by Space Data at the February 15, 2008 meeting when discussing alternative ways to control altitude of balloons and Space Data discussed ballonets.  When Ms. Ingersoll asked what a ballonet was, Space Data showed a book from 1927 with a chapter on ballonets as shown below.  In fact, this is Dependent Claim 22 of Space Data's first patent, the '941 patent).

[Ch. 3

| | Fabric z. per yd. | Wt. Seam lbs. per linear yd. |
|---|---|---|
| Ballonet Seam | 8.5 | .073 |
| Ballonet Shoe | 8.5 | .074 |
| Envelope Seam, Gas-tight, Circumferential | 13.4 | .0808 |
| Envelope Seam, Air-tight, Circumferential | 11.4 | .05214 |
| Envelope Seam, Gas-tight, Longitudinal | 13.4 | .120 |
| Envelope Seam, Air-tight, Longitudinal | 11.4 | .078 |

The width of the strips has been standardized to a maximum of 3 in.

The theoretical determination of the deformation of the envelope from which it is possible to determine the proper amount and location for tailoring, will not be dealt with here; it is set forth fully in Report No. 16 of the National Advisory Committee for Aeronautics (1917) by Haas and Dietzius as translated from the German by Professor Karl K. Darrow.

For the comparatively small nonrigid airships so far produced in this country, the proper amount of tailoring has been determined by one or more of the following methods: by observations on the form of the first airship of any new series upon which corrections may be based; by comparison of the bending moment curves of similar types of airships; or by water model tests showing the amount of deformation to be overcome.

#### Ballonet

**Historical.** The ballonets of the first practical airship to be constructed in America, the Goodyear $F$, 77,000 cu. ft., sister ship of the Navy $B$, 84,000 cu. ft. airship, were ovoidal in form and were suspended from the top of the envelope by means of patches and ropes, one being located in the

AIRSHIP HULL    35

nose and the other one-fourth of the envelope length from the tail of the airship.

This type of bailonet proved impracticable for the following reasons: Excessive fabric weight; internal rigging which was difficult to install and inaccessible to inspection adjustment, and maintenance; inflation difficulties caused by gas pressure on folded fabric which produced excessive strains on the suspension, at times causing it to break away.

**Form.** The ovoidal form was superseded by the diaphragm. In this type the underside is formed by the envelope and the upper side by a diaphragm duplicating the portion of the envelope enclosed. The diaphragm is attached to the inside of the envelope along the "ballonet intersection line." The problem is to design the diaphragm so that on deflation of the ballonet, the diaphragm fabric will lie evenly upon the envelope beneath.

With the ballonet located in the *nose* of the envelope, the diaphragm is designed as a duplication of the envelope patterns beneath (see Figure 8).



Figure 8. Ballonet Diaphragms and Attachment Details

### On Balloon to Balloon Communications

256.    As another example, Google claimed using the predicted movements of balloons to keep the constellation together, so each balloon could communicate with the others (also disclosed by Space Data to Google).  *See* U.S. Patent 9,306,668.

### On the "Call Home" Recovery Station

257.    As a further example, Google claimed as a novel and innovative Google invention an "incentivized recovery" system.  In plain English, Google would attach a label to the payload saying "reward: call" to ensure the recovery of the payload (also disclosed by Space Data to Google and on the side of many payloads Google photographed at Space Data's facility).

### On Communicating Balloon to Balloon to Maintain Position

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

258.    As another example, Google claimed as a novel and original Google invention the idea of the balloons in a constellation mesh communicating with one another to maintain position. *See* U.S. Patent 9,285,450 (an idea also disclosed by Space Data to Google).

### *On Flight Termination*

259.    As another example, Google claimed as a novel and innovative Google invention the idea of using an Exacto blade on a rail to cut a hole in the top of a balloon, to vent gas, to cause the balloon to descend.  *See* U.S. Patent 9,168,994 (also disclosed in concept by Space Data to Google).

260.    As another example, Google claimed as a novel and original Google invention the idea of using a blade to cut the balloon in half, so the top half of the balloon would serve as a parachute.  *See* 9,139,278.  This is an old concept from the following illustrations, as shown below, from a coffee table book in Space Data's lobby the day of Google's tour and passed around to the visitors when discussing various lighter than air technologies.







### *On Controlling the Rate of Descent*

261.    As another example, Google claimed as an original and novel Google invention the idea of using a drag plate (that is, a piece of flat material) below the payload to slow the descent of a balloon, should the balloon fail.  *See* U.S. Patent 9,096,301.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

Hosie Rice LLP
600 Montgomery Street, 34ᵗʰ Floor
San Francisco, CA  94111

### *On a Cut Down Mechanism*

262.    As another example, Google claimed as a novel and original Google invention the idea of using a "cut down" mechanism, to sever the payload from the balloon proper (also disclosed by Space Data to Google and used by Space Data in thousands of flights).  *See* U.S. Patent 9,016,634.

### *On Using a Fuel Cell for Energy*

263.    As another example, Google claimed as a novel and original Google invention the idea of using a hydrogen fuel cell to generate electricity to run a heater to heat the balloon during nighttime hours (also discussed by Space Data with Google).  *See* U.S. Patent 9,290,258 (also disclosed by Space Data to Google).

### *On Venting Gas through Straws*

264.    As another example, Google claimed as an original and novel Google invention the idea of using "straws," (*i.e.* tubes) perforating the exterior of a balloon, where one end of the "straw" could be opened to vent gas to cause the balloon to descend (a concept also discussed between Space Data to Google).  *See* U.S. Patent 9,211,942.  Similar to an early Space Data payload on display during Google's tour of Space Data.





_**Why This Matters**_

265.    From January 9, 2012 forward, Google has filed at least 102 published Google Loon applications, many of which are now patents.  Given that Google often files non-publication requests with its applications, as it did with every Loon application filed in January 2012 (the first filings), there may well be additional non-public Google Loon applications pending.  Putting aside its systematic effort to capture as Google inventions ideas disclosed to Google by others, **in all of these applications, Google claimed as novel, innovative and patentable the Space Data ideas that Google now insists were fully in the public record long before Google filed its patents.  If these ideas were public, as Google now claims in this litigation, Google could not have filed patents on these ideas.  Google's own sworn declarations to the PTO contradict its advocacy position in this litigation.**

M.      **The Interference: Google's Copycat Claims Now Belong to Space Data.**

266.    The PTO has now recognized that Space Data is the senior rights holder on these foundational balloon constellation networking patents.

267.    One of Google's first (January 9, 2012) patent filings related to "Relative Positioning of Balloons With Altitude Control and Wind Data."  Google filed this application on January 9, 2012, along with several related applications.  With each, Google filed a non-publication

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

request, which kept the filings dark, even though significantly limiting Google's foreign rights. That is, Google lost something as its price for keeping these applications secret.

268.    This application matured into U.S. Patent No. 8,820,678, which issued on September 2, 2014.

269.    The specification begins by noting the increasing demand for "network infrastructure" given proliferating connected devices.  This paragraph is common to most of Google's approximately 102 Loon patents and applications.

270.    The specification then describes a constellation of balloons working together to create a "mesh" to provide a "data network…."  The specification further describes **how** Google would pilot the balloon constellation:

> Example of embodiments help to provide a data network that includes a plurality of balloons; for example, a mesh network formed by high-altitude balloons deployed in the stratosphere. **Since winds in the stratosphere my affect the locations of the balloons in a differential manner, each balloon in an example network may be configured to change its horizontal position by adjusting its vertical position (i.e. altitude).**  For example, by adjusting its altitude, a balloon may be able to find winds that will carry it horizontally (e.g., latitudinally and/or longitudinally) to a designed horizontal location.

U.S. Patent No. 8,820,678 at 2:63-3:6 (emphasis added).

271.    The specification further describes an exemplary balloon, which consists of an outer envelope, an inner "bladder" which would use air as a ballast, a cut-down mechanism (to separate the payload form the balloon), several adjustable antennas, an electronics package, a battery and solar power source, and communications ability.

272.    The '678 Google patent broadly claims using the winds to fly a balloon constellation to provide a balloon mesh network to provide a data communications system.

273.    With this application, Google claimed as an original Google invention the preexisting Space Data balloon network, including the Space Data method of mapping winds in the stratosphere and flying the balloons accordingly.

274.    On June 1, 2016, Space Data filed an interference with the Patent Trial and Appeal Board ("PTAB").  Space Data asserted that it was the senior rights holder, as Google had simply copied preexisting Space Data technology.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

275.    On or about July 26, 2016, Google's counsel conceded the interference, and told the Administrative Law judge that Google would not contest the interference.  ("Google did not intend to contest priority in this case.").

276.    On August 31, 2016, the Administrative Panel, Judge Moore presiding, ruled for Space Data.  On December 22, 2016, the final Judgment was issued, and on February 22, 2017, after the statutory 63 day appeal period per 37 CFR 90.3 with no appeals filed, the judgment became final and nonappealable.  The Google application and Google claims went back to the PTO to be assigned to Space Data.

277.    On April 12, 2017 the PTO published a Notice of Allowance awarding the prior Google claims to Space Data.  That patent issued to Space Data on June 13, 2017 as the '193 Patent.

278.    **This prior Google '678 patent is fundamental to Google's Project Loon promiscuous patent filing strategy.**  As Space Data has been adjudicated to be the senior rights owner on this parent application, it perforce is the senior rights holder on all children of the '678 patent and the many related patents.

## COUNT I

## (Infringement of United States Patent No. 6,628,941 Against all Defendants)

279.    Space Data repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1 to 278 above.

280.    On September 30, 2003, United States Patent No. 6,628,941, entitled "Airborne Constellation of Communications Platforms and Method," (the "'941 Patent") was duly and legally issued.  A true and correct copy of the '941 Patent is attached hereto as Exhibit B and incorporated herein by reference.

281.    Gerald M. Knoblach and Eric A. Frische are the inventors of the '941 Patent.  Space Data is the assignee and owner of all right, title, and interest in and to the '941 Patent.

