1  KEKER, VAN NEST & PETERS LLP
   ROBERT A. VAN NEST - # 84065
2  rvannest@keker.com
   MATTHEW M. WERDEGAR - # 200470
3  mwerdegar@keker.com
   EUGENE M. PAIGE - # 202849
4  epaige@keker.com
   MATTHIAS A. KAMBER - # 232147
5  mkamber@keker.com
   RYAN K. WONG - # 267189
6  rwong@keker.com
   LEAH PRANSKY - # 302246
7  lpransky@keker.com
   SHAYNE HENRY - # 300188
8  shenry@keker.com
   ANDREW S. BRUNS - # 315040
9  abruns@keker.com
   633 Battery Street
10 San Francisco, CA 94111-1809
   Telephone:    415 391 5400
11 Facsimile:    415 397 7188

12 Attorneys for Defendants
   ALPHABET INC., GOOGLE LLC, and LOON LLC
13

14                UNITED STATES DISTRICT COURT

15               NORTHERN DISTRICT OF CALIFORNIA

16                    SAN JOSE DIVISION

17 SPACE DATA CORPORATION,                Case No. 5:16-cv-03260-BLF (NMC)

18          Plaintiff,                     **EXHIBITS 2, 12, 18, 19, 20, 21, 22, 27, 34,
                                          38, 40 TO DECLARATION OF
19      v.                                MATTHEW M. WERDEGAR IN
                                          SUPPORT OF DEFENDANTS' MOTION
20 ALPHABET INC., GOOGLE LLC, AND          OF SUMMARY JUDGMENT**
   LOON LLC,
21                                         Judge:      Hon. Beth Labson Freeman
          Defendants.
22                                         Date Filed: June 13, 2016

23                                         Trial Date: August 5, 2019

24
        <u>**REDACTED VERSIONS OF DOCUMENTS SOUGHT TO BE SEALED**</u>
25

26

27

28

# EXHIBIT 2

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# **APPENDIX A to the Expert Report of Sam Pullen**

## Technology Overview and Elements

[HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY]

**OVERVIEW OF LOON**

1.  This Overview of Loon section outlines Loon's[1] technology to support the claim-by-claim and limitation-by-limitation analysis below.  The main body of the report describes the Accused Product.  This section establishes certain technical aspects of the Accused Product.  There may be some information that is not specifically about Loon's technology, but that information also supports those arguments.  Some important additional technical background is found in the Technology section of the main report.

2.  The report sets out specific citations to documents and deposition testimony.  These citations are not intended to be exhaustive but instead exemplary.  I reserve the right to use other supporting material, based in part on the citations herein.  In addition, support for the discussion in this overview is found throughout the report and, in particular, in the "Elements" section below.

3.  In addition, I rely on the knowledge I gleaned from an inspection of a Loon Payload, Down Connector, ACS, base board, and Top Plate on August 23 and 24, 2018.  On those dates, I visited a "Rails 2," a Google X facility in Mountain View, California and inspected and disassembled a Loon Payload, ACS, base board, and Top Plate (among other components).  I was assisted during this inspection by counsel, but I directed the disassembly and taking of photographs and videos documenting the various components.  According to a document

---

[1] When I refer to Loon, Project Loon, or Google, I am referring collectively to the Defendants in the lawsuit captioned *Space Data Corporation, v. Alphabet Inc., et al*., No. 16-cv-03260 (N.D. Cal.), filed June 13, 2016.

APPENDIX A to the EXPERT REPORT                    HIGHLY CONFIDENTIAL –
OF SAM PULLEN                                       ATTORNEY'S EYES ONLY

produced by Google representing the "BOM" (that is Bill of Materials) provided by Google, the payload and components I inspected where from a V1.2 Loon Flight Vehicle.[2]

## I.      Detailed Discussion of Loon Technology

4.  This section provides a detailed discussion of the Google Accused Product, that is, Google's Loon Technology, including the Loon Flight Vehicle; Loon Operations ▮▮▮



; as well as Loon's manufacture and control of Loon balloons.

## A.  The Loon Flight Vehicle

5.  The Loon Flight Vehicle includes a number of components, including, among others, a

.

---

[2] *See V1.2 Flight Vehicle Cost – Hatchery BOM for Payload*, GOOG-SD-00303636-GOOG-SD-00303642 (created on September 7, 2018) at GOOG-SD-00303636.

[3] *See, e.g., Loon: Flight System Overview*, March 2-3, 2016, GOOG-SD-00070435-GOOG-SD-00070487 at GOOG-SD-00070439.

APPENDIX A to the EXPERT REPORT
OF SAM PULLEN

HIGHLY CONFIDENTIAL –
ATTORNEY'S EYES ONLY

Loon Mission Control.[553]



301.    Therefore, as shown above and throughout this report, it is my opinion that element 1a is performed by Google.

## C. Element 1b1

302.    The text for element 1b1 is "*determining locations of one or more neighbor balloons relative to the determined location of the target balloon*,"

**Evidence of Infringement**

303.    It is my opinion that Google performs the step of "determining locations of one or more neighbor balloons relative to the determined location of the target balloon."  This is evident from the Google documents, deposition testimony, and other evidence cited herein.

---

[553] *Project Loon - Mission Control*, GOOG-SD-00025594-GOOG-SD-00027429 (last modified on January 24, 2017) at GOOG-SD-00025950.

APPENDIX A to the EXPERT REPORT
OF SAM PULLEN

HIGHLY CONFIDENTIAL –
ATTORNEY'S EYES ONLY

304.     In support of my opinion, see the evidence cited throughout this report, in the Overview of Loon section above, and Claims 1 of the '193 Patent.  In particular, see the evidence cited in elements 1a and 1c1.

305.     As explained in the Primary Flight Controller and Loon Mission Control sections in the Detailed Description of Loon Technology above, and in element 1a above, Loon Mission Control continuously determines the location of each and every one of Loon's balloons.  As explained above, those determinations of location include, among other data points, each balloon's latitude, longitude, altitude, and time.  Each balloon's location, expressed as a three-dimensional point in time, is relative to every other balloon's location expressed in the same manner.

306.     In addition, for the benefit of its flight engineers, as shown below, Google, in its Smallworld UI, plots each balloon's relative location above the Earth's surface on a map.[554] Google's documents contain many such images, and the one below is shown merely as an example.

---

[554] *SmallWorld UI Flight Engineer Training Progra*m, GOOG-SD-00138074- GOOG-SD-00138156 (last modified on August 22, 2017) at GOOG-SD-00138077.

APPENDIX A to the EXPERT REPORT                              HIGHLY CONFIDENTIAL –
OF SAM PULLEN                                                ATTORNEY'S EYES ONLY



307.    The status of balloons as 'neighbor balloons' can be decided in many different ways.  This decision could be based on distances between the balloons, it could include all of the balloons in the fleet.  For example, the high level allocation and dispatch of balloons is based on the Loon balloons' relative distribution around the globe.[555]

308.    

---

[555] A detailed discussion of how Loon's fleet management system, using the Oregon Dispatcher program, makes these decisions can be found in the "Dispatch" section of the Detailed Discussion of Loon Technology above.

[556] *Google Loon Flight Operations, Dispatch*, GOOG-SD-00064339 (created on April 21, 2017).

[557] Candido Tr. at 151:14-21.

APPENDIX A to the EXPERT REPORT                    HIGHLY CONFIDENTIAL –
OF SAM PULLEN                                      ATTORNEY'S EYES ONLY

491.     Therefore, as shown above and throughout this report, it is my opinion that element 14a is satisfied by Google's Accused Product.

## C.  Element 14b1

492.     The text for element 14b1 is "*determining locations of one or more neighbor balloons relative to the determined location of the target balloon*,"

### Evidence of Infringement

493.     It is my opinion that Google's Accused Product, and specifically Google's data centers include a non-transitory computer readable medium having stored therein instructions executable by a computing device to cause the computing device to perform various functions, including "determining locations of one or more neighbor balloons relative to the determined location of the target balloon."  This is evident from the Google documents, deposition testimony, and other evidence cited herein.

494.     In support of my opinion, see the evidence cited throughout this report, in the Overview of Loon section above, and Claim 1 and 14 of the '193 Patent.  In particular, see the evidence cited in element 1b1 and 14pre.

495.     Therefore, as shown above and throughout this report, it is my opinion that element 14b1 is satisfied by Google's Accused Product.

## D.  Element 14b2

496.     The text for element 14b2 is "*wherein a desired movement of the target balloon comprises a desired horizontal movement of the target balloon*;"

### Evidence of Infringement

497.     It is my opinion that Google's Accused Product, and specifically Google's data centers include a non-transitory computer readable medium having stored therein instructions executable by a computing device to cause the computing device to perform various functions,

263

HIGHLY CONFIDENTIAL –
ATTORNEY'S EYES ONLY

# EXHIBIT 12

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CERTIFIED COPY

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                      SAN JOSE DIVISION

4                         --oOo--

5

6    SPACE DATA CORPORATION,          )
                                      )
7                 Plaintiff,          )
                                      )
8            vs.                      ) 5:15-cv-03260-BLF
                                      )
9    ALPHABET INC., and GOOGLE LLC,   )
                                      )
10                Defendants.         )
     _____  )

11

12

13

14      HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

15                VIDEO DEPOSITION OF

16                 MICHAEL PEARSON

17      _____
                    June 7, 2018

18

19

20

21

22

23

24   REPORTED BY BRANDON D. COMBS, RPR, CSR 12978
     438778

25

SINCE 1972

**BARKLEY**
*Court Reporters*
barkley.com

(310) 207-8000 Los Angeles      (415) 433-5777 San Francisco    (949) 955-0400 Irvine           (858) 455-5444 San Diego
(310) 207-8000 Century City     (408) 885-0550 San Jose         (760) 322-2240 Palm Springs     (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento       (800) 222-1231 Martinez         (702) 366-0500 Las Vegas        (800) 222-1231 Monterey
(951) 686-0606 Riverside        (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson        (516) 277-9494 Garden City
(212) 808-8500 New York City    (347) 821-4611 Brooklyn         (518) 490-1910 Albany           (914) 510-9110 White Plains
(312) 379-5566 Chicago          00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai         001+1+800 222 1231 Hong Kong

1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                   SAN JOSE DIVISION

4                      --o0o--

5

6   SPACE DATA CORPORATION,          )
                                     )
7                 Plaintiff,         )
                                     )
8            vs.                     ) 5:15-cv-03260-BLF
                                     )
9   ALPHABET INC., and GOOGLE LLC,   )
                                     )
10               Defendants.         )
    _____ )
11

12

13

14     HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

15                VIDEO DEPOSITION OF

16                 MICHAEL PEARSON

17     _____
                    June 7, 2018
18

19

20

21

22

23

24  REPORTED BY BRANDON D. COMBS, RPR, CSR 12978

25  Job 438778

2

BARKLEY
Court Reporters

11:31  1         A.    In lay terms, sure.

