# EXHIBIT A

# EXHIBIT 2

# REDACTED VERSION OF DOCUMENT

1    SPENCER HOSIE (CA Bar No. 101777)          **HIGHLY CONFIDENTIAL**
     shosie@hosielaw.com                         **ATTORNEYS' EYES ONLY**
2    DIANE S. RICE (CA Bar No. 118303)
     drice@hosielaw.com
3    LYNDSEY C. HEATON (CA Bar No. 262883)
     lheaton@hosielaw.com
4    BRANDON C. MARTIN (CA Bar No. 269624)
     bmartin@hosielaw.com
5    DARRELL R. ATKINSON (CA Bar No. 280564)
     datkinson@hosielaw.com
6    HOSIE RICE LLP
7    Transamerica Pyramid, 34th Floor
     600 Montgomery Street
8    San Francisco, CA 94111
     (415) 247-6000 Tel.
9    (415) 247-6001 Fax

10
     *Attorneys for Plaintiff*
11   *SPACE DATA CORPORATION*

12
                    UNITED STATES DISTRICT COURT
13            FOR THE NORTHERN DISTRICT OF CALIFORNIA
14                      SAN JOSE DIVISION

15
     SPACE DATA CORPORATION,              Case No. 5:16-cv-03260-BLF (NC)
16
                  Plaintiff,              **PLAINTIFF SPACE DATA**
17                                        **CORPORATION'S JULY 13, 2018**
                                          **AMENDED RESPONSES TO**
18   v.                                   **DEFENDANT GOOGLE LLC'S**
                                          **INTERROGATORY NOS. 12, 15, 16, 17,**
19   ALPHABET INC., and GOOGLE LLC,       **19, 20 & 23**

20                Defendants.
                                          Judge:      Hon. Beth Labson Freeman
21                                        Date Filed: June 13, 2016
                                          Trial Date: August 5, 2019
22
                <u>**HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY**</u>
23

24

25

26

27

28

1    Space Data Corporation ("Space Data" or "Plaintiff"), hereby provides its amended

2 responses (inclusive of objections) to Google LLC's ("Google" or "Defendant")

3 Interrogatory No. 12, 15, 16, 17, 19, 20 and 23 (the "Interrogatories").[1]

4    Discovery is ongoing, and Space Data has not yet completed discovery in this action,

5 and has not completed preparation for trial.  All of the following responses to Defendant's

6 discovery therefore are without prejudice to Space Data's right to produce evidence of any

7 subsequently discovered facts or subsequently discovered documents.  The information

8 hereinafter set forth is true and correct to the best of Space Data's knowledge as of this date,

9 and is subject to correction for inadvertent errors, mistakes or omissions.

10                               **GENERAL OBJECTIONS**

11    1.    All of Space Data's General Objections, and all of Space Data's Specific

12 Objections to the Interrogatories, made in Space Data's prior responses that relate to the

13 Interrogatories are incorporated herein by reference.

14    2.    Space Data objects to the Interrogatories to the extent they are inconsistent

15 with or purport to impose upon Space Data obligations exceeding those set forth in the

16 Federal Rules of Civil Procedure and the Local Rules of the United States District Court for

17 the Northern District of California, any discovery plan that may be agreed to by the parties

18 and approved by the Court, any other schedule or ruling that may be set forth by the Court, or

19 any other agreement of the parties.

20    3.    Space Data objects to the Interrogatories to the extent they seek description or

21 identification of all or each fact, act, document, persons, communications, or other evidence

22 or member of a category of information or thing concerning any subject matter.  This

23 language renders the Interrogatory vague, ambiguous, unintelligible, unduly broad, and

24 uncertain.  To the extent Space Data agrees to identify any information, it will conduct a

25 reasonable investigation for relevant, responsive, non-duplicative, non-privileged information

26

27 [1] Google and Alphabet Inc. are collectively referred to as "Defendants."

28

1    and make reasonable identifications based on its investigation, as, we are sure, will Google.

2         4.      Space Data objects to the Interrogatories to the extent they are vague,

3    ambiguous, overly broad and unduly burdensome, and not reasonably calculated to lead to

4    the discovery of admissible evidence.  Space Data expressly reserves all objections as to

5    vagueness, ambiguity, unintelligibility, and overbreadth.

6         5.      Nothing herein shall be construed as an admission by Space Data regarding

7    the admissibility or relevance of any fact or document or of the truth or accuracy of any

8    characterization contained in Google's discovery requests.  Space Data expressly reserves all

9    objections regarding the competency, relevancy, materiality, probative value, and

10   admissibility of all information provided, documents produced and contents thereof.

11        6.      Space Data objects to the Interrogatories to the extent that they are duplicative

12   of other discovery to be produced in this case or seek documents and things which are more

13   easily available through other, less burdensome means.

14        7.      Space Data objects to the Interrogatories to the extent that they seek

15   information, documents, or things that are not relevant to the subject matter of this action or

16   to a claim or defense of any party and/or are not reasonably calculated to lead to the

17   discovery of admissible evidence.

18        8.      Space Data objects to the Interrogatories to the extent they include subparts

19   that should be propounded, numbered, or counted as separate interrogatories in accordance

20   with Federal Rules of Civil Procedure 33.

21        9.      Space Data objects to the Interrogatories to the extent they seek information

22   that does not exist or that is otherwise outside of Space Data's possession, custody, or

23   control.

24        10.     Space Data objects to the Interrogatories to the extent they seek information

25   that is already within the possession of Defendants or that is readily accessible to Defendants,

26   as through public sources.

27        11.     Space Data objects to the Interrogatories, and each of the requests,

28

instructions and definitions therein or incorporated therein, insofar as the Interrogatories and any request, instruction or definition seeks information or production of documents or things protected by the attorney-client privilege, protected by the work-product doctrine, immune as trial-preparation material, or protected by any other applicable privilege, immunity, rule or duty of confidentiality which precludes or limits the disclosures of such information.  Such information shall not be provided in response to the Interrogatories and any inadvertent disclosures shall not be deemed a waiver of any privilege or related doctrine.

12.     Space Data objects to the Interrogatories to the extent they seek information, documents or things that contain trade secret, confidential or proprietary information.  Space Data will provide such information, documents or things only subject to the protection of the Stipulated Protective Order in this case (ECF 171).

13.     Space Data objects to the Interrogatories to the extent they require Space Data to provide information or documents or things that are subject to a non-disclosure or confidentiality agreement or protective order with a third party, or a legal or regulatory or other government restriction, or that contain the trade secrets of or confidential or proprietary or sensitive information of a third party.  To the extent Space Data identifies any such information, document or thing, it will abide by its confidentiality obligation that prevents disclosure and provide notice to Defendant of the nature of the information, document or thing and the confidentiality obligation that prevents disclosure.  To the extent that Space Data is able to provide any such information, documents or things, it will only do so subject to the protection of the Stipulated Protective Order in this case (ECF 171).

14.     Space Data objects to the Interrogatories to the extent they seek sensitive personal or private information that is otherwise confidential or protected by a person's right to privacy.  If Space Data provides any such information, documents or things, it will do so subject to the protection of the Stipulated Protective Order in this case (ECF 171).

15.     Space Data objects to the Interrogatories as premature, as fact discovery has not been completed and many of Google's corporate witnesses have not yet testified, and to

1    the extent it seeks information that is the subject of expert discovery.

2          16.     Space Data objects to the Interrogatories as premature, given Space Data has

3    not completed its investigation of facts, witnesses or documents relating to this case, has not

4    completed analysis of available information, and has not completed preparation for trial.

5    Trial is not set in this matter until August 5, 2019.  Opening expert reports are not due until

6    September 7, 2018.

7          17.     Space Data objects to the Interrogatories to the extent they seek electronically

8    stored information ("ESI") in in a format not maintained by Space Data, ESI from sources

9    that are not reasonably accessible because of undue burden or expense, or ESI in a format

10   that is unduly burdensome and not reasonably proportionate to the needs of the case where

11   other formats have been produced or are available.  Space Data objects to the Interrogatories

12   to the extent they are inconsistent with or purport to impose upon Space Data obligations

13   exceeding those set forth by the Stipulated Order Re: Discovery of Electronically Stored

14   Information, the Stipulated Order Re: Discovery of Emails, or any other agreements as to ESI

15   reached by the parties or ordered by the Court.

16         18.     Space Data objects to Definition No. 1 as vague, ambiguous, overly broad and

17   unduly burdensome, and not reasonably calculated to lead to the discovery of admissible

18   evidence to the extent it purports to include within the scope of "Space Data," "you" "your"

19   or "Plaintiff" entities that are not Plaintiff.  Space Data will construe "Space Data," "you"

20   "your" and "Plaintiff" to mean Plaintiff Space Data Corporation.

21         19.     Space Data objects to Definition Nos. 6 and 8 to the extent they purport to

22   impose upon Space Data obligations exceeding those set forth in the Federal Rules of Civil

23   Procedure and the Local Rules of the United States District Court for the Northern District of

24   California, any discovery plan agreed or that may be agreed to by the parties and approved

25   by the Court, any other schedule or ruling that may be set forth by the Court, or any other

26   agreement of the parties.  Space Data will respond in accordance with these rules /

27   agreements.  Space Data further objects to these definitions to the extent they seek

28

1  information protected by the attorney-client privilege, the work-product doctrine, or any

2  other applicable privilege, protection or immunity, including FRE 408 and FRCP 26(b), or

3  information subject to a non-disclosure or confidentiality agreement or protective order with

4  a third party, or information subject to a legal, regulatory or government restriction, or

5  information that contains the trade secrets of or confidential or proprietary information of a

6  third party.

7          20.    Space Data objects to Definition No. 7 as vague and ambiguous to the extent

8  that the parties may have different interpretations of the term "Confidential Information" as

9  used in the parties' NDA.

10         21.    Space Data objects to Definition Nos. 9 and 10 to the extent they purport to

11  impose upon Space Data obligations exceeding those set forth in the Federal Rules of Civil

12  Procedure and the Local Rules of the United States District Court for the Northern District of

13  California, any discovery plan agreed or that may be agreed to by the parties and approved

14  by the Court, any other schedule or ruling that may be set forth by the Court, or any other

15  agreement of the parties.  Space Data will respond in accordance with these rules /

16  agreements.  Space Data further objects to these definitions to the extent they seek

17  information protected by the attorney-client privilege, the work-product doctrine, or any

18  other applicable privilege, protection or immunity, including FRE 408 and FRCP 26(b), or

19  information subject to a non-disclosure or confidentiality agreement or protective order with

20  a third party, or information subject to a legal, regulatory or government restriction, or

21  information that contains the trade secrets of or confidential or proprietary information of a

22  third party, or sensitive personal or private information that is otherwise confidential or

23  protected by a person's right to privacy.  Space Data also objects to these definitions as

24  vague, ambiguous, overly broad and unduly burdensome, and not reasonably calculated to

25  lead to the discovery of admissible evidence.

26         22.    Space Data objects to Definition No. 15 as unduly burdensome to the extent it

27  seeks to include affiliates, subsidiaries, predecessors-in-interest, successors-in-interest, and

28

1    present and former officers, directors, managers, employees, consultants, agents, attorneys,

2    accountants, and representatives of Defendants within the definition of "third party."  Space

3    Data will not read the term "third party" to include the Google or Alphabet associated

4    persons described in the immediately preceding sentence.

5          23.    Space Data objects to Instruction No. 1 to the extent it purports to impose

6    upon Space Data obligations exceeding those set forth in the Federal Rules of Civil

7    Procedure and the Local Rules of the United States District Court for the Northern District of

8    California, any discovery plan agreed or that may be agreed to by the parties and approved

9    by the Court, any other schedule or ruling that may be set forth by the Court, or any other

10    agreement of the parties.  Space Data will not provide an "incomplete response / efforts that

11    were made log."  Space Data further objects to Instruction No. 1 to the extent it seeks

12    information that is outside of Space Data's possession, custody, or control.  Space Data

13    further objects to Instruction No. 1 as vague, ambiguous, overly broad and unduly

14    burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

15    For example, the term "best knowledge" renders the request vague, ambiguous and unduly

16    burdensome.

17          24.    Space Data objects to Instruction No. 2 to the extent it purports to impose

18    upon Space Data obligations exceeding those set forth in the Federal Rules of Civil

19    Procedure and the Local Rules of the United States District Court for the Northern District of

20    California, any discovery plan agreed or that may be agreed to by the parties and approved

21    by the Court, any other schedule or ruling that may be set forth by the Court, or any other

22    agreement of the parties.  Space Data also objects to Instruction No. 2 as unduly burdensome

23    to the extent it purports to require that Space Data "state the grounds for any objection with

24    specificity" with regard to post-filing privileged, work product, trial preparation or otherwise

25    immune materials or information.

26          25.    Space Data objects to Instruction No. 3 to the extent it purports to impose

27    upon Space Data obligations exceeding those set forth in the Federal Rules of Civil

28

1 | Procedure and the Local Rules of the United States District Court for the Northern District of
2 | California, any discovery plan agreed or that may be agreed to by the parties and approved
3 | by the Court, any other schedule or ruling that may be set forth by the Court, or any other
4 | agreement of the parties.  Space Data further objects to Instruction No. 3 as vague and
5 | ambiguous, especially as to the phrase "subject to Google's right to clarify the meaning in the
6 | same or a different manner."  Space Data does not agree that Google has any rights beyond
7 | those provided by the Federal Rules of Civil Procedure or the Local Rules of the United
8 | States District Court for the Northern District of California.

9 |        26.    The fact that part or all of any request has been answered shall not be
10 | construed to be a waiver of any objections to any request.

11 |        27.    Space Data expressly incorporates each of the foregoing General Objections
12 | into each of the Specific Objections set forth below.  No response shall be understood as, nor
13 | is intended to be, a waiver of any General Objection or any Specific Objection that may be
14 | separately stated with respect to any response.  Nor shall any response to a request be
15 | deemed to constitute any agreement or concession that the subject matter thereof is relevant
16 | to this action.

