SPENCER HOSIE (CA Bar No. 101777)
shosie@hosielaw.com
DIANE S. RICE (CA Bar No. 118303)
drice@hosielaw.com
BRANDON C. MARTIN (CA Bar No. 269624)
bmartin@hosielaw.com
DARRELL R. ATKINSON (CA Bar No. 280564)
datkinson@hosielaw.com
FRANCESCA M. S. GERMINARIO (CA Bar No. 326208)
fgerminario@hosielaw.com
HOSIE RICE LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111
(415) 247-6000 Tel.
(415) 247-6001 Fax

*Attorneys for Plaintiff*
*SPACE DATA CORPORATION*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| SPACE DATA CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> ALPHABET INC., GOOGLE LLC, and LOON LLC, <br><br> Defendants. | Case No. 5:16-cv-03260-BLF (NC) <br><br> **REFILED (PER COURT ORDER ECF NO. 630): SPACE DATA CORPORATION'S OPPOSITION TO DEFENDANTS' MOTION TO QUASH TRIAL SUBPOENAS AND EXHIBITS 7, 8, 14, 16, 17, 19 & 20 THERETO** <br><br> Courtroom:  3, Fifth Floor <br> Judge:       Hon. Beth Labson Freeman <br> Date Filed:  June 13, 2016 <br> Trial Date:  Not Set |

*Hosie Rice LLP*
*600 Montgomery Street, 34th Floor*
*San Francisco, CA  94111*

SPENCER HOSIE (CA Bar No. 101777)
shosie@hosielaw.com
DIANE S. RICE (CA Bar No. 118303)
drice@hosielaw.com
BRANDON C. MARTIN (CA Bar No. 269624)
bmartin@hosielaw.com
DARRELL R. ATKINSON (CA Bar No. 280564)
datkinson@hosielaw.com
FRANCESCA M. S. GERMINARIO (CA Bar No. 326208)
fgerminario@hosielaw.com
HOSIE RICE LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111
(415) 247-6000 Tel.
(415) 247-6001 Fax

*Attorneys for Plaintiff*
*SPACE DATA CORPORATION*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| SPACE DATA CORPORATION,<br><br>                    Plaintiff,<br><br>v.<br><br>ALPHABET INC., GOOGLE LLC, and<br>LOON LLC,<br><br>                    Defendants. | Case No. 5:16-cv-03260-BLF (NC)<br><br>**PLAINTIFF SPACE DATA<br>CORPORATION'S OPPOSITION TO<br>DEFENDANTS' MOTION TO QUASH<br>TRIAL SUBPOENAS**<br><br>Courtroom:  3, Fifth Floor<br>Judge:      Hon. Beth Labson Freeman<br>Date:       July 19, 2019<br>Time:       9:00 a.m.<br><br>Date Filed:  June 13, 2016<br>Trial Date:  August 5, 2019 |

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**I.**      **INTRODUCTION, SUMMARY, AND ISSUES PRESENTED.**

Three weeks before trial, Google filed a motion on shortened time to quash the trial subpoenas for Larry Page and Sergey Brin.  Brin was subpoenaed for trial a year ago, and both Page and Brin were long since listed as Space Data trial witnesses.  Google made no mention of its intent to file a motion to quash as the parties spent weeks crafting their Joint Pre-Trial Statement (filed June 14, 2019).  For that matter, Google counsel asked Space Data to provide a concrete date certain for the Page/Brin trial testimony; as Google put it then, "[b]locking out the full trial period on their schedules is not possible."  *See* § II, below.  Space Data did so.  *Id.*  Why this expedited motion now?

On the merits, it is not Space Data's obligation to prove that these local and available witnesses should honor their trial subpoenas; it is Google's burden to show that they should not.  *See* § III (Law), below.  Google has not even tried to make that showing, which would normally require affidavits from Messrs. Page and Brin demonstrating unreasonable burden.

Both Page and Brin have unique knowledge central to the case.  Both went to intimate meetings with Space Data in Mountain View.  Both participated in multiple internal small meetings about <mark>acquiring Space Data</mark>.  Both went to Space Data's facility in Chandler, and spent the better part of the day there.  Every Google witness except Larry Page says Page personally made the decision to ███████████████████████████.  Larry Page ████████████████, and ████████████████████ ███████████████ And in its Summary Judgment briefing, Google asserted that Google ███████████ because "it was not impressed with Space Data's ███████████," citing and relying on Mr. Page's deposition testimony.  Space Data is entitled to have a jury assess the relative credibility of Google witnesses.

Finally, a deposition is no substitute for live trial testimony.  Perhaps both Page and Brin will remember nothing about anything.  Fine; let them so tell the jury, and let the jury assess their credibility.  No person is above the law.  Messrs. Page and Brin work twelve minutes away from the Courthouse.  Both should honor the process and appear.

II.       **THE RECORD**.

On April 9, 2018, Space Data served a deposition notice for Larry Page and a deposition notice for Sergey Brin.  Given their prominence, Space Data agreed to limit each deposition to 3.5 hours.  Google did not file an "apex" motion to quash, and duly produced both deponents for deposition in Palo Alto (they did not want to travel to San Francisco).

Space Data deposed Page on June 27, 2018.  His deposition started at 12:49 p.m. and ended at 3:25 p.m.  The pace was brisk, and the transcript is 135 pages long.

Space Data deposed Sergey Brin on July 23, 2018.  This deposition was shorter, as Google observes.

Space Data then served trial subpoenas for both (Brin on July 23, 2018; Page on March 6, 2019).  *See* Declaration of Spencer Hosie ("Hosie Dec."), Exs. 4 & 5.  Google accepted the trial subpoenas for both, but reserved its right to challenge the subpoenas, as Google points out.  Google counsel then said, "we would like to confer with you to identify the trial days for which Mr. Page and Mr. Brin would need to appear.  Blocking out the full trial period on their schedules is not possible."  Hosie Dec., Ex. 6 (Email from Werdegar to Hosie, March 1, 2019).

In early April, this Court heard argument on Google's Motion for Summary Judgment.  Both parties' briefs discussed Brin and Page's direct personal involvement, Space Data's brief particularly.  *See* Hosie Dec., Exs. 7 (Google Summ. J. Br.) at 16:6-8 & 22:13-26; 8 (Space Data's Summ. J. Opp.) at 1:17-24, 2:14-3:1, 3:20-4:2, 4:19-4:27, 5:9-14, 7:1-7, 11:5-6, 11:15-18, 13:1-3 & 25:21-23; 9 (Google Summ. J. Reply) at 10:2-5.  The Court issued an Order thereafter, and the Order itself sets out Mr. Page's personal involvement on the issues now going to trial.  *See* Hosie Dec., Ex. 10 at 5:27-6:4, 6:19-20, 6:24-26, 15:23-26, 16:21-26 & 17:10-12.

Given this Order, Space Data counsel wrote to confirm that Google would call Mr. Page at least in Google's case-in-chief.  *See* Hosie Dec., Ex. 11 (Hosie Email to Werdegar, May 10, 2019).  Google responded that "Google does not **currently** plan to do so, but reserves the right to do so depending [sic] as a rebuttal witness depending on Space Data's case in chief."  *See* Hosie Dec., Ex. 12 (Kamber Email to Hosie, May 13, 2019) (emphasis added).  Space Data counsel

2

1   immediately responded, "Ok.  We will call in ours."  *See* Hosie Dec., Ex. 13 (Hosie Email to

2   Kamber, May 13, 2019).

3          Beginning in early April, the parties began an elaborate meet and confer process to craft a

4   Joint Pre-Trial Statement.  *See* Hosie Dec., ¶ 2.  From its April draft witness list forward, Space

5   Data listed both Page and Brin as adverse trial witnesses in Space Data's case-in-chief.  *See*

6   Hosie Dec., ¶¶ 2, 5 & 7; *see also* Hosie Dec., Ex. 14.  Over multiple exchanges, many weeks,

7   and multiple meet and confer sessions, Google not once mentioned that it intended to file a last-

8   minute motion to quash the Page and Brin trial subpoenas.  *See* Hosie Dec., ¶¶ 2-8.  Space Data,

9   however, noted during the parties' June 6, 2019 in-person pre-trial meet and confer conference

10  that Space Data anticipated calling Page and Brin on August 9, 2019.  *See* Hosie Dec., Ex. 22

11  (Atkinson Email to defense counsel, June 20, 2019).  Space Data re-confirmed its anticipated

12  scheduling of Page and Brin's appearances two weeks later.  *See id*.

13         There matters rested until July 10, 2019, approximately three weeks before trial, and

14  about a month after the parties' filed Joint Pre-Trial Statement—in which Space Data mentions

15  Page 11 times, and Brin 6 times.  *See* Hosie Dec., ¶¶ 6-8.  On that day, Google counsel emailed

16  Space Data saying that Google wanted to file a motion to quash on shortened time, and asked

17  Space Data to agree.  *See* Hosie Dec., ¶ 8.  Appreciating that this issue needs to be resolved, and

18  given that the parties are in Court this coming Friday, Space Data took the high road and so

19  agreed.

20  **III.    THE LAW.**

21         Google bears the burden on its motion to quash.  *See Sec. & Exch. Comm'n v. Mozilo*,

22  No. CV 09-3994-JFW (MANx), 2010 WL 11468959, at *3 (C.D. Cal. Oct. 7, 2010) ("The

23  burden of persuading the court that a subpoena must be quashed on the ground of 'undue burden'

24  rests with the moving party") (citations omitted).  "To meet that burden, [Google] 'cannot rely

25  on a mere assertion that compliance would be burdensome and onerous without showing the

26  manner and extent of the burden and the injurious consequences of insisting upon compliance

27  with [Space Data's] subpoena[s].'"  *Id*. (citations omitted); *cf. Updateme Inc. v. Axel Springer*

28

3

1  *SE*, No. 17-cv-05054-SI (LB), 2018 WL 5734670, at *2 (N.D. Cal. Oct. 31, 2018) ("The

2  defendants here, who bear the burden in preventing [C.E.O.'s] deposition, have not made a

3  similar showing: unlike the CEO and chairman in *Celerity*, [defendant's C.E.O.] has not

4  submitted any declarations …").

5     Google's apex argument does not relieve Google of its burden.  *Cf. Finisar Corp. v.*

6  *Nistica, Inc*., No. 13-cv-03345-BLF (JSC), 2015 WL 3988132, at *2 (N.D. Cal. Jun. 30, 2015)

7  ("Even when the apex doctrine is at issue, however, 'the burden remains on the party' seeking to

8  avoid the deposition.'… A claimed lack of knowledge, by itself, or the fact that the apex witness

9  has a busy schedule, are both insufficient bases to foreclose otherwise proper discovery"); *Apple*

10 *Inc. v. Samsung Elec. Co., Ltd*., 282 F.R.D. 259, 263 (N.D. Cal. 2012) ("'When a witness has

11 personal knowledge of facts relevant to the lawsuit, even a corporate president or CEO is subject

12 to deposition'").

13    A plaintiff's failure to depose a witness weighs **in favor** of granting a motion to quash a

14 trial subpoena.  *See Amazon.com, Inc. v. Comm'r of Internal Revenue, T.C. Memo*. 2014-245,

15 No. 31197-12, 2014 WL 6980512, at *4 (T.C. Dec. 10, 2014) ("Respondent did not seek to

16 depose Mr. Bezos [Amazon's C.E.O.] and indicated that Mr. Bezos might not be called even if

17 the motion to quash were denied") (quashing subpoena to testify at trial) (cited by Google); *Plew*

18 *v. Ltd. Brands, Inc*., No. 08 Civ. 3741(LTS)(MHD), 2012 WL 379933, at *3 (S.D.N.Y. Feb. 6,

19 2012) ("Plaintiff has already deposed two senior executives with knowledge of the product, but

20 has made no effort to depose [Victoria Secret's C.E.O.]") (granting motion preventing C.E.O.