282.    The systems and methods practiced by Google's Project Loon infringes the '941 Patent.  The following describes, at least in part, Project Loon, which "uses software algorithms to determine where its balloons need to go, then moves each one into a layer of wind blowing in the

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1   right direction. By moving with the wind, the balloons can be arranged to form one large

2   communications network" (http://www.google.com/loon/how/).

3       283.    The following describes, at least in part, Project Loon: "Each balloon can provide

4   connectivity to a ground area about 80 km in diameter using a wireless communications technology

5   called LTE. To use LTE, Project Loon partners with telecommunications companies to share

6   cellular spectrum so that people will be able to access the Internet everywhere directly from their

7   phones and other LTE-enabled devices. Balloons relay wireless traffic from cell phones and other

8   devices back to the global Internet using high-speed links" (http://www.google.com/loon/how/).

9       284.    The Project Loon website describes a free-floating constellation communications

10  system comprising a plurality of lighter-than-air platforms comprising at least a first platform and a

11  second platform, as shown in the following images captured from the Project Loon website

12  (http://www.google.com/loon/how/):





Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

285.   The Project Loon website describes a first and second platforms comprising a communications signal transceiver, as shown in the following images captured from the Project Loon web site (http://www.google.com/loon/how/):



[Remainder of page intentionally blank]

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

286.    The Project Loon website describes a free floating platform without any longitudinal and latitudinal position control, as shown in the following images captured from the Project Loon website (http://www.google.com/loon/how/):





[Remainder of page intentionally blank]

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

287.   The Project Loon website describes a plurality of communications devices within a contiguous geographic area, at least one of said communications devices having communications capability with communications signal transceivers, as shown in the following images captured from the Project Loon website (http://www.google.com/loon/how/):



288.    The Project Loon website shows communications devices capable of handing off communication with one platform to another platform as the first platform moves out of a communication range of said at least one of the communications devices, as shown in the following images and video narratives captured from the Google Project Loon website (http://www.google.com/loon/how/ and https://www.youtube.com/watch?v=HOndhtfIXSY ):



"… so another balloon is coming just at the right time to take the place of one that left."

Project Lead, Mike Cassidy, https://www.youtube.com/watch?v=HOndhtfIXSY.



Project Loon began with a pilot test in June 2013, when thirty balloons were launched from New Zealand's South Island and beamed Internet to a small group of pilot testers. The pilot test has since expanded to include a greater number of people over a wider area. Looking ahead, Project Loon will continue to expand the pilot, with the goal of establishing a ring of uninterrupted connectivity at latitudes in the Southern Hemisphere, so that pilot testers in these latitudes can receive continuous service via balloon-powered Internet.

[Remainder of page intentionally blank]

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

289.   The Project Loon website shows a free floating constellation communications system that provides a line-of-sight coverage of wireless data to a population on a contiguous landmass, as shown in the following information captured from the Project Loon website (http://www.google.com/loon/how/):



Each balloon can provide connectivity to a ground area about 40 km in diameter at speeds comparable to 3G. For balloon-to-balloon and balloon-to-ground communications, the balloons use antennas equipped with specialized radio frequency technology. Project Loon currently uses ISM bands (specifically 2.4 and 5.8 GHz bands) that are available for anyone to use.

[Remainder of page intentionally blank]

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

290.    The Project Loon website shows a plurality of lighter-than-air platforms launched in a manner such that when in an operating in a range of 60,000 to 140,000 feet there is substantially a relative distance between said plurality of lighter-than-air platforms, as shown in the following information captured from the Project Loon website (http://www.google.com/loon/how/ and http://x.company/loon/):



Q: WHAT ARE PROJECT LOON BALLOONS?

A: Project Loon is a global network of high altitude balloons. The balloons ascend like weather balloons until they reach the stratosphere, where they drift above 18 km (60,000 ft), safely above the altitudes used for aviation. Unlike weather balloons, Loon balloons are superpressure, which enable them to stay aloft for 100+ days at a time. This is far longer than typical weather balloons, which last for a matter of hours. Loon balloons are also unique in that they are steerable and entirely solar powered.

Project Loon balloons travel around 20 km above the Earth's surface in the stratosphere. Winds in the stratosphere are generally steady and slow-moving at between 5 and 20 mph, and each layer of wind varies in direction and magnitude. Project Loon uses software algorithms to determine where its balloons need to go, then moves each one into a layer of wind blowing in the right direction. By moving with the wind, the balloons can be arranged to form one large communications network.

Q: HOW HIGH DO THE BALLOONS FLY?

A: We are flying in the stratosphere well above commercial air traffic and weather events, at around 18-27 km or 60,000 - 90,000 feet.

"We aim to launch and maintain a fleet of balloons to provide Internet coverage to users on the ground, with our Autolaunchers capable of safely and consistently launching a new balloon every 30 minutes."

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

1    291.    Defendants infringe claims of the '941 Patent.  Defendants, without authority, make,

2    use, import, offer to sell, and/or sell instrumentalities that practice systems and/or methods covered

3    by claims of the '941 Patent.  Google's Loon instrumentalities meet all of the elements of claims of

4    the '941 Patent, including, as further detailed in paragraphs 283 to 290 above, all the elements of

5    the '941 Patent, Claim 1.  Defendants have been, and are currently, directly infringing at least

6    claim 1 of the '941 Patent in violation of 35 U.S.C. § 271(a), literally or under the doctrine of

7    equivalents, by its Google Loon instrumentalities, that practice the inventions disclosed in the '941

8    Patent.

9    292.    While Defendants have been on notice of the '941 Patent since at least September

10   2007, Defendants started to, and continue to, make, use, import, offer to sell, and/or sell

11   instrumentalities that infringe the '941 Patent despite knowledge (or willful blindness) that their

12   actions constitute infringement of a valid patent.  In September 2007, Space Data sent Defendants

13   information about Space Data and its technology which noted Space Data's ownership of patents.

14   On February 15, 2008, executives of Defendants visited Space Data and launched a component of a

15   Space Data system that practices the '941 Patent and which bore the '941 Patent marking.  That

16   same day, Defendants were exposed to further components of, and information on, a Space Data

17   system that practices the '941 Patent.  More, Defendants disclosed the '941 Patent in an

18   information disclosure statement they filed in February 2012, as part of the prosecution of its '678

19   Patent (many of the '678 Patent claims were assigned to Space Data as part of an interference

20   proceeding).  Defendants had knowledge of the '941 Patent and Space Data's technology that

21   embodies it prior to when Defendants purport to have started work on their infringing

22   instrumentalities (2011), and prior to Defendants' public launch of its instrumentalities (2013).

23   Nevertheless, Defendants proceeded with their infringing instrumentalities despite their knowledge

24   (and an objectively high likelihood) that their acts would infringe the '941 Patent.  As detailed

25   above, Defendants have engaged in a deliberate plan to copy Space Data's technology and

26   inventions.  Defendants' conduct is egregious.  Defendants' infringement of the '941 Patent is

27   willful, intentional, and done in subjective bad faith.

28

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

293.    Defendants, without authority, supply and/or cause to be supplied in and/or from the United States at least a substantial portion of the components of instrumentalities covered by claims of the '941 Patent, in such a manner as to actively induce the combination of such components outside the U.S. in a manner that would infringe '941 Patent claims if the combination occurred within the U.S.  Defendants' infringing instrumentalities use, for example, balloons manufactured in the U.S., *see* paragraph 227, balloon payloads assembled in the U.S., and balloons launched from the U.S. and navigated abroad.  Defendants supply their U.S. manufactured/assembled balloons and payloads abroad for use in instrumentalities that practice all of the elements of claims of the '941 Patent.  *See, e.g.,* paragraphs 225 & 246 (Google Loon used to provide internet to several farmers in New Zealand) & paragraph 247 (describing the sending of balloons from a launch site in Puerto Rico to Peru).  Defendants' supply of balloons, payloads and other components from the U.S. for combination into instrumentalities that practice all of the elements of the claims of the '941 Patent is intentional.  *See, e.g.,* paragraphs 225, 246 & 248. Defendants have been, and are currently, infringing at least claim 1 of the '941 Patent in violation of 35 U.S.C. § 271(f)(1), literally or under the doctrine of equivalents.

294.    Defendants, without authority, supply and/or cause to be supplied in and/or from the United States components of instrumentalities covered by claims of the '941 Patent that are especially made and/or especially adapted for use in instrumentalities covered by claims of the '941 Patent.  These components are not staple articles and/or commodities of commerce suitable for substantial noninfringing uses.  Defendants do this knowing that these components are so made and/or adapted and intending that such components will be combined outside the U.S. in a manner that would infringe claims of the '941 Patent if such combinations occurred within the U.S. Defendants' infringing instrumentalities use, for example, balloons manufactured in the U.S., *see* paragraph 227, balloon payloads assembled in the U.S., and balloons launched from the U.S. and navigated abroad.  The Defendants' balloons and balloon payloads are made especially for Defendants' instrumentalities that practice all of the elements of claims of the '941 Patent and these balloons and payloads are not staple articles suitable for substantial noninfringing uses. Defendants' supply of balloons, payloads and other components from the U.S. for combination into

1   systems that practice all of the elements of the claims of the '941 Patent is intentional.  *See, e.g.,*

2   paragraphs 225, 246 & 248.  And, Defendants know that these balloons, payloads and other

3   components are especially made for Defendants very own infringing instrumentalities.  Defendants

4   have been, and are currently, infringing at least claim 1 of the '941 Patent in violation of 35 U.S.C.

5   § 271(f)(2), literally or under the doctrine of equivalents.

6        295.    As a result of Defendants' infringement, Space Data has been and continues to be

7   damaged and irreparably injured, including without limitation, the loss of sales and profits it would

8   have earned but for Defendants' actions, and damage to Space Data's reputation among potential

9   and existing customers, business partners, investors, and in the industry in general.

10        296.    Defendants will continue to irreparably harm Space Data unless enjoined.  Space Data

11   faces real, substantial and irreparable damage and injury of a continuing nature from infringement

12   for which Space Data has no adequate remedy at law.