11:31  2         Q.    And you say, yes, I'm in for the call?

11:31  3         A.    Yep.

11:31  4         Q.    And I'm sure you don't recall the details

11:31  5    of that call now?

11:31  6         A.    No, I do not.

11:31  7         Q.    Let me show you Exhibit 221.

11:32  8               (Whereupon, Exhibit 221 was marked for

11:32  9               identification.)

11:32 10    BY MR. HOSIE:

11:32 11         Q.    Earlier, sir, I asked you if Space Data

11:32 12    and Google executed the NDA, and you indicated you

11:32 13    couldn't remember.

11:32 14               If you could please look at 221 and

11:32 15    confirm to me that this is in fact a fully executed

11:32 16    Space Data/Google NDA?

11:32 17               MR. WONG:  And, obviously, Mr. Pearson,

11:32 18    you can take your time to look through any exhibit

11:32 19    that --

11:32 20               MR. HOSIE:  Hundred percent.

11:32 21               MR. WONG:  -- Mr. Hosie gives you.

11:32 22    BY MR. HOSIE:

11:32 23         Q.    Hundred percent.  If you need time to read

11:32 24    a doc, just say, hey, Hosie, I need time.  You can

11:32 25    even call me Hosie.  I won't be offended.  I've been

89

BARKLEY
Court Reporters

11:32 1    called worse.

11:32 2         A.   Yes, it appears that, if this is the same

11:32 3    NDA, that the signatures of Gerald Knoblach and

11:32 4    then, from our side, Matt Sucherman, which I assume

11:32 5    would make it an executed agreement.

11:33 6         Q.   Okay.

11:33 7              (Whereupon, Exhibit 222 was marked for

11:33 8              identification.)

11:33 9    BY MR. HOSIE:

11:33 10        Q.   Now let me show you what's been marked as

11:33 11   Exhibit 222.

11:33 12             Counsel.

11:33 13             Take your time to read this one, please,

11:33 14   starting at the back.  It's an email chain, and it's

11:33 15   always sensible, at least in my view, to read

11:33 16   chronologically from the oldest to the newest.

11:34 17        A.   Okay.

11:34 18        Q.   So this is an email chain that starts with

11:34 19   you and Chris Sacca emailing back and forth?

11:34 20        A.   Yeah, looks so.

11:35 21        Q.   And it starts with an email from Chris to

11:35 22   you.  You would be the Mike there, as you read that?

11:35 23        A.   I believe so, yeah.

11:35 24        Q.   Yeah.  And he says, Mike, in regards to

11:35 25   your earlier message about Space Data, you are not

90

BARKLEY
Court Reporters

02:56  1                  THE WITNESS:  I mean, stew or not, just

02:56  2     not continue conversations for a while, while we

02:56  3     figure out what we want to do.

02:56  4     BY MR. HOSIE:

02:56  5          Q.   And did this Space Data evaluation prompt

02:57  6     Google to do a build versus buy analysis on a

02:57  7     balloon Internet constellation technology?

02:57  8                  MR. WONG:  Objection.  Vague, foundation.

02:57  9                  THE WITNESS:  I don't know.

02:57 10     BY MR. HOSIE:

02:57 11          Q.   One way or the other?

02:57 12          A.   One way or the other.

02:57 13          Q.   Because you don't know anything about how

02:57 14     Loon came to be born at Google, do you?

02:57 15          A.   I don't know.

02:57 16          Q.   Let me show you what I marked as

02:57 17     Exhibit 233.

02:57 18                  (Whereupon, Exhibit 233 was marked for

02:57 19                  identification.)

02:57 20     BY MR. HOSIE:

02:57 21          Q.   You might want to read this one from the

02:57 22     bottom up, chronologically.

02:57 23          A.   Sorry, which part should I start with?

02:57 24     The last page, or the --

02:57 25          Q.   Well, start with the email on February 24,

                                   225

BARKLEY
Court Reporters

02:57  1    on the first page.  I think I can limit our -- start

02:57  2    the Sunday, February 25 email from Ingersoll, Jim.

02:58  3        A.   Yep.

02:58  4        Q.   All right.  So, you respond to Ingersoll's

02:58  5    email, do you not?

02:58  6        A.   I do.

02:58  7        Q.   And you say, you are so much nicer than I

02:58  8    am.  I was going to go silent for longer and let

02:58  9    them stew and wonder what happened, happy face.

02:58 10             I read that correctly?

02:58 11        A.   Yes.

02:58 12        Q.   So does this refresh your recollection

02:58 13    that you were part of a group that decided in the

02:58 14    Thursday noon meeting earlier in the week that you

02:58 15    all were going to let Space Data stew?

02:59 16             MR. WONG:  Objection.  Assumes facts.

02:59 17             THE WITNESS:  I don't know what happened

02:59 18    in the Thursday meeting, but my recollection is that

02:59 19    we decided to kind of go silent.

02:59 20    BY MR. HOSIE:

02:59 21        Q.   Isn't it true, sir, that Google seized on

02:59 22    the Wall Street Journal article as a pretext to turn

02:59 23    Space Data down?

02:59 24             MR. WONG:  Objection.  Foundation and

02:59 25    assumes facts not in evidence.

226

BARKLEY
Court Reporters

03:12  1    individual.  Time is 3:12 P.M. on June 7, 2018.

03:12  2    BY MR. HOSIE:

03:12  3         Q.   Let me show you what's been marked as

03:12  4    Exhibit 234.

03:12  5              (Whereupon, Exhibit 234 was marked for

03:12  6              identification.)

03:13  7    BY MR. HOSIE:

03:13  8         Q.   You got a chance to read this, sir?

03:13  9         A.   Yeah, I skimmed it.

03:13  10        Q.   That's an email chain that you're on at

03:13  11   the final email?

03:13  12        A.   Yes.

03:13  13        Q.   And it's dated, the final email is dated

03:13  14   June 6, 2008?

03:13  15        A.   Yes.

03:13  16        Q.   Is this before or after Google had the

03:13  17   final thumbs down decision on Space Data?

03:13  18             MR. WONG:  Objection.  Assumes facts and

03:13  19   vague.  Foundation.

03:13  20             THE WITNESS:  It's after the Wall Street

03:13  21   Journal article came out, and we decided to go

03:13  22   silent for a while.

03:13  23   BY MR. HOSIE:

03:13  24        Q.   Is this the -- during the go silent for a

03:13  25   while period, or after Google said, we're just going

                                   229

MICHAEL PEARSON - HIGHLY CONF, AEO                    BARKLEY
                                                      Court Reporters

03:19  1   not clear from the email chain exactly which

03:19  2   technology is being referenced.

03:19  3          If you look back at Dylan's email, he's

03:19  4   kind of going on a, again, the game of telephone of

03:19  5   just, I want to try and put Internet into dark

03:19  6   places.  And there may be some kind of notions of

03:19  7   how to make that happen.

03:19  8   BY MR. HOSIE:

03:19  9       Q.   Let me see if I can sharpen your

03:19 10   recollection with Exhibit 116.

03:19 11          I'm going to ask you about the top email

03:19 12   from Ingersoll to Alder, copied to you and many

03:20 13   others.

03:20 14       A.   Okay.

03:20 15       Q.   All right.  So this is dated July 1, 2008?

03:20 16       A.   Yes.

03:20 17       Q.   Is this before or after the thumbs down

03:20 18   decision on Space Data at Google?

03:20 19          MR. WONG:  Objection.  Assumes facts and

03:20 20   vague, foundation.

03:20 21   ██████████████   ███████████████████████

██  ██  █████████████████████████████████████████████

██  ██  ████████████████████████

██  ██  ██████████████

██  ██        ██   ██████████████████████████████████

235

BARKLEY
Court Reporters

03:20   1



236

BARKLEY
Court Reporters



03:21  1

03:22  24    BY MR. HOSIE:

03:22  25         Q.   That's what it says?

237

BARKLEY
Court Reporters

```
 1                 DEPOSITION OFFICER'S CERTIFICATE

 2    STATE OF CALIFORNIA     )
                              ) ss.
 3    COUNTY OF SAN FRANCISCO )

 4

 5

 6            I, Brandon Combs, hereby certify:

 7            I am a duly qualified Certified Shorthand

 8    Reporter in the State of California, holder of

 9    Certificate Number CSR 12978 issued by the Certified Court

10    Reporters' Board of California and which is in full

11    force and effect.  (Fed. R. Civ. P. 28(a)(1)).

12            I am authorized to administer oaths or

13    affirmations pursuant to California Code of Civil

14    Procedure, Section 2093(b) and prior to being examined,

15    the witness was first duly sworn by me.  (Fed. R. Civ.

16    P. 28(a)(a)).

17            I am not a relative or employee or attorney or

18    counsel of any of the parties, nor am I a relative or

19    employee of such attorney or counsel, nor am I

20    financially interested in this action.  (Fed. R. Civ. P.

21    28).

22            I am the deposition officer that

23    stenographically recorded the testimony in the foregoing

24    deposition and the foregoing transcript is a true record

25                            / / /
```

MICHAEL PEARSON - HIGHLY CONF, AEO

BARKLEY
Court Reporters

1    of the testimony given by the witness.  (Fed. R. Civ. P.

2    30(f)(1)).

3         Before completion of the deposition, review of

4    the transcript [  ] was [XX] was not requested.  If

5    requested, any changes made by the deponent (and

6    provided to the reporter) during the period allowed, are

7    appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9    Dated: June 13, 2018

10

11

12

13

14    _____

15

16

17

18

19

20

21

22

23

24

25

249

MICHAEL PEARSON - HIGHLY CONF, AEO

BARKLEY
Court Reporters

# EXHIBIT 18

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**CERTIFIED COPY**

1          IN THE UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3              SAN JOSE DIVISION

4                ---o0o---

5

6

   SPACE DATA CORPORATION,       )

7                         )

             Plaintiff,   )

8                         )

          vs.          )   Case No.