17 |        28.    All of the responses set forth below are made without waiving or intending to
18 | waive any objection, including but not limited to objections as to competency, relevancy,
19 | materiality, authenticity, privilege, or admissibility.  Space Data reserves the right to revise
20 | or supplement its responses to the Interrogatories at any time should additional responsive
21 | information be discovered and/or additional claims be asserted.  Space Date also reserves the
22 | right to assert additional objections at any time.

23 | **AMENDED RESPONSES TO INTERROGATORIES**
24 | **INTERROGATORY NO. 12:**

25 |        Identify with specificity each item of Confidential Information that Space Data
26 | contends Google has used or disclosed in violation of the NDA.

27 | **AMENDED (07/13/2018) RESPONSE:**

28 |

1    Space Data refers to and incorporates by reference each of the foregoing General

2    Objections.  In addition to the foregoing General Objections, Space Data specifically objects

3    to this interrogatory because, amongst other things, the request's reference to "each item of

4    Confidential Information" renders it overly broad, unduly burdensome and not reasonably

5    calculated to lead to the discovery of admissible evidence.  Space Data also objects to this

6    request to the extent it includes subparts that should be propounded, numbered, or counted as

7    separate interrogatories in accordance with Federal Rules of Civil Procedure 33.  Space Data

8    further objects to this interrogatory to the extent it seeks information within Defendants

9    possession, custody and/or control, and/or information more easily available to Defendants,

10   as through public sources.  Space Data also objects to this interrogatory as premature, given

11   that Space Data has not completed its investigation of facts, witnesses or documents relating to

12   this case (including the NDA), has not completed discovery, has not completed analysis of

13   available information, and has not completed preparation for trial.  Space Data also objects to

14   this interrogatory to the extent it seeks trade secret, confidential, or proprietary information

15   of a third party, sensitive personal or private information of a third party, or sensitive

16   government information.  Space Data further objects to this interrogatory to the extent it

17   seeks information, documents, and/or things protected by the attorney-client privilege, the

18   work-product doctrine, or any other applicable privilege or immunity.

19        Subject to, and without waiver of, the foregoing General and Specific Objections,

20   Space Data responds further as follows:

21        Space Data has identified, with specificity, the trade secrets that it is informed and

22   believes Google has misappropriated in its Fifth Amended § 2019.210 Disclosure, served on

23   May 8, 2018 (the "2019 Trade Secrets").  The 2019 Trade Secrets are summarized below:

24        **Trade Secret Category One: Wind Data Trade Secrets Enumerated**

25        1. The proprietary wind data on display for Google during its February 15, 2008 visit

26   to Space Data's Chandler, Arizona facility, representing data related to 11 flights and

27   depicted in the screenshots attached thereto as Exhibit A to the Fifth Amended 2019.10

28

1  Statement (pp. 17, 35, 52, 68, 84, 102, 118, 102, 118, 166, 183, 196, and 212).

2       2. The conclusion that a stratospheric balloon array comprising balloons spaced less

3  than 100 miles apart (a "Tight Array") could be flown to optimize communications with

4  mainstream broadband devices based upon taking advantage of Space Data's proprietary

5  knowledge that at 60,000 to 80,000 feet (the "Peaceful Band"), there are sufficient layers of

6  wind at different but appropriately consistent velocities to permit a Tight Array to be

7  maintained; wherein the Tight Array is maintained by steering balloons by adjusting their

8  altitude to catch different winds of different velocities at different altitude levels within the

9  Peaceful Band. In particular, the knowledge that many different altitude zones exist within

10 the Peaceful Band and the knowledge of the different velocities at those altitudes allows

11 recently-launched balloons to be lifted to specific altitudes where the known wind velocity

12 will transfer these balloons into tight slots within the existing balloon array. If only a few

13 altitude zones were known with uncertain wind velocities, balloons could not be maneuvered

14 precisely. The consequence would be that a tight array of balloons could not be maintained,

15 as both existing and newly-launched balloons would drift in uncertain ways and could not be

16 controlled with precision.

17       **Trade Secret Category Two: Hover Algorithm**

18       1. Space Data's optimized dimensions, shape, and design of vent and ballast as were

19 on display to Google during the February 2008 visit. Photos of the optimized vent and ballast

20 that were shown to Google are attached thereto as Exhibit B to the Fifth Amended 2019.10

21 Statement. This trade secret covers the particular vent depicted in the photos in Exhibit B to

22 the Fifth Amended 2019.10 Statement which has a cylindrical base, a cone-shaped top,

23 measures approximately 3-inches-wide and approximately 5-inches-high and has one hole

24

25

26

27

28













PLAINTIFF'S JULY 13, 2018 AMENDED RESPONSES TO
GOOGLE'S INTERROGATORY NOS. 12, 15, 16, 17, 19, 20 & 23

Case No. 5:16-cv-03260-BLF (NC)
(HC:AEO)

1

2       These 2019 Trade Secrets are Space Data's proprietary confidential information and

3 constitute Space Data Confidential Information under the parties' NDA.  Google's use and

4 disclosure of the 2019 Trade Secrets outside the bounds of the parties' NDA constitutes a

5 breach of contract.  To the extent that any of the information identified as a 2019 Trade

6 Secret by Space Data is found not to constitute a trade secret under applicable law (or, in the

7 event Space Data's 2019.210 Disclosure is found to be insufficiently detailed), these asserted

8 trade secrets remain, nonetheless, Space Data Confidential Information and any disclosure or

9 use of that information outside the bounds of the NDA would still be a breach of contract.

10       Further, Space Data identified, pursuant to the NDA, an enumerated list of 16

11 categories of confidential information disclosed to Google during the February 2008 visit to

12 Space Data's facilities in an email from Eric Frische to Michael Pearson, dated February 19,

13 2008.  *See* GOOG-SD-00157496.  Each of those identified categories constitutes Space Data

14 Confidential Information, as do the vision slides and financial information shared with

15 Google prior to the February 2008 visit.  The vision slides and financial information shared

16 with Google prior to the February 19, 2008 visit were identified as Confidential Information

17 at the time of disclosure to Google.  For example, the vision slides provided to Google on

18 January 2, 2008 by email were marked "Proprietary / Confidential."  Google's use and

19 disclosure of this Confidential Information outside the bounds of the parties' NDA

20 constitutes a breach of contract.

21       To the extent Space Data's Original, First Amended, Second Amended, Third

22 Amended and Fourth Amended 2019 Statements identified information as trade secrets that

23 is in addition to the Confidential Information described in the preceding responsive

24 paragraphs, this additional information constitutes Space Data proprietary confidential

25 information and constitutes Space Data Confidential Information under the parties' NDA.

26 Google's use and disclosure of this Confidential Information outside the bounds of the

27 parties' NDA constitutes a breach of contract.

28

1   *See also* Space Data's response to Interrogatories 13 and 14.

2   **INTERROGATORY NO. 15:**

3   State all facts and identify all documents that support your contention that you

4   have been injured by any use or disclosure of any item of Confidential Information by

5   Google in violation of the NDA, and identify all persons with knowledge of such facts.

6   **AMENDED (07/13/2018) RESPONSE:**

7   Space Data refers to and incorporates by reference each of the foregoing General

8   Objections.  In addition to the foregoing General Objections, Space Data specifically objects

9   to this interrogatory because, amongst other things, the request's reference to "all facts"; "all

10  documents"; and "all persons" renders it overly broad, unduly burdensome and not

11  reasonably calculated to lead to the discovery of admissible evidence. Space Data further

12  objects to this request as premature to the extent it seeks information that is the subject of

13  expert discovery.  Space Data's technical experts are assessing Defendants' use of Space

14  Data's confidential information; such assessments will ultimately inform the damages

15  analysis in this case.  Space Data's damages and technical experts have not concluded their

16  analysis and are not expected to do so until opening expert reports are due (September 27,

17  2018).  The close of expert discovery in this case is December 7, 2018.

18  Space Data further objects to this request to the extent it includes subparts that

19  should be propounded, numbered, or counted as separate interrogatories in accordance with

20  Federal Rules of Civil Procedure 33.  Space Data further objects to this interrogatory to the

21  extent it seeks information within Defendants possession, custody and/or control, and/or

22  information more easily available to Defendants, as through public sources. Space Data

23  further objects to this interrogatory to the extent it seeks trade secret, confidential, or

24  proprietary information of a third party, sensitive personal or private information of a third

25  party, or sensitive government information.  Space Data further objects to this interrogatory

26  to the extent it seeks information, documents, and/or things protected by the attorney-client

27  privilege, the work-product doctrine, or any other applicable privilege or immunity.

28

1    Subject to, and without waiver of, the foregoing General and Specific Objections,

2    Space Data responds further as follows:

3    The parties entered into The Mutual Non-Disclosure Confidentiality and

4    Nondisclosure Agreement ("NDA") effective as of December 1, 2007, for the purpose of

5    engaging in "discussions and negotiations concerning a proposed acquisition of shares or

6    assets" of Space Data.  This was the only permissible use of the Space Data information.

7    Because Google told Space Data it was interested in acquiring the company and

8    because the parties had executed the two-way NDA, Space Data provided Google with

9    unprecedented access to confidential, proprietary information and trade secrets.  Space Data

10   felt Google's interest in acquiring the company was sincere, since Google co-founders Larry

11   Page and Sergey Brin both attended Space Data's first meeting at Google's headquarters in

12   September 2007 and a follow-on meeting in November 2007.  Then, on November 28, 2007,

13   Minnie Ingersoll emailed Space Data and copied Mike Pearson from Google's corporate

14   development team saying "I think he's the right person to help us take this discussion into

15   more formal deal terms."  *See* GOOG-SD-00144458.   Once the NDA was signed, Space

16   Data provided Google with its proprietary historical financial statements, financial

17   projections, and modeling, which revealed information regarding all the relevant cost

18   variables relevant to running a balloon-based communications network. Space Data's

19   financial details are not publicly known and its financial model was proprietarily developed

20   over years of operating as the only balloon-based communications company.   Detail about

21   the actual cost drivers of a balloon-based communications network, developed from Space

22   Data's actual operational experience, provided value and a competitive advantage to Space

23   Data.  These details were only provided to Google for the purpose of evaluating a potential

24   acquisition.

25   Space Data also provided proprietary "vision" slides to Google, which detailed

26   different potential applications of Space Data's technology. These slides were also

27   designated as confidential under the NDA.  As described fully in the Third Amended

28

Complaint, on February 15, 2008, a team of Google engineers, corporate development personnel, and Google's co-founders, Larry Page and Sergey Brin, came to visit Space Data to perform technical due diligence.  Space Data had never before and has not since provided the kind of access Google had during that visit.

The Google team launched Space Data balloons and then received tours of Space Data's labs, workshops, and Network Operations Center ("NOC").  In the labs and workshops, Google was able to view and photograph deconstructed payloads and components.  Throughout the tour, Space Data's team provided detail about Space Data's payload design, vent, ballast, and thermal management techniques that were on display. During the tour of the NOC, Space Data allowed Google to take up-close, detailed photographs of the wind data, flight data, hover inputs and outputs, and NOC control system. Space Data also explained to Google, in technical detail, what was happening on each screen in the NOC, what the wind data was showing, and how all the information fit together. Space Data explained to Google that, based on its 200,000 flight hours of knowledge, Space Data had concluded that a stratospheric balloon array comprising balloons spaced less than ███████████████████████ flown to optimize communications with mainstream broadband devices based upon taking advantage of the layers of wind at different but appropriately consistent velocities ████████████████████████ ████ Space Data explained it had determined that many different altitude zones exist ██████████████████ Space Data's proprietary knowledge of the different velocities at those altitudes allows recently-launched balloons to be lifted to specific altitudes where the known wind velocity will transfer these ████████████████ existing balloon array.  This knowledge differed than what was in the public domain at the time and was key because, if only a few altitude zones are known with uncertain wind velocities, balloons cannot be maneuvered as precisely.  The consequence ████████████████ ███████████████████████ be maintained.

Space Data also explained in detail to Google what was displayed on the NOC

1  screens regarding the hover algorithm and how, in concert with the optimal design and

2  placement of the vent and ballast system on display for Google, Space Data achieves and

3  maintains hover.  *See* also Response to Interrogatory No. 19.

4       Space Data would never have shared its core, technical knowhow, developed from

5  hundreds of thousands of flight hours, if it thought Google would be permitted to use such

6  information for its own purposes without any credit or payment to Space Data.

7       Google failed to treat Space Data's confidential information with the appropriate

8  controls under the NDA from the beginning. On [insert date] Google

9  In 2011, when Google claims it was first starting to develop Loon internally, a member of the

10  Loon team, Josh Weaver, emailed Dan McCloskey and Phil Gossett, two key members of

11  Google's due diligence team who visited Space Data on February 15, 2008, wanting to find

12  out what the team learned from their view into Space Data.  As Weaver put it then:



13

14

15

16

17

18

19  *See* GOOG-SD-00158448-451.  Dan McCloskey, Larry Alder  and Phil Gossett, each

20  responded with  substantive summaries of Google Space Data interactions.  *See id.*  This one

21  example of cross-contamination between the Google Loon team and the Space Data due

22  diligence team was not an isolated incident.  *See generally* Response to Interrogatory No. 14.

23       Defendants improperly developed Google Loon based on Space Data's confidential

24  and trade secret information, in breach of the NDA.  Defendants' use of Space Data's

25  proprietary financial modeling, historical financial data, vision slides, and information

26  derived from access to Space Data's proprietary wind data, hover algorithm, thermal

27  management system, altitude control system, and network operations center to develop

28

1  Project Loon constitutes a breach of the NDA.  Defendants' disclosure of certain Space

2  Data's trade secrets and confidential information in Google's '193 Patent application as and

3  asserted "ownership" of Space Data's intellectual property is also a breach of the NDA as it

4  violates § 8, which states that "[no Party acquires any intellectual property rights under this

5  Agreement[.]  Google also breached the NDA by sharing proprietary, Space Data

6  information with the entire Google Access group in contravention of the purpose of the

7  NDA, which was to evaluate and acquisition or business partnership with Space Data.

8       Space Data suffered damage as a direct and proximate result of Defendants' breaches

9  of the NDA.  Assuming that Google had performed on the NDA (*i.e.* had kept Space Data's

10 confidential information and trade secrets secret and not used the information in

11 contravention to the purpose of the NDA), Space Data would not have to be competing with

12 Loon while Google used Space Data's own technology.  Space Data would not have lost out

13 on potential profits to Loon if Google had not usurped Space Data's confidential information

14 out right.  *See* July 10, 2018 Amended Response to Interrogatory No. 6.  The injury suffered

15 by Space Data includes, without limitation, the loss of sales and profits it would have earned

16 but for Defendants' actions, and injury to Space Data's reputation among potential and

17 existing customers, business partners, investors, and in the industry in general.