21 from testifying at trial) (cited by Google).

22    Not one case Google cites—and we are aware of none otherwise—supports the idea that

23 an apex witness with personal knowledge of relevant facts who has been deposed should not

24 come to trial and testify.  Most of the cases Google cites involve product-liability cases in which

25 the apex witness knows nothing about the particular facts and circumstances at issue.  Just the

26 opposite is true here.  Indeed, courts reject the argument that sitting for a deposition relieves a

27 witness from attending trial.  *See Cartagena v. Serv. Source, Inc*., No. 1:17-CV-742, 2019 WL

28

4

355728, at *4 (M.D. Penn. Jan. 29, 2019) (rejecting defendant's argument that its C.E.O. should not have to appear at trial because she "was deposed and [] her deposition testimony should be sufficient"); *Mozilo*, 2010 WL 11468959, at *1 (requiring non-party, former Chief Risk Officer, to testify at trial where non-party had testified for 14.5 hours over two deposition days in the action, and where non-party had testified for 5 days in another S.E.C. investigation).  This is not surprising, given the strong presumption in favor of live trial testimony:

> In the conduct of the trial itself, any jury would prefer to see and hear important witnesses in person.  In this way, the jury can better assess demeanor and credibility.  And, live testimony is easier to follow and comprehend than deposition read-ins or video clips.  The difficulty is exacerbated by the fact that depositions are often taken before certain fact issues gather importance.  They may, therefore, not fully address points decisive to the jury.  Live testimony, therefore, always is to be preferred over deposition excerpts.

*Mozilo*, 2010 WL 11468959, at *4, quoting *In re Funeral Consumers Antitrust Litig.*, 2005 WL 2334362, *6 (N.D. Cal. Sep. 23, 2005); *see also* Fed. R. Civ. P. 43(a) ("At trial, the witnesses' testimony must be taken in open court unless a federal statute, the Federal Rules of Evidence, these rules, or other rules adopted by the Supreme Court provide otherwise").

Where a high-ranking executive has unique personal knowledge relevant to a case, he or she should be compelled to testify.  *See, e.g.*, *Apple*, 282 F.R.D. at 265 ("In light of the evidence proffered … that [Samsung's C.E.O.] was at the head of a strategic shift … at precisely the [relevant] time … the court is similarly persuaded that [C.E.O.] may have engaged in the 'type of **hands-on action** which demonstrates the unique personal knowledge required …'") (emphasis added) (compelling deposition); *id.* at 267 (finding that emails in which a Samsung Executive Vice President ordered side-by-side comparison of products, "suggest[ed] at least one area in which [Executive Vice-President] [sic] has unique, firsthand knowledge (**of his own intent and meaning in issuing such a directive**) that cannot be supplied by other means") (emphasis added) (compelling deposition); *id.* at 268 ("[Samsung Senior Vice-President], **as the sender, is likely to have his own unique knowledge of what he intended by his comments and questions**") (emphasis added) (compelling deposition); *Updateme*, 2018 WL 5734670, at *2 (denying protective order as to defendant's C.E.O.'s deposition where it appeared the C.E.O. had

5

1  "unique first-hand, non-repetitive knowledge (**including about his 'vision'** …") (emphasis

2  added); *see also Opperman v. Path, Inc*., No. 13-cv-00453-JST, 2015 WL 5852962, at *2 (N.D.

3  Cal. Oct. 8, 2015); *Finisar*, 2015 WL 3988132, at *3; *Oracle Am. Inc. v. Google Inc*., No. C-10-

4  03561-WHA (DMR), 2011 WL 12675492, at *1 & 1 n.1 (N.D. Cal. Jul 21, 2011).

5  ## IV.   PAGE AND BRIN HAVE UNIQUE, PERSONAL KNOWLEDGE.

6  The apex doctrine is designed, for example, to prevent someone from deposing Elon

7  Musk in a lemon law case about a defective Tesla.  Leveraging a case by leveraging an involved

8  C.E.O. of a big company is a dubious tactic and obviously improper.

9  That is not what is happening here.  Both Page and Brin—particularly Page—were

10  intimately involved in events central to the trial of this case.  *See* Hosie Dec., Exs. 7 at 16:6-8 &

11  22:13-26; 8 at 1:17-24, 2:14-3:1, 3:20-4:2, 4:19-4:27, 5:9-14, 7:1-7, 11:5-6, 11:15-18, 13:1-3 &

12  25:21-23; 9 at 10:2-5; 10 at 5:27-6:4, 6:19-20, 6:24-26, 15:23-26, 16:21-26 & 17:10-12; *see also*

13  Hosie Ex. 15 (DeVaul Dep.), 133:1-134:24 (Richard DeVaul describing Brin as ▮▮▮▮▮▮▮▮

14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ They went to the meetings, went to Space Data, and made

15  the decisions that now actuate this case.  They have unique personal knowledge directly on point,

16  including what they in fact thought of the technology, why Google ▮▮▮▮▮▮▮, what they did

17  to try to develop Google's own balloon technology, why they approved Loon ▮▮▮▮▮▮ and so

18  forth.

19  As one specific but telling illustration: Google argued in its Summary Judgment brief that

20  ▮▮▮▮▮▮▮▮▮▮ because it was not impressed by the Space Data ▮▮▮▮▮▮▮▮▮.  It

21  cites Larry Page's testimony in support.  *See* Hosie Dec., Ex. 7 at 16:6-8.  But, if this were so,

22  why did ▮▮▮▮▮▮ Google's own Dylan Casey to roll-out an SDC-like Google Loon

23  ▮▮▮▮▮▮▮▮▮▮▮ just several months after Google said no to Space Data?  *See*

24  Hosie Dec., Ex. 8 at 3:23-4:2.  Page hated the technology when owned by Space Data, but loved

25  the idea of rolling out its own balloon constellation.  These things are directly in conflict, and

26  Page personally is central to both.

27  Brin was also behind the balloon project idea ▮▮▮▮▮▮▮▮▮▮.  *See* Hosie Dec. Ex.

28

1   16 at GOOG-SD-00146296 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2   ▮▮▮▮▮▮▮).  And his email contradicts the story that Google ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3   ▮▮▮▮▮▮▮▮▮▮▮   *See* Hosie Dec. Ex. 17 at GOOG-SD-00146076 ▮▮▮▮▮▮▮▮

4   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5   ▮▮▮▮▮▮▮▮▮▮▮).

6        By way of further example, Page and Brin emailed with former Google X head Sebastian

7   Thrun about Space Data.  In 2010, Page asked Thrun to ▮▮▮▮▮▮▮▮▮▮ and told

8   Thrun about SDC, including that SDC could ▮▮▮▮▮▮▮▮▮balloons and that the

9   balloons were ▮▮▮▮  *See* Hosie Dec. Ex. 18 at GOOG-SD_00157990; *see also* Hosie Dec., Ex.

10  19 at GOOG-SD-00288341.  In August 2011, Brin emailed Thrun: ▮▮▮▮▮▮▮▮▮▮

11  ▮▮▮▮▮▮▮▮▮▮▮▮ Thrun then forwarded this Brin email to alleged

12  Loon inventor Richard DeVaul, with the message ▮▮▮▮▮▮▮▮  *See* Hosie Dec., Ex.

13  20 at GOOG-SD-00288350.  Page and Brin's testimony about these events is particularly

14  important, given that Space Data will not be calling Thrun, since Space Data was not able to

15  depose this apex non-party witness.  *See* Order Re: Thrun Deposition (ECF 271); Order Denying

16  Plaintiff's Request to Compel Discovery from Witness Sebastian Thrun (ECF 327).

17        Both parties recognize that Brin and Page are important trial witnesses.  For example,

18  Space Data has 147 trial exhibits where Page or Brin are the sponsoring trial witnesses.  Google

19  itself has 98 documents where Page or Brin are the sponsoring trial witnesses.  *See* Hosie Dec., ¶

20  9.

21        Both Page and Brin are directly involved, with unique personal knowledge.  The

22  knowledge being unique, and the case being at the trial stage, it cannot be obtained by other

23  means.  If a sitting U.S. President can be deposed, a tech mogul cannot testify?  *See Clinton v.*

24  *Jones*, 520 U.S. 681 (1997).

25  **V.**   **A DEPOSITION IS NO SUBSTITUTE FOR TRIAL TESTIMONY.**

26        Google cites no case that stands for the proposition it claims; specifically, that taking a

27  deposition tilts towards precluding subsequent trial testimony.  The law is to the contrary.  *See* §

28

7

III (Law), above.

A deposition is not trial testimony.  It is taken in a different forum and for a different purpose.  With a local witness well within the subpoena power, a capable trial lawyer takes a deposition to frame trial testimony, not replace trial testimony.  So it was here.  *See, e.g.,* Hosie Dec., Ex. 21 (Brin Dep.), 66:25-67:2 ("Mr. Hosie:  All right.  I am going to end this now on the assumption that we will have you [Brin] for trial").

## VI.   <u>WHY NOW?</u>

Just to ask this question is to answer it.

## VII.   <u>CONCLUSION</u>.

For the reasons set forth above, Google's motion should be denied.

Dated:  July 17, 2019                    Respectfully submitted,

*Spencer Hosie*
SPENCER HOSIE (CA Bar No. 101777)
shosie@hosielaw.com
DIANE S. RICE (CA Bar No. 118303)
drice@hosielaw.com
BRANDON C. MARTIN (CA Bar No. 269624)
bmartin@hosielaw.com
DARRELL R. ATKINSON (CA Bar No. 280564)
datkinson@hosielaw.com
FRANCESCA M. S. GERMINARIO (CA Bar No. 326208)
fgerminario@hosielaw.com
HOSIE RICE LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111
(415) 247-6000 Tel.
(415) 247-6001 Fax

*Attorneys for Plaintiff*
*SPACE DATA CORPORATION*

8

# EXHIBIT 7

# REDACTED VERSION OF DOCUMENT

KEKER, VAN NEST & PETERS LLP
ROBERT A. VAN NEST - # 84065
rvannest@keker.com
MATTHEW M. WERDEGAR - # 200470
mwerdegar@keker.com
EUGENE M. PAIGE - # 202849
epaige@keker.com
MATTHIAS A. KAMBER - # 232147
mkamber@keker.com
RYAN K. WONG - # 267189
rwong@keker.com
LEAH PRANSKY - # 302246
lpransky@keker.com
SHAYNE HENRY - # 300188
shenry@keker.com
ANDREW S. BRUNS - # 315040
abruns@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:     415 397 7188

Attorneys for Defendants
ALPHABET INC., GOOGLE LLC, and LOON LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| SPACE DATA CORPORATION,<br><br>                Plaintiff,<br><br>        v.<br><br>ALPHABET INC., GOOGLE LLC, and<br>LOON LLC,<br><br>                Defendants. | Case No. 5:16-cv-03260-BLF<br><br>**DEFENDANTS' CORRECTED NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>Date:          April 11, 2019<br>Time:         9:00 a.m.<br>Dept.:         Courtroom 3 – 5th Floor<br>Judge:        Hon. Beth Labson Freeman<br><br>Date Filed:  June 13, 2016<br><br>Trial Date:  August 5, 2019 |

**UNREDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

to" Google); *see also id.*, Exs. A–C.  All told, Google's visit to Space Data lasted approximately

four and a half hours, lunch included.  Ex. 16 (Knoblach 30(b)(6) Depo. Tr.) at 324:1–4, 328:18–

20; Ex. 13 (Barkley Depo. Tr.) at 97:9–19.