## COUNT II

### (Misappropriation of Trade Secrets Pursuant to 18 U.S.C. §§ 1836(b) and 1837 Against All Defendants)

16        297.    Space Data repeats, realleges, and incorporates by reference, as if fully set forth

17   herein, the allegations of paragraphs 1 to 278 above.

18        298.    Space Data's proprietary confidential technical and financial information disclosed

19   to Defendants, as further described above, *see, e.g.*, ¶¶110-138, 140-144 & 147-151, constitutes

20   trade secrets under 18 U.S.C. § 1839(3).  These trade secrets were disclosed under the NDA

21   between Space Data and Defendants.  *See, e.g.*, ¶¶111, 152-156 & 162-179.  These trade secrets

22   derive independent economic value from not being generally known to, and not being readily

23   ascertainable through proper means by, another person who can obtain economic value from their

24   disclosure or use.  Throughout its corporate history, Space Data has undertaken reasonable

25   measures to keep secret its proprietary confidential information.  Employees all sign secrecy

26   agreements, the Space Data facilities are security card keyed, all visitors sign in on a mandatory

27   visitor log, and no third party prospective partner was shown proprietary confidential information

28   absent signing a non-disclosure agreement.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

299.    Space Data's asserted trade secrets are not disclosed by Space Data's asserted patents.  For example, and as further detailed in paragraphs 44, 118-121, and 181 above, Space Data's proprietary confidential analysis of the micro-wind structure of the 60,000 to 140,000 foot range that shows a "peaceful band" at approximately 60,000 to 80,000 feet, ███████████ ████████████████████████████████████████████████████████ ████████████████████████, was not disclosed in the '941 Patent.  As a further example, the patents-in-suit clearly make no detailed financial disclosures with respect to the cost and logistical process of operating a balloon constellation.  Proprietary confidential financial information disclosed by Space Data to Defendants under the NDA makes such detailed cost and logistical process disclosures.

300.    Defendants misappropriated Space Data's trade secrets.  For example, Defendants used Space Data trade secrets, without express or implied consent, by using Space Data trade secrets in connection with its assessment of whether to pursue its Project Loon business and in its Project Loon business thereafter, as further described above.  *See, e.g.*, paragraphs 157-158, 160-161, 182-189 & 191-205.  Defendants knew or had reason to know that they could not use Space Data trade secrets in this way, as this use vastly exceeds the use permitted under the NDA, which was limited to use in connection with "discussions and negotiations concerning a proposed acquisition of the shares or assets of [Space Data]."  Defendants also disclosed Space Data trade secrets, without express or implied consent.  *See, e.g.*, paragraphs 159-160.  Defendants knew or had reason to know at the time of Defendants' disclosures that Defendants had a duty to maintain the secrecy of Space Data's trade secrets, as Defendants' disclosures exceed those permitted under the NDA, which obligated Defendants to hold Space Data's trade secrets in "confidence" and not to disclose them to "any person outside its organization."  Defendants also knowingly acquired Space Data trade secrets by improper means, including misrepresentation and breach of a duty to maintain secrecy.  Defendants' use, disclosure and acquisition of Space Data's trade secrets constitutes misappropriation under 18 U.S.C. § 1836(b), 1837 & 1839(5-6).

301.    Space Data's trade secrets misappropriated by Defendants relate to products and/or services used in, or intended for use in, interstate or foreign commerce.  For example, Space Data

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1    trade secrets misappropriated by Defendants relate to Space Data's constellation of stratospheric

2    floating balloons for communications.  Space Data uses its balloon constellation in interstate

3    commerce.  By 2004 Space Data had deployed a number of balloons covering four states, and by

4    2007 Space Data had a working balloon constellation covering vast swaths of the Southwestern

5    United States.  Space Data's technology has also been deployed abroad, including in Iraq.

6        302.    Defendants misappropriation of Space Data's trade secrets includes acts of

7    misappropriation that occurred after May 11, 2016. *See, e.g.*, paragraphs 190-205.  Defendants are

8    corporations organized under the laws of the U.S. State of Delaware.  Defendants misappropriation

9    includes acts committed in the U.S. and abroad, *see, e.g.*, paragraphs 190-205, and Defendants

10   committed acts in furtherance of their foreign misappropriation activities in the U.S. *See, e.g.*,

11   paragraphs 191-195 & 202.

12       303.    Space Data suffered damage as a direct and proximate result of Defendants'

13   misappropriation of Space Data's trade secrets.  The damage suffered by Space Data includes,

14   without limitation, the loss of sales and profits it would have earned but for Defendants' actions,

15   and damages to Space Data's reputation among potential and existing customers, business partners,

16   investors, and in the industry in general.  Defendants have also been unjustly enriched by their

17   misappropriation of Space Data's trade secrets.

18       304.    Defendants' misappropriation and misconduct was willful and malicious.

19   Defendants intentionally breached the use and disclosure limitations imposed by the NDA, and

20   deliberately exercised ownership over Space Data's trade secrets, in a conscious effort to harm

21   Space Data's competitive position and to gain a competitive advantage over Space Data, in

22   reckless disregard for Space Data's rights in its trade secrets.

23       305.    Defendants' use of Space Data trade secrets, without express or implied consent, in

24   connection with Defendants' Project Loon business is ongoing.  Defendants' continuing misuse

25   and/or disclosure of Space Data's trade secrets caused and continues to cause irreparable harm to

26   Space Data for which Space Data has no adequate remedy at law.  An injunction prohibiting

27   Defendants from further use and/or disclosure of Space Data's trade secrets is necessary to provide

28   Space Data complete relief.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1

## COUNT III

2

**(Misappropriation of Trade Secret Pursuant to California Civil Code § 3426, *et seq.* Against All Defendants)**

3

306.    Space Data repeats, realleges, and incorporates by reference, as if fully set forth

4

herein, the allegations of paragraphs 1 to 278 above.

5

307.    Space Data's proprietary confidential technical and financial information disclosed

6

to Defendants, as further described above, *see, e.g.*, ¶¶110-138, 140-144 & 145-151, constitutes

7

trade secrets under Cal. Civ. Code § 3426.1(d).  These trade secrets were disclosed under the NDA

8

between Space Data and Defendants.  *See, e.g.*, ¶¶110, 152-156 & 162-179.  These trade secrets

9

derive independent economic value from not being generally known to the public, or to others who

10

can obtain economic value from their disclosure.  Throughout its corporate history, Space Data has

11

undertaken reasonable efforts to maintain the secrecy of its proprietary confidential information.

12

Employees all sign secrecy agreements, the Space Data facilities are security card keyed, all

13

visitors sign in on a mandatory visitor log, and no third party prospective partner was shown

14

proprietary confidential information absent signing a non-disclosure agreement.

15

308.    Space Data's asserted trade secrets are not disclosed by Space Data's asserted

16

patents.  For example, and as further detailed in paragraphs 44, 118-121, and 181 above, Space

17

Data's proprietary confidential analysis of the micro-wind structure of the 60,000 to 140,000 foot

18

range that shows a "peaceful band" at approximately 60,000 to 80,000 feet, ██████████████

19

████████████████████████████████████████████████████████████████████

20

████████████████████████████, was not disclosed in the '941 Patent.  As a further

21

example, the patents-in-suit clearly make no detailed financial disclosures with respect to the cost

22

and logistical process of operating a balloon constellation.  Proprietary confidential financial

23

information disclosed by Space Data to Defendants under the NDA, makes such detailed cost and

24

logistical process disclosures.

25

309.    Defendants misappropriated Space Data's trade secrets.  For example, Defendants

26

used Space Data trade secrets, without express or implied consent, by using Space Data's trade

27

secrets in connection with its assessment of whether to pursue its Project Loon business and in its

28

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

Project Loon business thereafter, as further described above.  *See, e.g.*, paragraphs 157-158, 160-161, 182-189 & 191-205.  Defendants knew or had reason to know that they could not use Space Data's trade secrets in this way, as this use vastly exceeds the use permitted under the NDA, which was limited to use in connection with "discussions and negotiations concerning a proposed acquisition of the shares or assets of [Space Data]."  *See*, Ex. A, Preamble.  Defendants also disclosed Space Data trade secrets, without express or implied consent.  *See, e.g.*, paragraphs 159-160.  Defendants knew or had reason to know at the time of Defendants' disclosures that Defendants had a duty to maintain the secrecy of Space Data's trade secrets, as Defendants' disclosures exceed those permitted under the NDA, which obligated Defendants to hold Space Data's trade secrets in "confidence" and not to disclose them to "any person outside its organization."  Defendants also knowingly acquired Space Data trade secrets by improper means, including misrepresentation and breach of a duty to maintain secrecy.  Defendants' use, disclosure and acquisition of Space Data's trade secrets constitutes misappropriation under Cal. Civ. Code § 3426.1(b).

310.    Space Data suffered damage as a direct and proximate result of Defendants' misappropriation of Space Data's trade secrets.  The damage suffered by Space Data includes, without limitation, the loss of sales and profits it would have earned but for Defendants' actions, and damages to Space Data's reputation among potential and existing customers, business partners, investors, and in the industry in general.  Defendants have also been unjustly enriched by their misappropriation of Space Data's trade secrets.

311.    Defendants' misappropriation and misconduct was willful and malicious.  Defendants intentionally breached the use and disclosure limitations imposed by the NDA, and deliberately exercised ownership over Space Data's trade secrets, in a conscious effort to harm Space Data's competitive position and to gain a competitive advantage over Space Data, in reckless disregard for Space Data's rights in its trade secrets.

312.    Defendants' continuing misuse and/or disclosure of Space Data's trade secrets caused and continues to cause irreparable harm to Space Data for which Space Data has no adequate remedy at law.  An injunction prohibiting Defendants from further use and/or disclosure

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1   of Space Data's trade secrets is necessary to provide Space Data complete relief.

2   **COUNT IV**

3   **(Breach of Written Contract Against All Defendants)**

4   313.   Space Data repeats, realleges, and incorporates by reference, as if fully set forth

5   herein, the allegations of paragraphs 1 to 278 above.

6   314.   Defendants and Space Data entered into a "Mutual Confidentiality and

7   Nondisclosure Agreement," effective December 1, 2007 (the "NDA").  The NDA is attached

8   hereto as Exhibit A, and incorporated herein by reference.