9                         )   5:16-cv-03260

   ALPHABET, INC., and GOOGLE,   )   -BLF

10  INC.,                      )

                         )

11             Defendants.  )

                         )

12

13

14

                ---o0o---

15

           WEDNESDAY, JUNE 27, 2018

16

        VIDEOTAPED DEPOSITION OF LARRY PAGE

17

      HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

18                ---o0o---

19

20

21

22

23

24  REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR

     439674

25

SINCE 1972

**BARKLEY**
Court Reporters
barkley.com

(310) 207-8000 Los Angeles  (415) 433-5777 San Francisco  (949) 955-0400 Irvine  (858) 455-5444 San Diego
(310) 207-8000 Century City  (408) 885-0550 San Jose  (760) 322-2240 Palm Springs  (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento  (800) 222-1231 Martinez  (702) 366-0500 Las Vegas  (800) 222-1231 Monterey
(951) 686-0606 Riverside  (818) 702-0202 Woodland Hills  (702) 366-0500 Henderson  (516) 277-9494 Garden City
(212) 808-8500 New York City  (347) 821-4611 Brooklyn  (518) 490-1910 Albany  (914) 510-9110 White Plains
(312) 379-5566 Chicago  00+1+800 222 1231 Paris  00+1+800 222 1231 Dubai  001+1+800 222 1231 Hong Kong

1              IN THE UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3                     SAN JOSE DIVISION

4                        ---oOo---

5


6
   SPACE DATA CORPORATION,          )
7                                   )
                      Plaintiff,    )
8                                   )
             vs.                    )    Case No.
9                                   )    5:16-cv-03260
   ALPHABET, INC., and GOOGLE,      )    -BLF
10   INC.,                          )
                                    )
11                    Defendants.   )
                                    )
12

13

14
                        ---oOo---
15
                WEDNESDAY, JUNE 27, 2018
16
         VIDEOTAPED DEPOSITION OF LARRY PAGE
17
       HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY
18
                        ---oOo---
19

20

21

22

23

24   REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR

25



                            2

BARKLEY
Court Reporters

```
 1        A.   No, I don't recall exactly when.

 2        Q.   Do you recall, was it close on the heels

 3   of your visit or did it lag that by many, many

 4   months?

 5        A.   No, I don't recall.

 6        Q.   Was it more than a year later, do you

 7   recall that much at least?

 8        A.   I don't have any reason to think that.

 9        Q.   You think that the meeting, the

10   discussion, the consensus --

11        A.   Well, that seems highly implausible.

12        Q.   Yes, you'd expect it to have happened

13   sooner relative to the -- your tour, correct?

14        A.   But I don't recall.

15        Q.   All right, sir.  Do you recall why Google

16   decided not to go forward with Space Data, the why

17   of it?

18        A.   Well, I can give you my recollection.  I

19   mean, it was a long time ago.

20        Q.   Please.

21
```

01:03 appears next to lines 5, 10, 15, 20.

22



01:05  25                    (Phone interruption.)

23

         1              Do you recall saying, "Hey, Dylan, can you
         2     explore whether we can do this?"
         3        A.   I've already answered that question.
         4        Q.   And you don't recall?
02:45    5        A.   No.
         6        Q.   Thank you.
         7              MR. HOSIE:  Why don't we take a quick
         8     break.
         9              THE WITNESS:  Okay.
02:45   10              THE VIDEOGRAPHER:  This is the end of Disc
        11     No. 1, Volume I in the deposition of Larry Page.
        12     The time is 2:45 p.m., and we're off the record.
        13              (Whereupon a recess was taken.)
        14              (Reporter marked Exhibit No. 330 for
02:57   15              identification.)
        16              THE VIDEOGRAPHER:  Back on the record.
        17     This is the beginning of Disc No. 2, Volume I in
        18     the deposition of Larry Page.  The time is
        19     2:57 p.m. on June 27th, 2018.
02:57   20        Q.   BY MR. HOSIE:  Mr. Page, in our break, I
        21     placed before you what's been marked as
        22     Exhibit 330.  If you could take a minute and read
        23     that before I ask you questions.
        24        A.   Yes, of course.  Okay.
02:58   25        Q.   So this is an email chain, is it not, sir?


                                111

BARKLEY
Court Reporters

```
 1        A.   Yes, it's an email chain.

 2        Q.   And it begins with an email from you on

 3   November 13th, 2010, at 10:07 in the evening?

 4        A.   Yes.

 5        Q.   And it's to Sebastian Thrun?

 6        A.   Yeah, that's the way it looks.

 7        Q.   And Sebastian Thrun was working at X at

 8   the time, wasn't he, sir?

 9        A.   I think so, yeah.

10        Q.   And you sent him some information about a

11   balloon project, did you not?

12        A.   Sorry, I don't remember when X got formed,

13   the year exactly, but we had some sort of X-like

14   thing.

15        Q.   "X-like thing."  I'll take that.
```

16

112



113

LARRY PAGE - ATTORNEYS' EYES ONLY

BARKLEY
Court Reporters



18      Q.   And given your direction to Mr. Thrun, do

19  you know, did he go forward at X and start to look

03:00  20  at this idea?

21      A.   I don't know what happened, based on this.

22      Q.   Do you recall, sir, one way or the other?

23      A.   I mean, eventually, I guess, you know,

24  what became Project Loon got started, but I don't

03:01  25  know the details of that.

114

BARKLEY
Court Reporters



1

2

3

4

5

6

7

8     Q.   Okay.  And you don't, in fact, know what

9     Mr. -- whether Mr. Thrun even started looking at a

03:01 10   balloon-borne Internet constellation in 2010, also

11    true?

12    A.   I mean, I assume he did something, based

13    on the email, but I don't know for sure.

14

115

BARKLEY
Court Reporters

```
 1    take a look at that.
 2          MR. VAN NEST:  This was previously marked,
 3    Counsel --
 4          MR. HOSIE:  It was.
03:02 5          MR. VAN NEST:  -- 249?  Thank you.
 6          THE WITNESS:  Sorry, is this the same day?
 7     Q.   BY MR. HOSIE:  No, this is several days
 8    later.  You sent an email on November 15th to
 9    Sebastian Thrun.
03:02 10    A.   That's the same day as on the previous
11    email.
12     Q.   It is, but it's several days after you
13    started the email chain with Mr. Thrun on Saturday
14    night.
03:02 15    A.   It started six minutes after the -- the
16    last response there.
17     Q.   Which was on Monday, and you started that
18    chain on Saturday night?
19     A.   Yep.
03:02 20    Q.   Okay.  That's the sequence?
21     A.   Okay.
22     Q.   So you respond minutes later to Mr. Thrun,
23    do you not?
24     A.   Yeah.
03:02 25    Q.   And you say, "Okay.  Check out" -- and you
```

116

BARKLEY
Court Reporters

```
 1    link, again, to a Space Data public site?
 2        A.   Yeah, there's -- it looks like there's a
 3    PDF on their site.
 4        Q.   Yeah.
 5        A.   And I tell him that we launched one of the
 6    balloons.
 7        Q.   And you say, "Sergey and I launched one of
 8    these ourselves"?
 9        A.   Yep.
10        Q.   And then what does Mr. Thrun do with your
11    email, sir?
12        A.   I don't know.
13        Q.   Well, look at the top.  Doesn't he forward
14    it to Astro Teller?
15        A.   Oh, sorry.  Okay.
16        Q.   Is that correct?
17        A.   Yeah, sorry, there's other stuff in here,
18    too, but I assume that's correct.
19        Q.   Well, because that's what it says.
20        A.   So --
21        Q.   That's what it says, sir.  Mr. Thrun
22    forwarded your email to Astro Teller, correct?
23    ███   ██████████████████████████████
      ██  ███████████████   ████████████████████
  ██ ██  ██████████████████████████████
```

117

BARKLEY
Court Reporters

```
 1              But, yeah, I think so.
 2         Q.   All right.  Now, tell me what you know
 3     about Mr. Thrun's personal involvement in the
 4     earliest days of Loon at Google.
03:04  5         A.   Sorry, there's some data here on --
 6     ███████████████████████████████████████████
 7         Q.   Yes, I know.
 8         A.   Okay.
 9         Q.   It's not like this was -- Space Data was
03:04 10    your sole obsessive concern at the time.
11              So my question, Mr. Page, please tell me
12     what you know of Mr. Thrun's involvement in Google
13     Loon in their earliest days alive.
14         A.   I don't know.
03:04 15        Q.   Well, was he involved?
16         A.   I don't know.
17         Q.   Let me show you what's been marked as our
18     next in order.  This is Exhibit 331.
19              Counsel.
03:04 20             (Reporter marked Exhibit No. 331 for
21                  identification.)
22              THE WITNESS:  Okay.
23         Q.   BY MR. HOSIE:  It's an email from
24     Sebastian Thrun, correct?
03:04 25        A.   Yes, it is.
```

LARRY PAGE - ATTORNEYS' EYES ONLY

BARKLEY
Court Reporters

```
 1              DEPOSITION OFFICER'S CERTIFICATE
 2   STATE OF CALIFORNIA     )
                             ) ss.
 3   COUNTY OF SAN FRANCISCO )
 4
 5
 6         I, BALINDA DUNLAP, hereby certify:
 7         I am a duly qualified Certified Shorthand
 8   Reporter in the State of California, holder of
 9   Certificate Number CSR 10710 issued by the Certified Court
10   Reporters' Board of California and which is in full
11   force and effect.  (Fed. R. Civ. P. 28(a)(1)).
12         I am authorized to administer oaths or
13   affirmations pursuant to California Code of Civil
14   Procedure, Section 2093(b) and prior to being examined,
15   the witness was first duly sworn by me.  (Fed. R. Civ.
16   P. 28(a)(a)).
17         I am not a relative or employee or attorney or
18   counsel of any of the parties, nor am I a relative or
19   employee of such attorney or counsel, nor am I
20   financially interested in this action.  (Fed. R. Civ. P.
21   28).
22         I am the deposition officer that
23   stenographically recorded the testimony in the foregoing
24   deposition and the foregoing transcript is a true record
25                        / / /
```

137

LARRY PAGE - ATTORNEYS' EYES ONLY

BARKLEY
Court Reporters

1   of the testimony given by the witness.  (Fed. R. Civ. P.

2   30(f)(1)).

3           Before completion of the deposition, review of

4   the transcript [XX] was [  ] was not requested.  If

5   requested, any changes made by the deponent (and

6   provided to the reporter) during the period allowed, are

7   appended hereto.  (Fed. R. Civ. P. 30(e)).