18       The calculation of Space Data's damages for Google's breach may include, without

19 limitation, loss of profits Space Data would have earned but for Google's breach,

20 disgorgement for unjust enrichment by the Defendants, payment of reasonable royalty fees,

21 as well as injunctive relief.  Space Data also seeks pre-judgment and post-judgment interest

22 on the damages caused to them by reason of Defendants' conduct at the maximum legal rates

23 provided by statute or law and an award for its costs and disbursements in this civil action,

24 including reasonable attorneys' fees.

25       **1.      Lost Profits**

26       Google benefitted from breaching the NDA by, among other things, using Space

27 Data's proprietary technical and financial data on how to establish and run an optimal

28

1  balloon-based network, saving Google the substantial costs it would have had to occur to

2  develop that information on its own.  This helped Google advance it time to market and keep

3  it competitive.  Space Data is entitled to the difference in profits between the actual and the

4  so-called "but-for" world absent Google's breach of the NDA.  Plaintiff should be awarded

5  its lost profits as a result of the breach if the breach caused it to lose sales, to receive a lower

6  price or margin on sales than it otherwise would have received (so-called "price erosion"), or

7  to incur costs that it otherwise would not have incurred.

8       Space Data was and remains a fully operating business.  It has an office and

9  manufacturing facility in Chandler, Arizona.  It has the ability to scale-up its manufacturing

10 process manufacture and indeed has done so to meet high demand in the past.  Space Data

11 has, in the past 4 years, been in commercial negotiations with and provided commercial

12 demonstrations for ███████████████████ and has had commercial discussions with

13 ██████ as well.  *See* SD_825887-888; SD_825899-803; SD_825908; SD_825910-911;

14 SD_825921-923; SD_825741-743; SD_825972-973; SD_825747-750; SD_825744-746;

15 SD_825949-951; SD_825941-945; SD_825929-933; SD_825924-928; SD_825946-948;

16 SD_825934-940; SD_825912-914; SD_826017-020; SD_825884; SD_825909; SD_825979-

17 981; SD_825777-782; SD_825789; SD_825783-788; SD_825766-776; SD_825982-987;

18 SD_825988-990; SD_825991-995; SD_825996-; SD_825997-6001; SD_826002-007;

19 SD_826008; SD_826009-012; SD_826013; SD_826014-015; SD_.825896-898; SD_825885-

20 886; SD_825903-904; SD_825899-902; SD_825893-895; SD_825891-892; SD_825905-906.

21       Space Data has also marketed its high altitude balloon system for wide-area disaster

22 communications since 2001, as its technology offers a quick way to deploy coverage to an

23 area affected by natural disasters or other emergencies in less than 30 minutes.  *See*

24 SD_521364-382; SD_825919.  Over the past few years, Space Data has been in

25 conversations with ██████ to collaborate ███████████████████ a project

26 which is exploring ways to establish broadband coverage for emergency first responders or to

27 restore or expand networks after a disaster.  *See* SD_825908; SD_825910-911; SD_825970-

28

971.  These are two areas Google has solidly set its sights on.

Space Data has raised over $75 million in private capital to fund the development of its technology and business.[2] From 2007 through 2017, Space Data generated total income of over ████████, with gross profits of nearly ████████.[3] However, after Google's initial public launch of Project Loon in June 2013[4], Space Data's annual revenues decreased substantially for several years before rebounding slightly in 2017.[5]

In order to calculate Space Data's lost sales, a first step is to consider Google's projects to determine whether competition from Google hindered Space Data's ability to compete and/or win the project.



[2] "Investors," *Space Data*, available at https://www.spacedata.net/company/investors/, accessed January 30, 2018.
[3] Profit & Loss: January 2007 through December 2017, Space Data Corporation, January 31, 2018. (SDC PL 10 yrs.pdf)
[4] Third Amended Complaint, ¶ 224.; Vanian, Jonathan, "New Lawsuit May Deflate Google's Big Internet Balloon Project," *Fortune*, June 16, 2016, available at http://fortune.com/2016/06/15/google-sued-project-loon-balloon-project/, accessed January 26, 2018.
[5] Profit & Loss: January 2007 through December 2017, Space Data Corporation, January 31, 2018. (SDC PL 10 yrs.pdf).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28











1 ████████████████████████████████████████████

2 ████████████████████████████████████████████

3 ████████████████████████████████████████████

4 ██████████████████████████████████████████

5 █████████

6 ██████████

7 ███████████████████████████████████████████

8 ████████████████████████

9 **G. Competition**

10      As described above, ever since Loon made its public debut in 2013, Space Data has

11 had to compete against Google for customers, all while Google gets to take the benefit of

12 Space Data's patented technology and proprietary trade secrets.  Google operates in the same

13 market areas as Space Data and engages in negotiations with the same domestic carriers and

14 government divisions.  Space Data has been hamstrung in its ability to close deals since

15 Loon's arrival and the effective loss of its competitive patent advantage.

16      Further, the fact that Google's '678 patent was deemed to be rightfully Space Data's

17 during the Interference Proceeding is additional evidence supporting the fact that Google

18 Loon and Space Data are "close competitors."  *See Presido Components Inc v. Am. Technical*

19 *Ceramics Corp.*, 702 F. 3d 1351, 1365 (Fed. Cir. 2012).  Even Google itself called Space

20 Data a competitor when internally discussing the Puerto Rico project and Space Data's

21 granting permission to use its spectrum for humanitarian purposes.  *See* GOOG-SD-

22 00076931 ("So this is truly an example of the entire industry rallying together, from the

23 regulatory authorities, to telcos, to competitors, to help people who desperately need

24 connectivity.").

25      **2.      Unjust Enrichment**

26      Defendants were unjustly enriched by getting the benefit of Space Data's

27 confidential, proprietary information without compensating Space Data at all.  Google got the

28

1   benefit of the tens of millions of dollars and 200,000 flight hours poured into Space Data, and

2   never paid Space Data a penny.  It soaked up the information Space Data shared under NDA,

3   and then used it for its own purposes to jumpstart Project Loon.

4          The doctrine of unjust enrichment is an equitable principle based on the idea that one

5   party should not be able to unjustly enrich itself at the expense of another.  The principle of

6   unjust enrichment goes beyond merely restoring what a plaintiff actually lost.  Defendant was

7   unjustly enriched if its misappropriation of plaintiff's trade secrets caused Defendants to

8   receive a benefit that it otherwise would not have achieved. A party acting in conscious

9   disregard of the rights of another should be required to disgorge all profit in order to benefit

10  the injured party and deter the perpetrator from committing unlawful acts again.  Here, not

11  only did Space Data not get the benefit of the NDA bargain (Google keeping Space Data's

12  information confidential and using it only to evaluate a potential acquisition), Google has

13  also misused Space Data's information for its own profit.

14         Another potential way of measuring unjust enrichment is the entire enterprise or

15  acquisition value of a Space Data.  Where there is substantial evidence a defendant would

16  have acquired plaintiff if it had not chosen to misappropriate plaintiff's trade secrets instead,

17  acquisition value may be an appropriate measure.  *See X-It Products, LLC v Walter Kidde*

18  *Portable Equipment, Inc.,* 227 F. Supp. 2d 494 (E.D. Va. 2002).  Here, instead of acquiring

19  Space Data's intellectual property through a purchase of the company (or license), Google

20  simply took what it wanted. The quantum of those damages-whether considered as damages

21  for trade secret misappropriation or Defendants' use of Space Data's information in breach of

22  the parties' NDA- is what Defendants would have paid in a legitimate acquisition of Space

23  Data.

24         Another measure of unjust enrichment to Defendants is the expected cost savings to

25  Defendants from using Space Data's trade secrets in Defendants' Google Loon.  Due to the

26  misappropriation of Space Data's trade secrets, Defendants will benefit from many years of

27  future cost savings due to employing Space Data's trade secrets in Google Loon's systems.

28

1   Google avoided millions of dollars in cost in not having to experiment with flying balloons at

2   different altitudes to determine the best place to position them to sail with the winds, the

3   quality of the ███████████████████████████████████: it already had that

4   information from Space Data.  Google didn't need to do its own research to determine that

5   ██████████████████████████████████████ for insulation at

6   altitude or the best way to address thermal management concerns at 65,000 feet: it already

7   knew that from Space Data.  Google also didn't have to expend extra time and money on its

8   own hover algorithm, it could start from the knowledge Space Data shared with it. The same

9   is true for Google's Mission Control and financial modeling, all of it could be advanced by

10  *years* based on starting with the information Space Data provided to Google under the guise

11  of Google's interest in an acquisition.

12          Another measure of unjust enrichment to Defendants is the expected cost savings due

13  to reduced development expenses from using Space Data's trade secrets in Defendants'

14  Google Loon systems.  One way to measure the costs that Defendants saved through their

15  misappropriation of Space Data's trade secrets is by looking at the costs that Space Data

16  incurred to develop those trade secrets.  *See also* Response to Interrogatory No. 7.

17          **3.      Reasonable Royalty**

18          Damages may also be measured by a reasonable royalty in a manner similar to the

19  method used to value trade secret damage and patent damages. There are different

20  methodologies for calculating reasonable royalties which may be applicable to damages in

21  this matter, namely, a Georgia-Pacific approach, an "analytical" approach, a cost saving

22  approach, and a comparables approach.

23          Properly constructed, the hypothetical negotiation reflects the relevant expectations

24  and market factors that would have affected a real-world licensing negotiation. ██████████

25  ████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████

27

28



6 Third Amended Complaint, ¶ 11.











1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

██████████████████████████████████████████

██████████████████████████████████████

████████████████████████████

## B. *Georgia-Pacific* Factors

If Space Data's expert determines reasonable royalty damages under a hypothetical negotiation approach, Space Data may rely on the *Georgia-Pacific* factors, which have been found to be relevant to a calculation of a reasonable royalty both in the patent context, the trade secret context, and breach of NDA:

1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.

3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions to preserve that monopoly.

5. The commercial relationship between the licensor and the licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

6. The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his nonpatented items; and the extent of such derivative or convoyed sales.

7. The duration of the patent and the term of the license.

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any

evidence probative of the value of that use.

12.     The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13.     The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14.     The opinion testimony of qualified experts.

15.     The amount that a licensor (such as the patentee) and a license (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*Georgia-Pacific Factor 1.* Space Data has never licensed any of the trade secrets or confidential information relevant to this matter.

*Georgia-Pacific Factor 2.* Existing licenses for comparable technology can inform a reasonable royalty in real-life royalty negotiations and in the determination of reasonable royalty damages in litigation. Google has not produced any comparable licenses to date. Space Data notes that Google has refused to produce information relevant to the value of technologies with comparable applications to Space Data's products and Loon (e.g. Skybox Imaging acquisition and sale data).

*Georgia-Pacific Factor 3.* Expert analysis as to the scope of the license has not yet been completed.

*Georgia-Pacific Factor 4.* A licensor with an established policy of refusing to grant licenses to competitors may be able to receive a higher royalty rate than a licensor that routinely grants licenses. As discussed above, Space Data has **not** licensed its trade secrets or confidential information to third parties. The fact that Space Data does not license, but sells its own services, would increase the royalty rate as compared with an entity that licenses its technology. This is particularly true when licensing to a direct competitor, Google here.

*Georgia-Pacific Factor 5.* As described above in response to Interrogatory No. 6,

1    Space Data and Google are direct competitors in the balloon-based internet service market.

2        *Georgia-Pacific Factor 6.* ████████████████████████████████████████

3    ████████████████████████████████████████████████████████. Google's

4    advertising segment brought in over $79 billion in 2016 (about 88% of its total revenues).[7]

5    Furthermore, as of October 2017, Google controlled nearly 87% of the worldwide desktop

6    search engine market and over 94% of the mobile search engine market.[8]  If Project Loon is

7    able to provide internet access to the hundreds of millions of users that it intends to reach,[9]

8    Google can reasonably expect significant contributions to its search revenues from those

9    users.  Loon is a strategic business for Google.  In a reasonable royalty negotiation, the

10   generation of additional revenues in addition to just sales of Loon would be an important

11   consideration and benefit to Defendants from taking the hypothetical license. Thus, this

12   factor would be expected to increase Google's willingness to pay and hence the reasonable

13   royalty, possibly by a substantial amount.

14       *Georgia-Pacific Factor 7.* The date of the hypothetical negotiation would be the time

15   Google first began misusing Space Data's confidential information and trade secrets.  Expert

16   technical analysis is expected for this factor and has not yet been completed.

17       *Georgia-Pacific Factor 8.*  See response to Interrogatory 6 and content above

18   regarding Google's anticipated profits.  *See also* GOOG-SD-0073474 – 544 at 510 ███████

19   ████████████████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████████████████

21

22   [7] "Annual Report for the fiscal year ended December 31, 2016," Alphabet Inc., February 3,
     2017, p. 24, available at https://abc.xyz/investor/pdf/20161231_alphabet_10K.pdf, accessed
23   January 23, 2018.
     [8] "Worldwide desktop market share of leading search engines from January 2010 to October
24   2017," *Statista*, November 2017, available at
     https://www.statista.com/statistics/216573/worldwide-market-share-of-search-engines/,
25   accessed January 24, 2018; "Market share of selected leading mobile search providers in the
     United States from October 2012 to October 2017," *Statista*, November 2017, available at
26   https://www.statista.com/statistics/511358/market-share-mobile-search-usa/, accessed
     January 24, 2018.
27   [9] Third Amended Complaint, ¶15.