Shortly after Google's visit, on February 24, 2008, Google informed Space Data that it

was not interested in engaging in further discussions for the foreseeable future.  Ex. 17 at GOOG-

SD-00146120; Ex. 12 (Pearson Depo. Tr.) at 225:16–226:19.  Google ended negotiations because

it was not impressed with Space Data's team or technology.  *See* Ex. 18 (Page Depo. Tr.) at

22:15–23:20; *see also* Ex. 19 at GOOG-SD-00157611; Ex. 12 (Pearson Depo. Tr.) at 229:3–22.

And with Google having been outbid in the spectrum auction, there was ██████████████████

███████████████████████████████████  Ex. 20 at GOOG-SD-00146286;

Ex. 12 (Pearson Depo. Tr.) at 235:9–237:2.  Also, Google believed that Space Data had leaked

Google's interest in the company to the Wall Street Journal in violation of the NDA.  *See* Ex. 17

at GOOG-SD-00146120; Ex. 19 at GOOG-SD-00157611; Ex. 20 at GOOG-SD-00146286; Dkt.

No. 344-1 (NDA) ¶ 4 (requiring parties to keep confidential "the fact that discussions or

negotiations between the Parties to this Agreement are taking or have taken place").

In July 2011, years after the termination of Google's discussions with Space Data,

Google's "X" research and development group began to assess the viability of providing wireless

internet service to underserved areas of the world via balloons in the stratosphere.[5]  Richard

DeVaul, who came to Google from Apple in 2011, was the initial engineer to work on the project.

The project eventually became "Loon."  *See* Ex. 21 (Teller Depo. Tr.) at 42:7–44:25, Ex. 22

(DeVaul Depo. Tr.) at 7:23–8:2, 20:22–23:6, 25:16–28:12; *id*. Ex. 23 (Biffle Depo. Tr.) at 5:14–

---

[5] The general *idea* of using balloons to provide internet services—an idea that Space Data does

not claim to have originated—appeared on a list of ideas for possible X investigation in late 2009.

*See* Ex. 27; Ex. 21 (Teller Depo. Tr.) at 23:16–24:20.  But it remained just an idea on X's ideas

list—█████████████████████████████████████████████████████████

████████████████████████████████ well into 2011.  *See* Ex. 28; Ex. 21 (Teller Depo. Tr.)

at 35:10–15, 37:5–21.

25–28.  But Space Data acknowledges that this idea never went anywhere.  *Id.* at 28.  And Space

Data fails to offer any evidence that anyone inside Google used or disclosed any of Space Data's

asserted trade secrets or alleged confidential information in connection with this short-lived idea.

The closest Space Data comes is its citation to a July 1, 2008 email from Minnie Ingersoll, ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

"[i]n this email, Ingersoll forwarded a link to the Google Wiki" for Space Data, and further

asserts that this wiki "contained all of the Space Data confidential and highly confidential

information Google had secured through its due diligence[.]"  *Id.* at 27.  But, as discussed, Space

Data's claims concerning the contents of the wiki are inaccurate.  Other than stale financial

statements, the wiki does not contain any Space Data asserted trade secrets or other confidential

information.  *See* Hansman Decl., Ex. A ¶¶ 342–58.

    Space Data also points to a handful of documents and emails from 2009 through 2011

indicating that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and that the idea was one of many on a list to be considered by

Google X.  Ex. 31 (Rog. 14 Response) at 28.  But, again, the idea of using balloons for wireless

communications is not claimed by Space Data to be a trade secret or even confidential.  *See, e.g.,*

Ex. 9 (Knoblach 30(b)(6) Depo Tr.) at 156:20–25.  And far from establishing any improper use of

any of Space Data's asserted trade secrets or any other confidential information, the emails to

which Space Data points reflect Google's consideration of only ***public*** information about Space

Data.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*See* Ex. 34 at GOOG-SD-00288341; Ex. 35; Ex. 18 (Page Depo. Tr.) at 111:20–118:10.

Likewise, when ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Ex. 31 (Rog. 14 Response) at

28; Ex. 36; Ex. 37 (Alder Depo. Tr.) at 259:12–20.

    Next, Space Data points to Google's consideration in early 2011 ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *See* Ex. 31

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KEKER, VAN NEST & PETERS LLP

Dated: January 15, 2019                        By:   /s/ *Robert A. Van Nest*

ROBERT A. VAN NEST
MATTHEW M. WERDEGAR
EUGENE M. PAIGE
MATTHIAS A. KAMBER
RYAN K. WONG
LEAH PRANSKY
SHAYNE HENRY
ANDREW S. BRUNS

Attorneys for Defendants
ALPHABET INC., GOOGLE LLC, and
LOON LLC

DEFENDANTS' CORRECTED NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT
Case No. 5:16-cv-03260-BLF

# EXHIBIT 8

# REDACTED VERSION
# OF DOCUMENT

SPENCER HOSIE (CA Bar No. 101777)
shosie@hosielaw.com
DIANE S. RICE (CA Bar No. 118303)
drice@hosielaw.com
BRANDON C. MARTIN (CA Bar No. 269624)
bmartin@hosielaw.com
DARRELL R. ATKINSON (CA Bar No. 280564)
datkinson@hosielaw.com
HOSIE RICE LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111
(415) 247-6000 Tel.
(415) 247-6001 Fax

*Attorneys for Plaintiff*
*SPACE DATA CORPORATION*

**UNREDACTED VERSION
OF DOCUMENT SOUGHT
TO BE SEALED**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| SPACE DATA CORPORATION, | Case No. 5:16-cv-03260-BLF |
| Plaintiff, | **PLAINTIFF SPACE DATA CORPORATION'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| ALPHABET INC., GOOGLE LLC, and LOON LLC, | Date: April 11, 2019 |
| Defendants. | Time: 9 a.m. |
| | Courtroom: 3, Fifth Floor |
| | Judge: Hon. Beth Labson Freeman |
| | Date Filed: June 13, 2016 |
| | Trial Date: August 5, 2019 |

## I.   INTRODUCTION AND STATEMENT OF ISSUES.

*On Trade Secrets:* Google ignores most of the facts showing misappropriation.  It then debates the few facts it acknowledges.  On the record, the evidence proves that Google misappropriated Space Data's ("SDC") trade secrets and breached the NDA.

*On '193 Infringement:* Without admitting as much, Google raises a new claims contention on summary judgment.  It now says that the term "relative location" must be determined via a "vector," which it defines as the "distance and direction" between balloons.  But the claims do not mention a "vector."  Nor distance.  Nor direction.  Google's new claims construction comes too late, violates the Patent Local Rules, contradicts Google's position in claims, and wars with this Court's construction of the larger phrase including the words "relative location."

*On Willfulness:* Google overlooks that it is being sued on the patent it wrote to protect Loon.  When Google owned these claims, they were valid and covered Loon.  Now that SDC owns them, they are invalid and do not cover Loon.  Willfulness is always a **factual** inquiry; Google simply ignores the facts it finds inconvenient.

## II.   STATEMENT OF THE FACTS.

*In the Beginning:* In fall 2007, SDC met several times with Google, including two meetings with Brin and Page.  Ex. 42 (all "Ex." cites are to the Hosie Dec.).  Google planned to bid on FCC spectrum and thought that SDC could build-out the spectrum quickly.  Ex. 43.

Google's interest changed.  By November, both Brin and Page concluded that Google should ██████, spectrum results regardless.  Ex. 44 (Google emails) ("██████████████

███████████████████████████████████████

██████████████████████████████████

██████████████████████

Minnie Ingersoll, a Harvard MBA, led Google's team.  In late November, Ingersoll asked Mike Pearson—Corp. Dev.—to move SDC into "formal deal terms."  Ex. 45.  The parties signed Google's NDA as of December 1, 2007.  Pearson then asked SDC for confidential data so that Google could conclude its diligence.  Ex. 46.

In December, Ingersoll asked SDC for a final technical meeting at the SDC facility in Arizona.  Ex. 47.  Ingersoll also built a "Wiki" page—an internal Google website—to host all of the confidential SDC information Google had and would receive, including Google notes.  Ex. 48.  Ingersoll sent the Wiki address to every member of ██████████████oup, even those having nothing to do with SDC.  Ex. 49.

The Wiki was replete with confidential SDC information, including financials, customers and revenue, valuations, and technical use cases.  The Wiki excerpted and quoted portions of highly confidential SDC documents.  *See* Ex. 50.

Ingersoll also pressed Pearson to circulate an acquisition term sheet: "Mike … Can we push forward towards agreeing on a price?  Is it realistic that we could have a draft term sheet by the end of next week?"  Ex. 51.

From December 4th forward, SDC participated in many technical conference calls.  *See e.g.,* Ex. 52.  Google then uploaded or linked what it learned to its Wiki site.  *See e.g.,* Ex. 53.

The parties set the final technical meeting for February 15, 2008.  Just prior, Ingersoll asked Google engineer Phil Gossett to upload to the Wiki the details of Gossett's conversations with Page about how Google could use the SDC technology (known internally as "██ ██████████████████).  Ex. 54.



Gossett did so, writing that ████████████████████ ████████████████████████████████ ████████████████ Ex. 55 (emphasis ours).  Gossett said, ███████████ ████████████████ *Id.* (emphasis ours).  Gossett said that the balloon constellations would "float with the prevailing winds," and so not "require huge amounts of power."  *Id.*

Page's conclusion on how Google could use SDC's technology included:



*Id.* (emphasis ours).  These Page-Gossett points later surfaced in Loon's presentation to secure

1    Google approval and funding for Loon.  *See* below.

2          In preparing for the SDC tour, Ingersoll enlisted many of her Access team members in

3    reviewing SDC confidential information, several of whom would work directly on Loon later.

4    Ex. 56 (*e.g.,* Alec Proudfoot; Ryan Falor).

5          ***The February 2008 Tour:*** Google brought five cameras to the tour.  Germinario Dec, ¶

6    3.  Prior to the tour, Ingersoll promised that she and others would take "good notes."  Ex. 57.

7    The photos show five Google employees with notebooks or laptops, including one actually

8    taking notes.  Germinario Dec., ¶ 11.  One engineer, McCloskey, admitted that he took notes, but

9    said he later destroyed them.  Ex. 58.  (Google produced no notes).  Google produced only some

10   of the photos it took during the tour.  Based on the metadata, numerous images are missing.

11   Germinario Dec., ¶ 3.  Post-tour, one of the lawyers emailed Page some images, saying "these

12   will not be posted or emailed to anyone – **for obvious reasons**."  *See* Ex. 73 (emphasis ours).

13         During the tour, the SDC executives explained SDC's technology in detail.  Ex. 74.  This

14   was not a general press tour; it was unprecedented in SDC's history in the depth of disclosure.

15   Ex. 75; Knoblach Dec., ¶¶ 5 & 7.

16         After the tour, Ingersoll asked her team if Google should buy SDC.  Ex. 76.  On February

17   21, 2008, Google decided to give SDC the "silent treatment," citing anger over a Wall Street

18   Journal article published days earlier.  Ex. 77.  This was pretextual: Google knew about the

19   article before the tour, and its post-visit emails reflect neither anger nor consternation.  Ex. 78;

20   *see also* Knoblach Dec., ¶ 6.  Google team members testified that Page was angry about the

21   article and killed the SDC deal; Page testified that he did not know who killed the SDC

22   acquisition, nor when, nor why.  Ex. 79.