9   315.   Space Data performed or substantially performed under the NDA and/or any non-

10   performance by Space Data was excused.

11   316.   Under the NDA Space Data disclosed "Confidential Information" to Defendants,

12   including Space Data technical and financial information, know-how and trade secrets.  *See, e.g.*,

13   ¶¶111, 152-156 & 162-179.  The Space Data Confidential Information disclosed under the NDA to

14   Defendants, includes, but is not limited to, information shared with Defendants during Defendants'

15   February 2008 visit to Space Data's Chandler, Arizona facility.

16   317.   Defendants breached the NDA by, among other things: (1) using Space Data

17   Confidential Information to assess whether the Defendants should undertake their Google Loon

18   Project business; (2) using Space Data Confidential Information in implementations of their

19   Google Loon Project technology; (3) disclosing Space Data Confidential Information; and (4)

20   exercising ownership over Space Data Confidential Information.  Defendants' use, disclosure and

21   exercise of ownership over Space Data Confidential Information violates at least Sections 4 and 8

22   of the NDA.  *See* Ex. A.  Examples of specific conduct of Defendants that violated the NDA are

23   further described in paragraphs 157-161, 182-189 & 191-205 above.

24   318.   Pursuant to the NDA, Defendants were obligated to "hold in confidence" and "not

25   [to] disclose to any person outside its organization" any Space Data Confidential Information.

26   Defendants and its personnel were permitted to use Space Data Confidential Information "only for

27   the purposes" of "discussions and negotiations concerning a proposed acquisition of shares or

28

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

1   assets of" Space Data.  Defendants' use of Space Data Confidential Information, including certain

2   information identified herein as Space Data's trade secrets, in connection with Defendants' own

3   constellation of stratospheric floating balloons for communication, opposed to solely in relation to

4   Defendants' assessment of whether to purchase Space Data, was a violation of Section 4 of the

5   NDA.

6        319.    Pursuant to Section 8 of the NDA, "[n]o party acquire[d] any intellectual property

7   rights under [the NDA] (including, but not limited to, patent, copyright, and trademark rights)

8   except the limited rights necessary to carry out the purposes set forth in [the NDA]." *See* Ex. A §

9   8.  Defendants' use of Space Data Confidential Information in connection with Defendants' own

10  constellation of stratospheric floating balloons for communication, is contrary to, and in violation

11  of Section 8, as the NDA expressly states that Defendants shall not acquire any intellectual

12  property rights in Space Data's Confidential Information.

13       320.    Space Data suffered damage as a direct and proximate result of Defendants'

14  breaches of the NDA.  The damage suffered by Space Data includes, without limitation, the loss of

15  sales and profits it would have earned but for Defendants' actions, and damages to Space Data's

16  reputation among potential and existing customers, business partners, investors, and in the industry

17  in general.  Defendants have also been unjustly enriched by their use of Space Data's Confidential

18  Information in violation of the NDA.

19       321.    Defendants will continue to breach the NDA as described above unless enjoined

20  from doing so by this Court.  Space Data faces real, substantial and irreparable injury of a

21  continuing nature owing to Defendants' continuing breaches of the NDA for which Space Data has

22  no adequate remedy at law.

23                          **COUNT V**

24       **(Infringement of United States Patent No. 9,632,503 Against all Defendants)**

25       322.    Space Data repeats, realleges, and incorporates by reference, as if fully set forth

26  herein, the allegations of paragraphs 1 to 278 above.

27       323.    On April 25, 2017, United States Patent No. 9,632,503, entitled "Systems and

28  Applications of Lighter-Than-Air (LTA) Platforms," (the "'503 Patent") was duly and legally issued.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

A true and correct copy of the '503 Patent is attached hereto as Exhibit E and incorporated herein by reference.

324.    Gerald M. Knoblach, Eric A. Frische and Bruce Alan Barkley are the inventors of the '503 Patent.  Space Data is the assignee and owner of all right, title, and interest in and to the '503 Patent.

325.    The systems and methods practiced by Google's Project Loon infringes the '503 Patent.

326.    The Google Project Loon website shows that it has deployed a system comprising a plurality of airborne platforms, each airborne platform comprising an unmanned balloon, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/):

Project Loon balloons float in the stratosphere, twice as high as airplanes and the weather. They are carried around the Earth by winds and they can be steered by rising or descending to an altitude with winds moving in the desired direction. People connect to the balloon network using a special Internet antenna attached to their building. The signal bounces from balloon to balloon, then to the global Internet back on Earth.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111



Project Loon balloons travel around 20 km above the Earth's surface in the stratosphere. Winds in the stratosphere are generally steady and slow-moving at between 5 and 20 mph, and each layer of wind varies in direction and magnitude. Project Loon uses software algorithms to determine where its balloons need to go, then moves each one into a layer of wind blowing in the right direction. By moving with the wind, the balloons can be arranged to form one large communications network.

327.   The Google Project Loon website shows that it has deployed a system with a payload that is separate from the unmanned balloon, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/):





Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

328.    The Google Project Loon website shows that it has deployed a system with a transceiver, and first and second flight termination devices, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/):



329.    The Google Project Loon website shows that it has deployed a system with at least two separate power sources for the first and second flight termination devices, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/):



330.     The Google Project Loon website shows that it has deployed a system with a sensor, a processor, a pump, and a valve, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/):



Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

331. The Google Project Loon website shows that it has deployed a system with a tether that when broken separates the unmanned balloon and the payload, as shown in the following image captured from the Google Project Loon website (http://www.google.com/loon/how/):



332. The Google Project Loon website shows that it has deployed a system wherein the pump and the valve are configured to change an altitude of the airborne platform, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/):

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111



333.   The Google Project Loon website shows that it has deployed a system wherein the sensor comprises a pressure sensor, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/):

**Estimated Life Expectancy** :  Through multiple sensors, our flight systems constantly check indicators of balloon life (e.g., temperature and pressure).

334.   The Google Project Loon website shows that it has deployed a system wherein, in operation, the unmanned balloon substantially drifts along with the wind currents, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/):




Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

335.    The Google Project Loon website shows that it has deployed a system wherein the transceiver is capable of communicating with a communication device that is separate from the unmanned balloon, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/):



A network of **stratospheric balloons** that **connect directly** to user's mobile device via LTE

Balloon to balloon transmission extends reach into remote areas

Signal transmitted down to telco station

User connects via LTE-device

336.    The Google Project Loon website shows that it has deployed a system wherein each of the first and second flight termination devices has an ability to independently terminate a flight of the unmanned balloon, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/) and the ICAO (International Civil Aviation Organization) Rules:

**Safety features**

**WE COMPLY WITH OR EXCEED ALL HEAVY UFB REQUIREMENTS (ICAO Rules of the Air, Annex 2, Appendix 5)**

3.3    A heavy unmanned free balloon shall not be operated unless:

a)    it is equipped with at least two payload flight-termination devices or systems, whether automatic or operated by telecommand, that operate independently of each other;

b)    for polyethylene zero-pressure balloons, at least two methods, systems, devices, or combinations thereof, that function independently of each other are employed for terminating the flight of the balloon envelope;

337.    The Google Project Loon website shows that it has deployed a system wherein at least one of the geographical coordinates tracking system comprises a GPS, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/):

**VISIBILITY ELEMENTS**
**Triple Redundant Position Tracking**
1.        Transponder (ADS-B out with Mode A/C)
2.        Web based GPS
3         Iridium triangulation

**Radar Reflective Materials**

**Omnidirectional light beacon** ( > 5NM vis. )

**AVIONICS SYSTEM**
Transponder/ADS-B out, GPS + sensor state information, transmitted via Iridium

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

338.    The Google Project Loon website shows that it has deployed a system wherein the unmanned balloon is configured to operate above an altitude of about 60,000 feet, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/):

Transit occurs above 60,000 ft. In cases that we do transit below FL600, we coordinate with ATC.

339.    The Google Project Loon website shows that it has deployed a system wherein the unmanned balloon has a flight duration capability that is longer than that of weather balloons that have flight durations of approximately 2 hours, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/):

FLIGHT

We aim to launch and maintain a fleet of balloons to provide Internet coverage to users on the ground, with our Autolaunchers capable of safely and consistently launching a new balloon every 30 minutes. We have flown over 19 million km of test flights to date since the project began - with one of our record-breaking balloons surviving for 190 days aloft in the stratosphere.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

340.     The Google Project Loon website shows that it has deployed a system wherein the payload is configured to communicate with an additional airborne payload attached to a separate unmanned balloon, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/):

**DATA NETWORKING**
Balloon-to-balloon and balloon-to-ground communications

341.     The Google Project Loon website shows that it has deployed a system wherein each of the first and second flight termination devices has an ability to independently terminate a flight of the unmanned balloon based on a determination that further operation of the unmanned balloon presents a danger to air traffic, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/) and the ICAO Rules:

**Safety features**

**WE COMPLY WITH OR EXCEED ALL HEAVY UFB REQUIREMENTS (ICAO Rules of the Air, Annex 2, Appendix 5)**

The operator of a heavy unmanned free balloon shall activate the appropriate termination devices required by 3.3 a) and b) above:

   a)   when it becomes known that weather conditions are less than those prescribed for the operation;

   b)   if a malfunction or any other reason makes further operation hazardous to air traffic or to persons or property on the surface; or

   c)   prior to unauthorized entry into the airspace over another State's territory.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

342.    The Google Project Loon website shows that it has deployed a system wherein each of the first and second flight termination devices has an ability to independently terminate a flight of the unmanned balloon based on a determination of a malfunction of the unmanned balloon, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/):

## Safety features

### WE COMPLY WITH OR EXCEED ALL HEAVY UFB REQUIREMENTS (ICAO Rules of the Air, Annex 2, Appendix 5)

The operator of a heavy unmanned free balloon shall activate the appropriate termination devices required by 3.3 a) and b) above:

a)    when it becomes known that weather conditions are less than those prescribed for the operation;

b)    if a malfunction or any other reason makes further operation hazardous to air traffic or to persons or property on the surface; or

c)    prior to unauthorized entry into the airspace over another State's territory.