8   Dated: JULY 13, 2018

9

10

11

12

13   _____

14

15

16

17

18

19

20

21

22

23

24

25

138

BARKLEY
Court Reporters

# EXHIBIT 19

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**From:**    "Larry Alder" <lalder@google.com>
**To:**      "Dylan Casey" <dcasey@google.com>
**Sent:**    Fri, 6 Jun 2008 11:16:49 -0700
**Subject:**  Re: Google's 10th bday
**Cc:**      "Megan Smith" <megans@google.com>, "Marissa Mayer" <marissa@google.com>, "Mike
Pearson" <pearson@google.com>, "Sunil Daiuvoy" <sunild@google.com>, "Jack Ancone"
<ancone@google.com>, "David Lawee" <dlawee@google.com>

We visited on February 15, 2008.

---Larry A.

On Fri, Jun 6, 2008 at 10:44 AM, Dylan Casey <dcasey@google.com> wrote:

  Larry...when did you all visit? ████████████████████

On Fri, Jun 6, 2008 at 1:16 PM, Larry Alder <lalder@google.com> wrote:

  Megan,

  ████████████████████████████████████
  ████████████████████████████████████
  ██████████████████████████

---Larry A.

On Fri, Jun 6, 2008 at 10:10 AM, Megan Smith <megans@google.com> wrote:

  Dylan,

  ████████████████████████████████████
  ████████████████

  ████████████████████████████████████
  ██████████████████████

This is a pretty fun idea.  A little crazy, but interesting/v.cool if it works.  Is it sustainable? (as
  in, just for the event, or forever-ish?)

Let us know if you want help on this.

-- Megan

On Fri, Jun 6, 2008 at 10:04 AM, Dylan Casey <dcasey@google.com> wrote:

  Megan,



GOOG-SD-00157611

Marissa and I are leading Google's 10th birtday project and Larry mentioned the idea of giving the world, or internet dark spots, broadband internet access using blimps. Ironically an article in gizmodo mentioned it. Is there any truth to the article?

Thanks
Dylan

http://gizmodo.com/358940/google-may-buy-a-balloon-company-to-build-huge-wireless-networks

CONFIDENTIAL

# EXHIBIT 20

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**From:**   "Minnie Ingersoll" <minnie@google.com>
**To:**     "Larry Alder" <lalder@google.com>, "Dylan Casey" <dcasey@google.com>, ☐"Daniel Conrad"
<dconrad@google.com>, ☐"Mike Pearson" <pearson@google.com>, ☐"Megan Smith"
<megans@google.com>, ☐"Sunil Daluvoy" <sunild@google.com>, ☐"Jack Ancone"
<ancone@google.com>, "David Lawee" <dlawee@google.com>
**Sent:**   Tue, 1 Jul 2008 13:01:16 -0700
**Subject:** Re: Google's 10th bday

Dylan,

On Tue, Jul 1, 2008 at 10:26 AM, Larry Alder <lalder@google.com> wrote:

---------- Forwarded message ----------
From: **Dylan Casey** <dcasey@google.com>
Date: Mon, Jun 30, 2008 at 6:23 PM
Subject: Re: Google's 10th bday
To: Larry Alder <lalder@google.com>
Cc: Megan Smith <megans@google.com>, Mike Pearson <pearson@google.com>, Sunil
Daluvoy <sunild@google.com>, Jack Ancone <ancone@google.com>, David Lawee
<dlawee@google.com>

Hi Larry et al,

Can we meet to discuss the possibility of pulling this off?
Thanks
Dylan

On Fri, Jun 6, 2008 at 10:44 AM, Dylan Casey <dcasey@google.com> wrote:

Larry...when did you all visit?

On Fri, Jun 6, 2008 at 1:16 PM, Larry Alder <lalder@google.com> wrote:

**EXHIBIT** 116
3 pg.
L. Alder
5/18/18

Megan,

[redacted]

---Larry A.

On Fri, Jun 6, 2008 at 10:10 AM, Megan Smith <megans@google.com> wrote:

> Dylan,

[redacted]

[redacted]

This is a pretty fun idea. A little crazy, but interesting/v.cool if it works. Is it sustainable? (as in, just for the event, or forever-ish?)

Let us know if you want help on this.

-- Megan

On Fri, Jun 6, 2008 at 10:04 AM, Dylan Casey <dcasey@google.com> wrote:

> Megan,
> Marissa and I are leading Google's 10th birtday project and Larry mentioned the idea of giving the world, or internet dark spots, broadband internet access using blimps. Ironically an article in gizmodo mentioned it. Is there any truth to the article?

Thanks
Dylan

http://gizmodo.com/358940/google-may-buy-a-balloon-company-to-build-huge-wireless-networks

--

Minnie Ingersoll | Product Manager | Google, Inc.
cell 650-862-5098 | office 650-253-4575

CONFIDENTIAL

GOOG-SD-00146288

# EXHIBIT 21

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**CERTIFIED COPY**

1        UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF CALIFORNIA

3            SAN JOSE DIVISION

4            ---oOo---

5

SPACE DATA CORPORATION,            )
6                                   )
            Plaintiff,              )
7                                   )
vs.                                 )
8                                   ) Case No.
ALPHABET, INC., and GOOGLE,        ) 5:16-cv-03260-BLF
9    LLC,                          ) (NC)
                                    )
10            Defendants.           )
                                    )
11    _____)

12

13

14

15    ***CONFIDENTIAL - ATTORNEYS' EYES ONLY***

16    VIDEOTAPED DEPOSITION OF ASTRO TELLER

17            June 13, 2018

18

19

20

21

22

23

24    JUVILYNN T. ARBUTHNOT, CSR No. 13817.
      439158
25

**BARKLEY**
*Court Reporters*
barkley.com

SINCE 1972

(310) 207-8000 Los Angeles      (415) 433-5777 San Francisco    (949) 955-0400 Irvine           (858) 455-5444 San Diego
(310) 207-8000 Century City     (408) 885-0550 San Jose         (760) 322-2240 Palm Springs     (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento       (800) 222-1231 Martinez         (702) 366-0500 Las Vegas        (800) 222-1231 Monterey
(951) 686-0606 Riverside        (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson        (516) 277-9494 Garden City
(212) 808-8500 New York City    (347) 821-4611 Brooklyn         (518) 490-1910 Albany           (914) 510-9110 White Plains
(312) 379-5566 Chicago          00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai         001+1+800 222 1231 Hong Kong

```
 1                 UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                      SAN JOSE DIVISION

 4                        ---oOo---

 5

     SPACE DATA CORPORATION,          )
 6                                     )
                Plaintiff,             )
 7                                     )
     vs.                               )
 8                                     ) Case No.
     ALPHABET, INC., and GOOGLE,       ) 5:16-cv-03260-BLF
 9   LLC,                              ) (NC)
                                       )
10              Defendants.            )
                                       )
11   _____)

12

13         ***CONFIDENTIAL - ATTORNEYS' EYES ONLY***

14            VIDEOTAPED DEPOSITION OF ASTRO TELLER,

15   taken on behalf of the Plaintiff, at Hosie Rice, LLP, 600

16   Montgomery Street, 34th Floor, San Francisco, California,

17   commencing at 12:02 p.m., on Wednesday, June 13, 2018,

18   before JUVILYNN T. ARBUTHNOT, Certified Shorthand

19   Reporter No. 13817.

20

21

22

23

24

25
```

ASTRO TELLER - ATTORNEYS' EYES ONLY

BARKLEY
Court Reporters

```
      1    BY MR. HOSIE:
      2        Q    Let me show you what's been marked as our next
      3    in order, Exhibit 246.
      4             (Deposition Exhibit 246 was marked
12:20 5             for identification and attached
      6             hereto.)
      7    BY MR. HOSIE:
      8        Q    I know you're a doctor, but I don't stand on
      9    formality, so I'm going to call you "Mr. Teller."  Is
12:21 10   that okay by you, sir?
     11        A    Sure.
     12        Q    And you don't have to call me "Attorney Hosie"
     13    either.
     14        A    Deal.
12:21 15       Q    Deal.
     16             I've marked our next in order Exhibit 246.  I
     17    can tell you this document was created December 12th,
     18    2009, and Sebastian Thrun is its author.  I'm going to
     19    ask you only about the "high-altitude Internet backbone
12:21 20   sentence" on the first page.
     21             MR. WERDEGAR:  And you're welcome to take as
     22    much time as you need to look at the document.
     23             THE WITNESS:  Okay.  Well, I can see the line
     24    you're referring to.
12:21 25   BY MR. HOSIE:
```

23

BARKLEY
Court Reporters

1        Q     Right.  And my question, sir:  Have you ever

2   seen this document before?

3        A     Certainly not in its current format.

4        Q     With all the redactions?

12:21  5        A     I remember a document that this could easily be

6   a redacted version of.

7        Q     Okay.

8        A     It's a little hard to tell from this, but

9   it's -- it's -- there was a long list of ideas that we

12:22 10  kept at X, and I can believe that this was some early

11  version of that document that was then redacted, but I

12  can't tell you from looking at this whether that's true

13  or not.

14        Q     Fair enough.  Was there a name for this list of

12:22 15  interesting projects at X?

16        A     You know, there was more than one list, but we

23        A     To get ideas on paper, mostly.

24        Q     Do you know who Thomas Zurbuchen is?

12:22 25  Z-u-r-b-r-u-c-h-e-n [sic]?