28

1

2

*Georgia-Pacific Factor 9.*  As a general matter, there are ways other than using

balloon-based technology to provide Internet service, including terrestrial networks using

cable or phone networks, and wireless networks through satellite arrays.[10]  However, many

of these traditional methods are not economically viable in rural and remote regions.

Terrestrial networks and satellites are extremely expensive and are only cost-effective when

they cover densely populated regions.[11]  Companies like Facebook have invested significant

resources to provide internet access using drones and laser technology.[12]  Google also

experimented with drones with its January 2014 purchase of Titan Aerospace, which

produces high-flying solar-powered drones.[13]  At that time, it appeared that Google wanted

to develop an alternative to the balloon-powered internet services that it had already begun to

develop with Project Loon. However, Alphabet shuttered Titan in 2016, reassigning some of

the former Titan staff members to Project Loon[14] because Project Loon was considered

"more promising" in terms of economics and technical feasibility than using drones.[15]

One of the reason's that Google began to explore drones as an alternative Internet

---

[10] Third Amended Complaint, ¶¶ 28-33.

[11] Third Amended Complaint, ¶¶ 29-33

[12] Hempel, Jessi, "Inside Facebook's Ambitious Plan to Connect the Whole World," *Wired*, January 19, 2016, available at https://www.wired.com/2016/01/facebook-zuckerberg-internet-org/, accessed January 23, 2018.

[13] "Google to acquire drone-maker Titan Aerospace," USA Today, available at https://www.usatoday.com/story/tech/2014/04/14/google-to-acquire-drone-maker-titan-aerospace-facebook-aced/7706513, accessed on June 13, 2017; "Google Buys Titan Aerospace," UAS Vision, available at https://www.uasvision.com/2014/04/16/google-buys-titan-aerospace, accessed on June 13, 2017.

[14] "Google sends Titan broadband drones to the unicorns' graveyard," The Register, available at https://www.theregister.co.uk/2017/01/12/google_sends_titan_broadband_drones_to_the_uni corns_graveyard, accessed on June 12, 2017.

[15] "Alphabet ended drone Internet project, saying economics didn't work out," arsTechnica, available at https://arstechnica.com/information-technology/2017/01/alphabet-axed-internet-drones-says-balloon-broadband-is-more-promising, accessed on June 13, 2017; "Alphabet ended drone Internet project, saying economics didn't work out," *ars TECHNICA*, available at https://arstechnica.com/information-technology/2017/01/alphabet-axed-internet-drones-says-balloon-broadband-is-more-promising/.

provider was that balloons "[were] larger and harder to control," and drones were viewed as easier to put into and keep inside target coverage areas.[16]  Comparing the technical and economic aspects of Project Loon to existing alternatives and similar emerging technologies is a basic step in formulating and executing the spinoff and such plans leading up to it.  As Space Data's trade secrets and confidential information provided key knowledge to Google in developing Loon, this factor would increase Google's willingness to pay as well as the reasonably royalty calculations for the patents-at-issue.

    *Georgia-Pacific Factor 10.* ███████████████████████████████

████████████████████████████████████ The benefits from Project Loon, however, are not only limited to Google's cash flow gains.  With the help of the Space Data's proprietary information, Loon would be able to provide internet service to areas with no access to internet and to places with internet services interrupted due to a natural disaster.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

---

[16] "Google Buys Titan Aerospace," UAS Vision, available at https://www.uasvision.com/2014/04/16/google-buys-titan-aerospace, accessed on June 13, 2017.
[17] GOOG-SD-00072892-913 at 897.
[18] GOOG-SD-00073545-615 at 563.
[19] GOOG-SD-00073545-615 at 564-5.
[20] GOOG-SD-00073545-615 at 563.
[21] GOOG-SD-0073755-811 at 760.

1    the world.  There are clear benefits, especially for underdeveloped countries, to be gained

2    from increased connectivity.  An analysis by Deloitte shows that extending internet access in

3    developing economies to the level of developed nations can "raise living standards and

4    incomes by up to $600 per person a year" and "[lift] 160 million people out of extreme

5    poverty."[22] Reaching 90% of the world population with wireless service could also "provide

6    over $22 trillion of GDP growth by 2030" and provide 120 million jobs.[23]

7         The great promise of Project Loon, enabled by Space Data's proprietary technology

8    and information, would tend to increase Google's willingness to pay as well as the

9    reasonable royalty for the patents at issue.

10         *Georgia–Pacific Factor 11.*  Google improperly made use of Space Data's

11    confidential information and trade secrets for purposes of Project Loon, in contravention of

12    the NDA. *See* Response to Interrogatory No. 14.

13         *Georgia–Pacific Factor 12.* ███████████████████████████

14 ████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████████

18 ████████████████████████████

19         *Georgia-Pacific Factor 13.*  The portion of the realizable profit that should be

20    credited to the invention as distinguished from non-Space Data confidential and trade secret

21    elements calls for apportionment.  Space Data intends to rely on the analysis of technical

22    experts and damages experts in order to perform an apportionment analysis.

23         *Georgia-Pacific Factor 14.*  The opinions of technical experts are necessary in order

24

25 [22] "Google internet balloons and drones could boost GDP by trillions and save millions of lives," nextBIGfuture, available at https://www.nextbigfuture.com/2014/12/google-internet-balloons-and-drones.html, accessed on May 24, 2017.

26 [23] "Google internet balloons and drones could boost GDP by trillions and save millions of lives," nextBIGfuture, available at https://www.nextbigfuture.com/2014/12/google-internet-

27 balloons-and-drones.html, accessed on May 24, 2017.

28

1  provide technical knowledge, background, and assumptions that will be used to supplement

2  and guide any analyses of damages. To date, no technical expert has conducted any analysis

3  or offered any opinions on the technical matters related to this case.  As such, further

4  technical expert opinion is required.

5       **4.    Injunctive Relief**

6       The NDA explicitly provides that: "Each Party acknowledges that damages for

7  improper disclosure of Confidential Information may be irreparable; therefore, the injured

8  Party is entitled to seek equitable relief, including injunction and preliminary injunction, in

9  addition to all remedies available to it."

10       Several factors weigh in favor of an injunction here.

11       **Factor 1: Irreparable Injury**

12       Google's continued misuse of Space Data's confidential information and trade secrets

13  gives it an unfair advantage in the marketplace.  Courts have found irreparable harm when a

14  defendant's misappropriation allows it to gain a competitive edge in a nascent or fast-

15  growing market, like balloon-based internet services here.  Damage to reputation can be hard

16  to quantify, as can price erosion, but that does not mean the irreparable injury does not occur.

17  Space Data will continue to suffer significant damage to its goodwill if Loon continues to be

18  allowed to compete using Space Data's own technology.

19       Here, Space Data is very much a practicing entity, its principal business (in fact its

20  only business) centers on balloon-borne internet and communication systems; and Google

21  Loon competes directly with Space Data, including in the domestic United States.  It has an

22  office and manufacturing facility in Chandler, Arizona.  It has the ability to scale-up its

23  manufacturing and indeed has done so to meet high demand in the past.  Space Data has, in

24  the past 4 years, been in commercial negotiations with and provided commercial

25  demonstrations for ███████████████ and has had commercial discussions with

26  ███ as well.  *See* SD_825887-888; SD_825899-803; SD_825908; SD_825910-911;

27  SD_825921-923; SD_825741-743; SD_825972-973; SD_825747-750; SD_825744-746;

28

1  SD_825949-951; SD_825941-945; SD_825929-933; SD_825924-928; SD_825946-948;

2  SD_825934-940; SD_825912-914; SD_826017-020; SD_825884; SD_825909; SD_825979-

3  981; SD_825777-782; SD_825789; SD_825783-788; SD_825766-776; SD_825982-987;

4  SD_825988-990; SD_825991-995; SD_825996-; SD_825997-6001; SD_826002-007;

5  SD_826008; SD_826009-012; SD_826013; SD_826014-015; SD_.825896-898; SD_825885-

6  886; SD_825903-904; SD_825899-902; SD_825893-895; SD_825891-892; SD_825905-906.

7        Space Data has also marketed its high altitude balloon system for wide-area disaster

8  communications since 2001, as its technology offers a quick way to deploy coverage to an

9  area affected by natural disasters or other emergencies in less than 30 minutes.  *See*

10  SD_521364-382; SD_825919.  Over the past few years, Space Data has been in

11  conversations with ▮▮▮ to collaborate ▮▮▮▮▮▮▮▮▮▮ a project

12  which is exploring ways to establish broadband coverage for emergency first responders or to

13  restore or expand networks after a disaster.  *See* SD_825908; SD_825910-911; SD_825970-

14  971.  Space Data also has historically been and remains a major partner of the U.S.

15  Department of Defense in providing remote voice, wireless internet, and imagining services.

16        Space Data has raised over $75 million in private capital to fund the development of

17  its technology and business. From 2007 through 2017, Space Data generated total income of

18  over ▮▮▮▮, with gross profits of nearly ▮▮▮▮.  Ever since Loon made its public

19  debut in 2013, Space Data has had to compete against Google for customers, all while

20  Google gets to take the benefit of Space Data's patented technology and proprietary trade

21  secrets.  Google operates in the same market areas as Space Data and engages in negotiations

22  with the same domestic carriers and government divisions.  Space Data has been hamstrung

23  in its ability to close deals since Loon's arrival.  *See also* Response to Interrogatory 6.

24        In particular, Space Data lost out to Google in a bid to provide wireless coverage to

25  Puerto Rico following Hurricane Maria in 2017.  While the was a humanitarian project, the

26  benefits to the company winning the bid went well beyond good P.R. about charitable efforts.

27  The Loon Puerto Rico trial allowed Google to prove that Loon works and redounded

28

1  worldwide recognition for Google.  All of it built on Space Data's patents and trade secrets.

2  The Puerto Rico trial put Google on the map in a way that Space Data cannot counter.

3  Google is such a large player in the global market, it clouds out Space Data's ability to gain

4  commercial traction.







17    There are many other illustrations along the same lines.  The critical point is this:

18  absent an injunction, Space Data will suffer irreparable, critical damage.  Space Data is an

19  operating company, and it is entitled to the right to the monopoly granted by the patent laws

20  and the benefit of its proprietary, secret know-how.  It must have the right to exclude Google,

21  just as the law contemplates.

22    Here, there is a clear causal nexus between Defendants' misappropriation of trade

23  secrets and breach of the NDA and the harm resulting from Defendants' unfair head-start in

24  bringing Loon to market.  This is because the Space Data's confidential information and

25  trade secrets – its wind data trade secrets especially- are key to optimizing the function of a

26  balloon-based communication system to work with existing, broadband devices.  Using

27  Space Data's proprietary knowledge, in contravention of the NDA, gave Google an unearned

28

1  head start and helped Google avoid millions in costs in their efforts to establish a

2  commercially-viable network.

3       **Factor 2: Inadequate Remedies at Law**

4       Space Data has never licensed its technology, has a business to protect, including its

5  business reputation, its reputation for inventiveness, its pricing curves, and the like.  The

6  same reasons supporting the fact that Space Data will suffer irreparable harm support a

7  finding that monetary damages are an inadequate remedy here.  Courts have found that the

8  showing of a head-start advantage based on improper use of a competitor's technology is

9  sufficient to establish that harm to the plaintiff cannot be remedied by money damages alone.

10  *See Netlist Inc. v. Diablo Techs Inc.*, No. 13-cv-05962-YGR 2015 WL 153724, at *8 (N.D.

11  Cal. Jan. 12, 2105). The head-start gained by Google has already done significant damage to

12  Space Data and should not be allowed to continue.

13       **Factor 3: The Balance of Equities**

14       Where, as here, Space Data has invested years of time and tens of millions of dollars

15  in developing its confidential information and trade secrets, it is profoundly inequitable to

16  effectively "acquire" all of that knowhow without payment to Space Data and position itself

17  as a direct competitor.  To put this in context here, if Google can compete with Space Data

18  directly, using Space Data's own patented technology, trade secrets, and confidential

19  information, then Google will have an enormous competitive advantage, given its unlimited

20  wealth, lobbying connections, and the fear it commands given its ability to retaliate against

21  smaller competitors selling competing products.  There is a reason, for example, that the EU

22  just levied a multibillion dollar fine against Google.  Another important factor here is

23  whether the Defendant knowingly built its business in contradiction of the IP rights of others,

24  as Google did here.  The balance of hardships favors Space Data.  While Google may face

25  some cost in being enjoined from making, selling, or using Loon, that is the price a company

26  pays when it builds its business on an information it misappropriates.  On the other hand,

27

28

1  Space Data continues to suffer severe hardship by being forced to compete against its own

2  trade secrets and patented technology.

3       **Factor 4: The Public Interest**

4       Finally, the public interest is enhanced by a court entering a permanent injunction is

5  circumstances such as these.  Any other rule would encourage a much larger competitor to

6  cannibalize its much smaller competitors, even though the smaller competitors are often the

7  source of valuable innovation in the marketplace generally.  Why invest in innovation when a

8  Google can simply get a smaller company to reveal its proprietary information under NDA,

9  breach the NDA and use the proprietary information and trade secrets for Google's own

10  projects – claiming the projects were developed organically at Google -- and then pay a mere

11  small royalty as it runs its competitor out of business?  That is hardly equitable.  There is also

12  a strong public interest in protecting intellectual property rights.

13       *See* also Responses to Interrogatories 6, 7, 8, and 16.

14  **INTERROGATORY NO. 16:**

15       Describe in detail the types of damages to which you contend you are entitled as

16  relief for your claim of breach of the NDA.