23         ***The Google SDC Birthday Rollout:***  In May 2008, **after** Google said "no" to SDC, ▮▮▮

24   and ▮▮▮ asked Google ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25   ▮▮▮▮▮▮▮▮▮▮▮▮▮ commemorate Google's tenth anniversary (September

26   2008).  Casey emailed members of the Google SDC team, asking for help:

27   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████

Ex. 80 (emphasis ours).  Ingersoll sent the <mark>Wiki</mark> site link to Casey:

> Dylan
>
> ████████████████████████████████████
> ██████████████████████████████████████
> ███████████████████████████████████
> █████████████████████████████████████
> ████████████████████████

*Id.* Casey then emailed Ingersoll to set a meeting for the next day:

> Minnie, Can we meet asap?  I'd like [to] get up to ████████████████
> ████████████████████████████████████████
> ████████████████

*Id.* Casey then asked an odd question: "██████████████████████████████████████

████████████████████████████████ Ex. 81.  Ultimately, the group concluded that Google could not roll-out an SDC network in just two months.

Alder, Conrad, McCloskey, and Ingersoll said that they did not know whether Google had an NDA with SDC.  Ex. 82.  Ingersoll testified that she did not "remember" if she cared if it were proper to share the SDC information with Casey.  Ex. 83.

***2009-2010: Sebastian Thrun and the "X" Hot List:*** Sebastian Thrun co-founded the Google "Moonshot" factory, now "X."  In 2009, X circulated a "hot 100" list of ideas.  A balloon "internet backbone" was on the first page.  Ex. 84.

In 2010, Page asked Thrun to explore a balloon network and told Thrun about SDC, including that <mark>█████████████████████████████████████████████</mark> Ex. 85.  These points were **not** on SDC's public website.  Thrun then contacted Google SDC team members and talked to Brin about SDC.  Ex. 86.

***The Secret Spectrum Survey:*** In February 2011, Google employee Milo Medin concluded that Google ████████████████████████ As Medin put it to Page:

> █████████████████████████████████
> ████████████████████████████
> ██████████████████████████████
> ████████████████████

Ex. 87 (emphasis ours).

**_Richard DeVaul and Loon's Immaculate Conception:_** Astro Teller became the co-head of X in 2009.  In 2011, Teller recruited Apple engineer Richard DeVaul, and DeVaul joined X on June 22, 2011.  DeVaul first worked on an ███████████████.  Thereafter, he met with Thrun and Teller, who told him that ████████████████████████████.  Ex. 88.  DeVaul denied that Teller or Thrun ██████████████████████████████ ███████████████ Ex. 89.

On July 11, 2008, 15 business days after joining X, DeVaul set a meeting to discuss ████████████████████████████████████████████████████████████████████████" Ex. 90.  The next day, DeVaul diagrammed a balloon.  Ex. 91.  (This diagram appeared months later in DeVaul's presentation used with Page to secure Loon approval; _see_ below).  This ████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████. _Id._  No Google documents reflect how DeVaul derived these ideas in days.

On July 28, 2011, DeVaul created a spreadsheet assessing a balloon network.  The spreadsheet largely recounts public information on wireless technology.  But one page of the spreadsheet says that Loon ████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ███████████████████████████," Ex. 50.  No Google documents show DeVaul independently confirming that small balloon fleets would work, that San Francisco could be covered ███████████████████████████ ████████████████ (other conclusions on the spreadsheet **are** footnoted to sources).  DeVaul's conclusions were, in fact, ████████████████████████.  Ex. 93 (Loon co-inventor Biffle: "██████████████████████████████████████").

On August 3, 2011, DeVaul sent a revised invite: ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████

1    ***In a Surprising Meeting, Page Greenlights Loon:***   In November, DeVaul and Teller met

2    ████████████████████████████.  DeVaul's presentation contains ███████████████

3    ████████████████████████████████████████████████████████████████████████

4    ████████████████████████████████   *Compare* Ex. 103 *with* Ex. 104.  Page ████████

5    ████████████████████████████████████████████████████████████████████

6    Ex. 105.  Leaving the meeting, ██████████████████████████████████████████

7    ████████████████████████████████████████████   Ex. 106.

8         DeVaul's presentation deck ties directly to SDC confidential information.  Google's Ela

9    Beres worked directly with Larry Alder and Ingersoll in 2011.  On September 27, Ingersoll noted

10   that she ███████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████

12   ████████).  Beres met with DeVaul and Teller, and confirmed that **they** asked her to put together

13   a "quick model" on balloon economics.  Ex. 108.  Beres sent this mail to Ingersoll and Alder.  *Id.*

14   Beres then prepared a spreadsheet with balloon cost and other data and sent the information to

15   DeVaul, Ingersoll, and others.  Ex. 109.  Google's production metadata identifies the

16   "custodians" of this spreadsheet as "Alder" and "Minnie Ingersoll," the prior SDC team leaders.

17   *Id.*

18        Google left its SDC Wiki page up for years.  Its 30(b)(6) witness on the Wiki, Pearson,

19   could not even say whether the Wiki remains up today.  Ex. 110.  Numerous Google employees

20   ████████████████████████████████████████████████████████████████████████

21   ████████.  111.)  At least two of the ████████████████████████████  Ex. 112.  ████████

22   ████████████████████████████████████████████████████████████████████

23   ████████████████████████████████████.  113.  Every full-time Google employee could ████████

24   ████████████████████████████████████████.  114 & 111.

25        Google unveiled Loon in 2013.  Alphabet rolled out Loon as a new company in 2018.  It

26   now competes directly with SDC.  Ex. 115; Knoblach Dec., ¶ 11.

27        ***Loon Patents SDC's Invention:***  In January 2012, Google began filing Loon patent

28   applications.  In the first foundational filing, Google claimed a balloon constellation exploiting

7

1   early Loon engineers.  *See* above, § II.  They all testified that they did not know whether there

2   was an NDA, much less what was confidential and what not.  Are we to believe that these

3   employees then somehow carefully parsed what they told their counterparts, *e.g.* editing out the

4   confidential points?

5          The documents and information chain (█████████████████████████████████

6   █████████████ how that key SDC information migrated ██████, and did so in writing.

7          As initially conceived in the ████████████████████████████████████████

8   inexpensive, and looked exactly like the SDC balloons.  The cost information was the same.

9   And, at a macro level, Loon did and does exactly the same thing that SDC does: flies balloons

10  together using ambient winds alone to provide coverage.  Were these similarities all

11  coincidental?  *Cf. Think Village-Kiwi, LLC v. Adobe Sys., Inc.*, No. C 08-04166 SI, 2009 WL

12  3837270, at *4 (N.D. Cal. Nov. 16, 2009) ("[A] jury could infer from [defendant's] use of

13  [plaintiff's] unique catchphrase that [defendant] used [plaintiff's] confidential information in

14  developing [product]").

15         Google also says that it killed the SDC deal because Page "was not impressed with Space

16  ██████████████████ Br. at 16:7. Why, then, did Page press ██████████████████████

17  ████████ in 2008, just months after the tour? ██████████████████████ Why did he

18  ████████████████████████ Google also says it did not want SDC because it lost the

19  spectrum bid.  But it knew it lost the ████████████████████. Ex. 138.  Google's

20  internal emails say that it wanted SDC regardless of spectrum results.  Ex. 139.

21         The converse matters, too.  Google has no documentary evidence showing independent

22  development.  Where did DeVaul get the idea?  How did he know as of July 28, 2011, as he

23  ██████████████████████████████████████████████████████? Where

24  did he secure the cost information? ███████████████████████? And how

25  did he do this work with only one work product, a diagram on a white board?

26         Nor did Google limit SDC's confidential information to the SDC acquisition process;

27  Google knows how to use a clean room protocol when it wants to.

28         Google lead Ingersoll denied that Google was conducting a due diligence, claimed not to

1    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ There is a straight line from

2    SDC financial disclosures to Google, to Beres, to DeVaul, and then, through the "Daedalus"

3    presentation deck, to Page.  Information recorded is not memory unaided.

4        ***Thermal Management:*** DeVaul conceded that thermal management created serious

5    challenges for stratospheric ballooning.  Ex. 143.  In the tour, SDC walked Google through its

6    disassembled payloads.  Ex. 144.  Google took photographs of those payloads that ▮▮▮▮▮▮▮

7    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Ex. 145.

9    Combinations of these techniques are SDC trade secrets.  *See* Ex. 146 at 4:25-5:9, 5:18-22, 6:3-6.

10   These techniques seem simple, but are actually ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11   ▮▮▮▮▮▮▮▮ Ex. 147 (emphasis ours); *see also id.* ▮▮▮▮▮▮▮▮▮) (emphasis ours);

12   *cf.* Ex. 146 at 6:18-24.

13       Google struggled to ▮▮▮▮▮▮▮▮▮▮ Ex. 148 at 97, ▮▮▮▮▮▮▮▮▮▮▮▮

14   ▮▮▮▮▮▮▮▮, *id.* at 99, which it now uses ▮▮▮▮▮▮▮▮▮▮▮.  *Compare id.* at

15   202 *with* Ex. 149 at Exhibit C at 1 & 3; *see also* Ex. 150. ▮▮▮▮▮▮▮▮▮▮

16   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Ex. 151 ▮▮▮▮▮▮▮

17   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18   ▮▮▮▮▮▮.  Ex. 152.

19       ***The NOC Trade Secrets:*** SDC displayed and Google photographed the data that SDC

20   captures, monitors, and analyzes including: (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22   ▮▮▮▮ Ex. 153 at 9:22-10:9.  Google focused on the ▮▮▮▮▮▮▮▮▮▮▮▮▮

23   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24   ▮▮▮▮▮▮▮▮▮▮▮ Ex. 154 at 19-20 ▮▮▮▮▮▮▮▮▮▮▮▮

25   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The same flights tracked

26   ▮▮▮▮▮▮▮.  *Id.* at 18-19. ▮▮▮▮▮▮▮▮▮▮▮ Ex. 155. ▮▮▮▮

27   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. 156

28   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 157 (flight

1  date for determining which conduct is pre-suit is the date of the patentee's affirmative

2  allegation").  Google may cite *MasterObjects, Inc. v. Google, Inc.*, No. C 11-1054 PJH, 2013

3  WL 12177460 (N.D. Cal. May 2, 2013) to the contrary.  This opinion was pre-*Mentor Graphics*,

4  and is flawed: under that decision, if SDC filed a new '193/'706 case, there would be notice; if it

5  amended its existing '941 complaint, there would not.  This cannot be right.

6        Prior to the TAC, Google knew that SDC accused Loon of infringing issued patents;

7  Google had pre-suit notice.  *See* Ex. 199.  Even short notice is notice enough.  *See Nat'l Presto*

8  *Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1193 (Fed. Cir. 1996) (complaint filed the day

9  patent issued could assert willfulness given "several months' advance notice" of the issue date);

10  *see also Malibu Boats, LLC v. MasterCraft Boat Co., LLC*, No. 3:16-cv-82-TAV-HBG, 2016

11  WL 8286158, at * 3-5 (E.D. Tenn. 2016).

12       ***Post-Suit Conduct is Enough:***  Finally, a willfulness claim may be based solely on post-

13  TAC conduct charged by a subsequent (here the fifth amended) Complaint, as Google knows.

14  *See Word to Info, Inc. v. Google Inc.*, 140 F. Supp. 3d 986, 990 (N.D. Cal. 2015) (cited by

15  Google).  Nor does a plaintiff forfeit a willfulness claim if it does not seek a preliminary

16  injunction.  *See PersonalWeb*, 2017 WL 2180980, at *20.

17       As to the '706, willfulness remains relevant to attorneys' fees even absent damages.  *See*

18  *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1340 (Fed. Cir. 2004).

19  **VII.   <u>CONCLUSION.</u>**

20       Like a fungus in a forest, Google Loon was rooted in confidential information Google

21  learned from SDC.  There is a straight line from SDC confidential disclosures to Google's Wiki,

22  to DeVaul, and then recycled to Page for Loon approval, all nicely now sanitized as an original

23  Google project.

24       On infringement, Google is sidling into a claims dispute while pretending otherwise.

25  Why not ask this Court to construe "relative location" at claims?  How, now, can Google square

26  its "vector" definition with the Court's actual construction?  And how can it do all of this while

27  pretending otherwise?