343.    Defendants infringe claims of the '503 Patent.  Defendants, without authority, make, use, import, offer to sell, and/or sell instrumentalities that practice systems and/or methods covered by claims of the '503 Patent.  Google's Loon instrumentalities meet all of the elements of claims of the '503 Patent, including, as further detailed in paragraphs 326 to 342 above, all the elements of the '503 Patent, Claim 1.  Defendants have been, and are currently, directly infringing at least claim 1 of the '503 Patent in violation of 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by its Google Loon instrumentalities, that practice the systems and/or methods disclosed in the '503 Patent.

344.    Defendants were on notice that Space Data intended to assert the '503 Patent against them since at least April 7, 2017, when Space Data asked Defendants to stipulate to its addition to this case.  Given Space Data provided Defendants with the issue notification for the '503 Patent prior to the patent's issuance, Defendants have known, or should have known, of the '503 Patent's issuance since its April 25, 2017 issuance date.  Yet, following the issuance of the '503 Patent, Defendants continued to, and still continue to, make, use, import, offer to sell and/or sell

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1    instrumentalities that infringe the '503 Patent, despite knowledge (or a willful blindness) that these

2    actions, and others, constitute infringement of a valid patent.

3          345.    Defendants have been on notice that Space Data's technology is patented since at

4    least September 2007, when Space Data sent Defendants information about Space Data and its

5    technology, which noted Space Data's ownership of patents.  On February 15, 2008, executives of

6    Defendants visited Space Data and launched a component of a Space Data system that was marked

7    with the number of a Space Data patent.  That same day, Defendants were exposed to further

8    components of, and information on, a Space Data system.

9          346.    Defendants were on notice of the claims of the '503 Patent since at least April 12,

10   2017, when Space Data sent Defendants a copy of the published application, issue notification and

11   a draft claim chart.  The originally filed claims of the application that issued as the '503 Patent are

12   identical to the issued claims.

13         347.    Despite having pre-issuance knowledge of the '503 Patent's claims, knowledge that

14   the '503 Patent issued, knowledge of Space Data's technology, and knowledge that Space Data

15   intended to assert the '503 Patent against Defendants, Defendants have continued with their

16   activities that infringe the '503 Patent.  Defendants did so in subjective bad faith and knowing there

17   was an objectively high likelihood they infringed.  As detailed above, Defendants have engaged in

18   a deliberate plan to copy Space Data's technology and inventions.  Defendants' conduct is

19   egregious.  Defendants' infringement of the '503 Patent is willful and intentional.

20         348.    Defendants, without authority, supply and/or cause to be supplied in and/or from

21   the United States at least a substantial portion of the components of instrumentalities covered by

22   claims of the '503 Patent, in such a manner as to actively induce the combination of such

23   components outside the U.S. in a manner that would infringe '503 Patent claims if the combination

24   occurred within the U.S.  Defendants' infringing instrumentalities use, for example, balloons

25   manufactured in the U.S., *see* paragraph 227, balloon payloads assembled in the U.S., and balloons

26   launched from the U.S. and navigated abroad.  Defendants supply their U.S.

27   manufactured/assembled balloons and payloads abroad for use in instrumentalities that practice all

28   of the elements of claims of the '503 Patent.  *See, e.g.,* paragraphs 225 & 246 (Google Loon used

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1   to provide internet to several farmers in New Zealand) & paragraph 248 (describing the sending of

2   balloons from a launch site in Puerto Rico to Peru).  Defendants also supply transceivers, flight

3   termination devices, sensors, processors, pumps, valves and other components abroad, from the

4   U.S., for use in systems that practice all of the elements of claims of the '503 Patent.  Defendants'

5   supply of balloons, payloads and other components from the U.S. for combination into

6   instrumentalities that practice all of the elements of the claims of the '503 Patent is intentional.

7   *See, e.g.,* paragraphs 225, 246 & 248.  Defendants have been, and are currently, infringing at least

8   claim 1 of the '503 Patent in violation of 35 U.S.C. § 271(f)(1), literally or under the doctrine of

9   equivalents.

10          349.    Defendants, without authority, supply and/or cause to be supplied in and/or from the

11   United States components of instrumentalities covered by claims of the '503 Patent that are

12   especially made and/or especially adapted for use in instrumentalities covered by claims of the

13   '503 Patent.  These components are not staple articles and/or commodities of commerce suitable

14   for substantial noninfringing uses.  Defendants do this knowing that these components are so made

15   and/or adapted and intending that such components will be combined outside the U.S. in a manner

16   that would infringe claims of the '503 Patent if such combinations occurred within the U.S.

17   Defendants' infringing instrumentalities use, for example, balloons manufactured in the U.S., *see*

18   paragraph 227, balloon payloads assembled in the U.S., and balloons launched from the U.S. and

19   navigated abroad.  The Defendants' balloons and balloon payloads are made especially for

20   Defendants' instrumentalities that practice all of the elements of claims of the '503 Patent and

21   these balloons and payloads are not staple articles suitable for substantial noninfringing uses.

22   Defendants' supply of balloons, payloads and other components from the U.S. for combination into

23   systems that practice all of the elements of claims of the '503 Patent is intentional.  *See, e.g.*,

24   paragraphs 225, 246 & 248.  And, Defendants know that these balloons, payloads and other

25   components are especially made for Defendants' very own infringing systems.  Defendants have

26   been, and are currently, infringing at least claim 1 of the '503 Patent in violation of 35 U.S.C. §

27   271(f)(2), literally or under the doctrine of equivalents.

28

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

350.     As a result of Defendants' infringement, Space Data has been and continues to be damaged and irreparably injured, including without limitation, the loss of sales and profits it would have earned but for Defendants' actions, and damage to Space Data's reputation among potential and existing customers, business partners, investors, and in the industry in general.

351.     Defendants will continue to irreparably harm Space Data unless enjoined.  Space Data faces real, substantial and irreparable damage and injury of a continuing nature from infringement for which Space Data has no adequate remedy at law.

## COUNT VI

### (Infringement of United States Patent No. 9,643,706 Against all Defendants)

352.     Space Data repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1 to 278 above.

353.     On May 9, 2017, United States Patent No. 9,643,706, entitled "Systems and Applications of Lighter-Than-Air (LTA) Platforms," (the "'706 Patent") was duly and legally issued.  On August 14, 2018, the PTO issued a Certificate of Correction removing Bruce Alan Barkley from the list of named-inventors on the Title Page of the '706 Patent.  A true and correct copy of the '706 Patent and the August 14, 2018 Certificate of Correction are attached hereto as Amended Exhibit F and incorporated herein by reference.

354.     Gerald M. Knoblach and Eric A. Frische are the inventors of the '706 Patent.  Space Data is the assignee and owner of all right, title, and interest in and to the '706 Patent.

355.     The systems practiced by Google's Project Loon infringes the '706 Patent.

356.     The Google Project Loon website shows that it has deployed a system comprising an airborne platform comprising an unmanned balloon, a payload that is separate from the unmanned balloon, a transceiver, and first and second flight termination devices, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/):

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

A small box containing the balloon's electronic equipment hangs underneath the inflated envelope, like the basket that is carried by a hot air balloon. This box contains circuit boards that control the system, radio antennas to communicate with other balloons and with Internet antennas on the ground, and batteries to store solar power so the balloons can operate during the night.

## Safety features

**WE COMPLY WITH OR EXCEED ALL HEAVY UFB REQUIREMENTS (ICAO Rules of the Air, Annex 2, Appendix 5)**

**VISIBILITY ELEMENTS**
**Triple Redundant Position Tracking**
1.    Transponder (ADS-B out with Mode A/C)
2.    Web based GPS
3    Iridium triangulation

**Radar Reflective Materials**

**Omnidirectional light beacon ( > 5NM vis. )**

**REDUNDANT FLIGHT TERMINATION**
**Soft Terminate ( ~90 minute descent time )**
Slowly vents gas for gradual descent

**Hard Terminate ( ~60 minute descent time )**
Quickly vents gas for fast descent

THE PAYLOAD AND BALLOON STAY AS ONE

Flight termination
Safety tether
LED Strobe light
Parachute

357.    The Google Project Loon website shows that it has deployed a system with at least two separate power sources for the first and second flight termination devices, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/):

[Remainder of page intentionally blank]

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

1

358.    The Google Project Loon website shows that it has deployed a system with a sensor,

2    a processor, a pump, and a valve, as shown in the following information captured from the Google

3    Project Loon website (http://www.google.com/loon/how/):

4

5

6

7

8

9

10

11

12



13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

359.    The Google Project Loon website shows that it has deployed a system with a tether that when broken separates the unmanned balloon and the payload, as shown in the following image captured from the Google Project Loon website (http://www.google.com/loon/how/):



360.    The Google Project Loon website shows that it has deployed a system wherein the pump and the valve are configured to change an altitude of the airborne platform, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/):

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111



ALTITUDE CONTROL
Pumps and valves that enable the
balloon to maneuver with the winds

361.   The Google Project Loon website shows that it has deployed a system wherein the sensor comprises a pressure sensor, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/):

**Estimated Life Expectancy** : Through multiple sensors, our flight systems constantly check indicators of balloon life (e.g., temperature and pressure).