24

BARKLEY
Court Reporters

```
        1      A     Yes.  I believe it was late June of 2011.

        2      Q     Okay.  Long after the fall of 2010?

        3      A     That's how the calendar functions.  Yes.

        4      Q     Thank you.  This is a funny business, sir.  It's

12:32   5   important that we --

        6      A     That's all right.  That's all right.

        7      Q     You gotta --

        8      A     I'm just -- I'm not sure how to answer --

        9      Q     No.  You're doing fine.  You're doing fine.

12:33  10            Let me show you what has been marked as

       11   Exhibit 250.

       12            (Deposition Exhibit 250 was marked

       13            for identification and attached

       14            hereto.)

       15            THE WITNESS:  Okay.

       16   BY MR. HOSIE:

       17      Q     Was this shown to you by your lawyers in your

       18   prep session?

       19      A     No.

12:33  20      Q     Do you recognize it?

       21      A     No.

       22      Q     Do you know who Johnny Lee is?

       23      A     Yes.

       24      Q     What was Johnny Lee's position at Apple in the

12:33  25   spring of 2011, please?
```

ASTRO TELLER - ATTORNEYS' EYES ONLY

BARKLEY
Court Reporters

```
 1        A     That's right.

 2        Q     All right.  So Lee preceded DeVaul at Rapid

 3   Eval?

 4        A     Correct.
```

[redacted]

```
12        Q     All right, sir.  So fair to say that this idea

13   of using balloons to provide an Internet backbone was

14   percolating at X before DeVaul even joined X?

15             MR. WERDEGAR:  Objection.  Vague.

16             THE WITNESS:  Yes.

17   BY MR. HOSIE:

18        Q     You see that here on this piece of paper?

19        A     I see that the idea of Internet backbones made

20   of weather balloons preceded the hiring of Richard

21   DeVaul, yes.

22        Q     Right.  And you also saw several e-mails earlier

23   in our examination today, where Sebastian Thrun was

24   talking about Space Data in the context of that idea?

25        A     I remember the e-mails that you just showed me.
```

37

BARKLEY
Court Reporters

```
        1        Q    Do you know, was he the progenitor of this
        2   meeting, one way or the other?
        3             MR. WERDEGAR:  Objection.  Lacks foundation.
        4             THE WITNESS:  I just don't remember, but it's
12:40   5   possible.
        6   BY MR. HOSIE:
        7        Q    All right, sir.  And so tell me, as you recall,
        8   how it was that Mr. DeVaul started working on balloons
        9   within two weeks of joining Google as an employee.
12:40  10        A    There's so many different things there.  Can
       11   you, like, give me a more narrow question, like --
       12        Q    Yeah.  So DeVaul joins Rapid Eval at X very late
       13   June 2011; correct so far?
       14        A    Yes.
12:40                 ████  ██      ██████████████████████████████
            ██████████████████████████████████████████████████████
            ██      ██    ██████
            ██      ██    ███████████████████████████████████
            ██      ██    █████████
12:40  20        Q    So how was it that DeVaul became interested in
       21   working on balloons within his first two weeks at Google?
       22             MR. WERDEGAR:  Objection.  Lacks foundation.
       23   BY MR. HOSIE:
       24        Q    If you know.
12:41  25             MR. WERDEGAR:  Calls for a narrative.
```

                                42

BARKLEY
Court Reporters

```
 1              THE WITNESS:  He was hired into a rapid
 2    evaluation team.  There were hundreds of ideas floating
 3    around the building.  His entire job was to go picking
 4    through those ideas, trying to throw them out.  He
12:41 5    ████████████████████████████████████████████████
 6    some idea floating around the building.  This doesn't
 7    seem at all remarkable to me.
 8    BY MR. HOSIE:
 9        ██    ████████    ████████████████
██  ██    ██████████████████████████████
    ██    ████████████
12    Q    Yeah.  And so the idea of balloon-borne Internet
13    was percolating at X before DeVaul joined you; fair?
14              MR. WERDEGAR:  Objection.  Asked and answered.
12:41 15    Vague.
16              THE WITNESS:  Now that you have refreshed me
17    with these particular e-mails, I see that that's the
18    case.
19    BY MR. HOSIE:
12:41 20    Q    Fair enough.  And so your best sense of it now
21    is that DeVaul talked to someone or heard something, and
22    that got him sparked on the balloon stuff --
23              MR. WERDEGAR:  Objection.
24    BY MR. HOSIE:
12:41 25    Q    -- within two weeks of his joining Rapid Eval?
```

43

BARKLEY
Court Reporters

```
 1            MR. WERDEGAR:  Lacks foundation.  Calls for
 2   speculation.
 3            THE WITNESS:  That's not exactly how I would put
 4   it.  My memory is that I talked to Rich about many of
 5   these ideas, and when I mentioned that there was some
 6   receptivity to certain ideas, like balloon-powered
 7   Internet, Rich said, "Oh, I've been thinking about that
 8   for a decade or more."
 9   BY MR. HOSIE:
10       Q    Got it.
11       A    So --
12       Q    So that's what you recall?
13       A    Yes.
14            MR. WERDEGAR:  Let the witness finish, please.
15            THE WITNESS:  So whether that fact that he had
16   been thinking about it for a decade or more and that
17   there was some incremental receptivity from Larry was
18   what caused him to call this meeting -- that, I can't
19   tell you.
20   BY MR. HOSIE:
21       █    ███    ████████████████████
```

█ ██████████████████████████████████████

█ ████████████████████████████████████████

█ ████████████████████████

██ █   █    █████

                              44

BARKLEY
Court Reporters

```
 1               DEPOSITION OFFICER'S CERTIFICATE
 2    STATE OF CALIFORNIA       )
                                ) ss.
 3    COUNTY OF MARIN           )
 4
 5
 6              I, JUVILYNN T. ARBUTHNOT, hereby certify:
 7              I am a duly qualified Certified Shorthand
 8    Reporter in the State of California, holder of
 9    Certificate Number 13817 issued by the Court Reporters
10    Board of California and which is in full force and
11    effect.  (Fed. R. Civ. P. 28(a)).
12              I am authorized to administer oaths or
13    affirmations pursuant to California Code of Civil
14    Procedure, Section 2093(b) and prior to being examined,
15    the witness was first duly sworn by me.  (Fed. R. Civ. P.
16    28(a), 30(f)(1)).
17              I am not a relative or employee or attorney or
18    counsel of any of the parties, nor am I a relative or
19    employee of such attorney or counsel, nor am I
20    financially interested in this action.  (Fed. R. Civ. P.
21    28).
22              I am the deposition officer that
23    stenographically recorded the testimony in the foregoing
24    deposition and the foregoing transcript is a true record
25    of the testimony given by the witness.  (Fed. R. Civ. P.
```

145

BARKLEY
Court Reporters

```
 1   30(f)(1)).

 2          Before the completion of the deposition, review

 3   of the transcript [XX] was [  ] was not requested.  If

 4   requested, any changes made by the deponent (and provided

 5   to the reporter) during the period allowed, are appended

 6   hereto.  (Fed. R. Civ. P. 30(e)).

 7   Dated: June 29, 2018.

 8

 9

10

11   _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

146

BARKLEY
Court Reporters

# EXHIBIT 22

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CERTIFIED COPY

1                IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                         SAN JOSE DIVISION

4

5    SPACE DATA CORPORATION,            )
                                        )
6                    Plaintiff,         )
                                        )
7             v.                        ) No. 5:16-cv-03260-BLF
                                        )
8    X, ALPHABET INC., and GOOGLE       )
     INC.,                              )
9                                       )
                     Defendants.        )
10   _____)

11

12

13

14

15                C O N F I D E N T I A L

16              DEPOSITION of RICHARD DEVAUL

17                    July 19, 2017

18

19

20

21

22

23

24   Reported by: Karen Moon, CSR No. 12450
     426654

25

SINCE 1972

BARKLEY
Court Reporters
barkley.com

(310) 207-8000 Los Angeles      (415) 433-5777 San Francisco   (949) 955-0400 Irvine          (858) 455-5444 San Diego
(310) 207-8000 Century City     (408) 885-0550 San Jose        (760) 322-2240 Palm Springs    (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento       (800) 222-1231 Martinez         (702) 366-0500 Las Vegas       (800) 222-1231 Monterey
(951) 686-0606 Riverside        (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson       (516) 277-9494 Garden City
(212) 808-8500 New York City    (347) 821-4611 Brooklyn         (518) 490-1910 Albany          (914) 510-9110 White Plains
(312) 379-5566 Chicago          00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai        001+1+800 222 1231 Hong Kong

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                     SAN JOSE DIVISION

 4

 5   SPACE DATA CORPORATION,         )
                                     )
 6                  Plaintiff,       )
                                     )
 7         v.                        ) No. 5:16-cv-03260-BLF
                                     )
 8   X, ALPHABET INC., and GOOGLE    )
     INC.,                           )
 9                                   )
                    Defendants.      )
10   _____)

11

12

13

14            C O N F I D E N T I A L

15

16         Deposition of RICHARD DEVAUL, taken

17         on behalf of the Plaintiff, at

18         600 Montgomery Street, 34th Floor,

19         San Francisco, California, commencing

20         at 10:03 a.m., Wednesday, July 19, 2017,

21         before Karen Moon, Certified Shorthand

22         Reporter No. 12450.

23

24

25
```

2

BARKLEY
Court Reporters

| | | |
|---|---|---|
| 10:04:50 | 1 | Q    You currently work on Project Loon at Google; |
| 10:04:54 | 2 | do you not, sir? |
| 10:04:55 | 3 | A    I do not. |
| 10:04:56 | 4 | Q    When did you stop? |
| 10:04:59 | 5 | A    I transferred off of Loon in late June of |
| 10:05:03 | 6 | 2013. |
| 10:05:04 | 7 | Q    Were you replaced by someone? |
| 10:05:07 | 8 | MR. KAMBER:  Objection.  Vague. |
| 10:05:11 | 9 | THE WITNESS:  I was succeeded in the |
| 10:05:13 | 10 | leadership of Loon by Mike Cassidy. |
| 10:05:18 | 11 | BY MR. HOSIE |
| 10:05:18 | 12 | Q    And then Mike Cassidy had that job for what, |
| 10:05:21 | 13 | six, seven months? |
| 10:05:23 | 14 | MR. KAMBER:  Objection.  Assumes facts not in |
| 10:05:23 | 15 | evidence. |
| 10:05:27 | 16 | THE WITNESS:  Mike Cassidy was the principal |
| 10:05:29 | 17 | leader of Loon for, as far as I recall, another two |
| 10:05:35 | 18 | years or so. |
| 10:05:35 | 19 | BY MR. HOSIE |
| 10:05:36 | 20 | Q    Great.  Who replaced Mr. Cassidy? |
| 10:05:41 | 21 | A    The -- Mike Cassidy was I would say not |
| 10:05:43 | 22 | replaced.  He was joined by a man named Tom Moore. |
| 10:05:50 | 23 | Q    You joined Google circa the summer of 2011? |
| 10:05:56 | 24 | A    I joined Google on -- mid-June of 2011. |
| 10:06:00 | 25 | That's correct. |

7

BARKLEY
Court Reporters

10:06:02 1      Q    You came from Apple?

10:06:04 2      A    Yes.

10:06:05 3      Q    How did you come to join Google, sir?