17  **AMENDED (07/13/2018) RESPONSE:**

18       Space Data refers to and incorporates by reference each of the foregoing General

19  Objections.  In addition to the foregoing General Objections, Space Data specifically objects

20  to this interrogatory because, amongst other things, "types of damages" renders it vague,

21  ambiguous and overly broad.  Space Data further objects to this interrogatory to the extent it

22  seeks information within Defendants possession, custody and/or control, and/or information

23  more easily available to Defendants, as through public sources.  Space Data further objects to

24  this request as premature to the extent it seeks information that is the subject of expert

25  discovery, as Plaintiff intends to rely on expert assistance in performing damages

26  computations.  Space Data also objects to this interrogatory to the extent it seeks trade secret,

27  confidential, or proprietary information of a third party, sensitive personal or private

28

1  information of a third party, or sensitive government information.  Space Data further objects

2  to this interrogatory to the extent it seeks information, documents, and/or things protected by

3  the attorney-client privilege, the work-product doctrine, or any other applicable privilege or

4  immunity.

5        Subject to, and without waiver of, the foregoing General and Specific Objections,

6  Space Data responds further as follows:

7        Space Data suffered damage as a direct and proximate result of Defendants' breaches

8  of the NDA.  Assuming that Google had performed on the NDA (*i.e.* had kept Space Data's

9  confidential information and trade secrets secret and not used the information in

10  contravention to the purpose of the NDA), Space Data would not have to be competing with

11  Loon while Google used Space Data's own technology.  Space Data would not have lost out

12  on potential profits to Loon if Google had not usurped Space Data's confidential information

13  out right.  *See* July 10, 2018 Amended Response to Interrogatory No. 6.  The injury suffered

14  by Space Data includes, without limitation, the loss of sales and profits it would have earned

15  but for Defendants' actions, and injury to Space Data's reputation among potential and

16  existing customers, business partners, investors, and in the industry in general.

17        The calculation of Space Data's damages for Google's breach may include, without

18  limitation, loss of profits Space Data would have earned but for Google's breach,

19  disgorgement for unjust enrichment by the Defendants, payment of reasonable royalty fees,

20  as well as injunctive relief.  Space Data also seeks pre-judgment and post-judgment interest

21  on the damages caused to them by reason of Defendants' conduct at the maximum legal rates

22  provided by statute or law and an award for its costs and disbursements in this civil action,

23  including reasonable attorneys' fees.

24      **1.**    **Lost Profits**

25        Google benefitted from breaching the NDA by, among other things, using Space

26  Data's proprietary technical and financial data on how to establish and run an optimal

27  balloon-based network, saving Google the substantial costs it would have had to occur to

28

1  develop that information on its own.  This helped Google advance it time to market and keep

2  it competitive.  Space Data is entitled to the difference in profits between the actual and the

3  so-called "but-for" world absent Google's breach of the NDA.  Plaintiff should be awarded

4  its lost profits as a result of the breach if the breach caused it to lose sales, to receive a lower

5  price or margin on sales than it otherwise would have received (so-called "price erosion"), or

6  to incur costs that it otherwise would not have incurred.

7          Space Data was and remains a fully operating business.  It has an office and

8  manufacturing facility in Chandler, Arizona.  It has the ability to scale-up its manufacturing

9  process manufacture and indeed has done so to meet high demand in the past.  Space Data

10  has, in the past 4 years, been in commercial negotiations with and provided commercial

11  demonstrations for ████████████████ and has had commercial discussions with

12  ████ as well.  *See* SD_825887-888; SD_825899-803; SD_825908; SD_825910-911;

13  SD_825921-923; SD_825741-743; SD_825972-973; SD_825747-750; SD_825744-746;

14  SD_825949-951; SD_825941-945; SD_825929-933; SD_825924-928; SD_825946-948;

15  SD_825934-940; SD_825912-914; SD_826017-020; SD_825884; SD_825909; SD_825979-

16  981; SD_825777-782; SD_825789; SD_825783-788; SD_825766-776; SD_825982-987;

17  SD_825988-990; SD_825991-995; SD_825996-; SD_825997-6001; SD_826002-007;

18  SD_826008; SD_826009-012; SD_826013; SD_826014-015; SD_.825896-898; SD_825885-

19  886; SD_825903-904; SD_825899-902; SD_825893-895; SD_825891-892; SD_825905-906.

20          Space Data has also marketed its high altitude balloon system for wide-area disaster

21  communications since 2001, as its technology offers a quick way to deploy coverage to an

22  area affected by natural disasters or other emergencies in less than 30 minutes.  *See*

23  SD_521364-382; SD_825919.  Over the past few years, Space Data has been in

24  conversations with ██████ to collaborate ████████████████████ a project

25  which is exploring ways to establish broadband coverage for emergency first responders or to

26  restore or expand networks after a disaster.  *See* SD_825908; SD_825910-911; SD_825970-

27  971.  These are two areas Google has solidly set its sights on.

28

1   Space Data has raised over $75 million in private capital to fund the development of

2   its technology and business.[24] From 2007 through 2017, Space Data generated total income

3   of over █████████, with gross profits of nearly ████████.[25] However, after Google's

4   initial public launch of Project Loon in June 2013[26], Space Data's annual revenues decreased

5   substantially for several years before rebounding slightly in 2017.[27]

6       In order to calculate Space Data's lost sales, a first step is to consider Google's

7   projects to determine whether competition from Google hindered Space Data's ability to

8   compete and/or win the project.

9   █   ████████

10  ████████████████████████████

11  ████████████████████████████

12  ██████████████████████████

13  █████████████████████████████

14  ████████████████████████████

15  █████████████████████████████

16  █████████████████████████████

17  █████████████████████████████

18  ████████████████████████████

19  ██████████████████████████████

20  █████████████████████████████

21  ████████████████████████████

22  _____

23  [24] "Investors," *Space Data*, available at https://www.spacedata.net/company/investors/, accessed January 30, 2018.

    [25] Profit & Loss: January 2007 through December 2017, Space Data Corporation, January 31,

24  2018. (SDC PL 10 yrs.pdf)

    [26] Third Amended Complaint, ¶ 224.; Vanian, Jonathan, "New Lawsuit May Deflate

25  Google's Big Internet Balloon Project," *Fortune*, June 16, 2016, available at

    http://fortune.com/2016/06/15/google-sued-project-loon-balloon-project/, accessed January

26  26, 2018.

    [27] Profit & Loss: January 2007 through December 2017, Space Data Corporation, January 31,

27  2018. (SDC PL 10 yrs.pdf).

28







1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



1 ████████████████████████████████████████████

2 ███████████████████████████████████████

3 ████████████████████████████████████████████

4 ███████████████████████████████████████

5 ████████████████████████████████

6 **E. "Graduation"**

7 As noted above, Google intends to roll out Loon as its own separate company and has

8 performed key analyses of Loon's profitability in making that decision.

9 Loon started as a part of "X," the research lab at Google charged with nurturing

10 "world-changing" ideas, and growing those ideas into commercial businesses.  One of the

11 more well-known X projects involves Google's autonomous car driving technology.  This

12 project was incubated at X, and known by the code name as "Chauffeur."  After determining

13 such project was likely to be self-sustaining and enormously profitable, "Chauffeur" was

14 rolled out into a freestanding company, Waymo.  Several have written that Waymo may have

15 a market valuation in excess of $50 billion, all without having a penny in revenue.

16 Google refers to the process of maturing a technology out of X and into a separate

17 freestanding corporate entity as "Graduation" or "Alphabetization."  To Graduate, the

18 technology must be proven, the commercial success tangible (known in Google as "steady-

19 state"), and the business must be able to function independently.  These are the requisite

20 benchmarks for a X project to graduate into a freestanding company.

21 Google (Alphabet) graduated Loon as of July 1, 2018.  ████████████████████

22 ████████████████████████████████████████████

23 ████████████████████████████████████████████

24 ████████████████████████████████████████████

25 ████████████████████████████████████████

26 ████████████████████████████████████████████

27 ████████████████████████████████████████████

28

1
2
3
4
5
6
7

8  **G. Competition**

9      As described above, ever since Loon made its public debut in 2013, Space Data has

10 had to compete against Google for customers, all while Google gets to take the benefit of

11 Space Data's patented technology and proprietary trade secrets.  Google operates in the same

12 market areas as Space Data and engages in negotiations with the same domestic carriers and

13 government divisions.  Space Data has been hamstrung in its ability to close deals since

14 Loon's arrival and the effective loss of its competitive patent advantage.

15      Further, the fact that Google's '678 patent was deemed to be rightfully Space Data's

16 during the Interference Proceeding is additional evidence supporting the fact that Google

17 Loon and Space Data are "close competitors."  *See Presido Components Inc v. Am. Technical*

18 *Ceramics Corp.*, 702 F. 3d 1351, 1365 (Fed. Cir. 2012).  Even Google itself called Space

19 Data a competitor when internally discussing the Puerto Rico project and Space Data's

20 granting permission to use its spectrum for humanitarian purposes.  *See* GOOG-SD-

21 00076931 ("So this is truly an example of the entire industry rallying together, from the

22 regulatory authorities, to telcos, to competitors, to help people who desperately need

23 connectivity.").

24      **2.      Unjust Enrichment**

25      Defendants were unjustly enriched by getting the benefit of Space Data's

26 confidential, proprietary information without compensating Space Data at all.  Google got the

27 benefit of the tens of millions of dollars and 200,000 flight hours poured into Space Data, and

28

1   never paid Space Data a penny.  It soaked up the information Space Data shared under NDA,
2   and then used it for its own purposes to jumpstart Project Loon.

3         The doctrine of unjust enrichment is an equitable principle based on the idea that one
4   party should not be able to unjustly enrich itself at the expense of another.  The principle of
5   unjust enrichment goes beyond merely restoring what a plaintiff actually lost.  Defendant was
6   unjustly enriched if its misappropriation of plaintiff's trade secrets caused Defendants to
7   receive a benefit that it otherwise would not have achieved. A party acting in conscious
8   disregard of the rights of another should be required to disgorge all profit in order to benefit
9   the injured party and deter the perpetrator from committing unlawful acts again.  Here, not
10  only did Space Data not get the benefit of the NDA bargain (Google keeping Space Data's
11  information confidential and using it only to evaluate a potential acquisition), Google has
12  also misused Space Data's information for its own profit.

13        Another potential way of measuring unjust enrichment is the entire enterprise or
14  acquisition value of a Space Data.  Where there is substantial evidence a defendant would
15  have acquired plaintiff if it had not chosen to misappropriate plaintiff's trade secrets instead,
16  acquisition value may be an appropriate measure.  *See X-It Products, LLC v Walter Kidde*
17  *Portable Equipment, Inc.,* 227 F. Supp. 2d 494 (E.D. Va. 2002).  Here, instead of acquiring
18  Space Data's intellectual property through a purchase of the company (or license), Google
19  simply took what it wanted. The quantum of those damages-whether considered as damages
20  for trade secret misappropriation or Defendants' use of Space Data's information in breach of
21  the parties' NDA- is what Defendants would have paid in a legitimate acquisition of Space
22  Data.

23        Another measure of unjust enrichment to Defendants is the expected cost savings to
24  Defendants from using Space Data's trade secrets in Defendants' Google Loon.  Due to the
25  misappropriation of Space Data's trade secrets, Defendants will benefit from many years of
26  future cost savings due to employing Space Data's trade secrets in Google Loon's systems.
27  Google avoided millions of dollars in cost in not having to experiment with flying balloons at
28

1  different altitudes to determine the best place to position them to sail with the winds, the

2  quality of the winds in the ███████████████████████: it already had that

3  information from Space Data.  Google didn't need to do its own research to determine that

4  ███████████████████████████████████ for insulation at

5  altitude or the best way to address thermal management concerns at 65,000 feet: it already

6  knew that from Space Data.  Google also didn't have to expend extra time and money on its

7  own hover algorithm, it could start from the knowledge Space Data shared with it. The same

8  is true for Google's Mission Control and financial modeling, all of it could be advanced by

9  *years* based on starting with the information Space Data provided to Google under the guise

10  of Google's interest in an acquisition.

11      Another measure of unjust enrichment to Defendants is the expected cost savings due

12  to reduced development expenses from using Space Data's trade secrets in Defendants'

13  Google Loon systems.  One way to measure the costs that Defendants saved through their

14  misappropriation of Space Data's trade secrets is by looking at the costs that Space Data

15  incurred to develop those trade secrets.  *See also* Response to Interrogatory No. 7.

16      **3.      Reasonable Royalty**

17      Damages may also be measured by a reasonable royalty in a manner similar to the

18  method used to value trade secret damage and patent damages. There are different

19  methodologies for calculating reasonable royalties which may be applicable to damages in

20  this matter, namely, a Georgia-Pacific approach, an "analytical" approach, a cost saving

21  approach, and a comparables approach.

22      Properly constructed, the hypothetical negotiation reflects the relevant expectations

23  and market factors that would have affected a real-world licensing negotiation.  Even though

24  there are no profits from the Google Loon yet, Google expects robust profits in the future and

25  this expectation would inform a hypothetical negotiation and drive Google's willingness to

26

27

28

1   pay.  Ever since Google publicly announced Project Loon in mid-2013[28], it has produced

2   several internal projections for revenue from and profitability of the project. 

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   [28] Third Amended Complaint, ¶ 11.

28



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28









[REDACTED]

**B.** *Georgia-Pacific* **Factors**

If Space Data's expert determines reasonable royalty damages under a hypothetical

negotiation approach, Space Data may rely on the *Georgia-Pacific* factors, which have been

found to be relevant to a calculation of a reasonable royalty both in the patent context, the

trade secret context, and breach of NDA:

16.  The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

17.  The rates paid by the licensee for the use of other patents comparable to the patent in suit.

18.  The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

19.  The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions to preserve that monopoly.

20.  The commercial relationship between the licensor and the licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

21.  The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his nonpatented items; and the extent of such derivative or convoyed sales.

22.  The duration of the patent and the term of the license.

23.  The established profitability of the product made under the patent; its commercial success; and its current popularity.

24.  The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

25.  The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

26.  The extent to which the infringer has made use of the invention; and any

evidence probative of the value of that use.

27.     The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

28.     The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

29.     The opinion testimony of qualified experts.

30.     The amount that a licensor (such as the patentee) and a license (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*Georgia-Pacific Factor 1.*  Space Data has never licensed any of the trade secrets or confidential information relevant to this matter.