28  Dated:  February 15, 2019            Respectfully submitted,

1

2
    */s/ Spencer Hosie*
    SPENCER HOSIE (CA Bar No. 101777)
3   shosie@hosielaw.com
    DIANE S. RICE (CA Bar No. 118303)
4   drice@hosielaw.com
    BRANDON C. MARTIN (CA Bar No. 269624)
5   bmartin@hosielaw.com
    DARRELL R. ATKINSON (CA Bar No. 280564)
6   datkinson@hosielaw.com
    HOSIE RICE LLP
7   600 Montgomery Street, 34th Floor
    San Francisco, CA 94111
8   (415) 247-6000 Tel.
    (415) 247-6001 Fax
9
10  *Attorneys for Plaintiff*
    *SPACE DATA CORPORATION*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPP. TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT          Case No. 5:16-cv-03260-BLF

# EXHIBIT 14

# REDACTED VERSION OF DOCUMENT

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

*Space Data Corporation v. Google LLC et al.*
**Case No. 5:16-cv-03260-BLF (NC)**

<u>**Preliminary Plaintiff's Witness List**</u>

Space Data Corporation ("SDC") anticipates calling in its case-in-chief the following witnesses, either live or by deposition.

This list is not a commitment that Plaintiff will call any particular witness at trial, or a representation that any of the witnesses listed are available or will appear for trial.  If any witness is unavailable, Plaintiff reserves the right to use his or her deposition testimony.  Plaintiff reserves the right to call any witness identified as a "will call" witness by designation and vice versa.

Plaintiff also reserves the right to call at trial in its case: (1) any persons identified by Defendants on its witness list live or by deposition; and (2) additional witnesses not identified herein based upon any developments that may occur leading up to and/or during the course of the trial.  These disclosures are made based on the information that is reasonably available to SDC at this time and at this stage of the proceedings.  Plaintiff reserves the right to modify the list depending on the case developments and court rulings.  Further investigation and analysis may yield additional information.  As additional information becomes available, SDC reserves the right to supplement, revise, correct, clarify or otherwise amend these disclosures.

Plaintiff reserves all rights with respect to testimony that would be solely for the purpose of impeachment or rebuttal, or witnesses that would be called solely for impeachment or rebuttal.

This list is provided expressly subject to and without waiving any applicable privileges, protections or other immunities, including the attorney-client privilege and the work-product doctrine.

A.     <u>**Fact Witnesses Who May Be Called in Connection to Plaintiff.**</u>

| Witness | Short Statement of the Substance of Testimony | Will Call/May Call |
|---|---|---|
| Gerald Knoblach | *Gerald Knoblach is the CEO and co-founder of SDC.*  Mr. Knoblach is expected to testify about the concept development, research, planning, and organizational work for SDC; conception and reduction to practice of the inventions claimed in the Patents-in-Suit; reaction to the inventions covered by the Patents-in-Suit; inventorship of the Patents-in-Suit; secondary considerations of non-obviousness as to the Patents-in-Suit within his personal knowledge; the prosecution of the Patents-in-Suit and related | Will call |

1

| | | |
|---|---|---|
| | patents or patent applications, including the '193 Interference and the issuance of certificates of correction; research, development, design, function, and operation of SDC's Practicing Products; SDC meetings with Google; SDC NDAs and NDA with Google; disclosures in the February 19, 2008 email to Mike Pearson re "Space Data/Google Confidentiality Agreement"; trade secrets and confidential information shared with Google; the information identified in Space Data's Fifth Amended 2019.210 Trade Secret Disclosures; wind analysis; research and development of steering balloons, managing a fleet of balloons and/or stationkeeping; thermal management; SDC NOC tours and security; Google's February 2008 tour; post-tour emails, conversations and interactions with Google; steps taken to protect trade secrets and confidential information; specific features of each of the SDC trade secrets, the '193 and '706 patents; competition with Google and the market for SDC's technologies; SDC spectrum; marketing and sales of its product; SDC customers; efforts to provide wireless communications services to Puerto Rico; funding; damages caused by Google's misappropriation of the trade secrets, breach of contract and infringement; the cost of developing SDC's trade secrets; SDC's performance under the parties' NDA; subjects covered in his depositions; information pertaining to topic(s) for which he is a FRCP 30(b)(6) designee; and factual assertions in the FAC. He may also testify concerning documents on the exhibit list that are either authored by or were sent to him or are the subject matter of his declarations submitted in the case; and the maintenance and content of SDC business records on the exhibit list. | |
| George Ritchie | *Mr. Ritchie is the C.F.O. of SDC.*  Mr. Ritchie is expected to testify about SDC's business operations, including costs, logistics, strategy, finances, business and financial planning; SDC financial statements from 2008-present; SDC revenues, costs and profits; SDC development costs and expenses related to trade secrets; the development, contents, purpose and use of the financial model shared with Google; SDC business plans for providing broadband communications services to commercial customers from 2008-present; SDC's technology, finances, business relationships; funding; SDC's efforts to maintain the secrecy of its proprietary confidential information, including trade secrets; competition with Google; market for and sales of its product; subjects covered in his deposition; information pertaining to topic(s) for which he is a FRCP 30(b)(6) designee; and factual assertions in the FAC.  He may also testify concerning documents on the exhibit list that are either authored by or | Will call |

Preliminary Plaintiff's Witness List

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

|  | were sent to him or on the subject matter of his declarations submitted in this case; and the maintenance and content of SDC business records on the exhibit list. |  |
|---|---|---|
| Jim Wiesenberg | *Mr. Wiesenberg is SDC's Chief Strategy Officer and Board Member.*  Mr. Wiesenberg is expected to testify about SDC strategic alliances with wireless service providers and equipment manufacturers; SDC business and spectrum sales; NOC tours and security; meetings with Google and Google's February 2008 tour and information shared; financial information shared with Google; SDC efforts to protect trade secrets and confidential information; SDC Private Placement Memorandum; subjects covered in his deposition; and factual assertions in the FAC.  He may also testify concerning documents on the exhibit list that are either authored by or were sent to him. | May call |
| Eric Frische | *Eric Frische co-founded SDC and served as its CTO and as a Director.*  Mr. Frische is expected to testify about the conception and reduction to practice of the alleged inventions claimed in the Patents-in-Suit; reaction to the inventions covered by the Patents-in-Suit; inventorship of the Patents-in-Suit; secondary considerations of non-obviousness as to the Patents-in-Suit within his personal knowledge; the prosecution of the Patents-in-Suit and/or related patents or patent applications, including the '193 Interference; balloon and payload design and testing; the design of SDC's technology for various features including steering its balloons, managing a fleet of balloons and/or stationkeeping; research and development of thermal management; the NOC; systems and information displayed and explained to Google during facility tour; research, development and design of flight data monitoring system information displayed and explained to Google; the disclosures identified in his February 19, 2008 email to Mike Pearson re: "Space Data/Google Confidentiality Agreement"; subjects covered in his depositions; information pertaining to topic(s) for which he is a FRCP 30(b)(6) designee; and factual assertions in the FAC.  He may also testify concerning documents on the exhibit list that are either authored by or were sent to him. | Will call |
| Chad DeMeese | *Mr. DeMeese is a former SDC NOC operator and GIS software engineer.*  Mr. DeMeese is expected to testify about the information identified in Space Data's Fifth Amended 2019.210 Trade Secret Disclosures; the research, development, testing and use by SDC of its confidential information and trade secrets identified in the FAC and in the Fifth Amended 2019.210 Trade Secret Disclosures; the wind data on display during Google's February 2008 tour; testing, function, operation and use of SDC technology for steering its balloons, managing a fleet of balloons and/or | Will call |

Preliminary Plaintiff's Witness List

| | | |
|---|---|---|
| | stationkeeping; the "NOC" systems displayed and explained to Google including data monitored and displayed; testing, function, operation and use of flight data displayed and explained to Google; subjects covered in his depositions; information pertaining to topic(s) for which he is a FRCP 30(b)(6) designee; and the factual assertions in the FAC.  He may also testify concerning documents on the exhibit list that are either authored by or were sent to him; and the maintenance and content of SDC business records on the exhibit list. | |
| Bruce Barkley | *Bruce Barkley is the former SDC V.P. of Operations*.  Mr. Barkley will testify about SDC's commercial balloon networks; SDC NOC tours and NDAs and security; SDC customers; SDC payloads; SDC balloon launching for the commercial network; wind data; skysites; SDC NDAs; information pertaining to topic(s) for which he is a FRCP 30(b)(6) designee; subjects covered in his depositions; and factual assertions in the FAC.  He may also testify concerning documents on the exhibit list that are either authored by or were sent to him. | May call |
| William McCullough | *William McCullough is the SDC Director of Mechanical Engineering*.  Mr. McCullough is expected to testify about thermal management, skysite and payloads; balloon design; the tour of the SDC facility; NOC tours; subjects covered in his depositions; information pertaining to topic(s) for which he is a FRCP 30(b)(6) designee; and factual assertions in the FAC.  He may also testify concerning documents on the exhibit list that are either authored by or were sent to him. | May call |
| Bryan P. Collins | *Mr. Collins was counsel for Space Data*.  Mr. Collins is expected to testify regarding prosecution of the Patents-in-Suit, including the '193 Patent interference, and subjects covered in his deposition. He may also testify concerning documents on the exhibit list that are either authored or reviewed by him or were sent to him. | May call |
| Robert CF Perez | *Mr. Perez was counsel for Space Data*. Mr. Perez is expected to testify regarding prosecution of the Patents-in-Suit, including the '193 Patent interference, and subjects covered in his deposition. He may also testify concerning documents on the exhibit list that are either authored or reviewed by him or were sent to him. | May call |
| Charles F. Wieland III | *Mr. Wieland is counsel for Space Data*. Mr. Wieland is expected to testify regarding prosecution of the '193 Patent, including the issuance of the priority certificate of correction, and subjects covered in his deposition. He may also testify concerning documents on the exhibit list that are either authored or reviewed by him or were sent to him. | May call |

Preliminary Plaintiff's Witness List

| Larry Page*[1] | *Mr. Page is Google's co-founder, Chief Executive Officer of Alphabet Inc., and former Google C.E.O.*  Mr. Page may testify about meetings with SDC and Google's February 2008 tour; knowledge of photos taken but not emailed or posted "for obvious reasons" but put on the wiki; discussions, emails, analyses, meetings and communications regarding SDC and SDC balloon technology; meetings, emails and communications with Richard DeVaul, Astro Teller, Sergey Brin, Sebastian Thurn, Phil Gossett and other Google employees re: Loon development; meetings, emails and communications with Anne Bray and others regarding Loon's commercial viability and success; the "X" Hot List; "unconventional use cases"; conclusions on how Google could use SDC technology; the spectrum survey; decision to greenlight DeVaul's idea and funding; communications with Dylan Casey to roll-out an SDC constellation in 2008; Loon strategy, roll-out and practices; Loon projections and financials; Alphabet and Google financials; documents on the exhibit list that are either authored by or were sent to him and any subjects covered in his deposition. | Will call |
| Sergey Brin* | *Mr. Brin is Google's co-founder and President of Google's parent company, Alphabet Inc.*  Mr. Brin may testify about meetings with SDC and Google's February 2008 tour; knowledge of photos taken but not emailed or posted "for obvious reasons" but put on the wiki; knowledge of WSJ article; Mr. Brin's 2011 communications (including emails) with Sebastian Thrun regarding SDC and the Wall Street Journal article; discussions, emails, analyses, meetings and communications regarding SDC and SDC balloon technology; knowledge of Google's lost spectrum bid; meetings, emails and communications with Richard DeVaul, Astro Teller, Larry Page, and other Google employees re: Loon development; meetings, emails and communications with Anne Bray and others regarding Loon's commercial viability and success; bi-weekly and monthly Loon business update meetings; Loon manager Mike Cassidy's July 2014 economic review; Loon strategy, roll-out and practices; Loon projections and financing; Alphabet and Google financials; documents on the exhibit list that are either authored by or were sent to him and any subjects covered in his deposition. | Will call |

[1] As to any witness identified with an asterisk ("*"), Space Data intends to call that witness in its case-in-chief only if Defendants decline to call the witness in their case-in-chief.