362.   The Google Project Loon website shows that it has deployed a system wherein, in operation, the unmanned balloon substantially drifts along with the wind currents, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/):

ALTITUDE CONTROL
Pumps and valves that enable the
balloon to maneuver with the winds

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111



363.   The Google Project Loon website shows that it has deployed a system wherein the transceiver is capable of communicating with a communication device that is separate from the unmanned balloon, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/):



Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

364. The Google Project Loon website shows that it has deployed a system wherein each of the first and second flight termination devices has an ability to independently terminate a flight of the unmanned balloon, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/) and the ICAO Rules:

## Safety features

**WE COMPLY WITH OR EXCEED ALL HEAVY UFB REQUIREMENTS (ICAO Rules of the Air, Annex 2, Appendix 5)**

3.3   A heavy unmanned free balloon shall not be operated unless:

a)   it is equipped with at least two payload flight-termination devices or systems, whether automatic or operated by telecommand, that operate independently of each other;

b)   for polyethylene zero-pressure balloons, at least two methods, systems, devices, or combinations thereof, that function independently of each other are employed for terminating the flight of the balloon envelope;

365. The Google Project Loon website shows that it has deployed a system wherein at least one of the geographical coordinates tracking system comprises a GPS, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/):

**VISIBILITY ELEMENTS**
**Triple Redundant Position Tracking**
1.          Transponder (ADS-B out with Mode A/C)
2.          Web based GPS
3           Iridium triangulation

**Radar Reflective Materials**

**Omnidirectional light beacon** ( > 5NM vis. )

**AVIONICS SYSTEM**
Transponder/ADS-B out, GPS + sensor state information, transmitted via Iridium

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

366.   The Google Project Loon website shows that it has deployed a system wherein the unmanned balloon is configured to operate above an altitude of about 60,000 feet, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/):

Transit occurs above 60,000 ft. In cases that we do transit below FL600, we coordinate with ATC.

367.   The Google Project Loon website shows that it has deployed a system wherein the unmanned balloon has a flight duration capability that is longer than that of weather balloons that have flight durations of approximately 2 hours, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/):

FLIGHT

We aim to launch and maintain a fleet of balloons to provide Internet coverage to users on the ground, with our Autolaunchers capable of safely and consistently launching a new balloon every 30 minutes. We have flown over 19 million km of test flights to date since the project began - with one of our record-breaking balloons surviving for 190 days aloft in the stratosphere.

368.   The Google Project Loon website shows that it has deployed a system wherein the payload is configured to communicate with an additional airborne payload attached to a separate

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

unmanned balloon, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/):

**DATA NETWORKING**
Balloon-to-balloon and balloon-to-ground communications

369.    The Google Project Loon website shows that it has deployed a system wherein the payload remains attached to the unmanned balloon as one when landed unless the payload is separated from the unmanned balloon, as shown in the following information captured from the Google Project Loon website (http://www.google.com /loon/how/):



Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

370.    The Google Project Loon website shows that it has deployed a system wherein each of the first and second flight termination devices has an ability to independently terminate a flight of the unmanned balloon based on a determination that further operation of the unmanned balloon presents a danger to air traffic, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/) and the ICAO Rules:

The operator of a heavy unmanned free balloon shall activate the appropriate termination devices required by 3.3 a) and b) above:

  a)   when it becomes known that weather conditions are less than those prescribed for the operation;

  b)   if a malfunction or any other reason makes further operation hazardous to air traffic or to persons or property on the surface; or

  c)   prior to unauthorized entry into the airspace over another State's territory.

371.    The Google Project Loon website shows that it has deployed a system wherein each of the first and second flight termination devices has an ability to independently terminate a flight of the unmanned balloon based on a determination of a malfunction of the unmanned balloon, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/):

The operator of a heavy unmanned free balloon shall activate the appropriate termination devices required by 3.3 a) and b) above:

  a)   when it becomes known that weather conditions are less than those prescribed for the operation;

  b)   if a malfunction or any other reason makes further operation hazardous to air traffic or to persons or property on the surface; or

  c)   prior to unauthorized entry into the airspace over another State's territory.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

372.    Defendants infringe claims of the '706 Patent.  Defendants, without authority, make, use, import, offer to sell, and/or sell instrumentalities that practice systems covered by claims of the '706 Patent.  Google's Loon instrumentalities meet all of the elements of claims of the '706 Patent, including, as further detailed in paragraphs 356 to 371 above, all the elements of the '706 Patent, Claim 29.  Defendants have been, and are currently, directly infringing at least claim 29 of the '706 Patent in violation of 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by its Google Loon instrumentalities, that practice the systems disclosed in the '706 Patent.

373.    Defendants were on notice that Space Data intended to assert the '706 Patent against them since at least April 21, 2017, when Space Data sent Defendants the issue notification for the '706 Patent.  Given Space Data provided Defendants with the issue notification for the '706 Patent prior to the patent's issuance, Defendants have known, or should have known, of the '706 Patent's issuance since its May 9, 2017 issuance date. Yet, following the issuance of the '706 Patent, Defendants continued to, and still continue to, make, use, import, offer to sell and/or sell instrumentalities that infringe the '706 Patent, despite knowledge (or a willful blindness) that these actions, and others, constitute infringement of a valid patent.

374.    Defendants have been on notice that Space Data's technology is patented since at least September 2007, when Space Data sent Defendants information about Space Data and its technology, which noted Space Data's ownership of patents.  On February 15, 2008, executives of Defendants visited Space Data and launched a component of a Space Data system that was marked with the number of a Space Data patent.  That same day, Defendants were exposed to further components of, and information on, a Space Data system.

375.    Defendants were on notice of the claims of the '706 Patent since at least April 18, 2017, when Space Data sent Defendants a copy of the '706 Patent's file wrapper.  The originally filed claims of the application that issued as the '706 Patent are identical to the issued claims. Additionally, Space Data provided Defendants with a draft claim chart for the '706 Patent prior to the filing of Space Data's complaint that first asserted the '706 Patent.

376.    Despite having pre-issuance knowledge of the '706 Patent's claims, knowledge that the '706 Patent issued, knowledge of Space Data's technology, and knowledge that Space Data

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1  intended to assert the '706 Patent against Defendants, Defendants have continued with their

2  activities that infringe the '706 Patent.  Defendants did so in subjective bad faith and knowing there

3  was an objectively high likelihood they infringed.  All-in-all, as detailed above, Defendants have

4  engaged in a deliberate plan to copy Space Data's technology and inventions.  Defendants' conduct

5  is egregious.  Defendants' infringement of the '706 Patent is willful and intentional.

6        377.    Defendants, without authority, supply and/or cause to be supplied in and/or from the

7  United States at least a substantial portion of the components of instrumentalities covered by

8  claims of the '706 Patent, in such a manner as to actively induce the combination of such

9  components outside the U.S. in a manner that would infringe '706 Patent claims if the combination

10  occurred within the U.S.  Defendants' infringing instrumentalities use, for example, balloons

11  manufactured in the U.S., *see* paragraph 227, balloon payloads assembled in the U.S., and balloons

12  launched from the U.S. and navigated abroad.  Defendants supply their U.S.

13  manufactured/assembled balloons and payloads abroad for use in instrumentalities that practice all

14  of the elements of claims of the '706 Patent.  *See, e.g.*, paragraphs 225 & 246 (Google Loon used

15  to provide internet to several farmers in New Zealand) & paragraph 248 (describing the sending of

16  balloons from a launch site in Puerto Rico to Peru).  Defendants also supply transceivers, flight

17  termination devices, sensors, processors, pumps, valves and other components abroad, from the

18  U.S., for use in instrumentalities that practice all of the elements of claims of the '706 Patent.

19  Defendants' supply of balloons, payloads and other components from the U.S. for combination into

20  instrumentalities that practice all of the elements of the claims of the '503 Patent is intentional.

21  *See, e.g.*, paragraphs 225, 246 & 248.  Defendants have been, and are currently, infringing at least

22  claim 29 of the '706 Patent in violation of 35 U.S.C. § 271(f)(1), literally or under the doctrine of

23  equivalents.

24        378.    Defendants, without authority, supply and/or cause to be supplied in and/or from the

25  United States components of instrumentalities covered by claims of the '706 Patent that are

26  especially made and/or especially adapted for use in systems covered by claims of the '706 Patent.

27  These components are not staple articles and/or commodities of commerce suitable for substantial

28  noninfringing uses.  Defendants do this knowing that these components are so made and/or adapted

1   and intending that such components will be combined outside the U.S. in a manner that would

2   infringe claims of the '706 Patent if such combinations occurred within the U.S.  Defendants'

3   infringing instrumentalities use, for example, balloons manufactured in the U.S., *see* paragraph

4   227, balloon payloads assembled in the U.S., and balloons launched from the U.S. and navigated

5   abroad.  The Defendants' balloons and balloon payloads are made especially for Defendants

6   instrumentalities that practice all of the elements of claims of the '706 Patent and these balloons

7   and payloads are not staple articles suitable for substantial noninfringing uses.  Defendants' supply

8   of balloons, payloads and other components from the U.S. for combination into instrumentalities

9   that practice all of the elements of the claims of the '706 Patent is intentional.  *See, e.g.*, paragraphs

10  225, 246 & 248.  And, Defendants know that these balloons, payloads and other components are

11  especially made for Defendants' very own infringing instrumentalities.  Defendants have been, and

12  are currently, infringing at least claim 29 of the '706 Patent in violation of 35 U.S.C. § 271(f)(2),

13  literally or under the doctrine of equivalents.

14  379.  As a result of Defendants' infringement, Space Data has been and continues to be

15  damaged and irreparably injured, including without limitation, the loss of sales and profits it would

16  have earned but for Defendants' actions, and damage to Space Data's reputation among potential

17  and existing customers, business partners, investors, and in the industry in general.

18  380.  Defendants will continue to irreparably harm Space Data unless enjoined.  Space

19  Data faces real, substantial and irreparable damage and injury of a continuing nature from

20  infringement for which Space Data has no adequate remedy at law.

21  **COUNT VII**

22  **(Infringement of United States Patent No. 9,678,193 Against All Defendants)**

23  381.  Space Data repeats, realleges, and incorporates by reference, as if fully set forth

24  herein, the allegations of paragraphs 1 to 278 above.

25  382.  On June 13, 2017, United States Patent No. 9,678,193, entitled "Systems and

26  Applications of Lighter-Than-Air (LTA) Platforms," (the "'193 Patent") was duly and legally

27  issued.  On October 9, 2018, the PTO issued a Certificate of Correction, certifying "that an error

28  appears in the" '193 Patent and stating that the '193 Patent "is hereby corrected as shown" on the

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

1  Certificate of Correction.  The October 9, 2018 Certificate of Corrections rectifies an

2  administrative error in the priority chain information on the first page of the patent which was

3  inadvertently cited inconsistently. A true and correct copy of the '193 Patent and the October 9,

4  2018 Certificate of Correction are attached hereto as Amended Exhibit G and incorporated herein

5  by reference.