10:06:11 4      A    I was recruited by Astro Teller.

10:06:19 5      Q    Astro, that refers to a haircut he had in high

10:06:23 6  school; does it not, sir?

10:06:25 7      A    I actually don't know.

10:06:27 8      Q    And how did you know Astro Teller?

10:06:31 9      A    I did not.

10:06:33 10     Q    So how did he come to find you, as you

10:06:35 11  understood it?

10:06:38 12     A    As I understood it, Astro found me because he

10:06:41 13  was aware of my work in graduate school.

10:06:45 14     Q    And graduate school was MIT?

10:06:48 15     A    Yes.  That was the second graduate school that

10:06:50 16  I attended.

10:06:51 17     Q    And what was your work in graduate school that

10:06:54 18  attracted Mr. Teller's interest?

10:06:58 19          MR. KAMBER:  Objection.  Foundation.

10:07:02 20          THE WITNESS:  I don't know for sure.

10:07:03 21  BY MR. HOSIE

10:07:03 22     Q    What did he tell you?

10:07:07 23          MR. KAMBER:  Objection.  Foundation.  Assumes

10:07:08 24  facts not in evidence.

10:07:10 25          THE WITNESS:  Astro never actually told me why

8

RICHARD DEVAUL - CONFIDENTIAL

BARKLEY
Court Reporters

10:20:53  1   BY MR. HOSIE

10:20:53  2        Q    You've never seen a Google org chart?

10:20:57  3        A    I have never seen a Google org chart.

10:21:05  4        Q    So there are four members of rapid evaluation,

10:21:08  5   and you guys have part of the space that's shared by

10:21:12  6   Google X as of 2011; correct?

10:21:17  7        A    That would have been true as of July,

10:21:21  8   August 2011.

10:21:24  9        Q    Okay.  And then did you start adding members

10:21:26 10   to rapid evaluation?

10:21:28 11        A    Yes.

10:21:37 12        Q    Who did you add, please?

10:21:38 13        A    I'm trying to remember who the next hire was.

10:21:44 14   Dan Monzy joined us for some period of time.  I'm trying

10:21:59 15   to remember who the next hire was after Dan.

10:22:16 16             I don't recall who the next hire was after

10:22:19 17   Dan.  We had an intern.  Oh, what was his name.  A

10:22:29 18   professor who was working on game-ification of things.

10:22:38 19   He had founded Foldit, the protein-folding collective

10:22:43 20   crowd-sourced thing.  He joined us for some period of

10:22:47 21   time.  His name will probably come to me.

10:22:52 22        Q    All right, sir.  And so what were you

10:22:55 23   personally asked to do when you joined the rapid

10:22:59 24   evaluation team in June of 2011?

10:23:05 25        A    I was asked to come up with big, potentially

                                       20

RICHARD DEVAUL - CONFIDENTIAL                    BARKLEY
                                                 Court Reporters

10:23:10  1    world-changing opportunities for Google X.

10:23:13  2        Q    And you said some of these big, potential

10:23:17  3    world-changing opportunities were suggested by other

10:23:21  4    members of Google X, not just the rapid evaluation team;

10:23:24  5    right?

10:23:26  6        A    That's true.

10:23:26  7        Q    Okay.  And is it not true that Larry Page

10:23:31  8    through Astro Teller asked you to think about a

10:23:34  9    balloon-borne internet constellation?

10:23:39 10        A    No.

10:23:39 11        Q    Who asked you to think about that, sir?

10:23:41 12        A    Nobody asked me to think about that.

10:23:43 13        Q    So you just came up with the idea on your own?

10:23:45 14        A    Yes.

10:23:46 15        Q    Where did you get the idea from?

10:23:51 16        A    There is a very long history of using balloons

10:23:54 17    for communication.  I first considered that when I was

10:23:58 18    working at the MIT Media Lab, probably circa '99, 2000.

10:24:09 19        Q    Did you do any writing on that then?

10:24:14 20        A    I don't have any publications on that.  It was

10:24:17 21    an idea I discussed with my adviser.

10:24:20 22        Q    Who was your adviser?

10:24:22 23        A    Alex Pentland.

10:24:26 24        Q    And so it just sort of marinated in your mind

10:24:31 25    from graduate school forward?

21

BARKLEY
Court Reporters

10:24:35  1          MR. KAMBER:  Objection.  Vague.

10:24:37  2   BY MR. HOSIE

10:24:37  3      Q    Are you confused by that question, sir?  It's

10:24:41  4   colorful, but I'm not sure it's confusing.

10:24:45  5      A    It was certainly not something I was actively

10:24:47  6   thinking about for a long time, but it was obviously

10:24:50  7   something I'd considered.

10:24:52  8      Q    Okay.  And so you're hired.  Astro Teller

10:24:58  9   says, Rich, come up with the next big world-changing

10:25:02 10   idea, and then you say here's one, how about a balloon

10:25:05 11   internet constellation?  Is that how it happened?

10:25:08 12      A    No.

10:25:09 13      Q    How did it happen?

10:25:14 14      A    I'm sorry.  Are you asking about the origin of

10:25:17 15   balloon concept or project?

10:25:19 16      Q    I'm asking about how you personally came up

10:25:22 17   with Loon and described it to your boss Astro Teller in

10:25:26 18   the summer of 2011.

10:25:28 19          MR. KAMBER:  Objection.  Lacks foundation.

10:25:29 20   Assumes facts not in evidence.

10:25:36 21   ▬▬▬▬▬▬▬▬▬    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬ ▬   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬ ▬   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬ ▬   ▬▬▬▬▬▬▬▬▬

▬▬ ▬      ▬▬▬▬▬▬▬▬▬▬▬▬▬

                         22

BARKLEY
Court Reporters

10:26:03   1   ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

███████████   ████████████████

10:26:26   7   BY MR. HOSIE

10:26:26   8        Q    All right.   Wasn't there a group at Google in

10:26:29   9   2011 already working on the connectivity problem?

10:26:33  10             MR. KAMBER:   Objection.   Vague.

10:26:38  11             THE WITNESS:   I was not aware of any other

10:26:40  12   group at Google working on global connectivity for the

10:26:49  13   folks who could not afford connectivity at that time.

10:26:54  14   BY MR. HOSIE

10:26:54  15        Q    Thank you.   Not quite my question.

10:26:56  16             Wasn't there another group at Google working

10:26:58  17   on the connectivity problem?   E.g. fiber, e.g. fixed

10:27:02  18   wing drones --

10:27:12  19             MR. HOSIE:   If I may finish, counsel.   That's

10:27:14  20   why the reporter's having a problem.   Please let me

10:27:16  21   finish my question before you interject.

10:27:20  22   BY MR. HOSIE

10:27:20  23        Q    That being the project that eventually became

10:27:23  24   Titan?

10:27:24  25             MR. KAMBER:   Objection.   Misstates prior

23

BARKLEY
Court Reporters

10:29:02  1          A     I don't know where it was located in June-ish
10:29:07  2     of 2011.  Eventually many offices moved, and we ended up
10:29:15  3     not too far away from them later on in a year or two.
10:29:19  4          Q     And by not too far away, what do you mean?
10:29:24  5          A     There was a one-mile jogging path that circled
10:29:27  6     around a wetland, and it turns out that the Access and
10:29:32  7     Energy office, once Craig Barratt took over, was located
10:29:37  8     on the other side of that jogging path.
10:29:41  9          Q     Did you know any of the folks working at the
10:29:45 10     Access group in the fall of 2011?
10:29:48 11          A     No.
10:29:48 12          Q     Did you ever meet them?
10:29:50 13          MR. KAMBER:  Objection.  Vague.
10:29:54 14          THE WITNESS:  Not to my knowledge.
10:29:55 15     BY MR. HOSIE
10:29:56 16          Q     All right, sir.  So as I understand the
10:30:00 17     evolution of what became Loon, you had done some
10:30:04 18     thinking about this as a graduate student.  You first
10:30:06 19     ████████████████████████████████████████   ████████
        ██  ██   ██████████████████████████████████████████████
        ██  ██   ████████████████████████████████████████████████
        ██  ██   ██████████████████████████████████████████
        ██  ██   ████████████████████████████
10:30:21 24          Fair summary?
10:30:22 25          A     That's a fair summary.


                              25

BARKLEY
Court Reporters

10:30:23   1        Q    Okay.  And so you go back to your space and
10:30:27   2    you start to think about connectivity?
10:30:31   3        A    Yes.
10:30:32   4        Q    Okay.  And it's pretty quickly apparent that
10:30:36   5    terrestrial infrastructure is not going to work to solve
10:30:40   6    that problem; right?
10:30:41   7        A    Yes.
10:30:42   8        Q    Right.  Because it's not economic?
10:30:44   9             MR. KAMBER:  Objection.  Vague.  Misstates
10:30:47  10    prior testimony.
10:30:49  11             THE WITNESS:  Yes.  Connectivity is a
10:30:54  12    important and valuable resource.  And if it can be
10:31:00  13    deployed terrestrially most places, it already has been.
10:31:04  14    BY MR. HOSIE
10:31:05  15        Q    Hundred percent.  That which can be built
10:31:08  16    easily and cheaply has been built; correct?
10:31:12  17             MR. KAMBER:  Objection.  Vague.  Foundation.
10:31:14  18             THE WITNESS:  In terms of connectivity, if
10:31:16  19    there is a low-cost conventional solution for
10:31:19  20    connectivity that is cost-effective, it has most likely
10:31:23  21    been deployed.
10:31:25  22    BY MR. HOSIE
10:31:25  23        Q    I think that's right.  Okay.  So that prompts
10:31:28  24    you to think in more unconventional ways.
10:31:33  25             Fair?

26

BARKLEY
Court Reporters

10:31:34  1        A    Yes.

10:31:35  2        Q    Looking for something new, something

10:31:37  3   different.

10:31:38  4             Also fair?

10:31:39  5             MR. KAMBER:  Objection.  Vague.

10:31:42  6             THE WITNESS:  I was looking for innovative

10:31:45  7   solutions that might combine new or old elements,

10:31:49  8   essentially anything that I thought could really

10:31:52  9   meaningfully impact that problem.

10:31:54 10   BY MR. HOSIE

10:31:55 11        Q    In a way that would be new and different?

10:31:58 12             MR. KAMBER:  Objection.  Vague.  Asked and

10:31:59 13   answered.

10:32:03 14             THE WITNESS:  We were by definition looking

10:32:05 15   for novel opportunities.