*Georgia-Pacific Factor 2.*  Existing licenses for comparable technology can inform a reasonable royalty in real-life royalty negotiations and in the determination of reasonable royalty damages in litigation. Google has not produced any comparable licenses to date. Space Data notes that Google has refused to produce information relevant to the value of technologies with comparable applications to Space Data's products and Loon (e.g. Skybox Imaging acquisition and sale data).

*Georgia-Pacific Factor 3.*  Expert analysis as to the scope of the license has not yet been completed.

*Georgia-Pacific Factor 4.*  A licensor with an established policy of refusing to grant licenses to competitors may be able to receive a higher royalty rate than a licensor that routinely grants licenses. As discussed above, Space Data has **not** licensed its trade secrets or confidential information to third parties. The fact that Space Data does not license, but sells its own services, would increase the royalty rate as compared with an entity that licenses its technology.  This is particularly true when licensing to a direct competitor, Google here.

*Georgia-Pacific Factor 5.*  As described above in response to Interrogatory No. 6,

1  Space Data and Google are direct competitors in the balloon-based internet service market.

2      *Georgia-Pacific Factor 6.*  ███████████████████████████████████

3  ████████████████████████████████████████████████████████████.  Google's

4  advertising segment brought in over $79 billion in 2016 (about 88% of its total revenues).[29]

5  Furthermore, as of October 2017, Google controlled nearly 87% of the worldwide desktop

6  search engine market and over 94% of the mobile search engine market.[30]  If Project Loon is

7  able to provide internet access to the hundreds of millions of users that it intends to reach,[31]

8  Google can reasonably expect significant contributions to its search revenues from those

9  users.  Loon is a strategic business for Google.  In a reasonable royalty negotiation, the

10  generation of additional revenues in addition to just sales of Loon would be an important

11  consideration and benefit to Defendants from taking the hypothetical license. Thus, this

12  factor would be expected to increase Google's willingness to pay and hence the reasonable

13  royalty, possibly by a substantial amount.

14      *Georgia-Pacific Factor 7.* The date of the hypothetical negotiation would be the time

15  Google first began misusing Space Data's confidential information and trade secrets.  Expert

16  technical analysis is expected for this factor and has not yet been completed.

17      *Georgia-Pacific Factor 8.*  ████████████████████████████████

18  ████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████

21

22  [29] "Annual Report for the fiscal year ended December 31, 2016," Alphabet Inc., February 3,
23  2017, p. 24, available at https://abc.xyz/investor/pdf/20161231_alphabet_10K.pdf, accessed
    January 23, 2018.
    [30] "Worldwide desktop market share of leading search engines from January 2010 to October
24  2017," *Statista*, November 2017, available at
    https://www.statista.com/statistics/216573/worldwide-market-share-of-search-engines/,
25  accessed January 24, 2018; "Market share of selected leading mobile search providers in the
    United States from October 2012 to October 2017," *Statista*, November 2017, available at
26  https://www.statista.com/statistics/511358/market-share-mobile-search-usa/, accessed
    January 24, 2018.
27  [31] Third Amended Complaint, ¶15.

28

1 ████████████████████████████████████████████████████

2 ████████████████████████████████

3     *Georgia-Pacific Factor 9.*  As a general matter, there are ways other than using

4 balloon-based technology to provide Internet service, including terrestrial networks using

5 cable or phone networks, and wireless networks through satellite arrays.[32]  However, many

6 of these traditional methods are not economically viable in rural and remote regions.

7 Terrestrial networks and satellites are extremely expensive and are only cost-effective when

8 they cover densely populated regions.[33]  Companies like Facebook have invested significant

9 resources to provide internet access using drones and laser technology.[34]  Google also

10 experimented with drones with its January 2014 purchase of Titan Aerospace, which

11 produces high-flying solar-powered drones.[35]  At that time, it appeared that Google wanted

12 to develop an alternative to the balloon-powered internet services that it had already begun to

13 develop with Project Loon. However, Alphabet shuttered Titan in 2016, reassigning some of

14 the former Titan staff members to Project Loon[36] because Project Loon was considered

15 "more promising" in terms of economics and technical feasibility than using drones.[37]

16     One of the reason's that Google began to explore drones as an alternative Internet

17

18 [32] Third Amended Complaint, ¶¶ 28-33.

[33] Third Amended Complaint, ¶¶ 29-33

19 [34] Hempel, Jessi, "Inside Facebook's Ambitious Plan to Connect the Whole World," *Wired*,
January 19, 2016, available at https://www.wired.com/2016/01/facebook-zuckerberg-
internet-org/, accessed January 23, 2018.

20 [35] "Google to acquire drone-maker Titan Aerospace," USA Today, available at
https://www.usatoday.com/story/tech/2014/04/14/google-to-acquire-drone-maker-titan-

21 aerospace-facebook-aced/7706513, accessed on June 13, 2017; "Google Buys Titan
Aerospace," UAS Vision, available at https://www.uasvision.com/2014/04/16/google-buys-

22 titan-aerospace, accessed on June 13, 2017.

[36] "Google sends Titan broadband drones to the unicorns' graveyard," The Register, available

23 at
https://www.theregister.co.uk/2017/01/12/google_sends_titan_broadband_drones_to_the_uni

24 corns_graveyard, accessed on June 12, 2017.

[37] "Alphabet ended drone Internet project, saying economics didn't work out," arsTechnica,

25 available at https://arstechnica.com/information-technology/2017/01/alphabet-axed-internet-
drones-says-balloon-broadband-is-more-promising, accessed on June 13, 2017; "Alphabet

26 ended drone Internet project, saying economics didn't work out," *ars TECHNICA*, available
at https://arstechnica.com/information-technology/2017/01/alphabet-axed-internet-drones-

27 says-balloon-broadband-is-more-promising/.

28

provider was that balloons "[were] larger and harder to control," and drones were viewed as easier to put into and keep inside target coverage areas.[38]  Comparing the technical and economic aspects of Project Loon to existing alternatives and similar emerging technologies is a basic step in formulating and executing the spinoff and such plans leading up to it.  As Space Data's trade secrets and confidential information provided key knowledge to Google in developing Loon, this factor would increase Google's willingness to pay as well as the reasonably royalty calculations for the patents-at-issue.

 *Georgia-Pacific Factor 10.*  ████████████████████████

████████████████████████████[39]  The benefits from Project Loon, however, are not only limited to Google's cash flow gains.  With the help of the Space Data's proprietary information, Loon would be able to provide internet service to areas with no access to internet and to places with internet services interrupted due to a natural disaster.

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

---

[38] "Google Buys Titan Aerospace," UAS Vision, available at https://www.uasvision.com/2014/04/16/google-buys-titan-aerospace, accessed on June 13, 2017.
[39] GOOG-SD-00072892-913 at 897.
[40] GOOG-SD-00073545-615 at 563.
[41] GOOG-SD-00073545-615 at 564-5.
[42] GOOG-SD-00073545-615 at 563.
[43] GOOG-SD-0073755-811 at 760.

1  the world.  There are clear benefits, especially for underdeveloped countries, to be gained

2  from increased connectivity.  An analysis by Deloitte shows that extending internet access in

3  developing economies to the level of developed nations can "raise living standards and

4  incomes by up to $600 per person a year" and "[lift] 160 million people out of extreme

5  poverty."[44] Reaching 90% of the world population with wireless service could also "provide

6  over $22 trillion of GDP growth by 2030" and provide 120 million jobs.[45]

7        The great promise of Project Loon, enabled by Space Data's proprietary technology

8  and information, would tend to increase Google's willingness to pay as well as the

9  reasonable royalty for the patents at issue.

10        *Georgia–Pacific Factor 11.*  Google improperly made use of Space Data's

11  confidential information and trade secrets for purposes of Project Loon, in contravention of

12  the NDA. *See* Response to Interrogatory No. 14.

13        *Georgia–Pacific Factor 12.* ████████████████████████████████

14  ███████████████████████████████████████████████████████████████

15  ███████████████████████████████████████████████████████████████

16  ███████████████████████████████████████████████████████████████

17  ███████████████████████████████████████████████████████████████

18  ███████████████████████████

19        *Georgia-Pacific Factor 13.*  The portion of the realizable profit that should be

20  credited to the invention as distinguished from non-Space Data confidential and trade secret

21  elements calls for apportionment.  Space Data intends to rely on the analysis of technical

22  experts and damages experts in order to perform an apportionment analysis.

23        *Georgia-Pacific Factor 14.*  The opinions of technical experts are necessary in order

24

25  [44] "Google internet balloons and drones could boost GDP by trillions and save millions of
   lives," nextBIGfuture, available at https://www.nextbigfuture.com/2014/12/google-internet-
   balloons-and-drones.html, accessed on May 24, 2017.

26  [45] "Google internet balloons and drones could boost GDP by trillions and save millions of
   lives," nextBIGfuture, available at https://www.nextbigfuture.com/2014/12/google-internet-

27  balloons-and-drones.html, accessed on May 24, 2017.

28

1  provide technical knowledge, background, and assumptions that will be used to supplement

2  and guide any analyses of damages. To date, no technical expert has conducted any analysis

3  or offered any opinions on the technical matters related to this case.  As such, further

4  technical expert opinion is required.

5        **4.     Injunctive Relief**

6       The NDA explicitly provides that: "Each Party acknowledges that damages for

7  improper disclosure of Confidential Information may be irreparable; therefore, the injured

8  Party is entitled to seek equitable relief, including injunction and preliminary injunction, in

9  addition to all remedies available to it."

10      Several factors weigh in favor of an injunction here.

11  **Factor 1: Irreparable Injury**

12      Google's continued misuse of Space Data's confidential information and trade secrets

13  gives it an unfair advantage in the marketplace.  Courts have found irreparable harm when a

14  defendant's misappropriation allows it to gain a competitive edge in a nascent or fast-

15  growing market, like balloon-based internet services here.  Damage to reputation can be hard

16  to quantify, as can price erosion, but that does not mean the irreparable injury does not occur.

17  Space Data will continue to suffer significant damage to its goodwill if Loon continues to be

18  allowed to compete using Space Data's own technology.

19      Here, Space Data is very much a practicing entity, its principal business (in fact its

20  only business) centers on balloon-borne internet and communication systems; and Google

21  Loon competes directly with Space Data, including in the domestic United States.  It has an

22  office and manufacturing facility in Chandler, Arizona.  It has the ability to scale-up its

23  manufacturing and indeed has done so to meet high demand in the past.  Space Data has, in

24  the past 4 years, been in commercial negotiations with and provided commercial

25  demonstrations for ████████████████ and has had commercial discussions with

26  ████ as well.  *See* SD_825887-888; SD_825899-803; SD_825908; SD_825910-911;

27  SD_825921-923; SD_825741-743; SD_825972-973; SD_825747-750; SD_825744-746;

28

1   SD_825949-951; SD_825941-945; SD_825929-933; SD_825924-928; SD_825946-948;

2   SD_825934-940; SD_825912-914; SD_826017-020; SD_825884; SD_825909; SD_825979-

3   981; SD_825777-782; SD_825789; SD_825783-788; SD_825766-776; SD_825982-987;

4   SD_825988-990; SD_825991-995; SD_825996-; SD_825997-6001; SD_826002-007;

5   SD_826008; SD_826009-012; SD_826013; SD_826014-015; SD_.825896-898; SD_825885-

6   886; SD_825903-904; SD_825899-902; SD_825893-895; SD_825891-892; SD_825905-906.

7          Space Data has also marketed its high altitude balloon system for wide-area disaster

8   communications since 2001, as its technology offers a quick way to deploy coverage to an

9   area affected by natural disasters or other emergencies in less than 30 minutes.  *See*

10  SD_521364-382; SD_825919.  Over the past few years, Space Data has been in

11  conversations with ▮▮▮▮ to collaborate ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ a project

12  which is exploring ways to establish broadband coverage for emergency first responders or to

13  restore or expand networks after a disaster.  *See* SD_825908; SD_825910-911; SD_825970-

14  971.  Space Data also has historically been and remains a major partner of the U.S.

15  Department of Defense in providing remote voice, wireless internet, and imagining services.

16         Space Data has raised over $75 million in private capital to fund the development of

17  its technology and business. From 2007 through 2017, Space Data generated total income of

18  over ▮▮▮▮, with gross profits of nearly ▮▮▮▮.  Ever since Loon made its public

19  debut in 2013, Space Data has had to compete against Google for customers, all while

20  Google gets to take the benefit of Space Data's patented technology and proprietary trade

21  secrets.  Google operates in the same market areas as Space Data and engages in negotiations

22  with the same domestic carriers and government divisions.  Space Data has been hamstrung

23  in its ability to close deals since Loon's arrival.  *See also* Response to Interrogatory 6.

24         In particular, Space Data lost out to Google in a bid to provide wireless coverage to

25  Puerto Rico following Hurricane Maria in 2017.  While the was a humanitarian project, the

26  benefits to the company winning the bid went well beyond good P.R. about charitable efforts.

27  The Loon Puerto Rico trial allowed Google to prove that Loon works and redounded

28

1  worldwide recognition for Google.  All of it built on Space Data's patents and trade secrets.

2  The Puerto Rico trial put Google on the map in a way that Space Data cannot counter.

3  Google is such a large player in the global market, it clouds out Space Data's ability to gain

4  commercial traction.





1 ████████████████████████

2 ██████████████████████████████████

3 ████████████████████████████████████████████

4 ███████████████████████████████████████████

5 █████████████████████████████████████████████████

6 ██████████████████████████████████████████

7 ███████████████████████████████████████

8        Further, the fact that Google's '678 patent was deemed to be rightfully Space Data's

9 during the Interference Proceeding is additional evidence supporting the fact that Google

10 Loon and Space Data are "close competitors," and that an injunction is warranted here. *See*

11 *Presidio Components Inc v. Am. Technical Ceramics Corp.*, 702 F. 3d 1351, 1365 (Fed. Cir.