Preliminary Plaintiff's Witness List

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| Richard DeVaul* | *Mr. DeVaul is a former Director at Alphabet, Inc.'s Research Lab X and lead Loon inventor.* Mr. DeVaul may testify about his work on a balloon-borne internet constellation; discussions, emails, meetings or other communications with Larry Page, Sergey Brin, Astro Teller, Dan McCloskey, Minnie Ingersoll, Josh Weaver, Sebastian Thrun, Larry Alder, Phil Gossett, and any other Google employee re: balloon technology in 2008; DeVaul's drawings on the whiteboard; Daedalus presentation; the development of Daedalus/Project Loon; Project Loon; the brainstorming session entitled "WiMax for the World," and development and use of wind data or wind models for Daedalus/Project Loon; Loon financial and cost projections; conception and reduction to practice of the '678 Patent and related patents/applications; inventorship of the '678 Patent and related patents/applications; prosecution of the '678 Patent and related patents/applications; documents on the exhibit list that are either authored by or were sent to him and any subjects covered in his deposition. | Will call |
| Larry Alder* | *Mr. Alder was Co-Leader of Google's Alternative Access Group and served as Director of Access Strategy at Google.* Mr. Alder may testify about meetings with SDC and Google's February 2008 tour; discussions, emails, analyses, meetings and communications regarding SDC and SDC balloon technology; knowledge of SDC NDA; discussions, emails, meetings or other communications with Richard DeVaul, Dan McCloskey, Sebastian Thrun, and other Google employees; work on balloon-based networks for Google.org; presentation deck to use constellation balloons in Africa; documents on the exhibit list that are either authored by or were sent to him and any subjects covered in his deposition. | Will call |
| Minnie Ingersoll* | *Ms. Ingersoll worked at Google for 12 years as a project manager and co-founded Google's Access Group.* Ms. Ingersoll may testify about meetings with SDC and Google's February 2008 tour; discussions, emails, analyses, meetings and communications regarding SDC and SDC balloon technology; creation, maintenance, the addition of content thereto, and the content stored therein, on the SDC wiki; uploads to the wiki; redaction of Google financial information on the wiki; access of Google employees to the wiki; "Spectrum-notes alias" and the "Daedalus alias"; the "Loon" alias; request to Gossett to upload information to the wiki; communications with Alec Proudfoot and Ryan Falor; knowledge of SDC NDA; Google's consideration of using high altitude balloons to provide communications bandwidth in relation to Google's tenth anniversary as a company in September 2008; documents | Will call |

Preliminary Plaintiff's Witness List

| | | |
|---|---|---|
| | on the exhibit list that are either authored by or were sent to her and any subjects covered in her deposition. | |
| Rosa Yaghmour* | *Ms. Yaghmour is employed as Loon intellectual property counsel.* Ms. Yaghmour may testify about the value and importance of the "more than 1000 patents for project Loon-related inventions"; her involvement with Loon since June 2016; Google's investment "developing and refining its proprietary balloon systems and technology"; Loon and X's technology, business and financial information and documentation; the technical and economic success of Loon; prosecution of foreign '678 Patent analogues; prosecution of the '678 Patent, including work on the Interference and Google's priority concession; Google's notice of the Patents-in-Suit; documents on the exhibit list that are either authored by or were sent to her or are the subject matter of her declarations submitted in the case; any subjects covered in her depositions or for which she was a FRCP 30(b)(6) designee. | Will call |
| Kyle Brookes* | *Mr. Brookes is a Senior Staff Mechanical Google Engineer.* Mr. Brookes may testify regarding the assertions in Google's counterclaim related to Project Loon's balloon communication system; Loon technology, including thermal management techniques and flight termination systems; documents on the exhibit list that are either authored by or were sent to him and any subjects covered in his deposition or for which he was a FRCP 30(b)(6) designee. | Will call |
| Astro Teller* | *Mr. Teller is the Co-Head of X.* Mr. Teller may testify regarding his discussions, emails, analyses, meetings and communications regarding SDC and SDC balloon technology; Google's decision to hire Richard DeVaul; discussions, emails, analyses, meetings and communications with Richard DeVaul, Larry Page, Sergey Brin, Minnie Ingersoll, Larry Alder, Mauro Goncalves, Ela Beres, Megan Smith, Sebastian Thrun and other Google employees related to the development of Loon; communications related to Sebastian Thrun's "please do not forward" email to Richard DeVaul and Astro Teller; work as a Daedalus advisor; Loon's deployments; evaluation of Loon; evolution of Loon; Loon technology; greenlighting of Loon; Moneyball valuation and PWC modeling; Loon valuation; Alpha Fund; Google spending on Loon; Loon budgets; the Minkowski project; personal involvement with Loon business partners and Telcos; the advantages of Loon over other technologies; Loon Graduation; documents on the exhibit list that are either authored by or were sent to him; any | Will call |

Preliminary Plaintiff's Witness List

| | subjects covered in his depositions and information pertaining to topic(s) for which he is a FRCP 30(b)(6) designee. | |
|---|---|---|
| Alastair Westgarth* | *Mr. Westgarth is Loon's C.E.O.*  Mr. Westgarth may testify regarding Loon sales, cost and revenue projections; Loon sales efforts; Loon customers/partners and potential customers/partners; Loon strategy, roll-out and practices; Loon financials and market and growth forecasts; Loon technology; Loon Graduation; documents on the exhibit list that are either authored by or were sent to him and any subjects covered in his deposition. | Will call |
| Michael Cassidy* | *Mr. Cassidy is a former Loon Project Leader.* Mr. Cassidy may testify regarding Loon sales, cost and revenue projections; Loon strategy, roll-out and practices; Loon financials and market and growth forecasts; Loon technology; documents on the exhibit list that are either authored by or were sent to him and any subjects covered in his deposition. | Will call |
| Sal Candido* | *Mr. Candido is a Senior Software Google Engineer.*  Mr. Candido may testify about assertions in Google's counterclaim related to Project Loon's balloon communication system; Loon technology, including Loon's Mission Control and fleet management algorithms; the value and importance of "station-keeping," "launch and ground infrastructure," "flocking" and "cluster-flocking" to the technical and economic success of Project Loon; studies and analyses regarding adding lateral propulsion to Loon balloons; documents on the exhibit list that are either authored by or were sent to him; any subjects covered in his depositions and information pertaining to topic(s) for which he is a FRCP 30(b)(6) designee. | Will call |
| Josh Weaver* | *Mr. Weaver is a Google engineer who worked on Project Daedalus and Loon development.*  Mr. Weaver may testify about his involvement (discussions, emails, meetings) related to SDC; his work with others related to Daedalus; his August 2011 request that Google engineers share "what lessons were learned" from "the Space Data partnerships back in 2008"; the identity of all participants in these discussions and/or meetings; the identification of documents on internal wiki sites shared; discussions, emails, meetings or other communications with Richard DeVaul, Phil Gossett, Sebastian Thrun, Larry Alder, Dan McCloskey and other Google employees regarding balloon communication systems; DeVaul's development and model of his high altitude balloon project idea; documents on the exhibit list that are either | Will call |

| | authored by or were sent to him; any subjects covered in his depositions and information pertaining to topic(s) for which he is a FRCP 30(b)(6) designee. | |
|---|---|---|
| Anne Bray* | *Ms. Bray is Loon, Inc.'s Director of Business Development.*  Ms. Bray may testify regarding her 95% confidence in Loon becoming a commercial operation; external customer facing; Loon market opportunities, revenue projections, sales and commercial prospects; "The Summer's On Us"; Loon coverage in Puerto Rico, Kenya and other countries; Telkom Kenya; Telcos; Preparedness; mobile network expansion; Telefonica; First Net; AT&T; conversations with Larry Page, Sergey Brin, Astro Teller, Mike Collins, Mauro Goncalves, Ruth Porat, David Drummond and other Google employees regarding her expectation that Loon is to be a viable, commercial business; documents on the exhibit list that are either authored by or were sent to her and any subjects covered in her deposition. | Will call |
| David Jen* | *Mr. Jen is head of FP&A and Capital Allocation at X, The Moonshot Factory.*  Mr. Jen may testify regarding Moneyball, PWC analyses, and Loon economic models; meetings and conversations with Mr. Teller, Mr. Twidell, Ms. Reilly and other Google employees re: Loon project evaluation; documents on the exhibit list that are either authored by or were sent to him and subjects covered in his deposition. | Will call |
| Daniel Conrad* | *Mr. Conrad was a Google engineer, served as an early member of the Android and "Access" teams at Google and Android business project manager.*  Mr. Conrad may testify regarding meetings with SDC and the SDC February 15 visit; photos and notes taken; conversations with Minnie Ingersoll, Larry Alder, Sergey Brin, Mike Pearson, Phil Gossett, Larry Page, Chris Sacca, and Dylan Casey; members of the alternative access team; SDC wiki; uploads to the wiki; spectrum alias group; work related to the 700-MHz spectrum and other spectrum bands; SDC due diligence and task list; SDC NDA; SDC "potential acquisition"; Page and Brin's independent desire to acquire SDC; SDC valuation; Google's tenth anniversary and rollouts; documents on the exhibit list that are either authored by or were sent to him and subjects covered in his deposition. | Will call |
| Daniel McCloskey* | *Mr. McCloskey was a Google engineer and consultant on Loon.  Mr. McCloskey was a Google inventor on numerous patents, often with Phil Gossett as a co-inventor.  For several years, Mr. McCloskey served as head of Google's Advanced Technology and Projects Group.*  Mr. McCloskey may testify regarding SDC due diligence; potential SDC acquisition valuation; Google's SDC February 15 visit; SDC NDA; notes taken | Will call |

Preliminary Plaintiff's Witness List

| | | |
|---|---|---|
| | on the SDC tour; destruction of same; discussions with the Loon developers after Josh Weaver's "love to hear lessons learned" email; conversations and meetings with Richard DeVaul, Minnie Ingersoll, Josh Weaver and other Loon engineers about Project Loon; SDC wiki; uploads to the wiki; alternative access group and meetings; documents on the exhibit list that are either authored by or were sent to him; any subjects covered in his depositions or for which he was designated as a FRCP 30(b)(6) designee. | |

**B.     Expert Witnesses Who Will be Called in Connection to Plaintiff.**

| Witness List | Short Statement of the Substance of Testimony | May Be Called by Deposition |
|---|---|---|
| Sam Pullen | *Dr. Pullen is an expert retained by SDC to testify regarding infringement of the '193 and '706 patents by certain instrumentalities of Defendants and the validity of the '193 and '706 Patents.  He will testify regarding the matters discussed in his expert report of September 14, 2018, his rebuttal report dated November 16, 2018, his depositions, and his declarations filed in this case.* | Will call |
| Christine Meyer | *Dr. Meyer is an expert retained by SDC to testify regarding damages for patent infringement, theft of trade secrets and breach of contract.  She will testify regarding the matters disclosed in her expert report of September 14, 2018 and Addendum report dated November 6, 2018, and discussed in her deposition.* | Will call |

In addition to the witnesses identified above, SDC reserves the right to call any witness identified on Defendants' witness list. SDC will counter-designate testimony of various witnesses designated by Defendants pursuant to Judge Freeman's Jury Pretrial Standing Order.  Should Defendants introduce any deposition testimony it has designated for witnesses not at trial, SDC reserves the right, in rebuttal, to introduce the testimony it has counter-designated.