6        383.    Gerald M. Knoblach, Eric A. Frische and Bruce Alan Barkley are the inventors of

7  the '193 Patent.  Space Data is the assignee and owner of all right, title, and interest in and to the

8  '193 Patent.

9        384.    Methods, non-transitory computer medium and balloons practiced by Google's

10  Project Loon infringe the '193 Patent.

11        385.    The Google Project Loon website shows that Defendants use a method comprising

12  determining a location of a target balloon, as shown in the following information captured from the

13  Google Project Loon website (http://www.google.com/loon/how/):





386.   Defendants have publicly stated that they use a method for determining locations of one or more neighbor balloons relative to the determined location of the target balloon, as shown in the following image and transcribed excerpt taken from a video presentation by Project Loon Rapid Evaluator Dan Piponi (https://www.youtube.com/watch?v=mjyLynnQuC4):



Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"They [the balloons] look at their near-neighbors and tried to spread each other out nicely . . . But as we move forward, we may use methods that take into account everything. So every balloon essentially will have information about what every other balloon is doing. In future, it will probably be a much more sophisticated simulation."

387.    The Google Project Loon website shows that Defendants use a method wherein the target balloon comprises a communication system that is operable for data communication with at least one of the one or more neighbor balloons, as shown in the following information captured from the Google Project Loon website (http://www.google.com/loon/how/):



388.    Defendants have publicly stated that they use a method for determining a desired movement of the target balloon based on the determined locations of the one or more neighbor balloons relative to the determined location of the target balloon, as shown by the following information captured from a Google Plus Project Loon post (https://plus.google.com/+ProjectLoon/posts/AYJZLudVWNu) and the following image and transcribed excerpt taken from a video presentation by Project Loon Rapid Evaluator Dan Piponi (https://www.youtube.com/watch?v=mjyLynnQuC4):

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111



"Loon balloons navigate by moving up or down into different wind patterns travelling in different directions in the stratosphere. To do this accurately, the team has built a dynamic map of the stratospheric winds at different altitudes and different times. These maps allow us to make predictions of the wind patterns near the balloon that it can ascend or descend into depending the direction and speed we want, allowing us to sail towards our target location."

"They [the balloons] look at their near-neighbors and tried to spread each other out nicely . . . But as we move forward, we may use methods that take into account everything. So every balloon essentially will have information about what every other balloon is doing. In future, it will probably be a much more sophisticated simulation."

SPACE DATA CORP.'S FIFTH AMENDED COMPLAINT
FOR, *INTER ALIA*, PATENT INFRINGEMENT          - 130 -

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

389.    Defendants have publicly stated that they use a method wherein the desired movement of the target balloon comprises a desired horizontal movement of the target balloon, as shown by the following information captured from a Google Plus Project Loon post (https://plus.google.com/+ProjectLoon/posts/AYJZLudVWNu) and the following image taken from a Google Project Loon YouTube video (https://www.youtube.com/watch?v=eHCKL-fCmk8#action=share):

> "Loon balloons navigate by moving up or down into different wind patterns travelling in different directions in the stratosphere. To do this accurately, the team has built a dynamic map of the stratospheric winds at different altitudes and different times. These maps allow us to make predictions of the wind patterns near the balloon that it can ascend or descend into depending the direction and speed we want, allowing us to sail towards our target location."



390.    Defendants have publicly stated that they use a method for controlling the target balloon based on the desired movement of the target balloon, as shown by the following information captured from a Google Plus Project Loon post (https://plus.google.com/+ProjectLoon/posts/AYJZLudVWNu):

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



"Loon balloons navigate by moving up or down into different wind patterns travelling in different directions in the stratosphere. To do this accurately, the team has built a dynamic map of the stratospheric winds at different altitudes and different times. These maps allow us to make predictions of the wind patterns near the balloon that it can ascend or descend into depending the direction and speed we want, allowing us to sail towards our target location."

391.    Defendants have publicly stated that they use a method wherein controlling the target balloon based on the desired movement of the target balloon comprises controlling an altitude of the target balloon based on the desired horizontal movement of the target balloon, as shown by the following information captured from a Google Plus Project Loon post (https://plus.google.com/+ProjectLoon/posts/AYJZLudVWNu) and the following image taken from a Google Project Loon YouTube video (https://www.youtube.com/watch?v=eHCKL-fCmk8#action=share):



"Loon balloons navigate by moving up or down into different wind patterns travelling in different directions in the stratosphere. To do this accurately, the team has built a dynamic map of the stratospheric winds at different altitudes and different times. These maps allow us to make predictions of the wind patterns near the balloon that it can ascend or descend into depending the direction and speed we want, allowing us to sail towards our target location."



By moving our balloons up or down into a layer of wind blowing in the direction we want to travel, we can send them to areas where Internet access is needed.

392.    Defendants have publicly disclosed that Defendants use a balloon with a communication system operable for data communication with one or more other balloons in a mesh network of balloons (http://www.icao.int/MID/Documents/2015/ATM%20SG2/PPT%203%20-%20Google%20Loon.pdf):

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111



"coordinate as a mesh to ensure continuous coverage"

393.    Defendants have publicly disclosed that Defendants use a balloon with a controller coupled to the communication system, wherein the controller is configured to determine the balloon's location (https://x.company/loon/technology/):

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111





"The Project Loon team tracks the location of every balloon using GPS …."

394.    Defendants have publicly disclosed that Defendants use a balloon with a controller coupled to the communication system, wherein the controller is configured to determine locations of one or more neighbor balloons relative to the balloon's determined location wherein the one or more neighbor balloons are in the mesh network of balloons (https://www.youtube.com/watch?v=mjyLynnQuC4 and http://www.icao.int/MID/Documents/2015/ATM%20SG2/PPT%203%20-%20Google%20Loon.pdf):



"They [the balloons] look at their near-neighbors and tried to spread each other out nicely . . . But as we move forward, we may use methods that take into account everything. So every balloon essentially will have information about what every other balloon is doing. In future, it will probably be a much more sophisticated simulation."



Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

"...coordinated as a mesh to ensure continuous coverage."

395.    Defendants have publicly disclosed that Defendants use a balloon with a controller coupled to the communication system, wherein the controller is configured to determine a desired movement of the balloon based on the determined locations of the one or more neighbor balloons relative to the balloon's determined location, wherein the desired movement of the balloon comprised a desired horizontal movement of the balloon (https://plus.google.com/+ProjectLoon/posts/AYJZLudVWNu and https://www.youtube.com/watch?v=mjyLynnQuC4):



"Loon balloons navigate by moving up or down into different wind patterns travelling in different directions in the stratosphere. To do this accurately, the team has built a dynamic map of the stratospheric winds at different altitudes and different times. These maps allow us to make predictions of the wind patterns near the balloon that it can ascend or descend into depending the direction and speed we want, allowing us to sail towards our target location."



Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

"They [the balloons] look at their near-neighbors and tried to spread each other out nicely . . . But as we move forward, we may use methods that take into account everything. So every balloon essentially will have information about what every other balloon is doing. In future, it will probably be a much more sophisticated simulation."

396.    Defendants have publicly disclosed that Defendants use a balloon with a controller coupled to the communication system, wherein the controller is configured to control the target balloon based on the desired movement of the target balloon by controlling an altitude of the target balloon based on the desired horizontal movement of the target balloon (https://plus.google.com/+ProjectLoon/posts/AYJZLudVWNu):



"Loon balloons navigate by moving up or down into different wind patterns travelling in different directions in the stratosphere. To do this accurately, the team has built a dynamic map of the stratospheric winds at different altitudes and different times. These maps allow us to make predictions of the wind patterns near the balloon that it can ascend or descend into depending the direction and speed we want, allowing us to sail towards our target location."

397.    Defendants infringe claims of the '193 Patent.  Defendants, without authority, make, use, import, offer to sell, and/or sell instrumentalities that practice inventions, including methods, non-transitory computer medium and/or balloons, covered by claims of the '193 Patent.  Google's Loon instrumentalities meet all of the elements of claims of the '193 Patent, including, as further detailed in paragraphs 384 to 390 above, all the elements of the '193 Patent, Claim 1, and as further detailed in paragraphs 391 to 395 above, all the elements of the '193 Patent, Claim 17.  Defendants have been, and are currently, directly infringing at least Claims 1 and 17 of the '193 Patent in

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

1   violation of 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by its Google Loon

2   instrumentalities, that practice inventions disclosed in the '193 Patent.

3        398.   While Defendants were on notice that Space Data intended to assert the '193 Patent

4   against them since at least October 27, 2016, when the parties discussed the '193 Patent application

5   in a joint case management statement, and on notice of the '193 Patent's issuance since June 13,

6   2017, when Space Data sent them a copy of the patent, Defendants continue to make, use, import,

7   offer to sell and/or sell instrumentalities that infringe the '193 Patent, despite knowledge (or willful

8   blindness) that these actions, and others, constitute infringement of a valid patent.

9        399.   Defendants have been on notice that Space Data's technology is patented since at

10  least September 2007, when Space Data sent Defendants information about Space Data and its

11  technology, which noted Space Data's ownership of patents.  On February 15, 2008, executives of

12  Defendants visited Space Data and launched a component of a Space Data system that was marked

13  with the number of a Space Data patent.  That same day, Defendants were exposed to further

14  components of, and information on, a Space Data system.