10:32:09 16   BY MR. HOSIE

10:32:09 17        Q    In fact, that was your charter.  Come up with

10:32:12 18   new, novel, earth-changing ideas.  That was your whole

10:32:15 19   deal in the rapid evaluation; correct?

10:32:20 20             MR. KAMBER:  Objection.  Compound.  Vague.

10:32:22 21   Assumes facts not in evidence.

10:32:27 22             THE WITNESS:  I would say that we were -- our

10:32:29 23   mission was to create new opportunities, and those

10:32:35 24   opportunities would have at their core enabling

10:32:38 25   technology.  Generally speaking, that would be some

27

BARKLEY
Court Reporters

10:32:43  1    pretty radical technology.

10:32:48  2    BY MR. HOSIE

10:32:49  3         Q    Okay.  And what became Loon struck you

10:32:54  4    personally as a pretty radical technology?

10:33:00  5         A    No.

10:33:01  6         Q    It didn't strike you as a really cool new

10:33:03  7    idea?

10:33:08  8         A    Loon struck me as a opportunity enabled by

10:33:16  9    insight into the nature of the problem and utilizing

10:33:24 10    many existing components, but combined in a new way that

10:33:28 11    would potentially allow us to tackle the connectivity

10:33:33 12    problem at scale.

10:33:37 13         Q    And you were excited about this idea?

10:33:43 14         A    I was pretty excited about Loon.  That's

10:33:45 15    right.

10:33:46 16         Q    In fact, I think you wrote on your personal

10:33:48 17    website how new and cool it was in 2013.  Did you not,

10:33:52 18    sir?

10:33:56 19              MR. KAMBER:  Objection.  Vague.  Hearsay.

10:33:59 20              THE WITNESS:  I don't specifically recall the

10:34:01 21    date, but certainly once we announced Loon I posted

10:34:04 22    about how excited I was.  That's right.

10:34:06 23    BY MR. HOSIE

10:34:07 24         Q    Why were you excited?

10:34:12 25         A    I was excited, because I felt like we had the

28

BARKLEY
Court Reporters

```
 1              DEPOSITION OFFICER'S CERTIFICATE

 2

 3   STATE OF CALIFORNIA      )
                              )   ss.
 4   COUNTY OF ALAMEDA        )

 5

 6            I, Karen Moon, hereby certify:

 7           I am a duly qualified Certified Shorthand

 8   Reporter in the State of California, holder of

 9   Certificate Number CSR 12450 issued by the Court

10   Reporters Board of California and which is in full force

11   and effect.  (Fed. R. Civ. P. 28(a)).

12           I am authorized to administer oaths or

13   affirmations pursuant to California Code of Civil

14   Procedure, Section 2093(b) and prior to being examined,

15   the deponent was first duly sworn by me.  (Fed. R. Civ.

16   P. 28(a), 30(f)(1)).

17           I am not a relative or employee or attorney or

18   counsel of any of the parties, nor am I a relative or

19   employee of such attorney or counsel, nor am I

20   financially interested in this action.  (Fed. R. Civ. P.

21   28).

22           I am the deposition officer that

23   stenographically recorded the testimony in the

24   foregoing deposition and the foregoing transcript is a

25   true record of the testimony given by the witness.
```

148

BARKLEY
Court Reporters

1    (Fed. R. Civ. P. 30(f)(1)).

2           Before completion of the deposition,

3    review of the transcript [ XX ] was [ ] was not

4    requested.  If requested, any changes made by the

5    deponent (and provided to the reporter) during the

6    period allowed are appended hereto.  (Fed. R. Civ. P.

7    30(e)).

8

9
     Dated: August 1, 2017
10

11

12                              _____

13

14

15

16

17

18

19

20

21

22

23

24

25

149

BARKLEY
Court Reporters

# EXHIBIT 27

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

| Detailed description | Key people | Importance | Status |
|---|---|---|---|



**Mobile user interfaces**

REDACTED - SBI/NR

High-altitude Internet backbone | Deploy balloons (or similar) to create airborne Internet backbone | | |

**Energy**

REDACTED - SBI/NR



Δ π EXHIBIT 246
Teller
Deponent
6-13-18  JA
Date          Rptr.
WWW.DEPOBOOK.COM

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GOOG-SD-00292313



*REDACTED - SBI/NR*

Medical

*REDACTED - SBI/NR*

Transportation

*REDACTED - SBI/NR*

Robotics

*REDACTED - SBI/NR*

Radical Software Ideas

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GOOG-SD-00292314

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GOOG-SD-00292317

# EXHIBIT 34

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**From:**     Sebastian Thrun <thrun@google.com>
**To:**       Astro Teller <astroteller@google.com>
**Sent:**     Mon, 15 Nov 2010 22:46:31 -0800
**Subject:**  Fwd: quick question


---------- Forwarded message ----------
From: **L a r r y P a g e** <page@google.com>
Date: Mon, Nov 15, 2010 at 10:40 PM
Subject: Re: quick question
To: Sebastian Thrun <thrun@google.com>


OK

check out: http://www.spacedata.net/documents/SkySite_Telemetry_Overview_Jan06.pdf
Sergey and I launched one of these ourselves.

-Larry



On Mon, Nov 15, 2010 at 10:38 PM, Sebastian Thrun <thrun@google.com> wrote:





HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GOOG-SD-00288342



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 38

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED





GOOG-SD-00158228

# Space Data Corporation
## *The Leader in Near-Space Wireless*

## "SkySites = 700 MHz Bid Advantage"

November, 2007

Jerry Knoblach, CEO & Co-Founder
Eric Frische, CTO & Co-Founder
Jim Wiesenberg, CSO
www.spacedata.net



# **Advantages of Space Data for Google**

- Expand current M2M/SMS network to national SMS on our 900 MHz spectrum

- Nationwide PTT voice / SMS over Space Data's 900 MHz spectrum

- 100% coverage from Day 1 (Feb. 2009) of 700 MHz C +  D blocks

- 3rd network layer for lower latency, higher capacity vs. ATC alone

- Licensed supervisory / firmware update channel for TV White Space

- Our 900 MHz  spectrum is within int'l GSM band = inexpensive devices

- SkySite Patent approved in 42 countries

- Rapid deployment of ubiquitous wireless networks (protocol / freq. agnostic)

- High resolution imagery for Google Earth content



CONFIDENTIAL

# Advantages of Space Data for 700 MHz Licensees

- Improved rollout strategy
  - Ubiquity from SkySite® overlay from beginning
    - Transparent to consumer (no special device needed)
  - Fill in areas with towers as demand increases
  - First 100% coverage from any carrier
    - Poor coverage key component of customer satisfaction and thus churn rates
- Inexpensive method to meet FCC build out requirements
  - 70% geography. on A, B & E blocks
    - vs. 75% pops (about 10% geo.) for PCS auctioned in 1990s
  - 99.3% pop on Block D
    - $5B more than 75% pop build out if towers are used
    - Makes need for dual mode satellite device less significant
  - C block – REAG are large geographic markets which fit SkySite technology well
- Nearly $200 M in Bidding Credits available through the FCC's Tribal Land Bidding Credit Program
  - Space Data has successfully used this program on 4 auctions
- Wireless Technology agnostic – CDMA / WCDMA / WiMAX



GOOG-SD-00158231

# Bandplan for 700 MHz

- Assume operator has access to C & D Block + 20 MHz of Public Safety
  - 42 MHz broken into eight 5 MHz WiMAX TDD channels
  - Allows 6 ch. for reuse of 3 on SkySites & Towers + 2 fringe/core ch.



LOWER 700 MHz BAND
(CHANNELS 52-59)

UPPER 700 MHz BAND
(CHANNELS 60-69)

| Block | Frequencies | Bandwidth | Pairing | Area Type | Licenses |
|-------|-------------|-----------|---------|-----------|----------|
| A | 698-704, 728-734 | 12 MHz | 2 x 6 MHz | EA | 176 |
| B | 704-710, 734-740 | 12 MHz | 2 x 6 MHz | CMA | 734 |
| C | 710-716, 740-746 | 12 MHz | 2 x 6 MHz | CMA | 734* |
| D | 716-722 | 6 MHz | unpaired | EAG | 6* |
| E | 722-728 | 6 MHz | unpaired | EA | 176 |
| C | 746-757, 776-787 | 22 MHz | 2 x 11 MHz | REAG | 12 |
| D | 758-763, 788-793 | 10 MHz | 2 x 5 MHz | Nationwide | 1** |
| A | 757-758, 787-788 | 2 MHz | 2 x 1 MHz | MEA | 52*** |
| B | 775-776, 805-806 | 2 MHz | 2 x 1 MHz | MEA | 52*** |

Space Data®
CORPORATION

CONFIDENTIAL

# Three Sectors Per SkySite Platform

- WiMAX SkySite is despun, gravity gradient stablized and has 3 sectors
  - These use the Red, Green, and Blue channels (2 per sector)
  - Switches to Fringe ch. if overlap with towers (Yellow and Orange)
  - Can turn off sector over urban cores and suburbs with towers
- Suburban towers use same Red, Green, Blue ch. (2 per sector)
- Urban Cores can use all 8 channels due to higher urban signal levels
  - Building penetration in urban areas is 19 dB vs. 6 dB in rural areas



SkySite Sectors Use Orange or Yellow Ch. When over towers

Suburban Towers

Urban Core
Higher Power overcomes any SkySite Interference

Single WiMAX SkySite Coverage with 3 sectors

Space Data® CORPORATION

CONFIDENTIAL

# WiMAX SkySite® Platform

- Float altitude of 60,000 feet powered by combination of solar and fuel cell
- Fuel cell is powered by hydrogen taken from lifting gas and oxygen from hanging balloon or atmosphere
- Payload vents lifting gas and drops ballast to maintain altitude
- Payload target weight is under 12 pounds (FAA does not include $H_2$ or $O_2$ balloon systems)
- Antenna system consists of 3 thin-film, broadside Yagi antennas





Space Data® CORPORATION

# WiMAX SkySite Coverage Geometry

- Coverage Circle size limited by link budget and capacity considerations
  - Link budget compensated by gain of antenna, LNA, PA at SkySite
  - WiMAX provides adequate time advance for long path lengths
- Minimum elevation angle is 10.3 degrees
  - Equivalent to standing 0.2 miles from a 200 foot tower (i.e. little fading)
- At 60,000 feet (18.3 km) the following link distances can be achieved
  - 6Mbps/QPSK:  96 km / 60 mi
  - 12Mbps/16QAM:  76 km / 47 mi
  - 18 Mbps/64QAM: 39 km / 24 mi