12 2012).  Even Google itself called Space Data a competitor when internally discussing the

13 Puerto Rico project and Space Data's granting permission to use its spectrum for

14 humanitarian purposes. *See* GOOG-SD-00076931 ("So this is truly an example of the entire

15 industry rallying together, from the regulatory authorities, to telcos, to competitors, to help

16 people who desperately need connectivity.").

17        There are many other illustrations along the same lines.  The critical point is this:

18 absent an injunction, Space Data will suffer irreparable, critical damage.  Space Data is an

19 operating company, and it is entitled to the right to the monopoly granted by the patent laws

20 and the benefit of its proprietary, secret know-how.  It must have the right to exclude Google,

21 just as the law contemplates.

22        Here, there is a clear causal nexus between Defendants' misappropriation of trade

23 secrets and breach of the NDA and the harm resulting from Defendants' unfair head-start in

24 bringing Loon to market.  This is because the Space Data's confidential information and

25 trade secrets – its wind data trade secrets especially- are key to optimizing the function of a

26 balloon-based communication system to work with existing, broadband devices.  Using

27 Space Data's proprietary knowledge, in contravention of the NDA, gave Google an unearned

28

1    head start and helped Google avoid millions in costs in their efforts to establish a

2    commercially-viable network.

3           **Factor 2: Inadequate Remedies at Law**

4           Space Data has never licensed its technology, has a business to protect, including its

5    business reputation, its reputation for inventiveness, its pricing curves, and the like.  The

6    same reasons supporting the fact that Space Data will suffer irreparable harm support a

7    finding that monetary damages are an inadequate remedy here.  Courts have found that the

8    showing of a head-start advantage based on improper use of a competitor's technology is

9    sufficient to establish that harm to the plaintiff cannot be remedied by money damages alone.

10   *See Netlist Inc. v. Diablo Techs Inc.*, No. 13-cv-05962-YGR 2015 WL 153724, at *8 (N.D.

11   Cal. Jan. 12, 2105). The head-start gained by Google has already done significant damage to

12   Space Data and should not be allowed to continue.

13          **Factor 3: The Balance of Equities**

14          Where, as here, Space Data has invested years of time and tens of millions of dollars

15   in developing its confidential information and trade secrets, it is profoundly inequitable to

16   effectively "acquire" all of that knowhow without payment to Space Data and position itself

17   as a direct competitor.  To put this in context here, if Google can compete with Space Data

18   directly, using Space Data's own patented technology, trade secrets, and confidential

19   information, then Google will have an enormous competitive advantage, given its unlimited

20   wealth, lobbying connections, and the fear it commands given its ability to retaliate against

21   smaller competitors selling competing products.  There is a reason, for example, that the EU

22   just levied a multibillion dollar fine against Google.  Another important factor here is

23   whether the Defendant knowingly built its business in contradiction of the IP rights of others,

24   as Google did here.  The balance of hardships favors Space Data.  While Google may face

25   some cost in being enjoined from making, selling, or using Loon, that is the price a company

26   pays when it builds its business on an information it misappropriates.  On the other hand,

27

28

1   Space Data continues to suffer severe hardship by being forced to compete against its own

2   trade secrets and patented technology.

3          **Factor 4: The Public Interest**

4          Finally, the public interest is enhanced by a court entering a permanent injunction is

5   circumstances such as these.  Any other rule would encourage a much larger competitor to

6   cannibalize its much smaller competitors, even though the smaller competitors are often the

7   source of valuable innovation in the marketplace generally.  Why invest in innovation when a

8   Google can simply get a smaller company to reveal its proprietary information under NDA,

9   breach the NDA and use the proprietary information and trade secrets for Google's own

10  projects – claiming the projects were developed organically at Google -- and then pay a mere

11  small royalty as it runs its competitor out of business?  That is hardly equitable.  There is also

12  a strong public interest in protecting intellectual property rights.

13         *See* also Responses to Interrogatories 6, 7, 8, 15 and 17.

14  **INTERROGATORY NO. 17:**

15         State all facts and identify all documents that support your claim for damages for

16  breach of the NDA.

17  **AMENDED (07/13/2018) RESPONSE:**

18         Space Data refers to and incorporates by reference each of the foregoing General

19  Objections.  In addition to the foregoing General Objections, Space Data specifically objects

20  to this interrogatory because amongst other things, the request's reference to "all facts" and

21  "all documents" renders it overly broad, unduly burdensome and not reasonably calculated to

22  lead to the discovery of admissible evidence.  Space Data also objects to this request to the

23  extent it includes subparts that should be propounded, numbered, or counted as separate

24  interrogatories in accordance with Federal Rules of Civil Procedure 33.  Space Data further

25  objects to this interrogatory to the extent it seeks information within Defendants possession,

26  custody and/or control, and/or information more easily available to Defendants, as through

27  public sources.  Plaintiff objects to this request as premature as Plaintiff intends to rely on

28

1   expert assistance in performing damages computations and expert discovery has not yet

2   begun.  Space Data also objects to this interrogatory to the extent it seeks trade secret,

3   confidential, or proprietary information of a third party, sensitive personal or private

4   information of a third party, or sensitive government information.  Space Data further objects

5   to this interrogatory to the extent it seeks information, documents, and/or things protected by

6   the attorney-client privilege, the work-product doctrine, or any other applicable privilege or

7   immunity.

8        Subject to, and without waiver of, the foregoing General and Specific Objections,

9   Space Data responds further as follows:

10       *See* Response to Interrogatory No. 16, above.  *See also* Response to Interrogatory

11   Nos. 6, 7, 8 and 15.

12  **INTERROGATORY NO. 19:**

13       Separately for each Asserted Trade Secret, state all facts and identify all

14  documents that support your contention that the Asserted Trade Secret is not generally

15  known to the public or to other persons who can obtain economic value from its

16  disclosure or use, and identify all persons with knowledge of such facts.

17  **AMENDED (07/13/2018) RESPONSE:**

18       Space Data refers to and incorporates by reference each of the foregoing General

19  Objections.  In addition to the foregoing General Objections, Space Data specifically objects

20  to this interrogatory because amongst other things, the phrase "other persons who can obtain

21  economic value from its disclosure or use" is vague and ambiguous, and the request's

22  reference to "all facts"; "all documents"; and "all persons" renders it overly broad, unduly

23  burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

24  Space Data also objects to this request to the extent it includes subparts that should be

25  propounded, numbered, or counted as separate interrogatories in accordance with Federal

26  Rules of Civil Procedure 33.  Space Data further objects to this interrogatory to the extent it

27  seeks information within Defendants possession, custody and/or control, and/or information

28

1   more easily available to Defendants, as through public sources.  Space Data also objects to this

2   interrogatory as premature, given that Space Data has not completed its investigation of facts,

3   witnesses or documents relating to this case, has not completed discovery (for example,

4   Defendants' response to Space Data's Interrogatory No. 25 is outstanding), has not completed

5   analysis of available information, and has not completed preparation for trial.   Space Data

6   further objects to this interrogatory to the extent it seeks information, documents, and/or

7   things protected by the attorney-client privilege, the work-product doctrine, or any other

8   applicable privilege or immunity.

9          Subject to, and without waiver of, the foregoing General and Specific Objections,

10  Space Data responds further as follows:

11         Space Data's trade secrets are not generally known and are not readily ascertainable,

12  and Space Data has not disclosed its trade secrets in its patents.  *See* Responses to

13  Interrogatory Nos. 13 and 16 (preservation of secrecy and damages); Fifth Amended 2019

14  Statement (Space Data's wind data trade secrets are not disclosed by Space Data's patents

15  and explaining that by 2008 Space Data had cataloged over 200,000 flight hours of wind data

16  ██████████████████████████  Third Amended Complaint, ¶¶298 & 307.

17         The fact that Google filed patent applications copying Space Data's technology

18  proves that Google itself believed the ideas were not public; otherwise, Google could not

19  have filed the applications it did.

20         Space Data had to painstakingly develop each and every one of its trade secrets on its

21  own.  That would not have been necessary if they had been "generally known" to the public

22  or readily ascertainable.  For example:

23         **Hover Algorithm**:  Space Data had to do tests to see if it was even possible to ██

24  ████████████████████  *See* Transcript of June 1, 2018 Deposition of Eric Frische

25  ("Frische Tr.") at 37:5-16.  Indeed, even one of Space Data's own engineer's was "adamant"

26  that this could not be done.  *Id.*  It took Space Data "a long time to come to the algorithms"

27  and "mechanical methods built into the vent."  *Id.* at 229:10-230:6.  The "mechanical ballast

28

1   design" was critical as well.  *Id.* at 230:7-24.  Ballast and vent design required "[l]ots of

2   calculations," "chamber tests" and "over a span of a year" of work.  *Id.* at 231:2-232:11.

3         The design of the components of the vent and ballast system itself and choices about

4   the materials used for those comments required a great deal of design effort and R&D by

5   Space Data.  *See, e.g.*, Transcript of June 15, 2018 30(b)(6) Deposition of Bill McCullough

6   ("McCullough 30(b)(6) Tr.") at 14:14-16:19.

7         The design of the vent components alone took "on the order of a year and half to two

8   years" and Space Data had to try "a lot of iterations."  *Id.* at 32:20-33:25.  Many iterations

9   and changes were required to perfect the vent design shown to Google.  *Id.* at 33:1-38:9.  The

10  cost of designing the vent was "nontrivial."  *Id.* at 38:10-14.  Nobody, prior to Space Data,

11  vented latex balloons.  *Id.* at 40:4-7.  Space Data had to "start[ ] from scratch doing [its] own

12  analyses, using [its] own materials."  *Id.* at 41:24-25.  "There [weren't] any textbooks that

13  say[], This is how you vent . . ."  *Id.* at 43:25-44:1.

14        Space Data also had to consider many different variations in designing its ballast

15  components.  It had to consider various types of ballast, including multiple types of liquid

16  ballast and multiple types of solid ballast, "dozens of variations."  *See id.* at 67:9-18'; 90:6-

17  16; 92:16-93:12.  It also had to consider multiple auger designs, with consequent impact on

18  auger motor selection.  *Id*. at 90:3-15.  Its selection was made based on "empirical data"—in

19  other words, Space Data had to fly and test various designs and components to refine the

20  design it ultimately shared with Google on February 15, 2018.  *Id.*; *see also id.* at 94:14-

21  97:19.

22        Space Data designed its own hover algorithm.  Transcript of June 27, 2018 30(b)(6)

23  Deposition of David Coombs ("Coombs 30(b)(6) Tr.") at 16:14-15:6.  The algorithm itself

24  "was created by looking at past data acquired from manually venting and ballasting the

25  balloon[s]."  *Id.*; *see also id.* at 21:11-14.  In other words, to even begin to deduce what was

26  necessary for the algorithm, Space Data had to build balloons, fly many flights, track the data

27  from those flights, collect that data, and then analyze it.  *See, e.g., id.* at 23:21-24:5.  This

28

1  data was not and is not available to the public.  Nor was the hover algorithm a simple one-

2  hour coding project.  "The initial design . . . took several weeks and it was refined over a

3  much longer period of time, perhaps years."  *Id.* at 23:1-5.

4      **Thermal Management**:  It took Space Data "a long time to get to the point where [it]

5  could build a system that didn't require active thermal management" and it is justifiably

6  "pretty proud of what [it] had to do to overcome the thermal" issues involved in high-altitude

7  ballooning.  Frische Tr. at 237:18-241:3.  There was "a lot of R&D in terms of material

8  choices" and design.  Firsche Tr. at 242:17-244:12.  It took Space Data a great deal of trial

9  and error to get the thermal management design right.  Frische Tr. at 244:13-245:3.

10      **Process Flow for Space Data's Monitoring of its flight data that was on display**

11  **during Google's February 2008 visit**:  This flow chart describes Space Data's process flow.

12  It was unique to Space Data.  *See* Frishce Tr. at 247:1-249:22.

13      *See also* Knoblach Dep., Jul. 11-12, 2018 (discussing development of Space Data

14  trade secrets).

15      Discovery in this matter is ongoing and Space Data reserves the right to supplement

16  this response in light of any new deposition testimony, expert testimony, or other newly

17  discovered facts.

18  **INTERROGATORY NO. 20:**

19      Separately for each Asserted Trade Secret, state all facts and identify all documents

20  that support your contention that the Asserted Trade Secret derives independent economic

21  value, actual or potential, from not being generally known to the public or to other persons

22  who can obtain economic value from its disclosure or use and identify all persons with

23  knowledge of such facts.

24  **RESPONSE:**

25      Space Data refers to and incorporates by reference each of the foregoing General

26  Objections.  In addition to the foregoing General Objections, Space Data specifically objects

27  to this interrogatory because amongst other things, the phrase "other persons who can obtain

28

1   economic value from its disclosure or use" is vague and ambiguous, and the request's

2   reference to "all facts"; "all documents"; and "all persons" renders it overly broad, unduly

3   burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

4   Space Data also objects to this request to the extent it includes subparts that should be

5   propounded, numbered, or counted as separate interrogatories in accordance with Federal

6   Rules of Civil Procedure 33.  Space Data further objects to this interrogatory to the extent it

7   seeks information within Defendants possession, custody and/or control, and/or information

8   more easily available to Defendants, as through public sources.  Space Data also objects to this

9   interrogatory as premature, given that Space Data has not completed its investigation of facts,

10   witnesses or documents relating to this case, has not completed discovery, has not completed

11   analysis of available information, and has not completed preparation for trial.  Space Data

12   further objects to this interrogatory to the extent it seeks information, documents, and/or

13   things protected by the attorney-client privilege, the work-product doctrine, or any other

14   applicable privilege or immunity.

15       Subject to, and without waiver of, the foregoing General and Specific Objections,

16   Space Data responds further as follows:

17       Space Data's trade secrets derive independent economic value from not being

18   generally known or readily ascertainable.  Among other things, the independent economic

19   value of Space Data's trade secrets is evidenced by the effort, including time and money, that

20   Space Data put into painstakingly developing its trade secrets.  *See* Response to Interrogatory

21   No. 19; ECF 143-1 (Ritchie Dec.), ¶3 ("Space Data . . . has spent year, and tens of millions of

22   dollars in private investment, developing its technology"); ECF 235-1 (Ritchie Dec.), ¶3;

23   Quenneville Dep. at 177:21-23 ("Because it[ (wind data) is] part of our intellectual property,

24   and we have spent many dollars of company resources to get -- collect all that data and

25   understand it.").