Preliminary Plaintiff's Witness List

SPENCER HOSIE (CA Bar No. 101777)
shosie@hosielaw.com
DIANE S. RICE (CA Bar No. 118303)
drice@hosielaw.com
BRANDON C. MARTIN (CA Bar No. 269624)
bmartin@hosielaw.com
DARRELL R. ATKINSON (CA Bar No. 280564)
datkinson@hosielaw.com
HOSIE RICE LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111
(415) 247-6000 Tel.
(415) 247-6001 Fax

*Attorneys for Plaintiff*
*SPACE DATA CORPORATION*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| SPACE DATA CORPORATION,<br><br>      Plaintiff,<br><br>v.<br><br>ALPHABET INC., GOOGLE LLC, and LOON LLC,<br><br>      Defendants. | Case No. 5:16-cv-03260-BLF (NC)<br><br>**CERTIFICATE OF SERVICE RE PRELIMINARY PLAINTIFF'S WITNESS LIST**<br><br>Courtroom:  3, Fifth Floor<br>Judge:        Hon. Beth Labson Freeman<br><br>Date Filed:  June 13, 2016<br>Trial Date:  August 5, 2019 |

*Hosie Rice LLP*
*600 Montgomery Street, 34th Floor*
*San Francisco, CA 94111*

**CERTIFICATE OF SERVICE**

I, Jerry Shaw, am over the age of 18 years and am not a party to the within action.

My business address is Hosie Rice LLP, 600 Montgomery Street, 34th Floor, San Francisco,

California, 94111.

On April 26, 2019, I caused to be served the following:

• **PRELIMINARY PLAINTIFF'S WITNESS LIST**

via electronic mail and/or electronic file transfer system at San Francisco, California,

addressed to the following parties:

KEKER, VAN NEST & PETERS LLP
LOON-KVN@keker.com
ROBERT A. VAN NEST - # 84065
rvannest@keker.com
CHRISTA M. ANDERSON - # 184325
canderson@keker.com
MATTHEW M. WERDEGAR - # 200470
mwerdegar@keker.com
EUGENE M. PAIGE - # 202849
epaige@keker.com
MATTHIAS A. KAMBER - # 232147
mkamber@keker.com
RYAN K. WONG - # 267189
rwong@keker.com
THOMAS E. GORMAN - # 279409
tgorman@keker.com
LEAH PRANSKY - # 302246
lpransky@keker.com
ANDREW S. BRUNS - # 315040
abruns@keker.com
SHAYNE HENRY - # 300188
shenry@keker.com

*Attorneys for Defendants*
*Alphabet Inc., Google LLC, and Loon LLC.*

I certify under penalty of perjury under the laws of the United States of America that

the foregoing is true and correct.

DATED: April 26, 2019

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jerry Shaw

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

CERTIFICATE OF SERVICE: RE PRELIMINARY          2          Case No. 5:16-cv 03260-BLF (NC)
PLAINTIFF'S WITNESS LIST

# EXHIBIT 16

# REDACTED VERSION
# OF DOCUMENT

**From:**    "Minnie Ingersoll" <minnie@google.com>
**To:**       "LaDawn Jentzsch" <ladawn@google.com>
**Sent:**    Wed, 2 Jul 2008 13:54:46 -0700
**Subject:** Re: Google's 10th bday
**Cc:**       "Dylan Casey" <dcasey@google.com>

confirmed

On Wed, Jul 2, 2008 at 12:20 PM, LaDawn Jentzsch <ladawn@google.com> wrote:

> Minnie,
I went ahead and set up a meeting for the 2 of you at 9:30 tomorrow morning.  Please let me
>  know if this doesn't work and I'll move it to next week.
LaDawn

On Wed, Jul 2, 2008 at 12:09 PM, Dylan Casey <dcasey@google.com> wrote:

> Minnie,

Can we meet asap? I'd like get up to speed on as much as possible so I can evaluate  what the
>  costs would be to implement a web net over the worlds 10 darkest spots.
Thanks,
Dylan

On Tue, Jul 1, 2008 at 1:01 PM, Minnie Ingersoll <minnie@google.com> wrote:



On Tue, Jul 1, 2008 at 10:26 AM, Larry Alder <lalder@google.com> wrote:


---------- Forwarded message ----------
From: **Dylan Casey** <dcasey@google.com>
Date: Mon, Jun 30, 2008 at 6:23 PM
Subject: Re: Google's 10th bday
To: Larry Alder <lalder@google.com>

CONFIDENTIAL

Cc: Megan Smith <megans@google.com>, Mike Pearson <pearson@google.com>, Sunil Daluvoy <sunild@google.com>, Jack Ancone <ancone@google.com>, David Lawee <dlawee@google.com>

Hi Larry et al,

████████████████████████████████████████████

Can we meet to discuss the possibility of pulling this off?
Thanks
Dylan

On Fri, Jun 6, 2008 at 10:44 AM, Dylan Casey <dcasey@google.com> wrote:

Larry...when did you all visit? ████████████████████████

On Fri, Jun 6, 2008 at 1:16 PM, Larry Alder <lalder@google.com> wrote:

Megan,



---Larry A.

On Fri, Jun 6, 2008 at 10:10 AM, Megan Smith <megans@google.com> wrote:

████████████████████████████████████████████

This is a pretty fun idea.  A little crazy, but interesting/v.cool if it works.  Is it sustainable? (as in, just for the event, or forever-ish?)

Let us know if you want help on this.

-- Megan

On Fri, Jun 6, 2008 at 10:04 AM, Dylan Casey <dcasey@google.com> wrote:

CONFIDENTIAL

GOOG-SD-00146296

Megan,
Marissa and I are leading Google's 10th birtday project and Larry mentioned the idea
of giving the world, or internet dark spots, broadband internet access using blimps.
Ironically an article in gizmodo mentioned it. Is there any truth to the article?

Thanks
Dylan

http://gizmodo.com/358940/google-may-buy-a-balloon-company-to-build-huge-wireless-
networks

--
Minnie Ingersoll | Product Manager | Google, Inc.
cell 650-862-5098 | office 650-253-4575

--
LaDawn Jentzsch
Administrative Assistant
Product Management Department
Google
email: ladawn@google.com
desk: 650-214-5961
cell: 650-440-1382

--
Minnie Ingersoll | Product Manager | Google, Inc.
cell 650-862-5098 | office 650-253-4575

GOOG-SD-00146297

# EXHIBIT 17

# REDACTED VERSION
# OF DOCUMENT

**From:**   "Sergey Brin" <sergey@google.com>
**To:**     "Mike Pearson" <pearson@google.com>
**Sent:**   Tue, 19 Feb 2008 22:48:29 -0800
**Subject:** Re: WSJ article on Space Data
**Cc:**     "Larry Page" <page@google.com>, "Larry Alder" <lalder@google.com>, "Minnie Ingersoll" <minnie@google.com>, "Daniel Conrad" <dconrad@google.com>, "Dave Sobota" <dsobota@google.com>, "Joe Faber" <jfaber@google.com>, marias@google.com, "Jon Murchinson" <jonm@google.com>, "Phil Gossett" <philipg@google.com>

In all fairness to them, he did mention to me that this was going to come out.

--Sergey

On Feb 19, 2008 10:37 PM, Mike Pearson <pearson@google.com> wrote:
> All
>
> Here is the full article from Space Data that is to be published in the WSJ
> tomorrow.  Jerry and Eric maintain that they did not identify Google by name
> but that given our recent press on spectrum the WSJ chose to focus on us as
> the most likely suspect.  Can we use part of the Thursday spectrum meeting
> to get feedback from the visit last week and then decide how to move
> forward?
>
> Thanks
>
> Mike
>
>
>
>
>
>
> Floating a New Idea
> For Going Wireless,
> Parachute Included
> Balloon Launch Gets
> Google's Attention;
> Dairy Farmers Can Help
> By AMOL SHARMA
> February 20, 2008; Page A1
>
>
> CHANDLER, Ariz. -- Jerry Knoblach wants to bring wireless service to
> millions of rural Americans. His plan: Beam it down from balloons hovering
> at the edge of space.
>
> This isn't just hot air. His company, Space Data Corp., already launches 10
> balloons a day across the Southern U.S., providing specialized telecom
> services to truckers and oil companies. His balloons soar 20 miles into the
> stratosphere, each carrying a shoebox-size payload of electronics that acts
> like a mini cellphone "tower" covering thousands of square miles below.
> Cheap, disposable hydrogen-filled balloons carrying miniature versions of
> cellphone towers may soon provide service to rural, sparsely populated
> areas. WSJ's Amol Sharma visits Space Data, a company that makes the
> specialized balloons.
>

> His idea has caught the eye of Google Inc., according to people familiar
> with the matter. The Internet giant -- which is now pushing into wireless
> services -- has considered contracting with Space Data or even buying the
> firm, according to one person.
>
> Mr. Knoblach, Space Data's chief executive, declined to comment on specific
> partners. Google declined to comment.
>
> Expanding rural telecom services is a priority for regulators. About 36% of
> rural Americans don't have Internet connections. The problem is that it's
> expensive to string cable or build cellphone towers in areas with so few
> customers. Space Data says a single balloon can serve an area otherwise
> requiring 40 cell towers.
>
> Maintaining a telecom system based on gas-filled bladders floating in the
> sky requires some creativity. The inexpensive balloons are good for only 24
> hours or so before ultimately bursting in the thin air of the upper
> atmosphere. The electronic gear they carry, encased in a small Styrofoam
> box, then drifts gently back to earth on tiny parachutes.
>
> This means Space Data must constantly send up new balloons. To do that, it
> hires mechanics employed at small airports across the South. It also hires
> farmers -- particularly, dairy farmers.
>
> They're "very reliable people," says Mr. Knoblach. They have to "milk the
> cows 24-7, 365 days a year, so they're great people to use as a launch
> crew." Space Data pays them $50 per launch.
>
> Extra Pocket Money
>
> Sharon Hodges, a 60-year-old cattle-and-wheat farmer in Piedmont, Okla., and
> part-time balloon launcher, says she doesn't know much about technology but
> liked the extra pocket money.
>
> Every day just before sunset, she unfolds a deflated balloon, attaches it to
> a hydrogen tank and inflates it to about 6 feet in diameter. Then she
> hitches the electronic payload to the balloon, walks it through the
> 16-foot-tall double doors of her barn, and lets go of it.
>
> The balloons rise about 1,000 feet a minute and reach their target altitude
> of 65,000 to 100,000 feet in under two hours.
>
> Not the Hindenburg
>
> Most of Space Data's balloons are filled with hydrogen, because it is
> cheaper than the helium used in toy balloons and modern blimps. Hydrogen is,
> of course, flammable, but Mr. Knoblach says there's no safety issue because
> each balloon contains so little gas. "It's not like the Hindenburg," he
> says.
> A balloon being launched in Piedmont, Oklahoma.
>
> Mr. Knoblach also dismisses another potential hazard: Airplanes crashing
> into balloons. He points out that Space Data's balloons are similar in
> design to weather balloons, about 1,800 of which are launched world-wide
> every day without problems.
>