15       400.   Defendants were on notice of claims of the '193 Patent through Defendants own

16  patent filings.  Claim 1 of the '193 Patent in addition to other claims were captured from Google

17  through an interference between Google's U.S. Patent No. 8,820,678 and Space Data's application

18  that issued as the '193 Patent.  Claim 1 of the '193 Patent in its current form appeared in the

19  Google application that issued as U.S. Patent No. 8,820,678 on March 24, 2014 by way of an

20  amendment to an existing claim.  Google conceded that this claim and others would be Space

21  Data's by at least July 26, 2016, when Google indicated that it would not contest priority in the

22  interference between its patent and the application that issued as the '193 Patent.  Google's own

23  patent application (the application that gave rise to Google's U.S. Patent No. 8,820,678) gave

24  Defendants notice of claims of the '193 Patent, as did the interference proceeding.  Additionally,

25  Space Data provided Defendants with a draft claim chart for the '193 Patent prior to the filing of

26  Space Data's complaint that first asserted the '193 Patent.  And, Space Data kept Defendants

27  apprised of '193 Patent prosecution developments, including: (1) informing Defendants on April

28  14, 2017 that prosecution had return to the examiner and that Space Data anticipated receiving a

1   notice of allowance soon; (2) informing Defendants on May 11, 2017 that the '193 Patent's

2   application was sent to final data capture; and (3) informing Defendants on May 24, 2017 that the

3   '193 Patent would issue on June 13, 2017.

4       401.    Despite having knowledge that Google's former patent claims were captured by

5   Space Data, pre-issuance knowledge of the '193 Patent's claims, knowledge that the '193 Patent

6   issued, knowledge of Space Data's technology, and knowledge that Space Data intended to assert

7   the '193 Patent against Defendants, Defendants have continued with their activities that infringe

8   the '193 Patent.  Defendants did so in subjective bad faith and knowing there was an objectively

9   high likelihood they infringed.  As detailed above, Defendants have engaged in a deliberate plan to

10  copy Space Data's technology and inventions.  Defendants' conduct is egregious.  Defendants'

11  infringement of the '193 Patent is willful and intentional.

12      402.    Defendants, without authority, supply and/or cause to be supplied in and/or from the

13  United States at least a substantial portion of the components of instrumentalities covered by

14  claims of the '193 Patent, in such a manner as to actively induce the combination of such

15  components outside the U.S. in a manner that would infringe '193 Patent claims if the combination

16  occurred within the U.S.  Defendants' infringing instrumentalities use, for example, balloon

17  envelops manufactured in the U.S., *see* paragraph 227, and communication equipment assembled

18  in the U.S.  Defendants supply their U.S. manufactured/assembled balloon envelopes and

19  communication equipment abroad for use in instrumentalities that practice all of the elements of

20  claims of the '193 Patent.  *See, e.g.,* paragraph 225 & 246 (Google Loon used to provide internet to

21  several farmers in New Zealand).  Defendants' supply of components, including balloon envelopes

22  and communication equipment, from the U.S. for combination into instrumentalities that practice

23  all of the elements of claims of the '193 Patent is intentional.  *See, e.g.,* paragraphs 225 & 246.

24  Defendants have been, and are currently, infringing at least claim 17 of the '193 Patent in violation

25  of 35 U.S.C. § 271(f)(1), literally or under the doctrine of equivalents.

26      403.    Defendants, without authority, supply and/or cause to be supplied in and/or from the

27  United States components of instrumentalities covered by claims of the '193 Patent that are

28  especially made and/or especially adapted for use in instrumentalities covered by claims of the

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

'193 Patent.  These components are not staple articles and/or commodities of commerce suitable for substantial noninfringing uses.  Defendants do this knowing that these components are so made and/or adapted and intending that such components will be combined outside the U.S. in a manner that would infringe claims of the '193 Patent if such combinations occurred within the U.S. Defendants' infringing instrumentalities use, for example, balloon envelops manufactured in the U.S., *see* paragraph 227, and communication equipment assembled in the U.S.  The Defendants' balloon envelopes and communication equipment are made especially for Defendants' instrumentalities that practice all of the elements of claims of the '193 Patent and these balloon envelopes and communication equipment are not staple articles suitable for substantial noninfringing uses.  Defendants' supply of balloon envelopes, communication equipment and other components from the U.S. for combination into instrumentalities that practice all of the elements of the claims of the '193 Patent is intentional.  *See, e.g.,* paragraphs 225 & 246.  And, Defendants know that these balloon envelopes, communication equipment and other components are especially made for Defendants very own instrumentalities systems.  Defendants have been, and are currently, infringing at least claim 17 of the '193 Patent in violation of 35 U.S.C. § 271(f)(2), literally or under the doctrine of equivalents.

404.    As a result of Defendants' infringement, Space Data has been and continues to be damaged and irreparably injured, including without limitation, the loss of sales and profits it would have earned but for Defendants' actions, and damage to Space Data's reputation among potential and existing customers, business partners, investors, and in the industry in general.

405.    Defendants will continue to irreparably harm Space Data unless enjoined.  Space Data faces real, substantial and irreparable damage and injury of a continuing nature from infringement for which Space Data has no adequate remedy at law.

### **PRAYER FOR RELIEF**

WHEREFORE, Space Data prays for entry of judgment as follows:

A.    judgment in Space Data's favor and against Defendants on all causes of action alleged herein;

B.    that Defendants breached the NDA;

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1    C.    for damages in an amount to be further proven at trial;

2    D.    that Defendants be ordered to disgorge, restore and/or make restitution to Space

3          Data for all sums constituting unjust enrichment from their wrongful conduct, as

4          allowed by law according to proof;

5    E.    that the patents-in-suit are valid and enforceable;

6    F.    that Defendants have infringed one or more claims of each of the patents-in-suit;

7    G.    that Defendants' infringement of the patents-in-suit was willful;

8    H.    that Defendants account for and pay to Space Data all damages caused by the

9          infringement of the patents-in-suit, which by statute can be no less than a reasonable

10         royalty with respect to each patent-in-suit;

11   I.    that the damages to Space Data with respect to each of the patents-in-suit be

12         increased by three times the amount found or assessed pursuant to 35 U.S.C. § 284

13         and that the Defendants account for and pay to Space Data the increased amounts;

14   J.    that this be adjudicated an exceptional case and Space Data be awarded its

15         attorneys' fees in this action pursuant to 35 U.S.C. § 285;

16   K.    that Defendants have wrongfully misappropriated Space Data's trade secrets;

17   L.    that Defendants account for and pay to Space Data all damages caused by the

18         misappropriation of Space Data's trade secrets, which pursuant to Cal. Civ. Code §

19         3426.3, includes actual loss and any unjust enrichment not taken into account in

20         computing actual loss, or a reasonable royalty if neither damages nor unjust

21         enrichment is provable;

22   M.    that Defendants' misappropriation of Space Data's trade secrets was willful and

23         malicious, and for exemplary damages pursuant to Cal. Civ. Code § 3426.3(c), and

24         reasonable attorneys' fees and costs (including expert expenses) pursuant to Cal.

25         Civ. Code § 3426.4;

26   N.    that Defendants account for and pay to Space Data all damages caused by the

27         misappropriation of Space Data's trade secrets which, pursuant to 18 U.S.C. §

28         1836(b)(3)(B), includes actual loss and any unjust enrichment not addressed in

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

1    computing damages for actual loss, or a reasonable royalty in lieu of damages

2    measured by another method;

3    O.    that Defendants' misappropriation of Space Data's trade secrets was willful and

4          malicious, and for exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C), and

5          reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D);

6    P.    that this Court issue preliminary and final injunctions enjoining the Defendants,

7          their officers, agents, servants, employees and attorneys, and any other person in

8          active concert or participation with them, from continuing the acts herein

9          complained of with respect to infringement of the patents-in-suit, and more

10         particularly, that Defendants and such other persons be permanently enjoined and

11         restrained form further infringing the patents-in-suit;

12   Q.    that this Court issue preliminary and final injunctions enjoining the Defendants,

13         their officers, agents, servants, employees and attorneys, and any other person in

14         active concert or participation with them, prohibiting them from: continuing to use

15         Space Data's trade secrets; continuing to use Space Data's Confidential

16         Information; continuing to disclose Space Data's trade secrets; continuing to

17         disclose Space Data's Confidential Information; continuing to breach the

18         proprietary, confidentiality and use limitation provisions of the NDA; continuing to

19         exercise ownership over Space Data's trade secrets; and continuing to exercise

20         ownership over Space Data's Confidential Information;

21   R.    that this Court require Defendants to file with this Court, within thirty (30) days

22         after entry of final judgment, a written statement under oath setting forth in detail

23         the manner in which Defendants have complied with the injunctions;

24   S.    that Space Data be granted pre-judgment and post-judgment interest on the damages

25         caused to them by reason of Defendants' conduct at the maximum legal rates

26         provided by statute or law;

27   T.    that this Court award Space Data its costs and disbursements in this civil action,

28         including reasonable attorneys' fees; and

1    U.    that Space Data be granted such other and further relief as the Court may deem just

2          and proper under the circumstances.

3                                        Respectfully submitted,

4    Dated:  February 13, 2019           By:  ___/s/Spencer Hosie_____
                                         SPENCER HOSIE (CA Bar No. 101777)
5                                        shosie@hosielaw.com
                                         DIANE S. RICE (CA Bar No. 118303)
6                                        drice@hosielaw.com
                                         BRANDON C. MARTIN (CA Bar No. 269624)
7                                        bmartin@hosielaw.com
                                         DARRELL R. ATKINSON (CA Bar No. 280564)
8                                        datkinson@hosielaw.com
                                         HOSIE RICE LLP
9                                        Transamerica Pyramid, 34th Floor
                                         600 Montgomery Street
10                                       San Francisco, CA 94111
                                         (415) 247-6000 Tel.
11                                       (415) 247-6001 Fax
12
13                                       *Attorneys for Plaintiff, Space Data Corporation*
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

## DEMAND FOR JURY TRIAL

Space Data demands a jury trial on all causes of action, claims or issues in this action that are triable as a matter of right to a jury.

Respectfully submitted,

Dated: February 13, 2019

By: _/s/Spencer Hosie_____
SPENCER HOSIE (CA Bar No. 101777)
shosie@hosielaw.com
DIANE S. RICE (CA Bar No. 118303)
drice@hosielaw.com
BRANDON C. MARTIN (CA Bar No. 269624)
bmartin@hosielaw.com
DARRELL R. ATKINSON (CA Bar No. 280564)
datkinson@hosielaw.com
HOSIE RICE LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, CA 94111
(415) 247-6000 Tel.
(415) 247-6001 Fax