# Longer RF Link But Same Path Loss

- Terrestrial systems have to power through clutter
  - 141 dB path loss



Penetration
19 dB to 22 dB

200 ft

2 to 9 km = 121 dB

- Two path loss regions:
  - 42 mi free space path:                    -130 dB
  - Local fading path + penetration:        -  11 dB
                                                    - 141 dB path loss

98 km - Free Space Loss (1/R^2) = 130 dB

- Gains vs. Terrestrial Link:
  - Less penetration loss for rural bldgs.
  - Noise free environment
  - Cold LNA at antenna
  - Lower dynamic range allows for more LNA gain

0.5 km - fading
5 dB
200 ft
10.3 Deg
1,100 ft

Penetration
6 dB



**Space Data**
CORPORATION

CONFIDENTIAL

# WiMAX SkySite Antenna and Data Rates

- Antenna pattern for a 11.1 dBi Yagi
  - Downtilt = 30°

- Coverage Circle size limited by link budget and capacity
  - Average data rate: 10.6 Mbps



Edge of Coverage:
-11° / Ant Gain: 9.8 dB

Edge of 16QAM:
-14° down tilt
Ant Gain: 10.1 dB

Directly Under SkySite:
Ant Gain: -8.5 dB
QPSK in 6 mi circle

Edge of 16QAM:
-88° / Ant Gain: -2 dB

Edge of 64QAM:
-25° down tilt
Ant Gain: 11 dB

Inner Edge of 64QAM:
-70° down tilt
Ant Gain: 4.3 dB



*Note: Pattern is for commercially available antenna (Andrew DB498-PS)
Antenna optimized for SkySites would result in higher avg. data rates*

Space Data CORPORATION

GOOG-SD-00158237

# Population Density Map – 10x10 mi Grid

- 10 x 10 mile grids are about 50% of coverage of a rural tower site
- SkySites platform of choice for dark and most of light green areas
  - 93% of area: (dk. green = 46% of area, lt. green = 47% of area)



GOOG-SD-00158238

# Coverage of Current 850 MHz CDMA Carriers

- Verizon Digital Coverage = 36% Landmass
- Verizon Digital + Digital Roaming = 68% Landmass
- Verizon Digital + Digital / Analog Roaming = 77% Landmass



■ **Verizon Digital Coverage: >24,000 sites**
■ **Digital Roaming Coverage**
■ **Analog Roaming Coverage**
■ **No Coverage**

*Note: Population & Area Statistics for Continental US at Census Block level resolution*
*Alaska & Hawaii comprise <1% of population and >16% of landmass*
*Coverage maps downloaded 10/21/07 from http://www.verizonwireless.com/b2c/CoverageLocatorController*

Space Data®
CORPORATION

GOOG-SD-00158239

# WiMAX Network with SkySites & Towers

- Towers are initially built in urban areas which are 66% of population, but less than 2.5% of area
- 371 SkySites provide ubiquitous coverage of Continental US
- Each SkySite has 3 sectors with a reuse pattern of 3
  - When over urban areas sectors use the fringe channels



Space Data®
CORPORATION

CONFIDENTIAL

# SkySite Network provides More Devices, Lower Latency, & More Capacity than Satellites

- SkySites compatible with terrestrial user devices (i.e. dual mode not needed)
- GEO Satellites have inherent 240 ms latency that slows data transmissions
  - SkySite Platforms have 0.6 ms latency (372 times faster)
- Largest planned GEO satellite antenna can project at most 240 spot beams for Continental US with freq. reuse pattern of 7 due to interbeam interference
- 368 SkySites cover Continental US, each with 3 sectors and freq. reuse of 3
  - Capacity of SkySite Network is 11 times the capacity of a GEO Satellite with equal bandwidth of spectrum: (368*3 / 3 vs. 240 / 7)
  - Satellites have fixed capacity over 15 yr life whereas capacity of SkySite Network can be upgraded if needed for more capacity or new technology



**Smallest Available GEO Satellite Spot Beams
0.35 deg. from 22 meter antenna**
(spot beams elongate due to view from satellite at equatorial orbit)

**SkySites
each
with 3 sectors**

Space Data®
CORPORATION

CONFIDENTIAL

Notes Summary:

No speaker notes are contained in this presentation.

CONFIDENTIAL

GOOG-SD-00158242

# EXHIBIT 40

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**CERTIFIED COPY**

1          IN THE UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3              SAN JOSE DIVISION

4                ---oOo---

5

6

   SPACE DATA CORPORATION,            )
7                                      )
                    Plaintiff,         )
8                                      )
          vs.                          )    Case No.
9                                      )    5:16-cv-03260
   ALPHABET, INC., and GOOGLE,         )    -BLF
10   INC.,                             )
                                       )
11                  Defendants.        )
                                       )
12

13

14

15                ---oOo---

16         FRIDAY, MAY 11, 2018

17   VIDEOTAPED DEPOSITION OF EDWARD DANIEL McCLOSKEY

18     HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

19                ---oOo---

20

21

22

23

24   REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR
     438063
25

SINCE 1972

**BARKLEY**
Court Reporters
barkley.com

(310) 207-8000 Los Angeles      (415) 433-5777 San Francisco    (949) 955-0400 Irvine          (858) 455-5444 San Diego
(310) 207-8000 Century City     (408) 885-0550 San Jose         (760) 322-2240 Palm Springs     (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento       (800) 222-1231 Martinez         (702) 366-0500 Las Vegas        (800) 222-1231 Monterey
(951) 686-0606 Riverside        (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson        (516) 277-9494 Garden City
(212) 808-8500 New York City    (347) 821-4611 Brooklyn         (518) 490-1910 Albany           (914) 510-9110 White Plains
(312) 379-5566 Chicago          00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai         001+1+800 222 1231 Hong Kong

1          IN THE UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3                 SAN JOSE DIVISION

4                    ---o0o---

5

6

     SPACE DATA CORPORATION,          )
7                                      )
                        Plaintiff,     )
8                                      )
             vs.                       )   Case No.
9                                      )   5:16-cv-03260
     ALPHABET, INC., and GOOGLE,       )   -BLF
10   INC.,                             )
                                       )
11                      Defendants.    )
                                       )
12

13

14

15                    ---o0o---

16              FRIDAY, MAY 11, 2018

17   VIDEOTAPED DEPOSITION OF EDWARD DANIEL McCLOSKEY

18      HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

19                    ---o0o---

20

21

22

23

24   REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR

25

                          2

BARKLEY
Court Reporters

```
 1        Q.   Just yes or no, were you aware of whether
 2   there were any measures in place to ensure the
 3   Project Loon team was not using Space Data's
 4   intellectual property?
 5             MR. WONG:  Objection; vague, calls for
 6   speculation.
 7             THE WITNESS:  I am not aware of any
 8   measures.  I am not aware of any measures.
 9        Q.   BY MS. HEATON:  So that's a no.
10             In fact, there's communication between
11   those who visited Space Data and individuals who
12   worked on the Project Loon team, correct?
13             MR. WONG:  Objection; vague.
14             THE WITNESS:  As evidenced by these
15   emails, yes.
16             MS. HEATON:  I will mark as Exhibit 61 an
17   email bearing the Bates range GOOG-SD-00158228
18   through 242.
19                 (Reporter marked Exhibit No. 61 for
20                  identification.)
21        Q.   BY MS. HEATON:  This is an email from
22   Larry Alder from March 29, 2011, correct?
23        A.   Correct.
24        Q.   And he's sending the email to you?
25        A.   Correct.
```

04:54   5
04:54  10
04:54  15
04:55  20
04:56  25

232

BARKLEY
Court Reporters

```
 1        Q.   And what's the title?

 2        A.   "Some old Space Data slides."

 3        Q.   And Larry says, "Here's an old deck from

 4   Space Data from back in the day," correct?

 5        A.   Correct.
```

6        ███      ████████████████████████████

     ██   ██████████

     ██      ███   █████

     ██      ███   ████████████████████████████

  ██  ██  ███████████████████

```
11             MR. WONG:  Objection; assumes facts.

12             THE WITNESS:  This is in relation to the

13   -- what we mentioned before about Paul Kolodzy

14   trying to basically do spectrum measurements,

15   broad-scale spectrum measurements.

16        Q.   BY MS. HEATON:  So Larry sent around what

17   he called old slides from Space Data at that point,

18   correct?

19        A.   That's what it looks like.

20        Q.   Do you recall reviewing the Space Data

21   slides in 2011?

22        A.   I recall looking at this chart.

23        Q.   On page what?

24        A.   235.

25        Q.   And why did you look at that chart?
```

233

```
 1              DEPOSITION OFFICER'S CERTIFICATE
 2   STATE OF CALIFORNIA    )
                            ) ss.
 3   COUNTY OF SAN FRANCISCO )

 4

 5

 6        I, BALINDA DUNLAP, hereby certify:

 7        I am a duly qualified Certified Shorthand

 8   Reporter in the State of California, holder of

 9   Certificate Number CSR 10710 issued by the Certified Court

10   Reporters' Board of California and which is in full

11   force and effect.  (Fed. R. Civ. P. 28(a)(1)).

12        I am authorized to administer oaths or

13   affirmations pursuant to California Code of Civil

14   Procedure, Section 2093(b) and prior to being examined,

15   the witness was first duly sworn by me.  (Fed. R. Civ.

16   P. 28(a)(a)).

17        I am not a relative or employee or attorney or

18   counsel of any of the parties, nor am I a relative or

19   employee of such attorney or counsel, nor am I

20   financially interested in this action.  (Fed. R. Civ. P.

21   28).

22        I am the deposition officer that

23   stenographically recorded the testimony in the foregoing

24   deposition and the foregoing transcript is a true record

25                         / / /
```

239

EDWARD DANIEL McCLOSKEY-ATTORNEYS' EYES ONLY

BARKLEY
Court Reporters

1  of the testimony given by the witness.  (Fed. R. Civ. P.

2  30(f)(1)).

3          Before completion of the deposition, review of

4  the transcript [  ] was [XX] was not requested.  If

5  requested, any changes made by the deponent (and

6  provided to the reporter) during the period allowed, are

7  appended hereto.  (Fed. R. Civ. P. 30(e)).

8  Dated: JUNE 4, 2018

9

10

11  _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

240

BARKLEY
Court Reporters