26       The independent economic value of Space Data's trade secrets is also evidenced by

27   the extensive measures Space Data has taken to maintain the secrecy of its trade secrets over

28

1  the course of many years.  *See* Response to Interrogatory No. 13.  Clearly Space Data

2  believes its trade secrets derive independent economic value from not being generally known

3  or readily ascertainable.

4       The independent economic value of Space Data's trade secrets is further evidenced by

5  Google's (and Space Data's) use of Space Data's trade secrets, and by Google's intensive

6  acquisition due diligence of Space Data and its technology.  *See* Response to Interrogatory

7  No. 14 (discussing Google's use of Space Data's trade secrets and Google's acquisition due

8  diligence).  Google's intensive patent prosecution campaign with respect to stratospheric

9  balloon technology also demonstrates the value of Space Data's trade secrets.  *See* Yaghmour

10  (Google 30(b)(6) designee on "[t]he value and importance of the 'more than 100 patents for

11  its own Project Loon-related inventions' to the technical and economic success of Project

12  Loon) Dep. (Rough) at 45:18-46:1 ("Q. . . . How many Project Loon patents does Google

13  currently own . . . . A. I'm going to speculate about 400.  Q.  400 Loon-specific patnets? . . . .

14  The Witness: 400 global.  Globally.")

15       The independent economic value of Space Data's trade secrets if further

16  demonstrated by the competitive advantage Space Data derives from the secrecy of its trade

17  secrets.  *See* Fifth Amended 2019 Statement; ECF 143-1 (Ritchie Dec.), ¶7; ECF 235-1

18  (Ritchie Dec.), ¶6.

19       By way of further example, the independent economic value of Space Data's trade

20  secrets is also demonstrated by the injury, including damages, Space Data has suffered as a

21  result of Google's misappropriation.  *See* Response to Interrogatory No. 16.

22  **INTERROGATORY NO. 23:**

23       Separately for each Asserted Trade Secret, state all facts and identify all

24  documents that support your contention that you have been injured by Google's

25  alleged misappropriation of the Trade Secret and identify all persons with knowledge of

26  such facts.

27  **AMENDED (07/13/2018) RESPONSE:**

28

1    Space Data refers to and incorporates by reference each of the foregoing General

2    Objections.  In addition to the foregoing General Objections, Space Data specifically objects

3    to this interrogatory because amongst other things, the request's reference to "all facts"; "all

4    documents"; and "all persons" renders it overly broad, unduly burdensome and not

5    reasonably calculated to lead to the discovery of admissible evidence.  Space Data also

6    objects to this request to the extent it includes subparts that should be propounded, numbered,

7    or counted as separate interrogatories in accordance with Federal Rules of Civil Procedure

8    33.  Space Data further objects to this interrogatory to the extent it seeks information within

9    Defendants possession, custody and/or control, and/or information more easily available to

10   Defendants, as through public sources.  Plaintiff objects to this request as premature as

11   intends to rely on expert assistance in performing damages computations and expert

12   discovery has not yet begun.  Space Data also objects to this interrogatory to the extent it

13   seeks trade secret, confidential, or proprietary information of a third party, sensitive personal

14   or private information of a third party, or sensitive government information.  Space Data

15   further objects to this interrogatory to the extent it seeks information, documents, and/or

16   things protected by the attorney-client privilege, the work-product doctrine, or any other

17   applicable privilege or immunity.

18   Subject to, and without waiver of, the foregoing General and Specific Objections,

19   Space Data responds further as follows:

20   The parties entered into The Mutual Non-Disclosure Confidentiality and

21   Nondisclosure Agreement ("NDA") effective as of December 1, 2007, for the purpose of

22   engaging in "discussions and negotiations concerning a proposed acquisition of shares or

23   assets" of Space Data.  This was the only permissible use of the Space Data information.

24   Because Google told Space Data it was interested in acquiring the company and

25   because the parties had executed the two-way NDA, Space Data provided Google with

26   unprecedented access to confidential, proprietary information and trade secrets.  Space Data

27   felt Google's interest in acquiring the company was sincere, since Google co-founders Larry

28

1   Page and Sergey Brin both attended Space Data's first meeting at Google's headquarters in

2   September 2007 and a follow-on meeting in November 2007.  Then, on November 28, 2007,

3   Minnie Ingersoll emailed Space Data and copied Mike Pearson from Google's corporate

4   development team saying "I think he's the right person to help us take this discussion into

5   more formal deal terms."  *See* GOOG-SD-00144458.   Once the NDA was signed, Space

6   Data provided Google with its proprietary historical financial statements, financial

7   projections, and modeling, which revealed information regarding all the relevant cost

8   variables relevant to running a balloon-based communications network. Space Data's

9   financial details are not publicly known and its financial model was proprietarily developed

10  over years of operating as the only balloon-based communications company.   Detail about

11  the actual cost drivers of a balloon-based communications network, developed from Space

12  Data's actual operational experience, provided value and a competitive advantage to Space

13  Data.  These details were only provided to Google for the purpose of evaluating a potential

14  acquisition.

15      Space Data also provided proprietary "vision" slides to Google, which detailed

16  different potential applications of Space Data's technology. These slides were also

17  designated as confidential under the NDA.  As described fully in the Third Amended

18  Complaint, on February 15, 2008, a team of Google engineers, corporate development

19  personnel, and Google's co-founders, Larry Page and Sergey Brin, came to visit Space Data

20  to perform technical due diligence.  Space Data had never before and has not since provided

21  the kind of access Google had during that visit.

22      The Google team launched Space Data balloons and then received tours of Space

23  Data's labs, workshops, and Network Operations Center ("NOC").  In the labs and

24  workshops, Google was able to view and photograph deconstructed payloads and

25  components.  Throughout the tour, Space Data's team provided detail about Space Data's

26  payload design, vent, ballast, and thermal management techniques that were on display.

27  During the tour of the NOC, Space Data allowed Google to take up-close, detailed

28

1   photographs of the wind data, flight data, hover inputs and outputs, and NOC control system.

2   Space Data also explained to Google, in technical detail, what was happening on each screen

3   in the NOC, what the wind data was showing, and how all the information fit together.

4   Space Data explained to Google that, based on its 200,000 flight hours of knowledge, Space

5   Data had concluded that a stratospheric balloon array comprising balloons ███████████

6   ████████████████████████ could be flown to optimize communications with

7   mainstream broadband devices based upon taking advantage of the layers of wind at different

8   but appropriately consistent velocities ███████████████████████████

9   ██████   Space Data explained it had determined that many different altitude zones exist

10   within the Peaceful Band and that Space Data's proprietary knowledge of the different

11   velocities at those altitudes allows recently-launched balloons to be lifted to specific altitudes

12   where the known wind velocity will transfer these balloons into ████████ within the existing

13   balloon array.  This knowledge differed than what was in the public domain at the time and

14   was key because, if only a few altitude zones are known with uncertain wind velocities,

15   balloons cannot be maneuvered as precisely.  The consequence being that ███████████

16   █████████████████████████ cannot be maintained.

17        Space Data also explained in detail to Google what was displayed on the NOC

18   screens regarding the hover algorithm and how, in concert with the optimal design and

19   placement of the vent and ballast system on display for Google, Space Data achieves and

20   maintains hover.  *See also* Response to Interrogatory No. 19.

21        Space Data would never have shared its core, technical knowhow, developed from

22   hundreds of thousands of flight hours, if it thought Google would be permitted to use such

23   information for its own purposes without any credit or payment to Space Data.

24        Google failed to treat Space Data's confidential information with the appropriate

25   controls under the NDA from the beginning. On [insert date] Google

26   In 2011, when Google claims it was first starting to develop Loon internally, a member of the

27   Loon team, Josh Weaver, emailed Dan McCloskey and Phil Gossett, two key members of

28

1  Google's due diligence team who visited Space Data on February 15, 2008, wanting to find

2  out what the team learned from their view into Space Data.  As Weaver put it then:



8  *See* GOOG-SD-00158448-451.  Dan McCloskey, Larry Alder  and Phil Gossett, each

9  responded with  substantive summaries of Google Space Data interactions.  *See id.*  This one

10  example of cross-contamination between the Google Loon team and the Space Data due

11  diligence team was not an isolated incident.  *See generally* Response to Interrogatory No. 14.

12      Defendants improperly developed Google Loon based on Space Data's confidential

13  and trade secret information, in breach of the NDA.  Defendants' use of Space Data's

14  proprietary financial modeling, historical financial data, vision slides, and information

15  derived from access to Space Data's proprietary wind data, hover algorithm, thermal

16  management system, altitude control system, and network operations center to develop

17  Project Loon constitutes a breach of the NDA.  Defendants' disclosure of certain Space

18  Data's trade secrets and confidential information in Google's '193 Patent application as and

19  asserted "ownership" of Space Data's intellectual property is also a breach of the NDA as it

20  violates § 8, which states that "[no Party acquires any intellectual property rights under this

21  Agreement[.]  Google also breached the NDA by sharing proprietary, Space Data

22  information with the entire Google Access group in contravention of the purpose of the

23  NDA, which was to evaluate and acquisition or business partnership with Space Data.

24      Space Data suffered damage as a direct and proximate result of Defendants' breaches

25  of the NDA.  Assuming that Google had performed on the NDA (*i.e.* had kept Space Data's

26  confidential information and trade secrets secret and not used the information in

27

28

1  contravention to the purpose of the NDA), Space Data would not have to be competing with

2  Loon while Google used Space Data's own technology.  Space Data would not have lost out

3  on potential profits to Loon if Google had not usurped Space Data's confidential information

4  out right.  *See* July 10, 2018 Amended Response to Interrogatory No. 6.  The injury suffered

5  by Space Data includes, without limitation, the loss of sales and profits it would have earned

6  but for Defendants' actions, and injury to Space Data's reputation among potential and

7  existing customers, business partners, investors, and in the industry in general.

8  The calculation of Space Data's damages for Google's misappropriation of trade

9  secrets may include, without limitation, loss of profits Space Data would have earned but for

10  Google's misappropriation, disgorgement for unjust enrichment by the Defendants, payment

11  of reasonable royalty fees, as well as injunctive relief.

12  Defendants' trade secrets misappropriation has been willful and malicious. "Willful"

13  means that Defendants acted with a purpose or willingness to commit the act or engage in the

14  conduct in question, and the conduct was not reasonable under the circumstances at the time

15  and was not undertaken in good faith. "Malicious" means that Defendants acted with an

16  intent to cause injury, or that Defendants conduct was despicable and was done with a willful

17  and knowing disregard for the rights of others.  If willful and malicious trade secret

18  misappropriation exists, both CUTSA and DTSA allow punitive damages up to two times

19  any damages award.  Cal. Civil Code § 3426.3 and 18 U.S.C. § 1836(b)(3)(C). If willful and

20  malicious misappropriation exists, CUTSA and DTSA also allow recovery of attorneys' fees

21  and costs.  *See* § 3426.4 and 18 U.S.C. § 1836(b)(3)(D).  In addition to attorneys' fees, Space

22  Data is also eligible to receive reasonable expert fees under CUTSA § 3426.4.  Space Data

23  also seeks pre-judgment and post-judgment interest on damages caused to them by reason of

24  Defendants' misappropriation at the maximum legal rates provided by statute or the law.

25  *See* also Responses to Interrogatories 6, 7, 8, 15, and 16.

26  Dated: July 13, 2018            Respectfully submitted,

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:      */s/ Spencer Hosie*
SPENCER HOSIE (CA Bar No. 101777)
shosie@hosielaw.com
DIANE S. RICE (CA Bar No. 118303)
drice@hosielaw.com
LYNDSEY C. HEATON (CA Bar No. 262883)
lheaton@hosielaw.com
BRANDON C. MARTIN (CA Bar No. 269624)
bmartin@hosielaw.com
DARRELL R. ATKINSON (CA Bar No. 280564)
datkinson@hosielaw.com
HOSIE RICE LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111
(415) 247-6000 Tel.
(415) 247-6001 Fax

*Attorneys for Plaintiff*
*SPACE DATA CORPORATION*

1

## CERTIFICATE OF SERVICE

2         I, Darrell R. Atkinson, am a citizen of the United States and am employed in the

3   County of San Francisco, State of California.  I am over the age of 18 years and am not a

4   party to the within action.  My business address is Hosie Rice LLP, 600 Montgomery Street,

5   34th Floor, San Francisco, California, 94111.

6         On July 13, 2018, I served the following:

7

8   **PLAINTIFF SPACE DATA CORPORATION'S JULY 13, 2018 AMENDED RESPONSES TO DEFENDANT GOOGLE LLC'S S INTERROGATORIES NOS. 12, 15, 16, 17, 19, 20 & 23**

9

10   by email at San Francisco, California, addressed to the following parties:

11   Robert A. Van Nest
     Christa M. Anderson
12   Matthew M. Werdegar
     Eugene M. Paige
13   Matthias A. Kamber
     Ryan K. Wong
14   Thomas E. Gorman
     Leah Pransky
15   Andrew S. Bruns
     Shayne Henry
16   Keker, Van Nest & Peters LLP
17   633 Battery Street
     San Francisco, CA 94111-1809
18   rvannest@keker.com
19   canderson@keker.com
     mwerdegar@keker.com
20   epaige@keker.com
     mkamber@keker.com
21   rwong@keker.com
     tgorman@keker.com
22   lpransky@keker.com
23   abruns@keker.com
     shenry@keker.com
24   LOON-KVN@kvn.com

25   *Attorneys for Defendants*
     *Alphabet Inc. and Google LLC.*
26

27

28

1          I certify under penalty of perjury under the laws of the State of California that the

2   foregoing is true and correct.

3   DATED: July 13, 2018                     */s/ Darrell R. Atkinson*

4                                         Darrell R. Atkinson