CONFIDENTIAL

GOOG-SD-00146077

> According to a Federal Aviation Administration official, there are no
> records of passenger jets colliding with balloons in the U.S. The engines of
> a commercial jet are designed to withstand the ingestion of an eight-pound
> bird, the FAA says. (The payload on a Space Data balloon weighs six pounds.)
>
> Google believes balloons like these could radically change the economics of
> offering cellphone and Internet services in out-of-the-way areas, according
> to people familiar with its thinking. The company is among the registered
> bidders for a big chunk of radio spectrum at a government auction currently
> under way in Washington.
>
> At Space Data's command center in Chandler, engineers track their 10
> balloons on a wall-mounted electronic map. Balloons move slowly across
> Texas, New Mexico, Oklahoma and Arizona, where Space Data sells wireless
> services used by truckers to track their fleet. Overlapping rings on the map
> demarcate the coverage area of each balloon's transceiver.
>
> When a balloon approaches the end of its useful life, technicians send a
> signal to separate it from its electronic payload, which parachutes to
> earth. The balloons eventually burst into "confetti" from the low air
> pressure, Mr. Knoblach says.
>
> The environmental ramifications of the resulting shower of latex balloon
> scraps are complex. Some environmentalists argue balloons can be fatal to
> turtles, fish and whales, which mistake floating latex for jellyfish or
> other edible sea life. Several states, including Florida and Virginia,
> restrict balloon launches.
>
> Dale Florio, a spokesman for the Balloon Council, a trade group for balloon
> makers, says latex balloons biodegrade "at the rate of an oak leaf that
> falls from a tree."
>
> Net Benefit
>
> Mr. Knoblach says his operation was reviewed by more than a dozen federal
> agencies, which found no significant environmental impact. Some agencies
> even consider it a net benefit, he says: The balloons replace tall cellphone
> towers, which are blamed for killing a significant number of migratory birds
> that crash into them.
>
> While the balloons are cheap and disposable at $50 a pop, the transceivers
> they carry are worth about $1,500. Once a transceiver is released from its
> balloon to parachute back to earth, there's no way to predict where it will
> land. So Space Data has hired 20 hobbyists with GPS devices to track them
> down.
>
> Recovery missions can get intense. Workers have had to pluck transceivers
> out of trees in Louisiana, rappel down rocky cliffs in Arizona, trudge
> through swamps and kayak across ponds. Space Data pays them $100 per
> transceiver recovered.
>
> "These things can fall anywhere," says Chip Kyner of San Antonio, who once
> hiked seven miles before finding the transmitter he was looking for. The
> final mile was in pitch darkness.
>
> "It wasn't worth the $100," he says, "but it's a neat story."

CONFIDENTIAL

> ---------- Forwarded message ----------
> From: Jim Wiesenberg <jim.wiesenberg@spacedata.net>
> Date: Feb 19, 2008 8:45 PM
> Subject: WSJ article on Space Data
> To: Minnie Ingersoll <minnie@google.com>, Mike Pearson <pearson@google.com>
> Cc: Jerry Knoblach <knoblach@spacedata.net>, Eric Frische
> <efrische@spacedata.net>
>
>
>
>
>
>
> http://online.wsj.com/article/SB120347353988378955.html?mod=hps_us_inside_today
>
>
>
> Above is link to article that will be in Wednesday's paper but is online now
> as well as video.  I mentioned to Sergey that it was coming just before you
> all left.  We intend to continue to advise all queries that we receive that
> we contacted numerous parties that were likely bidders and have a NDA in
> place with several.  We thought you would appreciate seeing the attached
> still tonight and look forward to continuing our discussions soon.
>
>
>
> Regards,
>
>
>
> Jim Wiesenberg
>
> Chief Strategy Officer
>
> Space Data Corporation
>
> Chandler AZ 85224
>
> 480-722-2104 office
>
> 602-690-4929  mobile
>
> jim.wiesenberg@spacedata.net
>
>
>
>
>
>
> --
> Mike Pearson
> Principal, Corporate Development
> Google, Inc.
> 1600 Amphitheatre Parkway
> Mountain View, CA  94043
> 650.253.2582 direct

CONFIDENTIAL

GOOG-SD-00146079

> 617.817.5184 mobile
> pearson@google.com

CONFIDENTIAL

# EXHIBIT 19

# REDACTED VERSION
# OF DOCUMENT

**From:**   Sebastian Thrun <thrun@google.com>
**To:**   Astro Teller <astroteller@google.com>
**Sent:**   Mon, 15 Nov 2010 22:46:31 -0800
**Subject:**   Fwd: quick question

---------- Forwarded message ----------
From: **L a r r y  P a g e** <page@google.com>
Date: Mon, Nov 15, 2010 at 10:40 PM
Subject: Re: quick question
To: Sebastian Thrun <thrun@google.com>

OK

check out: http://www.spacedata.net/documents/SkySite_Telemetry_Overview_Jan06.pdf
Sergey and I launched one of these ourselves.

-Larry



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GOOG-SD-00288342



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 20

# REDACTED VERSION OF DOCUMENT



## Floating a New Idea

CONFIDENTIAL

# For Going Wireless, Parachute Included

**Balloon Launch Gets Google's Attention; Dairy Farmers Can Help**

**By AMOL SHARMA**
**February 20, 2008; Page A1**

CHANDLER, Ariz. -- Jerry Knoblach wants to bring wireless service to millions of rural Americans. His plan: Beam it down from balloons hovering at the edge of space.

This isn't just hot air. His company, Space Data Corp., already launches 10 balloons a day across the Southern U.S., providing specialized telecom services to truckers and oil companies. His balloons soar 20 miles into the stratosphere, each carrying a shoebox-size payload of electronics that acts like a mini cellphone "tower" covering thousands of square miles below.

Cheap, disposable hydrogen-filled balloons carrying miniature versions of cellphone towers may soon provide service to rural, sparsely populated areas. WSJ's Amol Sharma visits Space Data, a company that makes the specialized balloons.

His idea has caught the eye of Google Inc., according to people familiar with the matter. The Internet giant -- which is now pushing into wireless services -- has considered contracting with Space Data or even buying the firm, according to one person.

Mr. Knoblach, Space Data's chief executive, declined to comment on specific partners. Google declined to comment.

Expanding rural telecom services is a priority for regulators. About 36% of rural Americans don't have Internet connections. The problem is that it's expensive to string cable or build cellphone towers in areas with so few customers. Space Data says a single balloon can serve an area otherwise requiring 40 cell towers.

Maintaining a telecom system based on gas-filled bladders floating in the sky requires some creativity. The inexpensive balloons are good for only 24 hours or so before ultimately bursting in the thin air of the upper atmosphere. The electronic gear they carry, encased in a small Styrofoam box, then drifts gently back to earth on tiny parachutes.

This means Space Data must constantly send up new balloons. To do that, it hires mechanics employed at small airports across the South. It also hires farmers -- particularly, dairy farmers.



They're "very reliable people," says Mr. Knoblach. They have to "milk the cows 24-7, 365 days a year, so they're great people to use as a launch crew." Space Data pays them $50 per launch.

**Extra Pocket Money**

Sharon Hodges, a 60-year-old cattle-and-wheat farmer in Piedmont, Okla., and part-time balloon launcher, says she doesn't know much about technology but liked the extra pocket money.

Every day just before sunset, she unfolds a deflated balloon, attaches it to a hydrogen tank and inflates it to about 6 feet in diameter. Then she hitches the electronic payload to the balloon, walks it through the 16-foot-tall double doors of her barn, and lets go of it.

The balloons rise about 1,000 feet a minute and reach their target altitude of 65,000 to 100,000 feet in under two hours.

**Not the Hindenburg**

Most of Space Data's balloons are filled with hydrogen, because it is cheaper than the helium used in toy balloons and modern blimps. Hydrogen is, of course, flammable, but Mr. Knoblach says there's no safety issue because each balloon contains so little gas. "It's not like the Hindenburg," he says.



A balloon being

CONFIDENTIAL

launched in Piedmont,
Oklahoma.

Mr. Knoblach also dismisses another potential hazard: Airplanes crashing into balloons. He points out that Space Data's balloons are similar in design to weather balloons, about 1,800 of which are launched world-wide every day without problems.

According to a Federal Aviation Administration official, there are no records of passenger jets colliding with balloons in the U.S. The engines of a commercial jet are designed to withstand the ingestion of an eight-pound bird, the FAA says. (The payload on a Space Data balloon weighs six pounds.)

Google believes balloons like these could radically change the economics of offering cellphone and Internet services in out-of-the-way areas, according to people familiar with its thinking. The company is among the registered bidders for a big chunk of radio spectrum at a government auction currently under way in Washington.

At Space Data's command center in Chandler, engineers track their 10 balloons on a wall-mounted electronic map. Balloons move slowly across Texas, New Mexico, Oklahoma and Arizona, where Space Data sells wireless services used by truckers to track their fleet. Overlapping rings on the map demarcate the coverage area of each balloon's transceiver.

When a balloon approaches the end of its useful life, technicians send a signal to separate it from its electronic payload, which parachutes to earth. The balloons eventually burst into "confetti" from the low air pressure, Mr. Knoblach says.

The environmental ramifications of the resulting shower of latex balloon scraps are complex. Some environmentalists argue balloons can be fatal to turtles, fish and whales, which mistake floating latex for jellyfish or other edible sea life. Several states, including Florida and Virginia, restrict balloon launches.

Dale Florio, a spokesman for the Balloon Council, a trade group for balloon makers, says latex balloons biodegrade "at the rate of an oak leaf that falls from a tree."

**Net Benefit**

Mr. Knoblach says his operation was reviewed by more than a dozen federal agencies, which found no significant environmental impact. Some agencies even consider it a net benefit, he says: The balloons replace tall cellphone towers, which are blamed for killing a significant number of migratory birds that crash into them.

While the balloons are cheap and disposable at $50 a pop, the transceivers they carry are worth about $1,500. Once a transceiver is released from its balloon to parachute back to earth, there's no way to predict where it will land. So Space Data has hired 20 hobbyists with GPS devices to track them down.

Recovery missions can get intense. Workers have had to pluck transceivers out of trees in Louisiana, rappel down rocky cliffs in Arizona, trudge through swamps and kayak across ponds.

CONFIDENTIAL

GOOG-SD-00288353

Space Data pays them $100 per transceiver recovered.

"These things can fall anywhere," says Chip Kyner of San Antonio, who once hiked seven miles before finding the transmitter he was looking for. The final mile was in pitch darkness.

"It wasn't worth the $100," he says, "but it's a neat story."

---------- Forwarded message ----------
From: **Jim Wiesenberg** <jim.wiesenberg@spacedata.net>
Date: Feb 19, 2008 8:45 PM
Subject: WSJ article on Space Data
To: Minnie Ingersoll <minnie@google.com>, Mike Pearson <pearson@google.com>
Cc: Jerry Knoblach <knoblach@spacedata.net>, Eric Frische <efrische@spacedata.net>


http://online.wsj.com/article/SB120347353988378955.html?mod=hps_us_inside_today


Above is link to article that will be in Wednesday's paper but is online now as well as video.  I mentioned to Sergey that it was coming just before you all left.  We intend to continue to advise all queries that we receive that we contacted numerous parties that were likely bidders and have a NDA in place with several.  We thought you would appreciate seeing the attached still tonight and look forward to continuing our discussions soon.


Regards,


Jim Wiesenberg

Chief Strategy Officer

Space Data Corporation

Chandler AZ 85224

480-722-2104 office

602-690-4929  mobile

jim.wiesenberg@spacedata.net

CONFIDENTIAL

--
Mike Pearson
Principal, Corporate Development
Google, Inc.
1600 Amphitheatre Parkway
Mountain View, CA  94043
650.253.2582 direct
617.817.5184 mobile
pearson@google.com

CONFIDENTIAL

GOOG-SD-00288355